ROBERT V. PRONGAY (#270796)
  *rprongay@glancylaw.com*
CASEY E. SADLER (#274241)
  *csadler@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No. 3:20-cv-01683-CAB-AHG |
|---|---|
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933** |
| | JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ............................................................ 1

II.     JURISDICTION AND VENUE ....................................................... 4

III.    PARTIES ......................................................................................... 4

      A.     Lead Plaintiffs ..................................................................... 4

      B.     Corporate Defendant .......................................................... 5

      C.     Individual Defendants ......................................................... 5

      D.     Underwriter Defendants ...................................................... 9

IV.     STATEMENT OF RELEVANT FACTS ...................................... 11

      A.     Background on Progenity's Business Leading Up To The IPO .......... 11

            1.     Progenity Suffered Large, Persistent Financial Losses And Needed Cash To Survive .............................................. 11

            2.     Progenity Depended On Its Core Business From The Preparent and Innatal Testing Products To Generate Revenue ................. 12

            3.     Test Volumes and Average Selling Prices Were Key Performance Indicators for Progenity ............................................. 13

            4.     Progenity Depended On Billing Government Health Care Programs And Commercial Health Insurance Providers To Generate Revenue .......................................................... 14

            5.     Progenity Had Weak Internal Controls Over Financial Reporting 14

            6.     Progenity Agreed To A $49 Million Settlement For Misconduct Including Overbilling Government Health Care Programs For Innatal Tests ....................................................... 15

      B.     Progenity's June 2020 IPO ................................................ 17

C.    The Materially Misleading Registration Statement ................................ 18

1.    The Registration Statement Negligently Omitted To Disclose That Progenity Had Overbilled Government Payors For Preparent Tests By $10.3 Million ................................................................................. 18

2.    The Registration Statement Negligently Omitted To Disclose Progenity's Trend Of Decreasing Test Volumes ........................ 28

3.    The Registration Statement Negligently Omitted To Disclose Progenity's Trend Of Decreasing Average Selling Prices ......... 37

4.    The Registration Statement Negligently Omitted To Disclose Progenity's Trend Of Decreasing Revenues .............................. 44

V.    DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT ............ 49

A.    Section 11 Disclosure Requirements ...................................................... 49

B.    Disclosure Requirements Under Regulation S-K ................................... 50

1.    Item 303 Disclosure Requirements ............................................. 50

2.    Item 105 Disclosure Requirements ............................................. 51

C.    Defendants Violated Their Disclosure Obligations In the Registration Statement ............................................................................................... 52

VI.    CLASS ACTION ALLEGATIONS ................................................................ 52

VII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................... 54

VIII.    CLAIMS ........................................................................................................... 54

IX.    PRAYER FOR RELIEF ................................................................................. 57

X.    JURY TRIAL DEMANDED ........................................................................... 58

Lead Plaintiffs Lin Shen, Lingjun Lin, and Fusheng Lin ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Progenity, Inc. ("Progenity" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Progenity; (c) review and analysis of analyst reports regarding the Company; (d) interviews with former Progenity employees; and (e) review of other publicly available information concerning Progenity, including transcripts of Progenity's investor calls. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.  This is a securities class action on behalf of all individuals and entities that purchased or acquired Progenity common stock pursuant and/or traceable to the Company's false and misleading registration statement and prospectus, as amended (collectively, the "Registration Statement"),[1] issued in connection with Progenity's June 2020 initial public offering (the "IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Progenity, certain of its officers and directors (the "Individual Defendants") and the underwriters of the IPO ("Underwriter Defendants") (collectively, "Defendants").

---

[1] As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement that was filed by the Company on May 27, 2020, all amendments thereto, and the Prospectus filed on Form 424B4 on June 22, 2020, which was incorporated into and formed a part of the Registration Statement that became effective on June 18, 2020.

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

2.      Progenity is a biotechnology company based in San Diego, California. It specializes in developing and commercializing molecular testing products and precision medicine applications. The Company provides in vitro molecular tests designed to assist parents in making informed decisions related to family planning, pregnancy, and complex disease diagnosis.

3.      The most important products to Progenity's business at the time of the IPO were the Innatal and Preparent tests, from which Progenity derived a substantial portion of its revenue. The Innatal test is a noninvasive prenatal test offered to women early in pregnancy to screen for risk of fetal chromosomal conditions, such as Down syndrome, trisomy 13, and trisomy 18, and sex chromosome disorders. The Preparent test is an expanded carrier screen that is performed on women or couples before conception or early in a pregnancy to identify if they carry certain mutations that cause genetic diseases.

4.      On or about June 19 to 23, 2020, Defendants conducted Progenity's IPO. In the IPO, Defendants sold over 6.6 million shares of Progenity common stock at a price of $15 per share, generating over $100 million in gross proceeds.

5.      The Registration Statement for the IPO was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make the necessary disclosures required under the rules and regulations governing its preparation. Specifically, the Registration Statement failed to disclose that Progenity had overbilled government health care programs for its Preparent tests by using incorrect billing codes, and thus had overstated its revenues for the full year fiscal 2019 and first quarter 2020 financial periods provided in the Registration Statement by at least $10.3 million. The $10.3 million overstatement was a highly material fact, not least because it represented nearly one-quarter of Progenity's entire 2019 gross profits of $43.5 million, and because Progenity's business continued to burn cash at an alarming rate.

2

6.     Progenity belatedly revealed this $10.3 million Preparent overbilling issue to investors on August 13, 2020, however the fact of Progenity's Preparent overbilling existed well in advance of the IPO, thus rendering statements in the Registration Statement materially false and misleading when made. As Progenity admitted, this overbilling occurred in 2019 and early 2020. Firstly, Progenity accrued its $10.3 million liability to refund the Preparent test overbilled amounts during the second quarter of 2020. The IPO was conducted mere days before the close of the second quarter, and Progenity's disclosures indicate that it corrected its Preparent billing in "early 2020." Secondly, during the lead up to the IPO, Progenity was in the process of finalizing a $49 million settlement to resolve civil and criminal governmental investigations into misconduct including a nearly identical pattern of overbilling with respect to Progenity's Innatal tests. Thirdly, prior to the IPO, Progenity was aware of the correct billing code, but failed to use it, when submitting reimbursement claims for Preparent tests.

7.     After Progenity revealed its $10.3 million accrual for overbilling government payors for Preparent tests, Progenity's stock price declined $1.24 per share, or 13.8%, to close at $7.71 per share on August 14, 2020.

8.     In addition to the Preparent overbilling issue, the Registration Statement negligently failed to disclose that Progenity was suffering from material negative trends with respect to the Company's testing volumes, average selling prices for its tests, and revenues. Defendants' failure to disclose this information left investors ignorant of the significant deterioration in Progenity's prospects at the time of the IPO. And when Progenity disclosed these trends on October 29, 2020, over the following three trading days Progenity's stock price declined by $3.42 per share or 44.5%.

9.     As a result of Defendants' securities law violations, Plaintiffs and the Class have suffered significant losses and damages. While the Company sold its common stock for $15 per share in the IPO, Progenity's stock price had fallen to only

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

$4.27 per share as of the close of trading on November 2, 2020, a decline of over 70%. To this day Progenity's stock price remains far below its $15 per share IPO price. This action seeks to recover damages for Progenity investors.

## II.    JURISDICTION AND VENUE

10.    The claims alleged herein arise under §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

11.    This Court has jurisdiction over the subject matter of this action pursuant to §22 of the Securities Act [15 U.S.C. § 77v] and 28 U.S.C. § 1331.

12.    Venue is proper in this District pursuant to § 22 of the Securities Act [15 U.S.C. § 77v] and 28 U.S.C. § 1391(b) as the Company conducts business in this District and maintains its principal executive offices in this District.

13.    This Court has personal jurisdiction over each of the Defendants. Progenity is headquartered in this District, and defendants drafted the offering materials issued in connection with Progenity's IPO in part here, disseminated the misleading statements at issue here, and solicited stock purchasers here. The Underwriter Defendants (as defined below) also have substantial operations and/or conduct substantial business in California (directly or via agents), and represented Progenity and all or some of the other defendants in carrying out the IPO.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

15.    Lead Plaintiff Lin Shen, as set forth in the previously-filed certification (Dkt. No. 25-4) incorporated by reference herein, purchased or acquired Progenity common stock pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and was damaged thereby.

16.     Lead Plaintiff Lingjun Lin, as set forth in the previously-filed certification (Dkt. No. 25-4) incorporated by reference herein, purchased or acquired Progenity common stock pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and was damaged thereby.

17.     Lead Plaintiff Fusheng Lin, as set forth in the previously-filed certification (Dkt. No. 25-4) incorporated by reference herein, purchased or acquired Progenity common stock pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and was damaged thereby.

**B.     Corporate Defendant**

18.     Defendant Progenity, Inc. is a biotechnology company. Progenity is incorporated in Delaware, and its principal executive offices are located at 4330 La Jolla Village Drive, Suite 200, San Diego, CA 92122. The Company's common stock trades under the ticker symbol "PROG" on the NASDAQ, which is an efficient market. Progenity, through its officers and directors, published and filed with the SEC its Registration Statement that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's securities.

**C.     Individual Defendants**

19.     Defendant Harry Stylli ("Stylli") served as Progenity's Chief Executive Officer ("CEO") and Chairman of Progenity's Board of Directors (the "Board") at the time of the IPO, and continues to serve in those roles through the present. Defendant Stylli co-founded Progenity in 2011 and has served as Chairman or Executive Chairman of its Board at all times since the Company's founding. At all relevant times, Defendant Stylli has been one of Progenity's largest shareholders. From June 2005 to September 2009, Defendant Stylli was President, Chief Executive Officer, and a member of the board of directors of Sequenom, Inc. ("Sequenom"), a molecular diagnostic testing and genetics analysis company headquartered in San Diego. In September 2009, Sequenom terminated Defendant Stylli's employment in connection

with an internal investigation into employee mishandling of test data and results, and at the same time Sequenom terminated the employment of another officer who would later plead guilty to conspiracy to commit securities fraud in connection with the conduct at issue in Sequenom's internal investigation. Defendant Stylli also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO. In Progenity's 2019 fiscal year, Defendant Stylli received $395,000 in total compensation from Progenity.

20.    Defendant Eric d'Esparbes ("d'Esparbes") served as Progenity's Chief Financial Officer ("CFO") at the time of the IPO, and continues to serve in that role through the present. Defendant d'Esparbes joined Progenity as its CFO in May 2019. Prior to joining Progenity, Defendant d'Esparbes had more than 25 years of financial and executive experience in strategic planning and fund-raising functions for both private and public companies. Defendant d'Esparbes also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

21.    Defendant Jeffrey Alter ("Alter") served as a member of the Board at the time of the IPO. At the time of the IPO, Defendant Alter was a member of the Board's audit and compensation committees. The primary responsibilities of Progenity's audit committee are to oversee Progenity's accounting and financial reporting processes, including the audits of the financial statements, and the internal and external audit processes. The audit committee also oversees the system of internal control established by management. Progenity stated in the Registration Statement that Defendant Alter "has sufficient knowledge in financial and auditing matters to serve on the audit committee." Defendant Alter joined Progenity's Board in January 2019. From April 2004 to June 2018, Defendant Alter served in various chief leadership positions at UnitedHealthcare, a health plan business, including as Chief Executive Officer of its commercial group from November 2014 to June 2018. Defendant Alter also signed, or authorized the signing of, the Registration Statement issued in

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

connection with the IPO. In Progenity's 2019 fiscal year Defendant Alter received $471,457 in total compensation from Progenity.

