BRIAN M. LUTZ, SBN 255976
(*application for admission forthcoming*)
  blutz@gibsondunn.com
JEFFREY S. ROSENBERG
(*pro hac vice application forthcoming*)
  jsrosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:  415.393.8200

ALEXANDER K. MIRCHEFF, SBN 245074
  amircheff@gibsondunn.com
CAROLINE K. MONROY, SBN 329018
  cmonroy@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000

*Attorneys for Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell*

MATTHEW W. CLOSE, SBN 188570
  mclose@omm.com
MEG K. LIPPINCOTT, SBN 324713
  mlippincott@omm.com
YUAN (GRACE) ZHONG, SBN 318808
  yzhong@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone:  213.430.6000

DANIEL L. CANTOR
(*pro hac vice*)
  dcantor@omm.com
O'MELVENY & MEYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036-6537
Telephone:  212.326.2000

*Attorneys for Defendants Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG LLC*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | CASE NO. 20cv1683-CAB-AHG<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933**<br><br>Hearing<br>Date:            May 10, 2021<br>Courtroom: 15A<br>Judge:          Hon. Cathy Ann Bencivengo<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...............................................................................................1

II.  FACTUAL BACKGROUND ..............................................................................3

     A.   Progenity's Business and Billing Practices...............................................3

     B.   Progenity's IPO .......................................................................................4

     C.   Post-IPO Events .......................................................................................6

     D.   Claims at Issue .........................................................................................7

III. LEGAL STANDARDS ON A MOTION TO DISMISS .....................................8

IV.  ARGUMENT.....................................................................................................9

     A.   Plaintiffs Fail to Plead Any Actionable Misleading Statement or
          Omission...................................................................................................10

          1.   Accrual of $10.3 Million Refund to Government Payors .............10

          2.   Negative Trends................................................................................16

     B.   Plaintiffs Cannot Use Items 303 and 105 of Regulation S-K as
          Bases for Their Section 11 Claim ............................................................20

     C.   Plaintiffs Fail to State a Claim Under Section 15 ...................................22

V.   CONCLUSION ...............................................................................................22

Gibson, Dunn & Crutcher LLP

MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
CASE NO. 20CV1683-CAB-AHG

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re Acceptance Ins. Cos. Sec. Litig.*,
   423 F.3d 899 (8th Cir. 2005) ....................................................................................... 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................................ 8

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ......................................................................................... 6

*Baker v. Seaworld Entm't, Inc.*,
   2016 WL 2993481 (S.D. Cal. Mar. 31, 2016)............................................................... 14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................ 8

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
   2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020)............................................................... 12

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ....................................................................................... 10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*,
   856 F.3d 605 (9th Cir. 2017) ....................................................................................... 15

*Coronel v. Quanta Cap. Holdings Ltd.*,
   2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ................................................................. 12

*In re Dropbox Sec. Litig.*,
   2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) ........................................................ 10, 17

*In re Foundry Networks, Inc.*,
   2002 WL 32354617 (N.D. Cal. June 6, 2002)............................................................... 14

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ....................................................................................... 8

*Inc. v. Levinson*,
   485 U.S. 224 (1988)...................................................................................................... 20

ii

Gibson, Dunn & Crutcher LLP

## TABLE OF AUTHORITIES (*continued*)

Page(s)

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 998 (9th Cir. 2018) ................................................................................ 3

*In re LeapFrog Enters., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................................ 14

*Lin. v. Interactive Brokers Grp., Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008) .................................................................. 12

*Mallen v. Alphatec Holdings, Inc.*,
  2013 WL 1294640 (S.D. Cal. Mar. 28, 2013) ...................................................... 22

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................................. 20

*In re Obalon Therapeutics, Inc.*,
  2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) ........................................................ 3

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................... 10, 12, 15, 17, 18

*In re Orange 21 Inc. Sec. Litig.*,
  2006 WL 8455352 (S.D. Cal. Mar. 30, 2006) ...................................................... 22

*In re Pivotal Sec. Litig.*,
  2020 WL 4193384 (N.D. Cal. July 21, 2020) ............................................. 14, 19, 21

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .................................................................................. 9

*Rubke v. Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ........................................................................... 9, 12

*Scibelli v. Roth*,
  2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) ......................................................... 12

*In re Seracare Life Scis., Inc.*,
  2007 WL 935583 (S.D Cal. Mar. 19, 2007) ......................................................... 11

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) .............................................................................. 14

iii

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES (*continued*)

Page(s)

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ................................................................................. 4, 10

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ................................................................................. 20

*In re Verifone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) ........................................................................ 21

*Vess v. Ciba-Geigy Corp., USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................... 8

*In re Worlds of Wonder Sec. Litig.*,
  814 F. Supp. 850 (N.D. Cal. 1993) .......................................................................... 12

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .................................................................................... 10

*Zeid v. Kimberley*,
  930 F. Supp. 431 (N.D. Cal. 1996) .......................................................................... 14

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .................................................................................... 19

**STATUTES**

15 U.S.C. § 77k(a) ........................................................................................................ 9

15 U.S.C. § 77o(a) ...................................................................................................... 22

**REGULATIONS**

17 C.F.R. § 229.105 ............................................................................................ 8, 13, 21

17 C.F.R. § 229.303 ................................................................................................. 8, 21

iv

Gibson, Dunn &
Crutcher LLP

MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
CASE NO. 20CV1683-CAB-AHG

Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, Lynne Powell, Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG, LLC (collectively, "Defendants") submit this memorandum of points and authorities in support of their motion to dismiss the Amended Class Action Complaint (Doc. No. 38) (the "Amended Complaint").