22.    Defendant John Bigalke ("Bigalke") served as a member of the Board at the time of the IPO. At the time of the IPO, Defendant Bigalke was a member of the Board's audit, nominating/corporate governance, and special committees. Progenity stated in the Registration Statement that Defendant Bigalke "qualifies as an 'audit committee financial expert' as that term is defined in the rules and regulations established by the SEC." Progenity stated in the Registration Statement that Defendant Bigalke "has sufficient knowledge in financial and auditing matters to serve on the audit committee." At the time of the IPO, the special committee was responsible for evaluating, overseeing, making decisions, and taking actions for and on behalf of Progenity with respect to the then-pending government investigations and any related proceedings. Defendant Bigalke joined Progenity's Board in January 2019. Defendant Bigalke has served as the Chief Executive Officer of Second Half Healthcare Advisors, a healthcare strategy firm, since its founding by him in August 2016. Prior to founding Second Half Healthcare Advisors, he served as Vice Chairman and Senior Partner, Global Health Care Practice at Deloitte USA LLP, an accounting and consulting firm, from April 2012 to August 2016. Defendant Bigalke is a Certified Public Accountant. Defendant Bigalke also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO. In Progenity's 2019 fiscal year Defendant Bigalke received $489,299 in total compensation from Progenity.

23.    Defendant Jeffrey Ferrell ("Ferrell") served as a member of the Board at the time of the IPO. At the time of the IPO, Defendant Ferrell was a member of the Board's compensation and nominating/corporate governance committees. Defendant Ferrell joined Progenity's Board in June 2014. Defendant Ferrell has served as the Managing Partner of Athyrium Capital Management, LP, a life sciences focused investment and advisory company, since November 2008. Athyrium Capital

Management, LP and its affiliates have been among Progenity's largest investors at all relevant times. Defendant Ferrell also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

24.     Defendant Brian L. Kotzin ("Kotzin") served as a member of the Board at the time of the IPO. At the time of the IPO, Defendant Kotzin was a member of the Board's compensation and science committees. Defendant Kotzin joined Progenity's Board in June 2019. Defendant Kotzin has served as Senior Vice President, Clinical Development at Nektar Therapeutics, a biopharmaceutical company, since April 2017. Prior to Nektar, Defendant Kotzin was at Amgen Inc., where he served as Vice President, Global Clinical Development and Head, Inflammation Therapeutic Area from July 2004 to January 2015. Defendant Kotzin also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO. In Progenity's 2019 fiscal year Defendant Kotzin received $290,398 in total compensation from Progenity.

25.     Defendant Samuel Nussbaum ("Nussbaum") served as a member of the Board at the time of the IPO. At the time of the IPO, Defendant Nussbaum was a member of the Board's nominating/corporate governance, science, and special committees. Defendant Nussbaum joined Progenity's Board in January 2019. Defendant Nussbaum has served as a Strategic Consultant for EBG Advisors, the consulting arm for Epstein Becker and Green, since January 2016. Defendant Nussbaum has also served as a Senior Advisor to Sandbox Industries, a venture fund, since January 2017, and Ontario Teachers' Pension Fund since August 2016. From January 2000 until December 2015, Defendant Nussbaum served as Executive Vice President, Clinical Health Policy, and Chief Medical Officer of Anthem, Inc., a health insurance company. Defendant Nussbaum also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO. In Progenity's 2019 fiscal year Defendant Nussbaum received $475,207 in total compensation from Progenity.

8

26.     Defendant Lynne Powell ("Powell") served as a member of the Board at the time of the IPO. At the time of the IPO, Defendant Powell was a member of the Board's audit, science, and special committees. Progenity stated in the Registration Statement that Defendant Powell "has sufficient knowledge in financial and auditing matters to serve on the audit committee." Defendant Powell joined Progenity's Board in February 2019. Since September 2019 and October 2019, Defendant Powell has served as Chief Executive Officer and as a member of the board of directors, respectively, of Druggability Technologies Holdings Ltd, a specialty pharmaceutical company. Prior to joining Druggability, Defendant Powell served as Senior Vice President and Chief Commercial Officer of BioCryst Pharmaceuticals, Inc., a biotherapeutics company, from January 2015 to July 2019. Defendant Powell also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO. In Progenity's 2019 fiscal year, Defendant Powell received $467,874 in total compensation from Progenity.

27.     Defendants Stylli, d'Esparbes, Alter, Bigalke, Ferrell, Kotzin, Nussbaum, and Powell are collectively referred to hereinafter as the "Individual Defendants." All of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's common stock to investors in the IPO for their own financial benefit and the financial benefit of Progenity.

**D.   Underwriter Defendants**

28.     Defendant Piper Sandler & Co. ("Piper Sandler") underwrote the Company's IPO.  Defendant Piper Sandler also acted as a joint book-running manager and representative of the other underwriters and agreed to purchase 2,466,667 shares in the IPO, exclusive of its option to purchase additional shares. Based on the underwriting discount of $1.05 per share to be paid from Progenity to the underwriters

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

in the IPO, Defendant Piper Sandler received approximately $2,590,000 in connection with the IPO.

29.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") underwrote the Company's IPO. Defendant Wells Fargo also acted as a joint book-running manager and representative of the other underwriters and agreed to purchase 1,933,333 shares in the IPO, exclusive of its option to purchase additional shares. Based on the underwriting discount of $1.05 per share to be paid from Progenity to the underwriters in the IPO, Defendant Wells Fargo received approximately $2,030,000 in connection with the IPO.

30.     Defendant Robert W. Baird & Co. Incorporated ("Baird") underwrote the Company's IPO. Defendant Baird also agreed to purchase 1,000,000 shares in the IPO, exclusive of its option to purchase additional shares. Based on the underwriting discount of $1.05 per share to be paid from Progenity to the underwriters in the IPO, Defendant Baird received approximately $1,050,000 in connection with the IPO.

31.     Defendant Raymond James ("Raymond James") underwrote the Company's IPO. Defendant Raymond James also agreed to purchase 1,000,000 shares in the IPO, exclusive of its option to purchase additional shares. Based on the underwriting discount of $1.05 per share to be paid from Progenity to the underwriters in the IPO, Defendant Raymond James received approximately $1,050,000 in connection with the IPO.

32.     Defendant BTIG, LLC ("BTIG") underwrote the Company's IPO. Defendant BTIG also agreed to purchase 266,667 shares in the IPO, exclusive of its option to purchase additional shares. Based on the underwriting discount of $1.05 per share to be paid from Progenity to the underwriters in the IPO, Defendant BTIG received approximately $280,000 in connection with the IPO.

33.     Defendants Piper Sandler, Wells Fargo, Baird, Raymond James, and BTIG are referred to hereinafter as the "Underwriter Defendants."

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

34.     The Underwriter Defendants served as underwriters for the IPO. Collectively, they sold more than 6.6 million Progenity shares in the IPO at $15 per share and shared $7 million in underwriting discounts and commissions. Their failure to conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement was a substantial factor leading to the harm complained of herein.

IV.     **STATEMENT OF RELEVANT FACTS**

    A.     **Background on Progenity's Business Leading Up To The IPO**

35.     Based in San Diego, California, Progenity is a biotechnology company focused on developing and commercializing molecular testing products and precision medicine applications. The Company provides in vitro molecular tests designed to assist parents in making informed decisions related to family planning, pregnancy, and complex disease diagnosis.

        1.     **Progenity Suffered Large, Persistent Financial Losses And Needed Cash To Survive**

36.     At the time of the IPO, despite having already been in operation for nine years, Progenity had a history of large losses, substantial indebtedness, limited cash on hand, and limited ability to generate revenue. For example, in the Registration Statement, Progenity reported a loss from operations of $114 million for 2018, $140 million for 2019, and $52 million for the first quarter of 2020. Likewise, the Company admitted therein that "[w]e have incurred losses in the past, and we may not be able to achieve or sustain profitability in the future."

37.     The Registration Statement also explained that the Company liabilities were greater than its assets, reporting that as of December 31, 2019, Progenity had total current assets of $75 million, as compared to total current liabilities of $100 million, and had only $12 million of cash and cash equivalents on its balance sheet. The Company further admitted that "[o]perating our business will require a significant amount of cash, and our ability to generate sufficient cash depends on many factors,

AMENDED CLASS ACTION COMPLAINT                                   Case No. 20cv01683

some of which are beyond our control. We expect to need to raise additional capital after this offering, and if we cannot raise additional capital when needed, we may have to curtail or cease operations."

38.     These concerns were further addressed by the notes to Progenity's consolidated financial statements included in the Registration Statement, expressing "substantial doubt about the Company's ability to continue as a going concern":

> As of December 31, 2019, the Company had cash and cash equivalents of $33.0 million and an accumulated deficit of $348.5 million. For the year ended December 31, 2019, the Company also had a net loss of $148.0 million and cash used in operations of $106.1 million. The Company's primary sources of capital have been private placements of preferred stock and incurrence of debt. As of December 31, 2019, the Company had a $75.0 million term loan outstanding with a private equity firm (see Note 7), and mortgages outstanding of $3.3 million (see Note 8). Management does not believe that the current available cash and cash equivalents will be sufficient to fund the Company's planned expenditures and meet its obligations for at least 12 months following the financial statement issuance date without raising additional funding. As a result, there is substantial doubt about the Company's ability to continue as a going concern for the twelve months following the issuance date of the consolidated financial statements for the year ended December 31, 2019. The Company's ability to continue as a going concern is dependent upon its ability to raise additional funding.

39.     Therefore, at the time of the IPO, Progenity was in a precarious financial position and had a pressing need for cash.

**2.     Progenity Depended On Its Core Business From The Preparent and Innatal Testing Products To Generate Revenue**

40.     In 2015, Progenity launched both its "Innatal" Prenatal Screen and its "Preparent" Carrier Test. The Innatal test is a noninvasive prenatal test ("NIPT") offered to women early in pregnancy to screen for risk of fetal chromosomal conditions, such as Down syndrome, trisomy 13, and trisomy 18, and sex chromosome disorders. The Preparent test is an expanded carrier screen that is

1 performed on women or couples before conception or early in a pregnancy to identify
2 if they carry certain mutations that cause genetic diseases.