## I.  INTRODUCTION

This is the latest in a long line of cases brought in the name of stockholders asserting violations of the federal securities laws simply because a company's stock price has declined following an initial public offering ("IPO").  Plaintiffs' core complaint is that Progenity, Inc. ("Progenity" or the "Company") had a billing issue that would necessitate refunds and that, months after the IPO, and in the midst of a pandemic, the Company reported poor financial results.  These are disappointing developments, but they do not create liability under the federal securities laws, particularly when Progenity told investors that the Company's business had been adversely impacted by the COVID-19 pandemic and warned that the Company's performance may not improve after the IPO.  The securities class action complaint in this case should be dismissed for failure to plead facts sufficient to state a claim for violation of the federal securities laws.

Plaintiffs in this case attack IPO documents filed with the U.S. Securities and Exchange Commission ("SEC") in June 2020 by Progenity, a company whose business is focused on non-invasive prenatal testing and genetic carrier screening, among other things.  Plaintiffs claim that Progenity's IPO materials (the "Offering Materials") were false and misleading because they allegedly led investors to believe that *all* regulatory issues involving the Company's billing practices had been resolved in an earlier $49 million settlement with the Department of Justice ("DOJ") and the State of New York that Plaintiffs admit was fully disclosed in the Offering Materials and was limited to the billing code for a single product.  Plaintiffs fail to identify a single word in the

1

Gibson, Dunn & Crutcher LLP

Offering Materials that was false or misleading in light of a $10.3 million loss accrual announced nearly two months after the IPO.  Nor could they, given that the Amended Complaint pleads no facts demonstrating that anyone at Progenity knew at the time of the IPO of the billing issues that led to the $10.3 million charge.  As reflected in Plaintiffs' pleading, the $10.3 million charge was not determined and quantified until August 2020—nearly two months *after* the IPO, following a third-party audit.  And the billing issues that led to the $10.3 million charge were related to a *completely different product* than the earlier settlement.

Plaintiffs' hindsight theories of liability fail as a matter of law.  Plaintiffs allege broadly that the financial statements in the Offering Materials were false because they did not reflect the $10.3 million charge reported in August.  Plaintiffs allege no facts to show that Progenity's financials were misstated.  In fact, the Company's financials were accurately reported in compliance with U.S. generally accepted accounting principles ("GAAP").  Progenity could not have disclosed the $10.3 million charge or analyzed it as part of its financial statements at the time of the IPO because it was not "discovered and quantified" until months after the IPO took place.  Am. Compl. ¶ 62.  Nor can Plaintiffs state a claim based on risk factor disclosures in which Progenity expressly warned investors that the government could challenge Progenity's billing practices.  There are no facts pled demonstrating that the risk Plaintiffs focus on—that Progenity would have to take a $10.3 million charge—was known by Progenity or had materialized at the time of the IPO.

Plaintiffs fare no better with their theory that Progenity misled investors by failing to disclose negative trends in the Company's business.  Plaintiffs claim that the Offering Materials contained false or misleading statements that led IPO investors to believe that, despite the onset of the COVID-19 pandemic just months before, Progenity's business was improving.  But Plaintiffs fundamentally ignore what Progenity actually disclosed in the Offering Materials: that in light of the COVID-19 pandemic, the Company's testing volumes had declined, and there was no assurance

2

that testing volumes would rebound or improve. Not only do Plaintiffs ignore the express statement in Progenity's Offering Materials that testing volumes were in decline, but Plaintiffs go so far as to allege that Progenity told investors that testing volumes were increasing. That is nonsense. Progenity said no such thing. To credit Plaintiffs' theory would require turning a blind eye to the actual language of the Offering Materials, in which Progenity stated: "[b]eginning in March 2020, we began to observe significant declines in volumes of our molecular tests [and] pathology tests . . . due to the impact of the COVID-19 pandemic," Am. Compl. ¶ 102; "there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods," *id.* ¶ 102; and "[t]he spread of COVID-19, which has caused a broad impact globally, may materially affect us economically, including a significant reduction in laboratory testing volumes," *id.* ¶ 104. These disclosures defeat Plaintiffs' claim that Progenity failed to disclose declining trends in its business.

## II.    FACTUAL BACKGROUND

### A.    Progenity's Business and Billing Practices

Progenity is a biotechnology company based in San Diego that specializes in developing and commercializing molecular testing products and precision medicine applications in the maternal health and gastrointestinal spaces, among other things. *See* Am. Compl. ¶ 2. Progenity's primary products are (1) "Innatal," a non-invasive prenatal test ("NIPT") to screen for fetal chromosomal conditions such as Down Syndrome, and (2) "Preparent," an expanded carrier screening test for certain mutations that cause genetic diseases. *Id.* ¶¶ 3, 40. In response to the pandemic, Progenity also began providing molecular testing to screen for COVID-19. Declaration of Alexander K. Mircheff ("Mircheff Decl.") Ex. A at 12.[1]

---

[1] In considering this motion to dismiss, the Court "can consider documents under the 'incorporation by reference' doctrine when a plaintiff 'refers extensively to the document or the document forms the basis of the plaintiff's claims.'" *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *3 (S.D. Cal. Sept. 25, 2019) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 998, 1002 (9th Cir. 2018)). In

*(Cont'd on next page)*

3

Billing for these tests requires the assignment of a Current Procedure Terminology ("CPT") code describing the medical procedure performed.  Am. Compl. ¶ 62.  Government health care programs provide reimbursement for medical procedures performed on eligible patients based on the CPT code assigned to the procedure.  *Id.*  On March 31, 2020, Progenity reached a civil settlement agreement with the DOJ and the State of New York (acting on behalf of additional states) and paid $49 million to resolve allegations that the Company incorrectly billed government payors for Innatal (i.e., NIPT) tests after a change to the CPT code system in 2015.  *Id.* ¶¶ 47–51.