3     41.    At the time of the IPO, Progenity was heavily dependent on the success
4 of its Preparent and Innatal testing products for the continued survival of the
5 Company. As the Company explained in the Registration Statement, "[s]ubstantially
6 all of our revenue is derived from molecular laboratory tests, principally from the sale
7 of Innatal, Preparent, and pathology molecular testing. The revenue we derive from
8 our Innatal tests and our Preparent tests is roughly equal." Moreover, also in the
9 Registration Statement, the Company explained that, "[w]e currently receive and
10 expect to continue to receive a significant portion of our revenues from the sales of
11 our women's health-related NIPT product, Innatal, and our carrier screening products,
12 including Preparent."

13     42.    The Registration Statement further described the Company's "core
14 product portfolio" as consisting of "NIPT [*i.e.*, Innatal]; carrier screening [*i.e.*,
15 Preparent]; and hereditary cancer screening," which it also referred to as its
16 "molecular testing products," and explained "[o]ther than revenues from our
17 molecular testing business, we do not expect to generate revenues from other sources
18 in the immediate future." Similarly, the notes to Progenity's consolidated financial
19 statements state that, "[t]he Company's core business is focused on the prenatal carrier
20 screening and noninvasive prenatal test market."

**3.    Test Volumes and Average Selling Prices Were Key Performance Indicators for Progenity**

21
22
23     43.    Because Progenity's business is heavily dependent on Preparent and
Innatal tests for revenue, the volume of such tests processed by Progenity is a key
24
25 performance indicator for its business. According to Progenity's Registration
Statement, "[t]he volume of tests that we accession is one of the key performance
26
27 indicators that we use to evaluate our business. A test is accessioned when we receive
the test samples at our laboratory, the relevant information about the desired test is
28

AMENDED CLASS ACTION COMPLAINT    Case No. 20cv01683

entered into our systems, and the samples are routed into the appropriate process flow." As such, the average selling price Progenity receives for those tests is also a key performance indicator for its business: "[o]ur gross margin is an important indicator of the operating performance of our business. Higher gross margins reflect the average selling price of our tests, as well as the operating efficiency of our laboratory operations."

**4.    Progenity Depended On Billing Government Health Care Programs And Commercial Health Insurance Providers To Generate Revenue**

44.    The vast majority of Progenity's revenues depended on billing government health care programs and private commercial health insurance companies for Progenity's testing products. As Progenity disclosed in the Registration Statement:

> We generate revenue from the sales of our molecular tests and receive payments for such tests from four distinct channels: commercial third-party payors, government health benefits programs such as Medicare and Medicaid, laboratory distribution partners, and individual patients. Reimbursements from payors, including commercial third-party payors and government health benefits programs, constituted 97% of our revenue during the year ended December 31, 2019.

45.    Progenity further disclosed in the Registration Statement that "[o]ur future revenues and profitability will depend heavily upon the availability of coverage and adequate reimbursement from governmental and other third-party payors, both in the United States and in foreign markets, for the use of our products." The Registration Statement also stated that "[t]hird-party reimbursement for our testing represents a significant portion of our revenues, and we expect third-party payors such as third-party commercial payors and government healthcare programs to continue to be our most significant sources of payments in the foreseeable future."

**5.    Progenity Had Weak Internal Controls Over Financial Reporting**

46.    In the Registration Statement, Progenity revealed that it had had "material weaknesses related to a lack of (i) controls designed to reconcile tests

14

performed and recognized as revenue to billed tests and (ii) appropriately designed or effectively operating controls over the proper recording of accounts payable and accrued liabilities." However, the Registration Statement assured that Progenity had concluded that the "matters that constituted material weaknesses in our internal control over financial reporting . . . have since been remediated."

### 6. Progenity Agreed To A $49 Million Settlement For Misconduct Including Overbilling Government Health Care Programs For Innatal Tests

47.     In April 2018, Progenity received a civil investigative demand from the office of the U.S. Attorney for the Southern District of New York and a Health Insurance Portability and Accountability Act ("HIPAA") subpoena issued by the office of the U.S. Attorney for the Southern District of California.  In May 2018, Progenity received a subpoena from the State of New York Medicaid Fraud Control Unit.  These investigative demands and subpoenas were part of federal civil and criminal investigations, and state civil investigations, regarding what Progenity referred to in the Registration Statement as "discontinued legacy billing practices for our NIPT [*i.e.*, Innatal] and microdeletion tests and the provision of alleged kickbacks or inducements to physicians and patients."

48.     On March 31, 2020, Progenity reached an agreement on the monetary terms of a settlement with the U.S. Department of Justice ("DOJ") and the State of New York (with the State of New York Attorney General representing or facilitating the interests of all States participating in the settlement) with respect to relevant government health benefit programs. According to Progenity's Registration Statement, this agreement would "resolve all of the government's outstanding civil and criminal investigations, including the investigations by the U.S. Attorney's Office for the Southern District of California and the U.S. Attorney's Office for the Southern District of New York, as well as the investigation by the State AGs."

49.     The agreement in principle contemplated that Progenity would enter into a civil settlement agreement to pay $49.0 million in the aggregate in exchange for a

release of the civil claims. Progenity also expected to enter into a corporate integrity agreement with the Department of Health and Human Services Office of Inspector General as part of its planned settlement. The agreement in principle also contemplated that Progenity would enter into a non-prosecution agreement to resolve all criminal allegations, which Progenity claimed related to "discontinued legacy billing practices for our NIPT tests."

50.     The NIPT test overbilling conduct at issue in these investigations related to Progenity's use of incorrect Current Procedural Terminology ("CPT") codes when billing government health insurance programs for its Innatal tests. CPT codes are part of a numerical coding system that physicians and laboratories must use on claim forms to bill payors for healthcare services and to receive payments. The CPT code represents the service performed and affects the rate that the payor will reimburse the provider.

51.     Shortly following the IPO, Progenity and the various government agencies finalized the settlement and related agreements. In a Stipulation and Order of Settlement and Dismissal, entered into by Progenity, the U.S. Attorney for the Southern District of New York, and various other parties, which was so-ordered on July 23, 2020, Progenity admitted, acknowledged, and accepted responsibility for conduct including that:

a.     From March 2014 through April 2016, Progenity submitted false claims for payment to government payors to obtain reimbursement for NIPTs by improperly using CPT code 88271, which did not accurately represent the tests performed.

b.     Until January 2015, there was no CPT code specific to NIPTs. On January 2, 2015, a new CPT code, 81420, became active as the correct code that Progenity should have used to bill for its NIPTs. However, Progenity continued to submit false claims to government payors using the incorrect CPT code 88271.

AMENDED CLASS ACTION COMPLAINT                          Case No. 20cv01683

c.     As a result of incorrectly using CPT code 88721 and misrepresenting the type of test performed when submitting claims for payment to government payors for NIPTs, Progenity received payments for non-reimbursable tests, or received substantially higher payments than it was entitled to receive for the genetic testing services provided.

52.     Prior to the IPO, Progenity's Board established a special committee consisting of Defendants Bigalke (committee chair), Nussbaum, and Powell. The special committee was responsible for evaluating, overseeing, making decisions, and taking actions for and on behalf of Progenity with respect to the then-pending government investigations and any related proceedings.

**B.     Progenity's June 2020 IPO**

53.     Progenity filed the Registration Statement for its IPO on Form S-1 with the SEC on May 27, 2020, registering common stock of Progenity.  The Registration Statement was signed "[p]ursuant to the requirements of the Securities Act of 1933" by Defendants Stylli, d'Esparbes, Alter, Bigalke, Ferrell, Kotzin, Nussbaum, and Powell.

54.     Subsequent to the filing of the Registration Statement, Progenity filed amendments to the Registration Statement on Form S-1/A on June 4, 2020; June 15, 2020; and June 18, 2020 (filing two amendments on that date).  The amendments form part of the Registration Statement and were substantially similar to the Form S-1 filed on May 27, 2020, and were signed by or on behalf of the same Defendants "[p]ursuant to the requirements of the Securities Act of 1933."

55.     On June 19, 2020, Progenity announced the pricing of its IPO of 6,666,667 shares of its common stock at a public offering price of $15.00 per share. The Company further announced that the shares were expected to begin trading on The Nasdaq Global Market on June 19, 2020 under the ticker symbol "PROG".

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

56.     Together with the Prospectus filed with the SEC on Form 424B4 on June 22, 2020 (the "Prospectus"), the Registration Statement offered for sale 6,666,667 shares of common stock at $15.00 per share.

57.     On June 23, 2020, the Company completed the IPO. In the IPO, the Company issued and sold 6,666,667 shares of its common stock, at a price to the public of $15.00 per share. The IPO generated over $100 million in gross proceeds. The Company received approximately $88.7 million in net proceeds, after deducting underwriting discounts and commissions and other offering expenses payable by the Company.

**C.    The Materially Misleading Registration Statement**

58.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

**1.     The Registration Statement Negligently Omitted To Disclose That Progenity Had Overbilled Government Payors For Preparent Tests By $10.3 Million**

59.     Progenity inappropriately billed government payors for Preparent tests by using incorrect billing codes in all of 2019 and the beginning of 2020, and as a direct result received overpayments of approximately $10.3 million.    Progenity accrued a $10.3 million liability for the overpayment in the quarter ended June 30, 2020, and was required to refund this amount to the overbilled payors in October 2020.

60.     After the close of stock market trading on August 13, 2020, Progenity filed with the SEC a press release and slide deck reporting on its second quarter 2020 financial results. The press release stated that "[t]he second quarter revenues reflected a $10.3 million accrual for refunds to government payors," and the slide deck similarly indicated that Progenity's second quarter revenue "[i]ncludes $10.3 million accrual for refund reserve."

61.     Progenity hosted an investor call on August 13, 2020 at 4:30 p.m. ET to discuss its second quarter 2020 financial results. On that call, Defendant Stylli further elaborated on this refund reserve:

> As part of our work to improve our compliance program, including an internal auditing and monitoring functions, we commissioned the third-party review of our coding and billing processes. In connection with that audit, we identified that we had not appropriately transitioned the implementation of the new billing requirements for larger carrier screening panels, which were introduced in early 2019. As a result over the last 18 months, we received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020.

62.     Progenity further elaborated on this issue in its Form 10-Q for the second quarter of 2020, filed with the SEC on August 14, 2020:

> [D]uring the three months ended June 30, 2020, the Company accrued $10.3 million for refunds to government payors related to reimbursement for the Company's Preparent expanded carrier screening tests during 2019 and early 2020. In the United States, the American Medical Association ("AMA") generally assigns specific billing codes for laboratory tests under a coding system known as Current Procedure Terminology ("CPT"), which we and our ordering healthcare providers must use to bill and receive reimbursement for our molecular tests. Effective January 1, 2019, the AMA issued a CPT code for genetic testing for severe inherited conditions that includes sequencing of at least 15 genes, which affects potential reimbursement for the Company's Preparent expanded carrier screening tests. As part of the Company's work to improve its compliance program, including its internal auditing and monitoring function, the Company commissioned a third-party review of its billing processes. In connection with that audit, the Company identified that it had not effectively transitioned to the implementation of the new CPT code in 2019, and as a result the Company received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020. The final analysis of the amount of the overpayment is still being completed, but as a result of the analysis to date, during the three months ended June 30, 2020, the Company accrued $10.3 million for refunds to government payors. The Company's deadline to report and return the overpayment to the government programs is 60 days from the time the overpayment was

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

determined and quantified, thus the Company expects to repay this amount to the relevant government programs by early October 2020.