## B.    Progenity's IPO

Months into the COVID-19 pandemic, the Company conducted an IPO to raise capital to support its operations and invest in the research and development of its molecular testing program and precision medicine platform.  *See* Mircheff Decl. Ex. A at 3.  On May 27, 2020, Progenity filed the Registration Statement with the SEC, which it amended on June 4, June 15, and June 18, 2020.  Am. Compl. ¶¶ 53–54.  On June 22, 2020, the Company filed the Prospectus with the SEC.  *Id.* ¶ 56.  Pursuant to the Offering Materials, the Company sold 6,666,667 shares of common stock at $15.00 per share.  *Id.* ¶¶ 55–57.

**Disclosures Regarding Billing Practices.**  The Offering Materials described the potential business impact of the Company's reimbursement-related billing practices, including the risk that Progenity would need to refund payments received based on incorrect coding.  Specifically, Progenity explained that while the Company "submit[s] for reimbursement using CPT codes that we believe are appropriate for our testing," "payors may seek refunds of amounts they claim were inappropriately billed to a specified CPT code."  Am. Compl. ¶ 71; *see also* Mircheff Decl. Ex. A at 7 (noting the risk that "third-party payors will seek refunds of amounts that they claim were

assessing a plaintiff's allegations, the Court must consider the "full text of the [Offering Materials], including portions which were not mentioned in the complaint[]."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

4

Gibson, Dunn & Crutcher LLP

inappropriately billed based on either the CPT code used, or the number of units billed"). The Company further cautioned that while it had "implemented compliance policies and procedures intended to train and monitor our sales, billing, marketing and other personnel," such "efforts to implement appropriate monitoring . . . are ongoing and we have experienced situations in which employees may have failed to fully adhere to our policies and applicable laws in the past," and "[t]here can be no assurance that we will not experience similar issues in the future." Am. Compl. ¶ 73. Progenity explained that, in the event of additional coding errors, the Company "may be required to refund reimbursements already received." *Id.* ¶ 74. The Company even specifically noted the risk that it "may also decide to negotiate and settle with a third-party payor in order to resolve an allegation of overpayment," which "could have a material and adverse effect on our business, operating results, and financial condition." *Id.*

Progenity also described in the Offering Materials the scope of the Company's civil settlement with federal and state authorities concerning "discontinued legacy billing practices for our NIPT tests" (i.e., Innatal tests). Am. Compl. ¶ 49. In the settlement, Progenity admitted that it had continued using an old CPT code after a new CPT code had been assigned to NIPT tests. *Id.* ¶ 51.b. The Offering Materials stated that on March 31, 2020, the Company "reached an agreement on monetary terms with the DOJ and the State of New York . . . to resolve all of the government's outstanding . . . *investigations*" for $49 million. *Id.* ¶ 75 (emphasis added). The Offering Materials did not say or suggest that this settlement resolved all conceivable claims or allegations regarding government billing for Progenity's testing, particularly for tests that were not subject to the $49 million settlement. *See* Mircheff Decl. Ex. A at 15–16, 18. Nor do Plaintiffs allege that the government investigated anything related to Progenity's Preparent tests.

**Disclosures Regarding Declining Business Metrics in Light of the COVID-19 Pandemic.** Progenity's IPO took place just months after the onset of the COVID-

5

19 pandemic, which, as the Company explained in the Offering Materials, negatively impacted the Company's business and prospects.  Progenity disclosed that:

- "Beginning in March 2020, we began to observe significant declines in volumes of our molecular tests [and] pathology tests . . . due to the impact of the COVID-19 pandemic" and "there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods."  Am. Compl. ¶ 102;

- It was "currently observing a slowdown in [the Company's historic] volume growth as a result of the COVID-19 pandemic," *id.* ¶ 87;

- It "may not be able to maintain our sales volume and/or reimbursement rates in the future, which would adversely affect our business, operating results, and financial condition," *id.* ¶ 103;

- The "recent and ongoing COVID-19 pandemic could materially affect our operations, as well as the business or operations of third parties with whom we conduct business,"  Mircheff Decl. Ex. A at 5; and

- COVID-19 "may materially affect us economically, including a significant reduction in laboratory testing volumes," Am. Compl. ¶ 104.

Consistent with these disclosures, the Offering Materials contain no statement or suggestion that Progenity's testing volumes, or revenue generated from Progenity's testing, would increase following the IPO.

## C.    Post-IPO Events

Progenity's IPO went effective on June 22, 2020.  Almost immediately after the IPO, the Company's stock price traded below the $15.00 per share offer price, dropping to as low as $7.98 per share by July 2020.[2]  Plaintiffs fail to advise the Court of this stock price decline, which occurred *before* any of the disclosures that Plaintiffs claim corrected the alleged misstatements in Progenity's Offering Materials.  The Court may take judicial notice of this negative stock price movement.  *See, e.g.*, *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017).

On August 13, 2020, Progenity hosted an investor call to discuss its 2020 second quarter financial results.  Am. Compl. ¶ 61.  On the call, Progenity disclosed that it had

---

[2]  *See* Mircheff Decl. Ex. B at 20, 26.