63.     Progenity's second quarter 2020 Form 10-Q further stated:

In connection with the third-party review of the Company's coding and billing processes described in Note 4, which identified that the Company had not effectively transitioned to the implementation of the new CPT code for reimbursement for the Company's Preparent expanded carrier screening tests during 2019 and early 2020, the Company reviewed its reimbursement from commercial payors for these tests over the same time period. The Company may need to engage with payors in order to determine if any amounts could be subject to recovery or recoupment, as it is customarily done with commercial payors. . . If negotiations with payors result in claims or conclusions that overpayments have been made, this could have a material impact on the Company's financial results and position.

64.     Nowhere did the Registration Statement disclose that Progenity had overbilled government health care programs for Preparent tests, or that Progenity would imminently have to accrue and refund $10.3 million for such overbilling. However, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were negligently omitted.

65.     Progenity's IPO Prospectus was dated June 19, 2020, at a point when the second quarter (during which the $10.3 million refund liability was accrued) was already nearly completed with only days remaining. Progenity's own disclosures indicate that Progenity only received Preparent overpayments through "early 2020," therefore showing that Progenity corrected its Preparent billing in "early 2020."

66.     Furthermore, the Registration Statement itself makes clear that at the time of the IPO, Progenity was already aware of the CPT code that became effective in 2019 for Progenity's Preparent tests, stating in relevant part, "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

tests to decline." This risk factor disclosure was itself misleading because it merely stated in hypothetical terms that the new CPT code "may" cause a decline in Preparent reimbursement and failed to disclose that Progenity was required to use the new CPT code for expanded carrier screening tests effective January 1, 2019 when billing for its Preparent tests but failed to do so, resulting in a $10.3 million refund liability.

67.   In addition, Progenity had been under investigation by government agencies since April 2018 for its failure to implement a new CPT code for Innatal tests that resulted in Progenity overbilling government payors and, by the end of March 2020, had reached an agreement in principle to resolve these and other allegations for $49 million.  This should have alerted Progenity well in advance of the IPO to any similar instances of overbilling. However, the Registration Statement failed to disclose overbilling for Preparent tests resulting from the exact same pattern of failure to implement a newly effective CPT code in Progenity's billing.

68.   Progenity's negligent failure to disclose that it had overbilled government health care programs for Preparent tests and would imminently have to refund $10.3 million for such overbilling rendered materially false and misleading numerous statements contained in the Registration Statement.

69.   The Registration Statement repeatedly presented incorrect information relating to Progenity's 2019 and first quarter 2020 Statements of Operations. For example, the Registration Statement contained the following materially false information:

//

//

//

//

//

AMENDED CLASS ACTION COMPLAINT                         Case No. 20cv01683

| | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | (in thousands, except share and per share data) | | (in thousands, except share and per share data) (unaudited) | |
| Revenue | $ 127,974 | $ 143,985 | $ 47,507 | $ 16,828 |
| Cost of sales | 92,076 | 100,492 | 24,421 | 26,570 |
| Gross profit | 35,898 | 43,493 | 23,086 | (9,742) |
| Operating expenses: | | | | |
| Research and development | 48,712 | 63,400 | 15,248 | 11,240 |
| Selling and marketing | 50,187 | 58,888 | 15,567 | 14,436 |
| General and administrative | 51,238 | 61,324 | 14,278 | 17,108 |
| Total operating expenses | 150,137 | 183,612 | 45,093 | 42,784 |
| Loss from operations | (114,239) | (140,119) | (22,007) | (52,526) |
| Interest expense | (9,091) | (9,199) | (2,269) | (2,302) |
| Equity loss of equity method investee | (2,327) | — | — | — |
| Interest and other income, net | 1,801 | 575 | 257 | (20) |
| Loss before taxes | (123,856) | (148,743) | (24,019) | (54,848) |
| Income tax expense (benefit) | 5,250 | (706) | — | (37,696) |
| Net loss | $ (129,106) | $ (148,037) | $ (24,019) | $ (17,152) |
| Dividend paid to preferred stockholders | — | (3,652) | (3,652) | — |
| Stock dividend on exchange of Series A-1 for Series B Preferred Stock | — | (27,637) | — | — |
| Stock dividend on Series B Preferred Stock | — | (49,501) | — | — |
| Net loss attributable to common stockholders | $ (129,106) | $ (228,827) | $ (27,671) | $ (17,152) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (27.72) | $ (46.87) | $ (5.88) | $ (3.43) |
| Weighted average number of shares outstanding, basic and diluted | 4,657,337 | 4,882,662 | 4,705,641 | 4,993,393 |
| Pro forma loss per share, basic and diluted (unaudited)[1] | | $ (5.49) | | $ (0.49) |
| Pro forma weighted average shares outstanding, basic and diluted (unaudited)[1] | | 26,961,445 | | 35,063,069 |

These statements were materially false and misleading when made because Progenity had overbilled government payors by a total of $10.3 million in 2019 and the first quarter of 2020, and thus overstated its revenues for these periods by $10.3 million. This, in turn, caused every financial metric derived in whole or in part from Progenity's reported revenue to be similarly false.

70.     The Registration Statement similarly repeatedly presented incorrect information relating to Progenity's December 31, 2019 and March 31, 2020 balance sheets. For example, the Registration Statement contained the following materially false information:

//

//

//

//

//

//

//

//

AMENDED CLASS ACTION COMPLAINT                                   Case No. 20cv01683

**Accrued expenses and other current liabilities**

Accrued expenses and other current liabilities consist of the following (in thousands):

| | December 31, 2019 | March 31, 2020 |
|---|---|---|
| Accrual for reimbursement claims and settlements | $ 60,386 | $ 33,560 |
| Commissions and bonus | 6,357 | 6,185 |
| Vacation and payroll benefits | 5,506 | 8,751 |
| Accrued professional services | 5,322 | 3,206 |
| Other | 6,044 | 4,708 |
| Total | $ 83,615 | $ 56,410 |

**Other long-term liabilities**

Other long-term liabilities consist of the following (in thousands):

| | December 31, 2019 | March 31, 2020 |
|---|---|---|
| Accrual for reimbursement claims and settlements—long term | $ 12,205 | $ 49,137 |
| Other | 654 | 586 |
| Total | $ 12,859 | $ 49,723 |

These statements were materially false and misleading when made because Progenity had overbilled government payors by a total $10.3 million in 2019 and the first quarter of 2020, and thus understated its accruals for reimbursement claims and settlements for those periods. This, in turn, caused every financial metric derived in whole or in part from Progenity's accruals for reimbursement claims and settlements to be similarly false.

71. The Registration Statement misleadingly reassured investors that Progenity used correct CPT codes in its billing, stating in relevant part "[w]e currently submit for reimbursement using CPT codes that we believe are appropriate for our testing, but codes may be rejected or withdrawn and payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code." These statements were materially false and misleading when made because they represented that Progenity used appropriate billing codes, and failed to disclose that Progenity had submitted claims for Preparent test reimbursement that did not use appropriate CPT codes.

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

72. The Registration Statement contained several misleading statements relating to Progenity's procedures for recognizing variable consideration in revenue. For example, the Registration Statement misleadingly stated:

> Effective January 1, 2019, in accordance with ASC 606, the total consideration we expect to collect from insurance carriers, clinics, and patients in exchange for the tests accessioned is recognized in the period in which our tests are performed and reported to customers.
>
> The transaction price is an estimate and may be fixed or variable. Variable consideration includes reimbursement from healthcare insurers, government payors, and patients and is adjusted for estimates of disallowed cases, discounts, and refunds using the expected value approach. Tests billed to healthcare insurers and directly to patients can take up to six months to collect and we may be paid less than the full amount billed or not be paid at all. For insurance carriers and government payors, we utilize the expected value approach using a portfolio of relevant historical data for payors with similar reimbursement experience. The portfolio estimate is developed using historical reimbursement data from payors and patients, as well as known current reimbursement trends not reflected in the historical data. Such variable consideration is included in the transaction price only to the extent it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainties with respect to the amount are resolved.

These statements were materially false and misleading when made because, with respect to Progenity's revenue recognition for Preparent tests, the Company did not appropriately adjust its variable consideration to reflect refunds owed for overpayments, did not consider all material reimbursement trends when evaluating variable consideration, and included variable consideration in revenue when Progenity was likely to reverse a significant amount of revenue recognized (*i.e.*, the need to refund $10.3 million to government payors for Preparent overbilling).

73. The Registration Statement also contained a misleading risk factor which stated in relevant part:

> We have implemented compliance policies and procedures intended to train and monitor our sales, billing, marketing and other personnel. Our

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

efforts to implement appropriate monitoring of such personnel are ongoing and we have experienced situations in which employees may have failed to fully adhere to our policies and applicable laws in the past. There can be no assurance that we will not experience similar issues in the future. Failure by our sales, billing, marketing, or other personnel to follow our policies and comply with applicable laws may subject us to administrative, civil, and criminal actions, penalties, damages, fines, individual imprisonment, exclusion from participation in federal healthcare programs, refunding of payments received by us, and curtailment or cessation of our operations. . . In addition, commercial third-party payors may refuse to provide all or any reimbursement for tests administered, seek repayment from us of amounts previously reimbursed, and harm our ability to secure network contracts with third-party payors.

These statements were materially false and misleading when made because they presented as a mere hypothetical risk that compliance failures by Progenity's billing personnel "may" result in the need to refund payments, and failed to disclose that Progenity had to refund government payors $10.3 million for Preparent tests due to billing compliance failures.

74.     The Registration Statement also contained another misleading risk factor which stated in relevant part:

Third-party payors may decide to deny payment or recoup payment for testing that they contend to have been not medically necessary, against their coverage determinations, or for which they have otherwise overpaid, and we may be required to refund reimbursements already received. . . If a third-party payor successfully challenges that payment for prior testing was in breach of contract or otherwise contrary to policy or law, they may recoup payment, which amounts could be significant and would impact our operating results and financial condition, and it may decrease reimbursement going forward. We may also decide to negotiate and settle with a third-party payor in order to resolve an allegation of overpayment. Any of these outcomes, including recoupment or reimbursements, might also require us to restate our financials from a prior period, any of which could have a material and adverse effect on our business, operating results, and financial condition.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

These statements were materially false and misleading when made because they presented as a mere hypothetical risk that Progenity "may" be required to refund third-party payors for overbilling, and failed to disclose that Progenity had overbilled government payors for Preparent tests and so had to refund $10.3 million to them.