6

Gibson, Dunn & Crutcher LLP

discovered a new government-payor billing issue that would require the Company to reimburse certain payments and that it would accrue an expense on its financial statements to account for these future reimbursements. *See id.* Specifically, Progenity's CEO stated that as part of the Company's "work to improve our compliance program, including . . . internal auditing and monitoring functions, we commissioned the third-party review of our coding and billing processes," which "identified that we had not appropriately transitioned the implementation of the new billing requirements for larger carrier screening panels [i.e., Preparent tests], which were introduced in early 2019." *Id.* As a result of the review, Progenity determined that "over the last 18 months, [it] received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020." *Id.*

In the Company's Form 10-Q, filed the following day, Progenity stated that while "the final analysis of the amount of the overpayment is still being completed," the Company took prophylactic action to accrue a $10.3 million charge for reimbursement "as a result of analysis to date." *Id.* ¶ 62. Moreover, the Company stated that its "deadline to report and return the overpayment to the government programs is 60 days from the time the overpayment was *determined and quantified*, thus the Company expects to repay this amount to the relevant government programs by early October 2020." *Id.* (emphasis added). In other words, the overpayment was not "determined and quantified" until *early August 2020*—well *after* the June 2020 IPO, but before the Company's second quarter financial statements were prepared. Finally, the Company confirmed that its financial statements reflecting the accrual of the $10.3 million reimbursement were "prepared in conformity with GAAP." Mircheff Decl. Ex. C at 31. The Company has not restated its financials, and Plaintiffs do not allege that any restatement occurred or was required.

### D.   Claims at Issue

The Amended Complaint asserts claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). Plaintiffs allege that the Offering

Materials contained false and misleading statements and failed to disclose: (1) the Company's overbilling of government payors by $10.3 million for Preparent tests, which Plaintiffs claim resulted in the Company overstating its revenues, Am. Compl. ¶ 5; and (2) negative trends with respect to the Company's testing volumes, average selling prices for its tests, and revenues, *id.* ¶ 8.  Plaintiffs assert a Section 11 claim (Count I) against the Company, certain of its officers and directors (the "Individual Defendants"), and the underwriters of the IPO.  *Id.* ¶¶ 170–78.  Plaintiffs further claim that Defendants violated Items 303 and 105 of SEC Regulation S-K, 17 C.F.R. §§ 229.303 & 229.105, by allegedly failing to disclose known trends or uncertainties and material facts and risks that existed at the time of the IPO, *id.* ¶¶ 156–60. Plaintiffs also assert control person liability claims under Section 15 (Count II) against the Individual Defendants.  *Id.* ¶¶ 179–86.

## III.   LEGAL STANDARDS ON A MOTION TO DISMISS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted).

Section 11 claims that "sound in fraud" must satisfy the heightened pleading standards of Rule 9(b).  *E.g.*, *Vess v. Ciba-Geigy Corp.*, *USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).  Plaintiffs allege that the Offering Materials were false and misleading because the Company "failed to disclose that Progenity had overbilled government health care programs for its . . . tests," Am. Compl. ¶ 5, and "was suffering from material negative trends with respect to [its] testing volumes, average selling prices for

8

its tests, and revenues," *id.* ¶ 8.  Plaintiffs claim that the Company was "aware of" or "knew" these issues, *id.* ¶¶ 6, 66, 87, 89–90, 124, 127–28, 148–49, and failed to disclose these "known" material trends and uncertainties as required by Item 303, *id.* ¶¶ 97–98, 100–02, 117, 139, 156–59.  Because the Amended Complaint attempts to ground liability on a "unified course of fraudulent conduct," Plaintiffs must "state with particularity the circumstances constituting fraud" by "set[ting] forth what is false or misleading about [the challenged] statement[s], and why [they are] false." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted).  "[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012); *cf.* Am. Compl. ¶ 172.  Thus, Plaintiffs must plead each challenged misstatement or omission with specificity, and their failure to do so defeats their Section 11 claim.

Regardless, Plaintiffs' Section 11 claim would not even satisfy Rule 8's notice pleading standards and should be dismissed because Plaintiffs fail to plead facts giving rise to a plausible claim that the Offering Materials contained material misstatements or omissions.

## IV.    ARGUMENT

To state a claim under Section 11, a plaintiff must plead facts demonstrating that a company's registration materials either "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]"  15 U.S.C. § 77k(a).  "To prevail in [a Section 11] action, a plaintiff must prove . . . that the [alleged] omission or misrepresentation . . . would have misled a reasonable investor about the nature of his or her investment." *Rubke*, 551 F.3d at 1161 (internal quotation marks omitted).  To plead a material misstatement, a plaintiff must plead contemporaneous facts showing that statements in the offering materials were false or misleading at the time of the

9

offering—not simply that events occurred after the IPO that were harmful to the company's business. *See, e.g., In re Stac Elecs.*, 89 F.3d at 1409; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (a plaintiff "cannot use the benefit of 20-20 hindsight to turn management's business judgment into" a securities violation) (internal quotation marks omitted). An alleged misstatement also must be considered in light of "cautionary language disclosing specific risks, [because] no reasonable inference can be drawn that a statement regarding those risk was misleading." *In re Worlds of Wonder*, 35 F.3d at 1413. The "bespeaks caution" doctrine "provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims" that the statements were false or misleading. *Id.* (internal quotation marks omitted).

Pleading a Section 11 claim on an omission theory is "no small task for an investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). "Section 11's omissions clause . . . is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Id.* "An omission 'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists' to be actionable." *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

### A.    Plaintiffs Fail to Plead Any Actionable Misleading Statement or Omission

#### 1.    Accrual of $10.3 Million Refund to Government Payors

Plaintiffs allege that statements in the Offering Materials regarding Progenity's financial statements, and billing, compliance, and revenue practices, were false as a result of the $10.3 million charge reported in August 2020. Am. Compl. ¶¶ 66, 69–75. Plaintiffs do not allege that Progenity knew about the overbilling, or that it would

10

require a $10.3 million refund, at the time of the IPO.  And Plaintiffs cannot dispute that Progenity prepared its financials in accordance with GAAP and specifically warned investors that it could be required to reimburse government payors who challenged Progenity's billing for its testing—facts that fatally undermine Plaintiffs' allegations that the financial statements in the Offering Materials were false and that investors were misled to believe that the prior regulatory settlement resolved every possible overbilling claim.  As set forth below, none of the statements Plaintiffs claim were false or misleading in light of the $10.3 million charge are actionable as a matter of law.