75.     The Registration Statement misleadingly stated multiple times that:

> On March 31, 2020, we reached an agreement on the monetary terms with the DOJ and the State of New York (with the State of New York Attorney General representing or facilitating the interests of all States participating in the settlement, which we refer to collectively as the State AGs) with respect to relevant government health benefit programs to resolve all of the government's outstanding civil and criminal investigations, including the investigations by the U.S. Attorney's Office for the Southern District of California and the U.S. Attorney's Office for the Southern District of New York, as well as the investigation by the State AGs. The terms of this agreement in principle contemplate that we will enter into a civil settlement agreement providing that we will pay $49.0 million in the aggregate . . . for a release of the civil claims and that we will enter into a non-prosecution agreement to resolve all criminal allegations.

These statements were materially false and misleading when made because they indicated that all of Progenity's overbilling of government payors would be resolved by the $49 million settlement, and failed to disclose that Progenity had overbilled government payors by an additional $10.3 million which would not be resolved by the $49 million settlement.

76.     Based on these and other misleading omissions and disclosures in the Registration Statement, at the time of the IPO, investors reasonably (though it would later turn out, incorrectly) understood that Progenity's billing procedures were appropriate, that any required refunds of overbilled amounts were already reflected in Progenity's financial statements, and that Progenity's recently announced $49 million settlement would resolve the full extent of all existing liabilities for Progenity's overbilling of government payors.

AMENDED CLASS ACTION COMPLAINT                         Case No. 20cv01683

77.     Progenity's overbilling of government health care programs for Preparent tests, and its resulting $10.3 million refund liability, were material facts. The $10.3 million refund represented nearly a quarter of Progenity's entire annual gross profits for 2019 of $43.5 million. These facts were all the more material in light of Progenity's precarious financial position and pressing need for cash.

78.     These facts were additionally material because Progenity generated approximately 97% of its revenues through billing government health care programs and commercial health insurance companies, and because of the primary importance of Preparent tests to Progenity's business.

79.     These facts were also material because they presented the strong likelihood that Progenity had similarly overbilled commercial health insurance companies for Preparent tests and so would need to refund substantial additional amounts in excess of its $10.3 million liability to government payors.

80.     Further confirming the materiality of these facts and the resultant effects on Progenity's stock price, in an October 23, 2020 research note, BTIG analyst Sung Ji Nam wrote that Progenity shares were trading "significantly below the June IPO price," identifying "the recent federal/state scrutiny on legacy billing practices (resolved) and related settlement accruals impacting revenues" as "potential drivers" of Progenity's share price decline.

81.     On August 14, 2020, the first trading day after Progenity revealed its $10.3 million accrual for overbilling government payors for Preparent tests, Progenity's stock price closed at $7.71 per share as compared to $8.95 per share at the close of trading on August 13, 2020, a decline of $1.24 per share or 13.8%. The closing price on August 14, 2020 was nearly 50% below the $15.00 price investors paid for Progenity shares in the IPO less than two months previously.

1

2

### 2.     The Registration Statement Negligently Omitted To Disclose Progenity's Trend Of Decreasing Test Volumes

3

4       82.     At the time of the IPO, Progenity was on track for a sharp decline in

5   quarterly test volume. In 2019, Progenity averaged over 82,000 tests per quarter, or

6   over 27,000 tests per month. Progenity reported 79,000 tests in the first quarter of

7   2020, or a monthly average of over 26,000. However, Progenity completed only

8   24,000 tests in April 2020 and 23,000 tests in May 2020, the last two full months

9   before the IPO. Progenity would complete only 75,000 tests in the entire second

10  quarter. Worse still, Progenity's meager second quarter test numbers were inflated by

11  the addition of less valuable COVID tests, which generated far less revenue than the

12  Preparent and Innatal tests that formed the core of Progenity's business. The sharp

13  decline in test volumes was due in part to the COVID pandemic lockdowns that began

14  in the United States in March 2020, and Progenity's decisions to let go 10% to 15%

of its healthcare provider customers and to discontinue the flexible billing policy that

15  had previously been Progenity's main selling point with its customers.

16      83.     Progenity's August 13, 2020 second quarter results press release

17  reported that "[t]otal accessioned tests volume was 75,017 in the second quarter of

18  2020." Progenity's second quarter results slide deck revealed that Progenity's test

19  volumes were only 24,000 for April 2020 and 23,000 for May 2020.  On August 14,

20  2020, the first trading day after Progenity revealed its second quarter 2020 test

21  volumes, Progenity's stock price declined by $1.24 per share or 13.8%.

22      84.     The second quarter press release also stated that Progenity had "[a]dded

23  COVID-19 testing to our existing test menu" during the second quarter. The second

24  quarter slide deck, under the heading "Volume Showing Signs of Recovery," stated

25  "Demand for SARS CoV-2 tests increasing." And Progenity's August 14, 2020

26  second quarter Form 10-Q admitted that "[t]he Company expects test volumes to

27  continue to be adversely affected by COVID-19 and cannot predict when volumes

28  will return to normal."

85.    On November 9, 2020, Progenity held an investor call to report on its third quarter results. Defendant Stylli stated that "[i]n the quarter, we also witnessed some customer turnover due to necessary changes we implemented in revenue cycle management earlier this year."[2] Following up on this, Wells Fargo analyst Daniel Leonard asked, "[c]ould you elaborate what proportion of your customers did you have to essentially let go due to revenue cycle considerations?" Defendant Stylli replied, "I'll give you a rough number, 10% to 15%." Leonard then asked how long the customer turnover effects would be felt, to which Stylli replied, "[w]e're already at the tail end of it. So, I think this quarter, there's a small chance, it could spill over into next quarter as well. But I think most of it will be done this quarter and probably the first month of next quarter. But we really, really are at the tip of the tail. Most of it has worked through the process."  That Progenity had let go 10% to 15% of its customers earlier in 2020 and was already at the "tail end" of the effects of these reductions strongly indicates that these cuts had been made – or at least planned – at the time of the IPO in June 2020.

86.    Nowhere did the Registration Statement fully disclose the decreasing trends in Progenity's test volumes. However, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were negligently omitted.

87.    Progenity included interim information on test volumes in the Registration Statement (albeit in a limited and misleading fashion). For example, the

---

[2] "Revenue cycle management" refers to the process of identifying, collecting and managing revenue from payors based on the services provided to patients. As such, Defendant Stylli's admission that Progenity "let go" 10% to 15% of its customers "due to necessary changes we implemented in revenue cycle management" meant that Progenity had ceased doing business with a substantial number of healthcare providers because the testing ordered for their patients was not profitable for Progenity due to the payors involved and their applicable reimbursement policies.

Registration Statement stated that "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic," and that "[o]ur initial assessment of the impact of the COVID-19 pandemic is that our NIPT [*i.e.*, Innatal] test volumes have proved more resilient than our carrier screening [*i.e.*, Preparent] test volumes." This shows that Progenity tracked test volumes by test type in real time. Thus, Progenity knew in real time the number of each type of test it was processing, because processing tests was Progenity's primary revenue generating activity.

88.   Furthermore, Progenity's IPO Prospectus was dated June 19, 2020. At this point, Progenity had had multiple weeks during which to evaluate test volumes for April and May of 2020, and so had substantial visibility into total second quarter test volumes.

89.   In addition, at the time of the IPO, Progenity knew to expect yet further decreases in test volumes. First, in June 2020, the COVID-19 pandemic and resulting restrictions showed every sign of continuing indefinitely. Second, at this time, Progenity had already begun, or was at the very least planning, to let go 10% to 15% of its customers.

90.   That Progenity was aware of its declining testing volume in real time is confirmed by former Progenity employees. Confidential Witness 1 ("CW1"). CW1 was employed by Progenity as an Assay Transfer Technologist from March 2018 to October 2020. In this position, she[3] was responsible for scaling up the work produced by Progenity's research and development department. CW1 reported to vice president of laboratory operations Tim Webster and to director of assay transfer Brendan Terrier. According to CW1, in the spring of 2020 as the COVID crisis began in the United States, Progenity's testing volume became very low and employees working in the lab had almost no samples coming in. The lab's trends were explained to her

---

[3] For all confidential witnesses, this Complaint uses female pronouns irrespective of the person's gender in order to maintain the confidentiality of the witness's identity.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

by Progenity lab director Chris Riley.  According to CW1, the low testing rates in Progenity's lab commenced with the pandemic and continued through her departure in October 2020, at which time testing volume was still not back to its pre-pandemic normal levels.[4] According to CW1, Progenity's executive management was always aware of these trends, and Progenity's lab directors, Tim Webster, and vice president of accessioning, Alex Espinosa, held monthly and quarterly meetings to review incoming test volumes, as well as less formal weekly discussions.

91.    Confidential Witness 2 ("CW2") was a Business Development Manager for Progenity in Los Angeles, California from December 2018 to December 2020. CW2 reported to Progenity regional sales director Angie De St. Jeor. In her role as a Business Development Manager, CW2 received sales data for her Los Angeles East sales territory almost daily from at least two different Progenity platforms: Salesforce and Tableau. This data included test volume broken out by test type and by physician. Salesforce and Tableau were company-wide platforms through which sales representatives had access to information about their own sales territories. After a customer sent a test to Progenity, this information would typically appear in Tableau within four to seven days. Within CW2's territory sales volume went down significantly during the initial COVID lockdown.

92.    In addition, according to CW2, around March 1, 2020, Progenity implemented a new billing policy.  Progenity had previously instructed CW2 and other sales personnel to tell clients that Progenity's billing department would work with them to lower patients' out of pocket payments. At Progenity's national sales meeting in the last week of February 2020 (at which meeting Defendant Stylli was present), Progenity instructed CW2 and other sales personnel to stop telling clients about this billing policy, which CW2 believed was related to ongoing government

---

[4] Progenity's affiliate Avero Diagnostics operated a separate lab in Texas, where according to CW1, Progenity's COVID tests were processed.

investigations and settlements involving Progenity. According to CW2, this change substantially lowered morale among the sales force because Progenity's biggest selling point with customers had been the ability to have Progenity's billing department work with patients to lower out of pocket payments.  This billing policy change resulted in lost business for CW2, and substantial lost business for other Progenity sales representatives in territories across the country, as customers decided to use Progenity's competitors who offered tests at lower prices.

93.    That Progenity's 10% to 15% reduction in customers occurred or was planned at the time of the IPO is corroborated by the fact that Progenity laid off customer-facing personnel shortly after the IPO, as confirmed in an interview with a Progenity former employee. Confidential Witness 3 ("CW3") was employed by Progenity as a Business Development Manager in Tulsa, Oklahoma from August 2017 to approximately August 2020.[5] In this position she worked with all providers in Oklahoma to sell Progenity's services and bring in new business for Progenity and to keep track of current accounts. As part of her duties, CW3 made calls daily to providers and made sure they were stocked up on supplies. Progenity laid off CW3 in July 2020.  CW3 understood the reason for her termination to be that Progenity's business in Oklahoma was underperforming and that Oklahoma's reimbursement laws were not favorable for Progenity's business.