**i)  Financial Results.**  Plaintiffs claim that Progenity's financial statements for 2019 and the first quarter of 2020, which are included in the Offering Materials, were false and misleading because Progenity supposedly "overstated its revenues" and "understated its accruals for reimbursement claims and settlements for those periods" due to the subsequent $10.3 million refund.  Am. Compl. ¶¶ 69–70.  According to Plaintiffs, "[t]his, in turn, caused every financial metric derived in whole or in part from Progenity's reported revenue . . . [and] accruals for reimbursement claims and settlements to be similarly false." *Id.*  This conclusory assertion of falsity ignores basic accounting principles and fails to state a claim.

As Progenity explained in the Offering Materials, its "financial statements are prepared in accordance with GAAP."  Mircheff Decl. Ex. A at 8; *see also id.* at 4, 10, 13, 17.  Under GAAP, companies are required to account for contingencies in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 450.  *See* Mircheff Decl. Ex. D at 33, 35.[3]  ASC 450 defines a "loss contingency" as "[a]n existing condition, situation or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately

---

[3]  Accounting guidance, such as that promulgated by FASB, is subject to judicial notice and reference.  *See, e.g., In re Seracare Life Scis., Inc.*, 2007 WL 935583, at *4 (S.D Cal. Mar. 19, 2007).

be resolved when one or more future events occur or fail to occur." *Id.* at 39. A loss contingency must be accrued (i.e., reflected in the financial statements) if it is probable that a liability has been incurred as of the date of the financial statements and the amount of the loss can be reasonably estimated. *Id.* at 41–42. "The purpose of th[e]se conditions is to require accrual of losses when they are reasonably estimable and relate to the current or a prior period." *Id.* at 42.

No facts are pleaded in the Amended Complaint suggesting that the $10.3 million charge was required to be accrued at the time of the IPO. In fact, as the Amended Complaint alleges, the overpayment was not "determined and quantified" by Progenity until six weeks *after* the IPO, shortly before Progenity filed its Form 10-Q for the second quarter of 2020, on August 14, 2020. Am. Compl. ¶ 62; *see supra* at 7. Thus, the overbilling and the $10.3 million accrual could not have been disclosed or factored into Progenity's financial statements in the Offering Materials. Consistent with GAAP, the Company accrued the refund for the overpayment—i.e., the loss— when it was "probable" and "reasonably estimable," in August 2020. And for the same reason, the $10.3 million charge cannot be a material omission because this fact did not exist at the time Progenity filed the Registration Statement. *See Rubke*, 551 F.3d at 1164 ("A claim under section 11 based on the omission of information must demonstrate that the omitted information existed at the time the registration statement became effective."); *see also In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 865 (N.D. Cal. 1993), *aff'd in relevant part*, *In re Worlds of Wonder*, 35 F.3d 1407.[4]

[4] Courts routinely hold that the failure to allege specific facts supporting a conclusion that a company knew about the allegedly omitted information at the time of the IPO dooms Section 11 claims. *See, e.g.*, *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *5 (E.D.N.Y. Apr. 22, 2020) ("The relevant inquiry is not whether the issues had materialized prior to the IPO, but whether the facts were known to Defendants at the time of the IPO." (citing *Omnicare*, 575 U.S. at 196)); *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 26, 2009) ("[I]t is 'not a reasonable inference' to assume prior knowledge based upon actual knowledge at a later date." (quoting *Scibelli v. Roth*, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000))); *Lin. v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("A cognizable claim under Section 11 . . . requires

*(Cont'd on next page)*

12

Gibson, Dunn & Crutcher LLP

MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
CASE NO. 20CV1683-CAB-AHG

Progenity never corrected or restated its financials, nor do Plaintiffs allege that Progenity was required to do so.  *See* Mircheff Decl. Ex. C at 29–30 (describing $10.3 million accrual and not indicating that Progenity would correct or restate its financials).  The Company simply accrued a liability in accordance with GAAP—when the liability was reasonably estimable.  Plaintiffs' assertion that Progenity's financial statements were false because the Company later discovered a loss contingency and took a $10.3 million charge is at odds with basic accounting principles, and fails to state a claim.

**ii) Risk Factor Disclosures.**  Plaintiffs also cannot cast the Company's "risk factor" disclosures regarding its billing, compliance, and business practices as misstatements.  *See* Am. Compl. ¶¶ 66, 71, 73–75.  Risk factor disclosures, which the SEC instructs companies to make, are "'discussion[s] of the material factors that make an investment in the registrant or offering speculative or risky.'"  *Id.* ¶ 160 (quoting 17 C.F.R. § 229.105(a)).  In the Offering Materials, Progenity warned investors of key risks to its business, including risks that ultimately came to bear and resulted in the $10.3 million charge.  For example, Progenity warned investors that:

- "use of a [new] CPT code for [Preparent] tests . . . may . . . cause reimbursement for our Preparent . . . tests to decline," Am. Compl. ¶ 66;

- "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code," *id.* ¶ 71;

- "[f]ailure by our sales, billing, marketing, or other personnel to follow our [compliance] policies and comply with applicable laws may subject us to . . . refunding of payments received by us," *id.* ¶ 73;

- "third-party payors may . . . seek repayment from us of amounts previously reimbursed," *id.*;

---

plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." (internal quotation marks and citation omitted)); *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) ("Appellants argue that numerous statements made by the Appellees after the registration statement was issued show that Acceptance's reserves were inadequate at the time of issuance.  However, this type of retrospective analysis of awareness cannot be the basis for a claim.").