94.    That Progenity had access to real-time data regarding its business is further confirmed by Confidential Witness 4 ("CW4"). CW4 worked at Progenity from December 2017 through March 2019, first as a Senior Business Analyst, and from August 2018 on as a Business Intelligence Analyst. CW4 primarily reported to Progenity finance director Daniel Gonzalez and also performed projects at the request of corporate vice president of sales George Gianakopoulos, vice president of finance Eric Fox, and then-CFO Summit Aggarwal (prior to Defendant d'Esparbes taking

---

[5] CW3 reported to regional manager Jamie McElwrath.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

over the CFO role). In the fall of 2018, CW4 built a dashboard in Progenity's Tableau software platform that could auto-generate data by sales territory, including to show the percentage of each health care providers' patients that Progenity had attempted to collect payment from. CW4 also built reports for Progenity executives including Daniel Gonzalez and Eric Fox. According to CW4, Progenity utilized monthly reports regarding its insurance company payors showing how much they were paying Progenity month over month, including information regarding CPT codes and reimbursement claim denials. In addition, CW4 ran a report on Progenity's Avero Diagnostics affiliate every Friday for Eric Fox.

95.     That Progenity had access to real-time data regarding its business is also confirmed by Confidential Witness 5 ("CW5"). CW5 was a Revenue Analyst for Progenity in San Diego, California from March 2019 to March 2020. As part of her responsibilities, CW5 helped to produce a monthly revenue "report-out." These reports provided information about Progenity's revenue broken out by CPT code, showing the amount of monthly revenue attributable to each of Progenity's tests. These reports were presented to Progenity's CFO, vice president of finance, vice president of billing, and vice president of claims. In addition, these reports were disseminated to Progenity's board of directors.

96.     Progenity's negligent failure to disclose the negative trends in its test volumes rendered materially false and misleading numerous statements contained in the Registration Statement.

97.     The Registration Statement misleadingly assured investors that "[s]ince 2010, our molecular testing business has achieved consistent year-over-year test volume growth through our robust product portfolio and our strong commercial organization." These statements were materially false and misleading when made because they indicated that Progenity's test volumes were still growing at the time of the IPO and that these test volumes exceeded those from the same time period in the previous year, and because they failed to disclose that Progenity's test volumes were

33

sharply lower in April and May of 2020 and were likely to remain depressed due to known trends.

98.   The Registration Statement also misleadingly emphasized in an eye-catching graphic, "CONSISTENT GROWTH," in a heading with large size, all capital letter font, and stated underneath that heading "~1.5 million tests performed." These statements were materially false and misleading when made because they indicated that Progenity's test volumes were still growing at the time of the IPO, and failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends.

99.   The Registration Statement misleadingly contained three different versions of the same disclosure relating to Progenity's test volume growth, each of which was misleading in its own way.

100.   First, the Registration Statement outright falsely stated that "the growth rate of our test volume is accelerating":

> Since our inception, we have accessioned approximately 1.5 million tests in the United States and the growth rate of our test volume is accelerating. The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

These statements were materially false and misleading when made because they indicated that Progenity's test volumes were growing and that this growth was accelerating at the time of the IPO, and because they failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends.

101.   Second, the Registration Statement admitted to a "a slowdown in volume growth" rather than accelerating growth, but nonetheless claimed that Progenity was currently experiencing "volume growth," albeit at a slower rate than previously:

1
2
3
4
5
6
7

> Since our inception, we have accessioned approximately 1.5 million tests in the United States and the growth rate of our test volume was accelerating over a multi-year period, including early 2020. However, we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic. The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

8
9
10
11

These statements were materially false and misleading when made because they indicated that Progenity's test volumes were still growing at the time of the IPO, and failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends.

12
13
14

102.   Third, the Registration Statement admitted to temporary volume declines beginning in March, while misleadingly emphasizing the resilience and recovery of Progenity's test volumes:

15
16
17
18
19
20
21
22
23
24

> Beginning in March 2020, we began to observe significant declines in the volumes of our molecular tests as well as the pathology tests conducted by Avero Diagnostics due to the impact of the COVID-19 pandemic and work-from-home policies and other operational limitations mandated by federal, state and local governments as a result of the pandemic. However, we believe our business is resilient and we have observed positive signs of recovery so far. While we are implementing mitigation strategies to address these limitations, such as supporting patients and physicians virtually, there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods. Our initial assessment of the impact of the COVID-19 pandemic is that our NIPT test volumes have proved more resilient than our carrier screening test volumes; however, the comparative impact may change over time.

25
26
27
28

These statements were materially false and misleading when made because they misleadingly emphasized resilience and recovery in Progenity's test volumes, and failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends.

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

103.   Although the Registration Statement contained a risk factor relating to fluctuations in test volumes and other performance metrics, this risk factor disclosure was itself materially misleading:

> Our operating results, including our revenues, gross margin, profitability, and cash flows, have varied in the past and may vary significantly in the future, and period-to-period comparisons of our operating results may not be meaningful. . . . We also may face competitive pricing or reimbursement rate pressures, and we may not be able to maintain our sales volume and/or reimbursement rates in the future, which would adversely affect our business, operating results, and financial condition.

These statements were materially false and misleading when made because they presented as a mere hypothetical risk that Progenity "may" experience a decrease in test volumes, pricing or revenue, and failed to disclose that Progenity was at the time of the IPO experiencing significant declines for each of these metrics.

104.   Similarly, the Registration Statement contained another misleading risk factor stating in relevant part, "[t]he spread of COVID-19, which has caused a broad impact globally, may materially affect us economically, including a significant reduction in laboratory testing volumes." These statements were materially false and misleading when made because they presented as a mere hypothetical risk that Progenity "may" experience a decrease in test volumes, and failed to disclose that Progenity was at the time of the IPO experiencing significant test volume declines.

105.   Based on these and other misleading omissions and disclosures in the Registration Statement, at the time of the IPO investors reasonably (though it would later turn out, incorrectly) understood that Progenity's test volumes were growing at the time of the IPO, and were positioned for continued growth in the near future.

106.   The negative trends in Progenity's test volumes were material facts. Progenity had identified test volumes to investors as a "key performance indicator" for its business, and Progenity was dependent on its Preparent and Innatal tests to generate a significant portion of the Company's revenues. These facts were all the

more material in light of Progenity's precarious financial position and pressing need for cash.

107.   Further confirming the materiality of these facts and the resultant effects on Progenity's stock price, in an October 23, 2020 research note, BTIG analyst Sung Ji Nam wrote that Progenity shares were trading "significantly below the June IPO price," identifying "COVID-19-related headwinds on the core business" as a "potential driver[]" of the share price decline. The note went on to detail an "Upside Scenario" for Progenity's stock including "[f]aster than expected recovery in test volume growth adversely impacted by COVID-19," and a "Downside Scenario" with "[s]lower than expected recovery in test volume growth."

### 3.   The Registration Statement Negligently Omitted To Disclose Progenity's Trend Of Decreasing Average Selling Prices

108.   At the time of the IPO Progenity was experiencing a significant decline in the average selling price ("ASP") for its tests. ASP is Progenity's revenue from testing divided by the number of such tests.

109.   Progenity had ASP of approximately $438 in 2019. Progenity's ASP decreased to approximately $380 in the first quarter of 2020, as adjusted to remove the effect of Progenity's settlement accrual in that quarter. In the second quarter of 2020, during which Progenity sold $100 million of stock in the IPO, Progenity's ASP fell even further to approximately $368, as adjusted to remove the effect of Progenity's refund accrual in that quarter. This substantial second quarter decrease was due in part to a shift in Progenity's product mix away from higher-priced Preparent tests and toward lower-priced Innatal and COVID-19 tests, brought about by changes in customer behavior due to the COVID-19 pandemic and related restrictions.  The substantial second quarter decrease in ASP was also due in part to Progenity having to discontinue overbilling for Preparent tests, as it had done in 2019 and early 2020, and due to Progenity's decision to decrease the cash prices of its Preparent and Innatal tests by more than 50%.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

110.   This negative trend in Progenity's ASP continued well beyond Progenity's IPO and second quarter results. Progenity would later report results indicating third quarter 2020 ASP of approximately $309, a dramatic decline from the first and second quarter ASPs as adjusted for accruals. This dramatic decline in ASP was the continuation of the trends causing Progenity's second quarter ASP decline, and was caused by the same factors.

111.   Based on the revenues and test volumes reported in the Registration Statement, Progenity had ASP of approximately $438 in 2019.[6]

112.   On August 13, 2020 Progenity filed with the SEC a slide deck and held an investor call reporting on its second quarter 2020 financial results. Progenity's second quarter 2020 slide deck reported first quarter 2020 ASP of $213.50 as compared to second quarter 2020 ASP of $230.20, however these figures were accompanied by footnotes reflecting the impact of a $13.2 million accrual for settlements in the first quarter and a $10.3 million accrual for refund reserve in the second quarter. Reversing the effects of these accruals, Progenity's ASP in fact decreased from approximately $380 in the first quarter to approximately $368 in the second quarter.[7]

113.   Defendant d'Esparbes commented on ASPs in Progenity's second quarter 2020 investor call:

> We cannot [sic] explain the evolution of our ASP between the periods, while our first and second quarter's ASP was unusually low due to accruals that reduced revenue. Our second quarter ASP also reflects two main contributing factors. The first factor relates to the resilience of our NIPT volume demand during the quarter leading to a higher proportion of NIPT tests in our total volume compared to the first quarter.

_____

[6] 2019 revenue of $144.0 million, divided by 329,000 tests equals $437.69.

[7] The sum of first quarter revenue of $16.8 million and $13.2 million settlement accrual divided by 79,000 first quarter test volume equals $379.75. The sum of second quarter revenue of $17.3 million and $10.3 million refund accrual divided by 75,000 second quarter test volume equals $368.00.

The average reimbursement rate for NIPT tends to be slightly lowering [*sic*] for carrier screening and as a result, our portfolio ASP reflects that temporary shift during the second quarter. On a long-term basis, we believe our NIPT to carrier screening ratio should normalize to 1.2:1, our typical ratio as we've previously disclosed.

The second factor influencing our ASPs are ongoing in-network transition, where lower average rates have not yet been fully compensated by an expected higher percentage of test paid and increased in-network volume numbers.

114.   Later in the call, Baird analyst Catherine Ramsey Schulte pressed for more information regarding the decline in ASPs:

Then maybe, just going back to ASPs in the quarter, how much of that degradation was due to that mix shift away from carrier screening and towards NIPT, is there a way to quantify the impact or magnitude of that mix shift?

115.   Defendant Stylli responded to Schulte:

So, it was not that material. but it's definitely a contributor. Obviously, the accruals that we had in a quarter are the biggest impact on ASP.

But if you look at the trend lines, the shift is noticeable, but not overly material, but weren't [*sic*] highlighted, because the shift is a very good representation to the dynamics of the market and it's important to highlight, because the demand profile for NIPT and carrier screening are not exactly the same and I think we have very effective marketing strategies to make sure that they're continuing to perform well. But for this quarter, we felt it was reasonable to dimension it.