13

- "[t]hird-party payors may decide to . . . recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received," *id.* ¶ 74; and

- "[w]e may also decide to negotiate and settle with a third-party payor in order to resolve an allegation of overpayment," *id.*

Plaintiffs claim these risk factors were "false and misleading" because they supposedly "presented as . . . mere hypothetical risk[s]" issues that were already affecting the Company and "failed to disclose that Progenity had overbilled government payors for Preparent tests and so had to refund $10.3 million to them." Am. Compl. ¶ 74; *see also id.* ¶¶ 66, 71, 73, 75. But Plaintiffs are merely repeating their baseless, conclusory argument that the Company was required to disclose that it had overbilled government payors for Preparent tests *before* Progenity had determined and quantified the issue. *See id.* ¶ 62 (alleging Progenity "determined and quantified" the billing issue in August 2020—nearly two months *after* the IPO); *supra* at 7, 12. "The Ninth Circuit has noted that 'risk factors' are not actionable [under Section 11] without further factual allegations indicating that the risks had already 'come to fruition.'" *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *6 (N.D. Cal. July 21, 2020) (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 564 U.S. 27); *see also Baker v. Seaworld Entm't, Inc.*, 2016 WL 2993481, at *12 (S.D. Cal. Mar. 31, 2016) (holding that risk factor disclosures were not false or misleading because "[p]laintiffs . . . fail to plausibly allege Defendants knew that the [cautioned risks] were having any impact" at the time of the IPO). Progenity's risk disclosures also "are not actionable" because Plaintiffs merely contend that Progenity "should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results." *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (granting motion to dismiss for failure to state a claim); *see also In re Foundry Networks, Inc.*, 2002 WL 32354617, at *7 (N.D. Cal. June 6, 2002) ("Plaintiffs . . . cannot state a claim based on the disclosure of risk

14

factors."); *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) ("[W]arnings regarding potential adverse factors are not actionable as a matter of law.").

Moreover, Plaintiffs inaccurately describe the risk disclosures themselves. For example, Plaintiffs mistakenly assert that the risk disclosures warned only of potential risks when, according to Plaintiffs, Progenity already had experienced "billing compliance failures." Am. Compl. ¶ 73. That is not what the risk disclosure actually said. Progenity warned that "we *have experienced* situations in which employees may have failed to fully adhere to our policies . . . *in the past*." *Id.* (emphases added). Plaintiffs also claim that the Company "represented that Progenity used appropriate billing codes." *Id.* ¶ 71. Not so. Rather, Progenity stated "[w]e currently submit for reimbursement using CPT codes that we *believe* are appropriate for our testing." *Id.* (emphasis added). To state a claim for a false or misleading statement of opinion or belief, a plaintiff must plead that the "speaker d[id] not honestly hold the stated belief and the belief is objectively incorrect." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (citing *Omnicare*, 575 U.S. at 183–84). Plaintiffs plead no facts to support either prong.

For all these reasons, Plaintiffs fail to adequately plead that the risk factor warnings in Progenity's Offering Materials were false or misleading.

**iii) Settlement with the DOJ and the State of New York.** Plaintiffs contend that Progenity misled investors when describing the Company's $49 million settlement with the DOJ and the State of New York because, according to Plaintiffs, Progenity "indicated that all of [its] overbilling of government payors would be resolved by the $49 million settlement." Am. Compl. ¶ 75. Once again, Progenity never said that. Rather, the Offering Materials stated that the Company "reached an agreement on the monetary terms with the DOJ and the State of New York . . . to resolve all of the government's outstanding civil and criminal investigations" pursuant to which it would "pay $49.0 million in the aggregate." *Id.* Contrary to Plaintiffs' allegation, Progenity never said that the $49 million settlement resolved all possible claims for overbilling.

15

And Progenity warned investors that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code." *Id.* ¶ 71; *see also id.* ¶ 74 (explaining that Progenity "may be required to refund reimbursements already received"). Progenity even warned of future potential settlements "to resolve an allegation of overpayment," which "could have a material and adverse effect on our business, operating results, and financial condition." *Id.* ¶ 74. Moreover, as Plaintiffs acknowledge, the $49 million settlement with the DOJ and the State of New York involved the Company's "NIPT" or Innatal tests, *see id.* ¶¶ 47, 49, 50, 76, while the $10.3 million reimbursement issue involved the *Preparent* tests, *see, e.g.*, ¶¶ 7, 62.

The statements regarding the prior settlement were accurate; no reasonable investor could have been misled into believing that the prior settlement resolved every conceivable overbilling claim.

**iv) Revenue Recognition Practices.** Plaintiffs claim that the Offering Materials misstated Progenity's revenue recognition practices. Specifically, Plaintiffs allege that Progenity falsely stated that it recognizes revenue "in accordance with ASC 606." Am. Compl. ¶ 72. The Offering Materials explained that under ASC 606—the GAAP guidance covering "Revenue from Contracts with Customers"—"Revenue is primarily derived from providing molecular testing products, which are reimbursed through arrangements with third-party payors, laboratory distribution partners, and amounts from individual patients." Mircheff Decl. Ex. A at 11, 14. Plaintiffs plead no facts demonstrating that this statement was false, or that Progenity revenue recognition was *not* in accordance with ASC 606.