Although Defendant Stylli attempted to downplay the significance of the lower Innatal ASP, he contradicted himself and revealed the truth by admitting that higher relative Innatal volumes were "definitely a contributor" to lower overall ASP, and that this was "important to highlight."[8]

---

[8] Following the Company's August 13 disclosures, on August 14, 2020, Progenity's stock price declined by $1.24 per share or 13.8%.

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

116.   On October 29, 2020, Progenity filed with the SEC a press release reporting preliminary third quarter 2020 revenue and test volumes. Progenity reported that it "expects to report revenue for the third quarter of 2020 in a range of approximately $25 to $26 million," and stated that "Progenity's reported test volume for the third quarter of 2020 was more than 84 thousand tests."

117.   Based on even the high end of the expected revenue range and the reported test volume, this indicated third quarter ASP of approximately $310,[9] a dramatic decline from the first and second quarter ASPs of $380 and $368 as adjusted for accruals. This dramatic decline in ASPs was the materialization of risks that Defendants negligently failed to disclose to investors in the Registration Statement relating to the then known and foreseeable downward trend in ASP. In the three trading sessions following Progenity's October 29, 2020 disclosures which revealed its third quarter ASP, Progenity's stock price declined by $3.42 per share or 44.5%.[10]

118.   On November 9, 2020, Progenity provided further information in its final third quarter 2020 results in a press release, slide deck, investor call, and its third quarter Form 10-Q. This additional information confirmed the dramatic decline in Progenity's ASP that was ascertainable from the Company's October 29 press release, and further confirmed that this decline was driven in large part by shifts in Progenity's product mix.

---

[9] Third quarter revenue of $26 million divided by 84,000 third quarter test volume equals $309.52.

[10] On October 29, 2020 Progenity's stock price closed at $5.96 per share as compared to $7.69 per share at the close of trading on the prior trading day, a decline of $1.73 per share or 22.5%. On October 30, 2020 Progenity's stock price closed at $4.99 per share, a decline of $0.97 per share or 16.3% as compared to the closing price on the prior trading day. On November 2, 2020 Progenity's stock price closed at $4.27 per share, a decline of $0.72 per share or 14.4% as compared to the closing price on the prior trading day. The $4.27 per share closing price on November 2, 2020 was less than one-third of the $15.00 price investors paid for Progenity shares in the IPO less than five months previously.

---

AMENDED CLASS ACTION COMPLAINT                                        Case No. 20cv01683

119.   Progenity's third quarter 2020 slide deck confirmed third quarter test volume of 84,000, and reported revenue of $25.9 million, and ASP of $308.60.

120.   The slide deck also disclosed that the growth in Progenity's test volume came "primarily from Covid testing." Progenity's third quarter press release confirmed that the test volumes Progenity had reported for the second and third quarters "include[] the company's Innatal, Preparent, Riscover and COVID-19 testing."

121.   Progenity's third quarter 2020 Form 10-Q acknowledged that the lower reported ASP was caused in substantial part by shifts in Progenity's product mix:

> during the COVID-19 pandemic, which has caused an overall decrease in demand for our products, demand for our NIPT product has been more resilient than for our carrier screening products, leading to a higher proportion of NIPT tests in our product mix. The average reimbursement rate for our NIPT product tends to be slightly lower than for our carrier screening products. In addition, we added COVID-19 testing to our product mix, which has a lower reimbursement amount per test. As a result, our average selling price and revenue was negatively impacted.

122.   On Progenity's third quarter 2020 investor call, Defendant d'Esparbes acknowledged that COVID test volume was driving down Progenity's ASP, and that, controlling for the second quarter's refund reserve accrual, ASPs had declined from the second to the third quarter:

> the relative demand between our women's health products and our COVID-19 testing, which carries lower ASP . . . drives reported revenues . . . Our ASP improved in third quarter of 2020 compared to the second quarter, since we had no revenue accrual adjustments in the third quarter. Without such accrual, ASP would be slightly down due to a higher contribution from COVID test volume.

123.   Nowhere did the Registration Statement fully disclose the decreasing trends in Progenity's ASP. However, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

misleading, and were required to be included in the Registration Statement but were negligently omitted.

124.   Progenity knew in real time the ASPs for each of its test types, because Progenity had only a few commercially available tests and reimbursement for these tests provided almost all of Progenity's revenue.

125.   Progenity included interim information on test volumes by type of test in the Registration Statement (albeit in a limited and misleading fashion), stating that "[o]ur initial assessment of the impact of the COVID-19 pandemic is that our NIPT [*i.e.*, Innatal] test volumes have proved more resilient than our carrier screening [*i.e.*, Preparent] test volumes." This shows that Progenity tracked test volumes by test type in real time, and so was capable of determining related trends in overall ASP in real time.

126.   The IPO Prospectus was dated June 19, 2020, at a point when the second quarter was already nearly completed, thus giving Progenity substantial visibility into second quarter ASP.

127.   In addition, at the time of the IPO Progenity knew to expect yet further decreases in ASP. First, in June 2020 the COVID-19 pandemic and resulting restrictions showed every sign of continuing indefinitely. Due to the nature of and developments regarding the COVID-19 pandemic, Progenity knew that the pandemic would continue in the near term to shift Progenity's product mix away from higher ASP Preparent tests and toward lower ASP Innatal and COVID-19 tests. Second, at the time of the IPO Progenity had recently been forced to stop overbilling for Preparent tests, which would foreseeably reduce ASP for Preparent tests, and for Progenity's overall product mix of which Preparent tests constituted a substantial part.

128.   That Progenity knew to expect yet further decreases in ASP at the time of the IPO is further confirmed by former employees of the Company.  For example, CW2 stated that in her Los Angeles East sales territory the cash price for Progenity's Preparent test had been $595, but that after approximately March 1, 2020 this price

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

was reduced to $250 per test. According to CW2, at the same time Progenity also reduced the cash price for the Innatal test from $595 to $225 (before increasing to $250 in May or June of 2020). These changes in price were announced at Progenity's national sales meeting in the last week of February 2020, which was attended by Defendant Stylli. Therefore, based on CW2's statements, Progenity knew that these price reductions would affect ASP in the second quarter of 2020 and afterward. Additionally, as CW5 explained, reports were given to the Company's officers and executives showing the amount of monthly revenue attributable to Progenity's different types of testing.

129.   Progenity's negligent failure to disclose the negative trends in its ASP rendered materially false and misleading numerous statements contained in the Registration Statement.

130.   Although the Registration Statement stated that "[o]ur initial assessment of the impact of the COVID-19 pandemic is that our NIPT [*i.e.*, Innatal] test volumes have proved more resilient than our carrier screening [*i.e.*, Preparent] test volumes," these statements were materially false and misleading when made because they failed to disclose that Innatal tests had lower ASP than Preparent tests, and that Progenity's revenues and business would be harmed as a result of this change in Progenity's product mix.

131.   The Registration Statement stated that "[i]n response to the COVID-19 pandemic, the Avero Diagnostics laboratory is providing molecular testing for diagnosing COVID-19." However, these statements were materially false and misleading when made because they failed to disclose that Progenity's COVID tests had much lower ASP than its other tests, that Progenity planned to substantially ramp up COVID-19 testing which would foreseeably come to constitute a large portion of Progenity's total test volume, and that Progenity's revenues and business would be harmed as a result of this change in Progenity's product mix.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

132.   The Registration Statement stated that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may similarly cause reimbursement for our Preparent expanded carrier screening tests to decline." These statements were materially false and misleading when made because they presented as a mere hypothetical risk that this CPT code "may" cause Preparent reimbursement to decline, while omitting to disclose that Progenity had overbilled government payors by $10.3 million in 2019 and early 2020, and that Progenity would now have to cease overbilling which would cause the ASP for Preparent tests (and therefore Progenity's overall ASP) to decline.

133.   The negative trends in Progenity's ASP were material facts. These facts were additionally material in light of Progenity's statement that ASPs were an important contributor to its gross margin, and that gross margin was an "important indicator of the operating performance of our business." These facts were all the more material in light of Progenity's precarious financial position and pressing need for cash.

### 4.   The Registration Statement Negligently Omitted To Disclose Progenity's Trend Of Decreasing Revenues

134.   At the time of the IPO Progenity was experiencing a significant decline in revenue. Progenity reported an 8% sequential quarterly decline in revenue from the first quarter of 2020 to the second quarter (when controlling for refund and settlement accruals). Progenity's second quarter 2020 results were even worse in comparison to the same quarter of the prior year. Even when controlling for the effect of the second quarter 2020 accrual for refund reserves, Progenity's second quarter 2020 results represented a more than 50% decline in revenue from second quarter 2019 revenue of $57.2 million. Progenity's declining revenue was caused by its second quarter 2020 refund accrual, and was also caused in substantial part by the negative trends discussed above relating to Progenity's test volumes and ASP.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

135.   The negative trend in Progenity's revenue continued well beyond Progenity's IPO and second quarter results. Progenity would later report a mere $25.9 million of third quarter 2020 revenue, a substantial decline from prior quarters (adjusted for accruals). This further decline in Progenity's revenue was the continuation of the trends causing Progenity's second quarter revenue decline, and was caused by the same factors.

136.   On August 13, 2020 Progenity reported second quarter 2020 financial results, including revenue of $17.3 million, or $27.6 million when controlling for Progenity's $10.3 million accrual for refund reserves in the second quarter. Progenity's first quarter revenue had been $16.8 million, or $30.0 million when controlling for Progenity's $13.2 million accrual for settlements in the first quarter. This represented a substantial 8% sequential quarterly decline in revenue.

137.   Progenity's August 13, 2020 press release stated, "[r]evenue was $17.3 million in the three months ended June 30, 2020, compared to $57.2 million in the three months ended June 30, 2019," a nearly 70% decline. Even when controlling for the second quarter 2020 accrual for refund reserves, Progenity's second quarter 2020 results represented a more than 50% decline in revenue from the second quarter of 2019.

138.   Progenity's second quarter 2020 Form 10-Q further commented on the decrease in revenue, stating that the decline was "primarily due to a decrease in test volumes during the three months ended June 30, 2020 compared to the three months ended June 30, 2019, as a result of the COVID-19 shutdown," and in part due to other factors such as "an accrual of $10.3 million for refunds to government payors," and "rate degradation due to payor policy changes."[11]

---

[11] Following the Company's August 13 disclosures, on August 14, 2020, Progenity's stock price declined by $1.24 per share or 13.8%.