**2.    Negative Trends**

The same failure to identify any false or misleading statement in the Offering Materials forecloses Plaintiffs' claim that Progenity failed to warn of "material negative trends." Am. Compl. ¶ 8. According to Plaintiffs, Progenity misled investors into believing that the Company's testing volumes, average price per test, and revenue were increasing, rather than declining, at the time of the IPO. *Id.* ¶¶ 8, 105. These

16

allegations are premised on the supposed omission of information, rather than a misrepresentation—namely, that the Company failed to disclose as much declining testing, sales, and revenue data as Plaintiffs would have liked. *See id.* ¶¶ 97–98, 100–02. But Section 11 "affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading," *Omnicare*, 575 U.S. at 194, and the burden is on the plaintiff to demonstrate the omission "affirmatively created an impression of a state of affairs that differs in a material way from the one that actually exists," *In re Dropbox Sec. Litig.*, 2020 WL 6161502 at *6. Plaintiffs fail to carry this burden because the precise facts Progenity disclosed—namely, that with the onset of the COVID-19 pandemic, the Company's business had declined and there was no assurance it would rise again, *see* Am. Compl. ¶ 102—were entirely consistent with the supposedly omitted information.

**i) Testing Volumes.** Plaintiffs contend that statements in the Offering Materials concerning Progenity's testing volumes were false and misleading because they omitted data in a manner that misled investors into believing that testing volumes were increasing, when, according to Plaintiffs, volumes were actually declining at the time of the IPO. *See* Am. Compl. ¶¶ 97–98, 100–05. For example, Plaintiffs claim that Progenity supposedly failed to disclose that testing volumes were "sharply lower" in April and May 2020 and likely to remain depressed. *Id.* ¶¶ 97–98, 100–02. The alleged effect of these purported omissions is that, according to Plaintiffs, "investors reasonably . . . understood that Progenity's test volumes were growing at the time of the IPO, and were positioned for continued growth in the near future." *Id.* ¶ 105.

But these alleged omissions do not render any statement in the Offering Materials false or misleading. To the contrary, Progenity repeatedly explained exactly what Plaintiffs now allege it omitted: declines in testing volumes, which might not recover. The Company explicitly stated "*[b]eginning in March 2020*, we began to observe significant declines in the volume of our . . . tests . . . due to the impact of the COVID-19 pandemic," Am. Compl. ¶ 102 (emphasis added), and that "there can be no

17

assurance that the rate of *decline in our testing* volumes *will not continue* or accelerate in future periods." *Id.* (emphases added).  Even more, Progenity stated that "[t]he spread of COVID-19, which has caused a broad impact globally, may materially affect us economically, including a *significant reduction in laboratory testing volumes*." *Id.* ¶ 104 (emphasis added).  Accordingly, Progenity's purported failure to include April and May 2020 testing volumes data could not "render[] a published statement misleading," *Omnicare*, 575 U.S. at 194, because the Offering Materials adequately characterized ongoing declines in testing volumes—*beginning* in March due to COVID-19.  And Plaintiffs' claim that statements regarding "growth rate" and "volume growth" were misleading, *id.* ¶¶ 100, 101, also goes nowhere because, as the Offering Materials made clear, these were statements about growth and volume "[s]ince our inception," *id*.  No reasonable investor would think that these statements about Progenity's historical growth dating back to 2010, when read together with the explicit warnings that testing volumes and revenue had declined in the most immediate period before the IPO, misled investors into believing that Progenity's testing volumes were on the uptick and likely to increase following the IPO.

Plaintiffs other allegations that the Offering Materials failed to warn of decreasing testing volumes are entirely conclusory and fail to establish that anything Progenity said was false or misleading, or contained any actionable omission.  For example, Plaintiffs claim that, in addition to the COVID-19 pandemic, the decline in testing volumes was due to "Progenity's decision to let go 10% to 15% of its healthcare provider customers and to discontinue the flexible billing policy."  Am. Compl. ¶ 82.  But rather than pleading facts showing that these decisions had been made before the IPO and caused the decline in testing volumes, Plaintiffs merely speculate "that these cuts had been made – or at least planned – at the time of the IPO" and assume that these supposed facts were related to negative trends in testing volumes.  *Id.* ¶ 85.  And, of course, Progenity already warned investors that its testing volumes were declining prior to the IPO.

18

Nor do any of the allegations attributable to Confidential Witnesses ("CWs") demonstrate that any statement in the Offering Materials was false in light of the disclosed negative trend in testing volumes. *See* Am. Compl. ¶¶ 90–95, 128, 147. "When confidential witnesses report only unreliable hearsay or allege conclusory assertions, these allegations are insufficient." *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at \*13 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009)). Here, the CWs' conclusory and anecdotal statements only confirm what the Company disclosed in the Offering Materials—that testing volumes had declined in the period before the IPO—or provide additional context for the disclosures. For example, CW1 and CW2 assert that Progenity's testing volumes, which drive sales volumes, declined in the spring of 2020 during the pandemic. *See* Am. Compl. ¶¶ 90–91. The Offering Materials disclosed just that. *See id.* ¶¶ 102, 104. Similarly, CW3 asserts that she was laid off in July 2020 because Progenity's business was underperforming. *See id.* ¶ 93. And according to CW4 and CW5, Progenity had access to real-time business, sales, and revenue data. *See id.* ¶¶ 94–95. None of that is inconsistent with what Progenity disclosed: that its testing volumes were declining. **Critically, not one of the CWs point to any actual statement in the Offering Materials that was false or misleading.**

Plaintiffs fail to plead that any statement in the Offering Materials was false or misleading on account of Progenity's alleged failure to say more about what it already disclosed in the Offering Materials—that its testing volumes had declined with the onset of the COVID-19 pandemic.

**ii) Average Selling Prices.** Plaintiffs' claim that the Offering Materials omitted that the average selling price ("ASP") for its tests was decreasing, *see* Am. Compl. ¶¶ 108–33, also fails. There is only a single reference to ASP in the Offering Materials: "[h]igher gross margins reflect the average selling price of our tests, as well as the operating efficiency of our laboratory operations." *Id.* ¶ 43. Plaintiffs do not claim that this statement was false or misleading. Nor do Plaintiffs identify any other

19

statement in the Offering Materials that supposedly was rendered false or misleading by the alleged decline in Progenity's ASPs.  Plaintiffs plead no misstatement or omission related to ASPs.