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

139.   Progenity's October 29, 2020 press release reporting preliminary third quarter 2020 revenue and test volumes stated that Progenity "expects to report revenue for the third quarter of 2020 in a range of approximately $25 to $26 million." Based on even the high end of the reported revenue range, this represented yet another sequential quarterly decline, as compared to second quarter 2020 revenues of $27.6 million (controlling for the second quarter refund accrual), a decline of over 6%. This continued substantial decline in revenue was the materialization of risks that Defendants negligently failed to disclose to investors in the Registration Statement relating to the then known and foreseeable downward trend in revenues.[12]

140.   On November 9, 2020 Progenity provided further information in its final third quarter 2020 results in a press release, slide deck, investor call, and its third quarter Form 10-Q. This additional information confirmed the continued substantial decline in Progenity's revenue as reflected in the Company's October 29 press release, and further confirmed that this decline was driven in large part by Progenity's decreasing core test volumes and shifting product mix.

141.   The November 9, 2020 slide deck stated that Progenity had earned only $25.9 million in third quarter 2020 revenue, and disclosed that third quarter revenue reflected "revenue cycle management transition," *i.e.*, Progenity's decision to let go 10% to 15% of its customers earlier in 2020, which had predictably decreased Progenity's test volumes and revenue.

142.   On the November 9, 2020 investor call, Defendant Stylli stated:

> our third quarter financial performance still carries some of the effects from prior quarters, which includes the pandemic-induced lockdowns that occurred in Q1 and Q2, where we still showed relative resilience in demand of NIPT and carrier testing, but also a slower overall reimbursement progression in general, which delay the recognition of our revenue.

[12] In the three trading sessions following Progenity's October 29, 2020 disclosures, Progenity's stock price declined by $3.42 per share or 44.5%.

143.   Also on this call, Defendant d'Esparbes stated that "the relative demand between our women's health products and our COVID-19 testing, which carries lower ASP . . . drives reported revenues," and noted a "higher contribution from COVID test volume" in the quarter.

144.   Progenity's third quarter 2020 Form 10-Q disclosed that:

> during the COVID-19 pandemic, which has caused an overall decrease in demand for our products, demand for our NIPT product has been more resilient than for our carrier screening products, leading to a higher proportion of NIPT tests in our product mix. The average reimbursement rate for our NIPT product tends to be slightly lower than for our carrier screening products. In addition, we added COVID-19 testing to our product mix, which has a lower reimbursement amount per test. As a result, our average selling price and revenue was negatively impacted.

145.   Progenity's third quarter 2020 Form 10-Q also identified "a decrease in test volumes in the third quarter of 2020 as a result of the COVID-19 pandemic," as one of the primary factors as affecting revenues in the quarter.

146.   Nowhere did the Registration Statement fully disclose the decreasing trends in Progenity's revenue. However, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were negligently omitted.

147.   Progenity monitored its revenue in real time. The IPO Prospectus was dated June 19, 2020, at a point when the second quarter was already nearly completed, thus giving Progenity substantial visibility into second quarter revenue.  This is confirmed by CW4 who explained that Progenity utilized monthly reports regarding its insurance company payors showing how much they were paying Progenity month over month.  Moreover, this is further supported by CW5, who helped to produce monthly revenue reports that provided information about Progenity's revenue broken out by CPT code, showing the amount of monthly revenue attributable to each of Progenity's tests. The reports produced by CW5 were presented to Progenity's CFO,

vice president of finance, vice president of billing, and vice president of claims, and were disseminated to Progenity's board of directors. The reports described by CW4 and CW5 gave Progenity up to date insights into its revenue.

148.   In addition, Progenity's declining revenue was caused in substantial part by events and trends known to Progenity at the time of the IPO as described above. At the time of the IPO, Progenity was aware of (i) an imminent $10.3 million revenue-reducing liability to government payors for overbilled Preparent tests, (ii) negative trends in test volumes, and (iii) negative trends in ASP. At the time of the IPO, the clearly foreseeable effect of each of these would be to substantially reduce Progenity's revenues.

149.   Furthermore, as Defendant Stylli admitted in Progenity's November 9, 2020 investor call, "[o]ur leading indicator of demand, and to a large degree, revenue, is our reported volume . . . Revenue for us is a lagging indicator," and Progenity knew test volumes to be decreasing at the time of the IPO. Similarly, as Defendant d'Esparbes admitted on that same call, "the relative demand between our women's health products and our COVID-19 testing, which carries lower ASP . . . drives reported revenues," and Progenity knew COVID-19 testing would comprise an increasing percentage of Progenity's testing at the time of the IPO.

150.   Progenity's negligent failure to disclose the negative trends in its revenue rendered the Registration Statement materially false and misleading.

151.   The negative trends in Progenity's revenue were material facts. These facts were all the more material to investors in light of Progenity's precarious financial position and pressing need for cash.

152.   The materiality of these facts and its resultant effects on Progenity's stock price are confirmed by a November 10, 2020 research note by CGS-CIMB analysts Andrew Cooper and Lawrence Keusch, who wrote that Progenity's "$25-26M of pre-announced revenue" for the third quarter was "disappointing," that "since

its IPO" Progenity had "an unfortunate financial performance," and that "Progenity needs to show that the base business can perform as advertised."

## V.    DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT

153.   "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

154.   To effectuate this purpose, a Company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering"); *see also* 15 U.S.C. § 77k(a).

### A.    Section 11 Disclosure Requirements

155.   Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties,

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1)-(5).

## B. Disclosure Requirements Under Regulation S-K

### 1. Item 303 Disclosure Requirements

156.   Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required." *Id.*

157.   Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

> i.   Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

> ii.   Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

158. Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

159. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See* Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

### 2. Item 105 Disclosure Requirements

160. Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 CFR § 229.105(a).

Item 105 further requires the offering documents to "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 CFR § 229.105(b). The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

## C.   Defendants Violated Their Disclosure Obligations In the Registration Statement

161.   Defendants violated their disclosure obligations in the Registration Statement because they failed to disclose that Progenity's overbilling of government health programs for Preparent tests presented a significant risk that Progenity would have to refund the overbilled amounts, and as a result Progenity's revenue would be negatively impacted by at least $10.3 million.  Defendants' failure to disclose these material facts and risks violated Section 11 and Item 105.

162.   Additionally, Defendants' failure to disclose Progenity's negative trends in test volumes, average selling prices, and revenues also violated Section 11 and Item 303.  Likewise, Defendants' failure to disclose that the Company's 2020 revenue would be adversely impacted by at least $10.3 million due to its Preparent test overbilling violated Item 303.

## VI.   CLASS ACTION ALLEGATIONS

163.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the "Class," consisting of all individuals and entities that purchased or acquired Progenity common stock pursuant and/or traceable to the Company's false and misleading IPO Registration Statement, seeking to pursue remedies under Sections 11 and 15 of the Securities Act.  Excluded from

the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

164.   The members of the Class are so numerous that joinder is impracticable. Progenity common stock is actively traded on the NASDAQ and millions of shares were sold in the IPO. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through discovery, plaintiffs believe there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

165.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)      whether defendants violated the Securities Act, as alleged herein;

(b)      whether the Registration Statement misrepresented and/or omitted material information in violation of the Securities Act;

(c)      whether the Individual Defendants have a viable "due diligence" defense to the strict liability imposed by Sections 11 of the Securities Act;

(d)      whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Sections 11 of the Securities Act;

(e)      whether the Individual Defendants are control persons of Progenity for purposes of Section 15 of the Securities Act; and

(f)      whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

166.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

167.   Plaintiffs' will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in securities class actions.

168.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

169.   Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 15 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the IPO alleged herein.

## VIII.  CLAIMS

### FIRST CLAIM
### Violations of Section 11 of the Securities Act
### Against All Defendants

170.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

171.   This claim is brought under §11 of the Securities Act [15 U.S.C. §77k], on behalf of the Class, against all Defendants.

172.   This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud

AMENDED CLASS ACTION COMPLAINT                              Case No. 20cv01683

or fraudulent intent is hereby expressly disclaimed. This claim is based solely on strict liability and negligence.

173.   The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

174.   Progenity is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement. The Individual Defendants signed or authorized the signing of the Registration Statement on their behalves. The Underwriter Defendants marketed and underwrote the IPO and sold the Progenity stock issued in the IPO to Plaintiffs and the Class.

175.   As the issuer of the shares, Progenity is strictly liable to Plaintiffs and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to Plaintiffs and the Class for such material misstatements and omissions. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

176.   Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate.  Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained misrepresentations and/or omissions of material fact.  As such, Defendants are strictly liable to Plaintiffs and the Class.

AMENDED CLASS ACTION COMPLAINT                                    Case No. 20cv01683

177.   By reason of the conduct alleged herein, Defendants violated §11 of the Securities Act. Plaintiffs and the Class members purchased common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations. At the time of their purchases, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

178.   Because of the foregoing, Plaintiffs and the members of the Class are entitled to damages under Section 11 of the Securities Act.

## SECOND CLAIM
### Violations of Section 15 of the Securities Act
### <u>Against the Individual Defendants</u>

179.   Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

180.   This claim is brought under §15 of the Securities Act [15 U.S.C. §77o], against the Individual Defendants.

181.   This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed. This claim is based solely on strict liability and negligence.

182.   As detailed herein, each of Defendants committed primary violations of the Securities Act by committing conduct in contravention of §11 of the Securities Act.

183.   By reason of the conduct alleged herein, the Individual Defendants violated §15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

184.   The Individual Defendants, due to their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Progenity within the meaning of Section 15 of

the Securities Act. The Individual Defendants had the power, influence, and knowledge—and exercised the same—to cause Progenity to engage in the acts described herein.

185. The Individual Defendants, at all relevant times, participated in the operation and management of Progenity, and conducted and participated, directly and indirectly, in the conduct of Progenity's business affairs. The Individual Defendants were under a duty to disseminate accurate and truthful information with respect to Progenity's financial condition and prospects. Because of their positions of control and authority as officers and directors of Progenity, the Individual Defendants were able to, and did, control the contents of the Registration Statement (including the IPO Prospectus), which contained materially untrue and/or misleading statements and/or omitted to state material facts required to be stated therein.

186. Because of their conduct, the Individual Defendants are liable under Section 15 of the Securities Act to Plaintiffs and the members of the Class who purchased or acquired shares pursuant to the Registration Statement. As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs and the other members of the Class suffered damages in connection with their purchase and acquisition of shares pursuant to the Registration Statement.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses;

D.      Awarding extraordinary, equitable, and/or injunctive relief as permitted by law; and

E.      Granting such other, further and/or different relief as the Court deems just and proper.

## X.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  February 4, 2021          **GLANCY PRONGAY & MURRAY LLP**

                                  By:  *s/Casey E. Sadler*
                                  _____
                                  ROBERT V. PRONGAY (#270796)
                                    *rprongay@glancylaw.com*
                                  CASEY E. SADLER (#274241)
                                    *csadler@glancylaw.com*
                                  1925 Century Park East, Suite 2100
                                  Los Angeles, California 90067
                                  Telephone: (310) 201-9150
                                  Facsimile: (310) 201-9160

                                  *Attorneys for Lead Plaintiffs*

AMENDED CLASS ACTION COMPLAINT                    Case No. 20cv01683

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On February 4, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 4, 2021, at Los Angeles, California.

*s/ Casey E. Sadler*
Casey E. Sadler