**iii) Decreasing Revenues.**  Plaintiffs' theory that Progenity failed to disclose a trend of decreasing revenues, *see* Am. Compl. ¶¶ 134–52, also makes no sense in light of what the Company plainly disclosed: that its revenues had decreased.  The Offering Materials set out Progenity's revenue figures for the first quarter of 2020, illustrating declines from the prior year and noting that revenues were down by 64.6% compared to the same period in 2019.  Mircheff Decl. Ex. A at 9.  The Offering Materials further warned that "[i]t is possible that we will not generate sufficient revenue from the sale of our products to cover our costs."  *Id.* at 6.  Plaintiffs cannot support a claim that Progenity failed to disclose declining revenue when, in fact, declining revenue was disclosed.

**B.    Plaintiffs Cannot Use Items 303 and 105 of Regulation S-K as Bases for Their Section 11 Claim**

Having failed to allege a material misstatement or omission, Plaintiffs attempt to recast their inadequate Section 11 claim as a violation of Items 303 and 105 of SEC Regulation S-K.  *See* Am. Compl. ¶¶ 156–60.  These claims also fail.

To the extent Item 303 could be a basis for a Section 11 claim, Plaintiffs fail to plead that Progenity violated any disclosure duty under Item 303.[5]  Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably

---

[5]  It is unclear whether a violation of Item 303 can even give rise to a Section 11 claim.  Although the Ninth Circuit has stated that "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11," *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998), it has also held that "a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under" Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014) (internal quotation marks omitted).  Because the "duty to disclose under Item 303 is much broader than what is required under the standard pronounced in *Basic* [*Inc. v. Levinson*, 485 U.S. 224, 231 (1988)]," which defines materiality for both Section 11 and Section 10(b), the principal espoused by *NVIDIA* applies with equal force to a Section 11 claim.

20

likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). And while Regulation S-K "governs the disclosure of known historic trends," it "does not provide a basis of liability where a corporation fails to disclose the future." *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (internal quotation marks omitted). Progenity could not have disclosed the $10.3 million charge as a "known trend[] or uncertainty" because there is no allegation that it knew about that specific billing issue at the time. And Progenity made all required disclosures related to known, historical trend data regarding testing volume, average selling prices, and revenues. *See supra* at 17–20. Item 303 of Regulation S-K did not require the Company to make future projections based on those trends, as Plaintiffs allege. *See, e.g.*, Am. Compl. ¶ 97 (alleging that the Company "failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed"). Progenity disclosed that testing volumes and revenue had declined in light of the COVID-19 pandemic, and there was no assurance that these would increase following the IPO. In other words, even crediting Plaintiffs' allegations, Progenity disclosed the "trends" that Plaintiffs claim were "known" and "negative."

Nor can Plaintiffs establish liability under Item 105, which requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Again, Progenity's Offering Materials warned investors of the potential impact of overbilling government payors and declining testing volume and revenues associated with the COVID-19 pandemic, which Progenity told investors may not reverse following the IPO. *See supra* at 5–6. Item 105 requires only a "discussion" of such risks, not clairvoyance—a standard plainly met here. *See In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *8 (dismissing an Item 105 claim where "risk disclosures discuss exactly these possibilities" alleged in the complaint).

21

Plaintiffs' attempts to shoehorn Items 303 and 105 allegations into its Section 11 claim therefore fail.

### C.      Plaintiffs Fail to State a Claim Under Section 15

Section 15 imposes liability on any "person who . . . controls any person liable under" Section 11.  15 U.S.C. § 77o(a).  "Before liability may be imposed under § 15, there must be a primary violation of the securities laws."  *In re Orange 21 Inc. Sec. Litig.*, 2006 WL 8455352, at *4 (S.D. Cal. Mar. 30, 2006) (citation omitted).  "Because the [Amended Complaint] fails to adequately plead a primary violation under the Securities Act . . . the claims brought under § 15 of the Securities Act" necessarily fail. *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at *13 (S.D. Cal. Mar. 28, 2013), *aff'd sub nom. Fresno Cty. Emps. Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).

## V.      CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court dismiss the Amended Complaint with prejudice.

22

Gibson, Dunn & Crutcher LLP

Dated: April 5, 2021

GIBSON, DUNN & CRUTCHER LLP

By: _s/ Alexander K. Mircheff_
Brian M. Lutz
Jeffrey S. Rosenberg
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Email: blutz@gibsondunn.com
Email: jsrosenberg@gibsondunn.com

Alexander K. Mircheff
Caroline K. Monroy
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Email: amircheff@gibsondunn.com
Email: cmonroy@gibsondunn.com

*Attorneys for Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell*

O'MELVENY & MEYERS LLP

By: _s/ Daniel L. Cantor_
Matthew W. Close
Meg K. Lippincott
Yuan (Grace) Zhong
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: 213.430.6000
Email: mclose@omm.com
Email: mlippincott@omm.com
Email: yzhong@omm.com

Daniel L. Cantor
Times Square Tower
7 Times Square
New York, NY 10036-6537
Telephone: 212.326.2000
Email: dcantor@omm.com

*Attorneys for Defendants Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG LLC*

23

Gibson, Dunn & Crutcher LLP

**SIGNATURE CERTIFICATION**

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable to the above listed counsel, and that I have obtained authorization to affix all electronic signatures to this document.

Dated: April 5, 2021        GIBSON, DUNN & CRUTCHER LLP

By: *s/ Alexander K. Mircheff*
Alexander K. Mircheff

Gibson, Dunn & Crutcher LLP