ROBERT V. PRONGAY (#270796)
  *rprongay@glancylaw.com*
CASEY E. SADLER (#274241)
  *csadler@glancylaw.com*
GARTH A. SPENCER (#335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No. 3:20-cv-01683-CAB-AHG **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** Judge: Hon. Cathy Ann Bencivengo |

---

## TABLE OF CONTENTS

I.     INTRODUCTION ..........................................................................................1

II.    STATEMENT OF FACTS ...........................................................................2

       A.    Background Regarding Progenity's Business ..........................................2

       B.    Progenity Overbilled Government Payors By $10.3 Million For Preparent Tests During 2019 And Early 2020 ......................................3

       C.    Progenity Suffered From Negative Trends In Key Financial Metrics Leading Up To The June 2020 IPO ......................................................3

             1.    Test Volumes ..................................................................................3

             2.    Test Average Selling Prices ............................................................4

             3.    Revenues .........................................................................................4

       D.    Defendants Sold $100 Million Of Overpriced Stock In The IPO Pursuant To The Negligently Prepared Registration Statement .............5

III.   PLAINTIFFS FACE A MINIMAL PLEADING BURDEN UNDER THE SECURITIES ACT ...............................................................................5

IV.    PLAINTIFFS' CLAIMS ARE NOT GROUNDED IN FRAUD......................6

V.     THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATIONS OF SECURITIES ACT SECTION 11 .........................................................8

       A.    Misrepresentations And Omissions Relating To $10.3 Million In Preparent Test Overbilling ...................................................................8

             1.    Progenity's Preparent Overbilling Existed And Was Knowable At The Time Of The IPO .............................................................8

             2.    Reported Revenue Recognition Practices And Financial Results Were False And Misleading ......................................................11

             3.    Billing Related Risk Factors Were False And Misleading .........14

             4.    Progenity's Professed "Belief" That It Used Appropriate Billing Codes Was False And Misleading ............................................16

i

OPPOSITION TO MOTION TO DISMISS                                    Case No. 20cv01683

5.    Statements Regarding The Innatal Overbilling Settlement Were False And Misleading ....................................................17

6.    Omission Of Preparent Overbilling Violated Item 303 and Item 105, And Was False And Misleading .........................................17

B.    Misrepresentations And Omissions Relating To Negative Trends In Test Volumes, Average Selling Prices, And Revenues ........................19

1.    The CWs Reliably Show Progenity Knew Of Negative Trends 20

2.    Test Volumes ....................................................20

3.    Test Average Selling Prices.........................................23

4.    Revenues .......................................................24

VI.    THE AMENDED COMPLAINT ALLEGES A VIOLATION OF SECURITIES ACT SECTION 15 ................................................25

VII.    CONCLUSION .....................................................25

ii

# TABLE OF AUTHORITIES

CASES

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)..................................................................................14

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ........................................................................15, 23

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020).......................................................7, 17

*Coronel v. Quanta Cap. Holdings Ltd.*,
  2009 WL 174656 (S.D.N.Y. Jan. 26, 2009).............................................................9

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017)..........................................................................16

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ..............................................................................25

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)....................................................................................2, 4, 6

*In re Acceptance Ins. Cos. Sec. Litig.*,
  423 F.3d 899 (8th Cir. 2005) ................................................................................10

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020)..........................................................9

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ............................................................................7

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .......................................................................*passim*

*In re Foundry Networks, Inc.*,
  2002 WL 32354617 (N.D. Cal. June 6, 2002)........................................................15

OPPOSITION TO MOTION TO DISMISS                                   Case No. 20cv01683

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008)....................................................................14

*In re LeapFrog Enters., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007)....................................................................15

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ................................................................................18

*In re Peregrine Sys., Inc. Sec. Litig.*,
  2005 WL 8158825 (S.D. Cal. Mar. 30, 2005)........................................................13

*In re Restoration Robotics, Inc. Sec. Litig.*,
  417 F. Supp. 3d 1242 (N.D. Cal. 2019)..............................................................17, 18

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..................................................................................6, 7

*In re Silver Wheaton Corp. Sec. Litig.*,
  2016 WL 3226004 (C.D. Cal. June 6, 2016)..........................................................14

*In Re Violin Memory Sec. Litig.*,
  2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ........................................................6, 7

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..................................................................................13

*Lin v. Interactive Brokers Grp., Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008) ....................................................................10

*Mingbo Cai v. Switch, Inc.*,
  2019 WL 3065591 (D. Nev. July 12, 2019)............................................................7

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..........................................................................................*passim*

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ........................................................7

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) (denying motion ..................................8, 18

iv

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .......................................................... 14

*Rubke v. Capitol Bancorp Ltd*,
   551 F.3d 1156 (9th Cir. 2009) ............................................................................... 6, 8

*S.E.C. v. Cotton*,
   2006 WL 6382128 (C.D. Cal. Dec. 21, 2006) ........................................................ 13

*S.E.C. v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) ................................................................. 8, 18, 19, 25

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ............................................................................... 15

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ..................................................................... 18, 19, 20

*United States ex rel. Lee v. Colleges*,
   2012 WL 12878361 (C.D. Cal. Apr. 19, 2012) ...................................................... 13

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ............................................................................... 7, 8

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) .............................................................................................. 22

*W. Pennsylvania Elec. Emps. Pension Fund v. Mentor Graphics Corp.*,
   2018 WL 4524107 (D. Or. May 29, 2018) ............................................................. 15

*Zamani v. Carnes*,
   491 F.3d 990 (9th Cir. 2007) .................................................................................. 24

*Zeid v. Kimberley*,
   930 F. Supp. 431 (N.D. Cal. 1996) ........................................................................ 15

STATUTES

15 U.S.C. § 77k ......................................................................................................... 5

15 U.S.C. § 77k(a) .................................................................................................... 19

v

RULES

Fed. R. Civ. P. 15(a)(2).................................................................................................25

OPPOSITION TO MOTION TO DISMISS                                    Case No. 20cv01683

## I.     INTRODUCTION

This is a securities class action under the strict liability provisions of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons who purchased Progenity's shares in or traceable to its initial public offering ("IPO").[1] In the June 2020 IPO, Defendants were able generate over $100 million in gross proceeds. However, the registration statement and prospectus for the IPO (collectively, "Registration Statement"), which enabled this massive windfall, were negligently prepared and omitted material facts.

Prior to the IPO, the Company had overbilled government healthcare programs by $10.3 million, or nearly 25% of its 2019 gross profits, for one of its two main products, the Preparent test. Defendants claim that there "are no facts demonstrating that anyone at Progenity knew at the time of the IPO of the billing issues." Mot. at 2. Ignoring that this completely misstates the standard at issue and Plaintiffs do not have to demonstrate actual knowledge, Defendants are simply wrong and their claim is not credible. Prior to the IPO, the Company had already stopped overbilling the government by using an incorrect billing code – the correct one had been in effect since the beginning of 2019. Additionally, the Company had already admitted to a nearly identical pattern of overbilling government payors for Progenity's other main product, the Innatal test. Moreover, the Company even recognized a $10.3 million liability for the second quarter of 2020, the same quarter in which the IPO was completed with mere days left. As such, Defendants' claim

---

[1] Unless otherwise defined, capitalized terms herein have the same meaning as in the Amended Class Action Complaint for Violations of the Securities Act of 1933 [Doc. No. 38] ("Amended Complaint"). All "¶__" citations refer to the Amended Complaint, and all "Mot." citations refer to Defendants' memorandum in support of their motion to dismiss [Doc. No. 40-1]. "Defendants" includes Progenity, Inc. ("Progenity" or the "Company"), the Individual Defendants (¶¶19-26) and the Underwriter Defendants (¶¶28-32). Unless otherwise indicated, all emphasis is added and all internal quotation marks, footnotes, and citations are omitted.

1

that they could not have even been aware of this risk is simply unbelievable, and Defendants' failure to disclose Progenity's Preparent overbilling is actionable.

Likewise, at the time of the IPO, Progenity knew of severe negative trends in test volume, average selling prices, and revenue. The Company was aware of these trends since it monitored this information in real-time through regular, customized reports and internal data systems such as Salesforce and Tableau. Progenity in fact exacerbated these negative trends through conscious choices such as slashing cash prices for tests, firing customers, and discontinuing the flexible billing policy that had been Progenity's main selling point. However, not only did Defendants fail to disclose these trends to IPO investors, Progenity went so far as to falsely claim "the growth rate of our test volume is accelerating."

Now, after the market has learned the truth, wiping out millions of dollars in investors' money, Defendants cobble together disparate statements in an attempt to rewrite the Registration Statement, simply ignore controlling authority, and make a variety of specious arguments in order to escape liability. This revisionist text and other straw-man arguments cannot defeat the Amended Complaint's well-pled allegations, which make clear that the Registration Statement was materially false and misleading and failed to provide investors with the required disclosures mandated under the federal securities laws. In a Section 11 case under the Securities Act, an investor "need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Plaintiffs have undoubtedly pled their *prima facie* case here.

## II.    STATEMENT OF FACTS

### A.    Background Regarding Progenity's Business

During the IPO, Progenity was focused on developing and commercializing molecular tests and precision medicines. ¶35. Its most important products were the Innatal noninvasive prenatal test ("NIPT") and the Preparent expanded carrier screen, which generated a significant portion of the Company's revenue. ¶¶40-42.

OPPOSITION TO MOTION TO DISMISS                         Case No. 20cv01683

Progenity generated almost all of its revenue by billing government healthcare programs and commercial insurance providers. ¶¶44-45. As such, test volumes and test average selling prices were Progenity's key performance indicators. ¶43.

Shortly before the IPO, the Company announced an agreement to pay $49 million to settle claims including overbilling of government payors for NIPT tests. ¶¶47-52. Progenity referred to the misconduct as "discontinued legacy . . . practices," and assured investors that the agreement would "resolve all of the government's outstanding civil and criminal investigations." ¶¶47-48.

**B.    Progenity Overbilled Government Payors By $10.3 Million For Preparent Tests During 2019 And Early 2020**

Progenity overbilled government payors for Preparent tests during 2019 and "early 2020," for which it would imminently have to refund $10.3 million. ¶¶59-67. This refund liability represented nearly 25% of Progenity's 2019 gross profits. ¶77. The fact of this Preparent overbilling existed at the time of the June 2020 IPO. Progenity had been under investigation for overbilling the government for Innatal tests since April 2018, using a strikingly similar pattern of continuing to request payments using incorrect and outdated (but significantly more lucrative) billing codes. ¶67. Progenity in fact ceased overbilling the government for Preparent tests prior to the IPO in "early 2020," and the IPO Prospectus reveals that the Company was already aware of the correct CPT billing code it should have used. ¶¶65-66. Progenity accrued its $10.3 million refund liability in the second quarter (*i.e.* April-June) of 2020, and completed the IPO over June 19-23, 2020. ¶¶55-57, 65.

**C.    Progenity Suffered From Negative Trends In Key Financial Metrics Leading Up To The June 2020 IPO**

During the IPO, Progenity was suffering from deteriorating trends in the key metrics of test volume, test prices, and revenues. ¶¶82-95, 108-28, 134-49.

**1.    Test Volumes**

In 2019, the Company averaged over 82,000 tests per quarter (over 27,000 tests per month), as compared to 79,000 tests in the first quarter of 2020 (over

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

26,000 per month). ¶82. However, it completed only 24,000 tests in April and 23,000 tests in May. *Id.* Progenity knew of this trend in June 2020 because it had access to detailed, real-time information on test volumes from multiple sources. ¶¶87, 90-91, 94-95. This trend of declining test volumes was due to factors known at the time of the IPO: (i) beginning in March 2020 COVID pandemic lockdowns significantly decreased demand for Progenity's core products [¶¶87, 89-91], (ii) the Company decided to cease doing business with 10% to 15% of its healthcare provider customers [¶¶85, 89, 93], and (iii) in March 2020 Progenity discontinued the flexible billing policy that had previously been its main selling point [¶92].

### 2. Test Average Selling Prices

The Company had an average selling price ("ASP") for its tests of approximately $438 in 2019, decreasing to $380 in the first quarter of 2020. ¶109. Second quarter 2020 ASP was on track to fall even further, to approximately $368. *Id*. Progenity knew of this trend in June 2020 because it had access to detailed, real-time information on test volumes and revenues, which determine ASP. ¶¶91, 94-95, 124-25. This trend was due to factors known at the time of the IPO: (i) beginning in March 2020 the Company's product mix shifted away from higher-priced Preparent tests and toward lower-priced Innatal and COVID-19 tests, brought about by changes in customer behavior due to the COVID-19 pandemic [¶¶113-15, 121-22, 127], (ii) Progenity had to cease overbilling for Preparent tests prior to the IPO in "early 2020" [¶¶65, 127], and (iii) in March 2020 Progenity decreased the cash prices of its Preparent and Innatal tests by more than 50% [¶¶128].

### 3. Revenues

Second quarter 2020 revenue was on track to drop 8% compared to the first quarter, and more than 50% compared to the prior year. ¶134. Progenity knew of this trend in June 2020 because it had access to detailed, real-time information on revenues and test volumes (a leading indicator for revenues). ¶¶87, 90-91, 91, 94-95, 147, 149. This trend was due to factors known at the time of the IPO, as discussed

OPPOSITION TO MOTION TO DISMISS                                    Case No. 20cv01683

*supra*: (i) overbilling repayments such as the $10.3 million Preparent refund accrual, (ii) negative trends in test volumes, and (iii) negative trends in ASP. ¶¶138, 148.

### D.   Defendants Sold $100 Million Of Overpriced Stock In The IPO Pursuant To The Negligently Prepared Registration Statement

The Registration Statement used by Defendants to sell stock in the IPO negligently failed to disclose the foregoing facts regarding Preparent test overbilling and negative trends in key financial metrics. ¶58. Defendants conducted the IPO over June 19-23, 2020, selling 6,666,667 shares of Progenity common stock at $15 per share, generating gross proceeds of over $100 million. ¶¶55-57. Shortly after the IPO, on August 13, 2020 Progenity revealed that it would have to refund $10.3 million to overbilled government payors. ¶¶60-63. The Company also announced substantial declines in test volumes (¶¶83-84), ASP (¶¶112-15), and revenue (¶¶136-38) for the second quarter of 2020. Progenity's stock price promptly fell 13.8% to $7.71 per share. ¶81. After Progenity revealed poor third quarter ASP (¶¶116-17) and revenues (¶139) on October 29, 2020, caused by the same negative trends omitted from the Registration Statement, its stock fell by an additional 44.5% to only $4.27 per share, or less than one-third of the IPO price. ¶117 n.10.

### III.   PLAINTIFFS FACE A MINIMAL PLEADING BURDEN UNDER THE SECURITIES ACT

On a motion to dismiss, courts accept the complaint's allegations as true and construe them in the light most favorable to the non-moving party. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005).

To state a *prima facie* claim under § 11 of the Securities Act, a plaintiff need only plead that he acquired a security pursuant to a registration statement that: (1) contained an untrue statement of fact; (2) omitted a material fact required to be stated therein; or (3) omitted a material fact necessary to make the statements made not misleading. 15 U.S.C. § 77k; *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). The Securities Act "protects investors by ensuring that companies issuing securities . . . make a full and fair

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

disclosure of information relevant to a public offering." *Omnicare*, 575 U.S. at 178. Section 11 "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. . . Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 381-82.

No scienter is required for liability under Section 11 (*Daou*, 411 F.3d at 1027) and "the heightened pleading standards of the PSLRA do not apply." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009). As such, "Section 11 places a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382.

## IV.    PLAINTIFFS' CLAIMS ARE NOT GROUNDED IN FRAUD

Though Plaintiffs' allegations are sufficiently particular even under Rule 9(b), Rule 8 applies here, which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." "This is not an onerous burden. Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014).

Section 11 allegations need only satisfy Rule 8 unless they are grounded in fraud. *Daou*, 411 F.3d at 1027. Defendants falsely claim that the Amended Complaint must satisfy Rule 9(b) since it alleges a "unified course of fraudulent conduct." Mot. at 9. This argument is incorrect and their citations in support are highly misleading. In both *Rigel* and *Rubke*, plaintiffs had alleged a ***fraud claim*** under the civil fraud statute (section 10(b) of the Securities Exchange Act of 1934) and then argued that this "unified course of fraudulent conduct" resulted in corresponding Securities Act violations. *See Rubke*, 551 F.3d at 1161 ("Where as here . . . a complaint employs the exact same factual allegations to allege violations of ***section 11*** as it uses to allege fraudulent conduct under ***section 10(b) of the Exchange Act***, we can assume that it sounds in fraud."); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012) ("although the ***section 11 claim*** does

6

not adopt all of the allegations contained in the rest of the complaint . . . it merely relies on the same alleged misrepresentations from the December 13, 2007 press release that are central to Plaintiff's **section 10(b) fraud claim**"). In this limited situation, the courts found that "a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." Mot. at 9 (quoting *Rigel,* 697 F.3d at 885).

Here, Plaintiffs do not allege a fraud claim so there cannot be a unified course of fraudulent conduct between fraud and non-fraud claims, and the gravamen of the complaint certainly does not sound in fraud. *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546 (N.D. Cal. 2009) ("Courts generally apply Rule 8 to Section 11 claims where *only* non-fraud bases for liability are pled or where such claims are adequately distinguished from fraud claims") (collecting cases).

Furthermore, Defendants argue that certain allegations, such as those regarding "known trends" made in connection with Plaintiffs' claims for violation of Item 303, necessarily sound in fraud. However, this argument ignores that such allegations are perfectly consistent with innocent or negligent failures to disclose (the essence of a Section 11 claim) those known trends, and do not require or even imply intent to deceive (the essence of a fraud claim). *See, e.g., Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020) (applying Rule 8 to Section 11 claims including Item 303 violations); *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (same); *Violin Memory*, 2014 WLWL 5525946, at *8 (same); *cf. Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) ("The issue is whether the above-described trends were 'known' for purposes of Item 303, not whether Defendants acted with fraudulent intent."). Defendants' citation to *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) supports Plaintiffs on this point. The Ninth Circuit held that despite being pled alongside fraud based claims, allegations that the

OPPOSITION TO MOTION TO DISMISS                                    Case No. 20cv01683

defendant negligently failed to disclose known information were not grounded in fraud and not subject to Rule 9(b). *E.g.*, *id.* at 1106-07 ("Vess alleges that Novartis . . . *negligently* failed to disclose its financial relationship with the APA and CHADD, *knowing* that the information would be important to those diagnosed with ADD/ADHD").

## V.   THE AMENDED COMPLAINT STATES A CLAIM FOR VIOLATIONS OF SECURITIES ACT SECTION 11

Plaintiffs under Section 11 need only show "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material." *Daou*, 411 F.3d at 1027. Defendants do not challenge materiality. Their falsity arguments fail as set forth below and because "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds [could] not differ." *Id.*; *see also Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 387 (N.D. Cal. 2020) (denying motion to dismiss where "there is room for reasonable disagreement" as to adequacy of disclosure).

### A.   Misrepresentations And Omissions Relating To $10.3 Million In Preparent Test Overbilling

#### 1.   Progenity's Preparent Overbilling Existed And Was Knowable At The Time Of The IPO

Progenity overbilled government payors by $10.3 million for its Preparent tests during 2019 and "early 2020." ¶¶61-63; *see supra* Part II.B. Defendants' primary argument regarding Preparent overbilling is that Plaintiffs have not plausibly alleged the relevant information existed at the time of the June 2020 IPO. Defendants are wrong. Defendants do not dispute that this overbilling in fact occurred prior to the IPO during 2019 and "early 2020," which by itself defeats their argument. *See Rubke*, 551 F.3d at 1164 ("A claim under section 11 based on the omission of information must demonstrate that the omitted information *existed* at

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

the time the registration statement became effective.").

In addition, the Amended Complaint sets forth ample allegations further showing that the fact of this overbilling was knowable at the time of the IPO. Progenity's own statements clearly indicate that the Preparent overbilling only continued into "early 2020" and ceased prior to the IPO. ¶65. Because Progenity continued to sell Preparent tests beyond the completion of the IPO, this shows that Progenity changed its Preparent billing practices prior to the IPO. At the time of the IPO, the Company was aware of the correct CPT billing code it should have used to bill for Preparent tests. ¶66. Such billing codes represent to payors which services were performed and therefore are a key determinant of reimbursement rates. *See* ¶50. Leading up to the IPO, Progenity had for two years been under governmental investigation for an almost identical pattern of overbilling with respect to its other main product, the Innatal test. ¶67. And the Company accrued a $10.3 million liability for the Preparent overbilling in the second quarter (April-June) of 2020, which ended only days after the IPO was completed. ¶¶55-57, 65.

Because the fact of the Preparent overbilling clearly existed and was knowable at the time of the IPO, Defendants resort to an attempt to re-write Section 11 by suggesting in a footnote that Plaintiffs must also allege Progenity in fact "*knew* about the allegedly omitted information at the time of the IPO." Mot. at 12 n.4. As the Ninth Circuit has confirmed, actual knowledge is not the standard. *E.g.*, *Daou*, 411 F.3d at 1027 ("No scienter is required for liability under § 11"). And Defendants' own cited cases contradict their specious argument. *See In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *5 (E.D.N.Y. Apr. 22, 2020) (plaintiffs must "demonstrate that allegedly omitted facts both existed, and were known *or knowable*, at the time of the offering").[2]

---

[2] *See also Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009) (inquiring whether "the Company knew *or had reason to* (footnote continued)

9

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

Defendants similarly argue that their statements and omissions regarding Preparent overbilling cannot be false because Progenity did not "determin[e] and quantif[y]" the amount of overbilling until August 2020.[3] But this argument, focusing on when Progenity claims to have first gained actual knowledge of the precise amount of its overbilling, fails to contradict Plaintiffs' claims that the fact of Preparent overbilling existed and was *knowable* at the time of the IPO. Regardless of when Progenity bothered to quantify its precise liability, the Registration Statement was required to disclose the existence of substantial Preparent overbilling.

In any event, Progenity possessed information from which even the dollar amount of Preparent overbilling was readily knowable at the time of the IPO. Prior to the IPO Progenity knew the correct CPT code it should have used for Preparent tests. ¶¶65, 66. CPT billing codes are a key determinant of reimbursement rates. *See* ¶50. Progenity had access to real-time data on its test volumes by test type, and on its revenues associated with different CPT billing codes. ¶¶91, 94-95, 147.

If Defendants did not attempt to quantify the Preparent overbilling prior to the IPO despite having this information,[4] that only bolsters Plaintiffs' claims

---

*believe*, at the time the Prospectus and Registration Statement were filed, that the statement was untrue"); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (plaintiffs must allege "the allegedly omitted facts both existed and were known *or knowable,* at the time of the offering"); *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) ("There is no scienter requirement for a Section 11 claim").

[3] Defendants misquote this language as "discovered and quantified." Mot. at 2; ¶62.

[4] Defendants' sole support for their argument that the overbilling amount was not "determined and quantified" until August 2020 is one sentence from the second quarter 2020 Form 10-Q: "The Company's deadline to report and return the overpayment to the government programs is 60 days from the time the overpayment was determined and quantified, thus the Company expects to repay this amount to the relevant government programs by early October 2020." ¶62. At the pleading stage, this sentence says little about what Progenity knew, and nothing about what (footnote continued)

10

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

because it is yet more evidence of the negligent preparation of the Registration Statement. To the extent that Defendants seek to imply that the Preparent overbilling was not *determinable* or *quantifiable* prior to August 2020, that is an unfounded assertion contradicting Plaintiffs' factual allegations, and so is impermissible at the pleading stage. *See Daou.* 411 F.3d at 1013.

### 2.    Reported Revenue Recognition Practices And Financial Results Were False And Misleading

Because of Progenity's undisclosed $10.3 million in overbilling, the Registration Statement's reported financial results and descriptions of revenue recognition practices were false and misleading. Progenity's 2019 and first quarter 2020 revenues were overstated by $10.3 million. ¶69. Liabilities accrued for reimbursement claims were understated by $10.3 million. ¶70. And Progenity falsely claimed to apply ASC 606 to recognize as revenue only expected payment amounts *net of probable future refunds*. ¶72.[5]

Defendants entirely fail to address Plaintiffs' ASC 606 allegations. Defendants do not discuss the statements Plaintiffs contend were false, or the reasons Plaintiffs gave for their falsity. *See* ¶72 (specifying false statements and grounds for falsity). Instead, Defendants quote irrelevant disclosure language that

---

was *knowable*, at any given time. Moreover, "determined and quantified" appears to be a technical term of art, and it is entirely likely that Progenity simply interpreted this term so as to delay its repayment obligation as long as possible.

[5] ASC 606 is an accounting standard published by the Financial Accounting Standards Board to "establish[] principles for reporting useful information to users of financial statements about the nature, amount, timing and uncertainty of revenue and cash flows arising from the entity's contracts with customers." ASC 606-10-05-02. "The core principle of [ASC 606] is that an entity recognizes revenue . . . in an amount that reflects the consideration to which the entity expects to be entitled." ASC 606-10-05-03. Estimates of variable consideration are recognized as revenue "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." ASC 606-10-05-04-c.

---

11

Plaintiffs have not challenged, and assert that this language was not false. Mot. at 16. Defendants then make the conclusory assertion that Plaintiffs allege no facts showing failure to comply with ASC 606. On the contrary, Plaintiffs' allegations clearly show that ever since the AMA introduced a new CPT code applicable to Preparent tests beginning January 1, 2019, it was "probable" that Progenity would experience "a significant reversal in the amount of revenue recognized" when it belatedly corrected its Preparent test overbilling, and so ASC 606 precluded Progenity from recognizing in revenue the overbilled amounts. *See* ¶¶62-63, 66, 72.

Defendants' primary argument as to the falsity of Progenity's financial results is that these were presented in accordance with GAAP, and in particular with ASC 450 (or at least the small fragments of ASC 450 that Defendants have chosen to submit with their motion). However, Progenity's claim that its "financial statements are prepared in accordance with GAAP" is merely a conclusory assertion that fails to rebut Plaintiffs' plausible allegations that Progenity violated ASC 606, overstated its revenues, and understated its refund liabilities. This professed GAAP compliance is further undermined by Progenity's admission of previous weaknesses in internal controls relating to revenue recognition and accrued liabilities. ¶46.

Defendants' ASC 450 arguments fail for several reasons. First, the language quoted by Defendants requires "accrual of losses when they are reasonably estimable," and as discussed *supra* (*see* Part V.A.1) prior to the IPO, Progenity had access to substantial information from which liability for Preparent overbilling was probable, and the dollar amount of such liability reasonably estimable.

Second, the ASC 450 language cited by Defendants speaks only to accrual of *liabilities*, and so cannot contradict Plaintiffs' allegations regarding improper *revenue* recognition in violation of ASC 606, nor do Defendants argue that ASC 450 somehow overrides the requirements of ASC 606. Mot. at 11-12. Third, ASC 450 is mentioned nowhere in the Registration Statement or the Amended Complaint, and Defendants provide nothing besides their own say-so and a few small fragments of

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

ASC 450 to support their claim that it applied to Progenity's Preparent overbilling.[6]

Fourth, the proper application of accounting standards requires complex factual determinations and is ill-suited to resolution on the pleadings. *S.E.C. v. Cotton*, 2006 WL 6382128, at *8 (C.D. Cal. Dec. 21, 2006) ("Whether Lantronix's accounting practices and Defendant's actions were consistent with GAAP is a question of fact, best resolved by expert testimony. . . the Court may not make such a factual determination at this pleading stage."); *United States ex rel. Lee v. Colleges*, 2012 WL 12878361, at *6 (C.D. Cal. Apr. 19, 2012) ("resolution of this dispute should not depend on an evaluation of the snippets of relevant accounting standards provided by the parties, but rather on a more complete factual record, including lay and expert testimony"). Fifth, even if Defendants' accounting:

> was arguably consistent with the terms of certain specific accounting standards, this would not insulate [Defendants] . . . as a matter of law from liability under securities laws, because under both GAAP and the securities laws, business entities . . . are required to provide whatever additional information would be necessary to make the statements in their financial reports fair and accurate, and not misleading.

*In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *40 (S.D. Cal. Mar. 30, 2005).

---

[6] Because ASC 450 is mentioned nowhere in the Amended Complaint and does not otherwise "form the basis" of Plaintiffs' allegations, it is not subject to incorporation by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *see also id.* ("Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint"). To the extent ASC 450 is subject to judicial notice, only its contents may be noticed and not Defendants' proposed interpretation or application thereof. *See id.* at 1000 ("It is improper to judicially notice a transcript when the substance of the transcript is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes."). Similarly, to the extent that Defendants attempt to use any of the other exhibits in their request for judicial notice to create factual disputes with Plaintiffs' well-pled factual allegations, that practice is improper and the Ninth Circuit has strongly rejected it. *See id.* at 998.

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

Defendants next argue that Progenity's decision not to restate its financials proves that the financials were correct to begin with. This argument fails as a matter of simple logic, and numerous courts have roundly rejected it. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245–46 (N.D. Cal. 2008) ("[T]he lack of a restatement did not mean that LDK only engaged in legitimate conduct. . . To rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement.").[7]

### 3.    Billing Related Risk Factors Were False And Misleading

Plaintiffs identify risk factors in the Registration Statement that misleadingly discussed as mere hypothetical risks existing and knowable adverse information relating to Preparent overbilling. *E.g.*, ¶66 ("effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which *may* . . . cause reimbursement for our Preparent expanded carrier screening tests to decline"); ¶73 ("Failure by our . . . billing . . . personnel to . . . comply with applicable laws *may* subject us to . . . refunding of payments received by us");[8] ¶74.

---

[7] In fact, Courts have held even in securities fraud actions that have a higher pleading standard that the lack of a restatement does not immunize defendants for their conduct. *See In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) ("many courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had never restated their financial statements") (collecting cases); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *10 (C.D. Cal. Feb. 27, 2015) ("The fact that OSI received a clean audit opinion and that the financial statements were not restated does not alone immunize public companies and their principal officers from securities fraud claims"); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("the fact that the financial statements for the year in question were not restated does not end Aldridge's case . . . To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement.").

[8] Defendants chide Plaintiffs for "inaccurately" describing this risk factor (Mot. at 15), however Plaintiffs' characterization perfectly matches the above quoted text. (footnote continued)

OPPOSITION TO MOTION TO DISMISS                                    Case No. 20cv01683

Defendants' main argument regarding these risk factors simply rehashes their claim that Progenity did not know its precise refund liability at the time of the IPO, which fails for the reasons discussed *supra* (*see* Part V.A.1). Moreover, Defendants cite a trio of dated and unpersuasive District Court opinions for the proposition that risk factor disclosures cannot be misleading as a matter of law. Defendants surprisingly make this argument even though it ignores controlling Ninth Circuit precedent to the contrary. Defendants cite *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996), which contains little analysis on point and no citations to any authority to support its risk factor conclusion. The *In re Foundry Networks, Inc.*, 2002 WL 32354617, at *7 (N.D. Cal. June 6, 2002) opinion contains similarly little analysis on point, and the sole authority it cites for its risk factor holding is *Zeid*. Finally, *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) only cites to *Zeid* and *Foundry* to support its holding.

Defendants simply ignore that since these decisions, the Ninth Circuit has clearly (and repeatedly) held that a risk disclosure was potentially actionable where it "speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008); *see also W. Pennsylvania Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2018 WL 4524107, at *16 (D. Or. May 29, 2018) (recognizing that *Berson* contradicted *Zeid*'s risk factor holding). And shortly after deciding *Berson*, the Ninth Circuit again held a risk factor to be actionably misleading. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ("Similar to *Berson*, the passage in the Form 10–Q speaks about the risks of product liability claims in the abstract, with no indication that the risk may already have come to fruition."). After

---

*See* ¶73 (Progenity "presented as a mere hypothetical risk that compliance failures by Progenity's billing personnel 'may' result in the need to refund payments").

OPPOSITION TO MOTION TO DISMISS                              Case No. 20cv01683

*Berson* and *Matrixx*, Defendants' argument that risk factors are categorically incapable of misleading is untenable. *See also Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (risk factors held actionable).

### 4. Progenity's Professed "Belief" That It Used Appropriate Billing Codes Was False And Misleading

The Registration Statement claimed that "[w]e currently submit for reimbursement using CPT codes that we believe are appropriate for our testing, but . . . payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code." ¶71.[9] This created the misleading impression that Progenity billed with appropriate CPT codes, while failing to disclose that Progenity used incorrect CPT codes to overbill for Preparent tests. *See id.*

Defendants assert that this statement did not represent that Progenity used appropriate codes, but merely that Progenity *believed* it did so. Mot. at 15. Even assuming *arguendo* that this is purely a statement of opinion, it is clearly misleading under *Omnicare*. The Supreme Court held that "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability." 575 U.S. at 189. As such Progenity's belief must "fairly align[] with the information in [its] possession at the time," and such belief "in the face of known contradictory evidence, would not insulate [Progenity] from liability." *Id.* at 189 & n.6.

Progenity's professed belief did not fairly align with the information in its possession because, *inter alia,* prior to the IPO, Progenity had ceased Preparent overbilling and knew the correct CPT code it should have used for Preparent tests. ¶¶65, 66. In the face of such known contradictory evidence, Progenity's "belief" that

[9] Defendants mistakenly state that this disclosure was made in the Registration Statement's risk factors. Mot. at 13-14. It appears in the "Business" section.

OPPOSITION TO MOTION TO DISMISS                              Case No. 20cv01683

it used appropriate CPT codes was materially misleading. *See Uber*, 2020 WL 4569846, at *8 (falsity actionably alleged where registration statement "represented defendants *believed* Uber was complying with the law . . . even though defendants had no factual basis for offering these opinions").

### 5. Statements Regarding The Innatal Overbilling Settlement Were False And Misleading

The Registration Statement's announcement of a $49 million settlement to "resolve all of the government's outstanding civil and criminal investigations," was materially misleading in light of its failure to disclose Progenity's overbilling of government payors for Preparent tests. ¶75. "[W]hether a statement is misleading depends on the perspective of a reasonable investor," and a reasonable investor would understand this announcement to mean that Progenity had no reason to expect substantial near-term liabilities to the government for closely related overbilling practices. *Omnicare*, 575 U.S. at 186.

Defendants advance a narrow reading of this portion of the Registration Statement to argue that it is literally accurate, but that is not the relevant standard. *See Omnicare*, 575 U.S. at 192 ("Congress adopted § 11 to ensure that issuers tell[ ] the whole truth to investors. For that reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."); *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019) ("the issue is not whether the statements, taken separately, were literally true. The issue is whether defendants' statements taken and in context, would have mislead a reasonable investor about the nature of the [investment]."). Viewed in context and in light of the knowable but undisclosed information relating to Preparent overbilling, Progenity's claim to "resolve all of the government's outstanding civil and criminal investigations" materially misled investors.

### 6. Omission Of Preparent Overbilling Violated Item 303 and Item 105, And Was False And Misleading

Defendants do not dispute that Progenity's Preparent overbilling was required

OPPOSITION TO MOTION TO DISMISS                         Case No. 20cv01683

to be disclosed under Item 105 ("provide . . . a discussion of the material factors that make an investment in the registrant or offering speculative or risky"), nor could they. The potential for an imminent, multi-million dollar refund liability made investing in Progenity's IPO speculative and risky, especially in light of the Company's precarious financial position. ¶¶36-38. Defendants simply argue that their disclosure was adequate. Mot. at 21. However, as discussed *supra* in Part V.A.3, the Registration Statement's disclosures on this point were themselves materially false and misleading because they presented already materialized risks as mere possibilities. And a risk factor that addresses a general topic while omitting significant relevant details remains actionable. *See Slack Techs.*, 445 F. Supp. 3d at 386. In any event, "whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Todd*, 642 F.3d at 1220.

Defendants seek to inject doubt (via another footnote-argument) into whether violations of Item 303 can give rise to Section 11 liability. Mot. at 20 n.5. As they are forced to admit, no such doubt exists in the Ninth Circuit. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("[A]ny omission of facts required to be stated under Item 303 will produce liability under Section 11. Thus, allegations which sufficiently state a claim under Item 303 also state a claim under section 11."). Faced with this reality, Defendants imply that *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) may have overruled *Steckman*, but it did no such thing. While *NVIDIA* held that an Item 303 violation does not necessarily give rise to an Exchange Act Section 10(b) violation, it also explicitly distinguished Section 11 claims while favorably quoting *Steckman*. *NVIDIA*, 768 F.3d at 1055. In fact, Defendants' exact argument was recently confronted and rejected by Judge Davila of the Northern District of California. *Restoration Robotics*, 417 F. Supp. 3d at 1263 ("the *NVIDIA* Court was explicit in noting that *Steckman* was still good law. . . Thus, Plaintiff may bring an Item 303 claim").

To the extent that Progenity knew of its Preparent overbilling prior to the

OPPOSITION TO MOTION TO DISMISS                              Case No. 20cv01683

IPO, this was a "known trend" reasonably expected to have a material unfavorable impact on revenues, and so required disclosure under Item 303. *See* ¶162. At the very least, the liability to refund overbilled Preparent amounts was a "known uncertainty," also requiring disclosure under Item 303. *See* ¶162; ¶65 (Progenity ceased Preparent overbilling in "early 2020"); ¶66 (Progenity knew of the correct CPT code for Preparent tests prior to the IPO). Progenity's failure to disclose such known trends and uncertainties is actionable. *Steckman*, 143 F.3d at 1296.

**B.    Misrepresentations And Omissions Relating To Negative Trends In Test Volumes, Average Selling Prices, And Revenues**

During the IPO Progenity was suffering from undisclosed, deteriorating trends in its key financial metrics of test volumes (¶¶82-95), average selling prices (¶¶108-28), and revenues (¶¶134-49). Defendants do not dispute that such negative trends existed, or even that Item 303 required their disclosure, but merely claim their disclosure was adequate. Mot. at 17, 21. But deciding this issue in Defendants' favor on the pleadings "is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds [could] not differ." *Todd*, 642 F.3d at 1220.

Defendants' argument regarding these trends begins from the false premise that "Section 11 'affords a cause of action *only* when an issuer's failure to include a material fact has rendered a published statement misleading'." Mot. at 17 (quoting *Omnicare*, 575 U.S. at 194). Not so. The statutory text of Section 11 assigns liability where a registration statement (1) "contained an untrue statement of a material fact," (2) "omitted to state a material fact required to be stated therein," or (3) "omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Defendants ignore the context of their *Omnicare* quote, which makes clear that the Supreme Court was referring to only one of the multiple prongs of Section 11's liability scheme. *See Omnicare*, 575 U.S. at 194; *id.* at 187 n.3 ("Section 11's omissions clause also applies when an issuer fails to make mandated disclosures—those 'required to be stated'—in a registration statement."). For this

OPPOSITION TO MOTION TO DISMISS                                     Case No. 20cv01683

reason, "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11," regardless of whether the omission renders published statements misleading. *Steckman*, 143 F.3d at 1296.

As detailed below, the Registration Statement contained untrue statements regarding Progenity's negative trends, omitted trends required to be stated by Item 303, and contained statements rendered misleading by these omissions.

### 1.   The CWs Reliably Show Progenity Knew Of Negative Trends

Progenity's knowledge of downward trends in test volumes, ASP and revenue is further bolstered by the statements of several former employee confidential witnesses ("CWs"). ¶¶90-95, 128, 147. Defendants claim the CW allegations are conclusory, but each CW is identified by position and dates of employment, and their statements are factually detailed and based on the CWs' first-hand experience. *E.g.*, ¶91-92 (CW2 received sales data from Progenity's Salesforce and Tableau platforms, and attended the February 2020 Progenity national sales meeting where billing policy changes were announced); ¶95 (CW5 produced monthly revenue reports broken out by CPT code that were presented to executives including Progenity's CFO). Therefore, the CW allegations are reliable and plausibly show Progenity's knowledge of the negative trends. *See Daou*, 411 F.3d at 1015-16. Tellingly, Defendants do not actually dispute any of the CW allegations, but merely claim all negative trends were adequately disclosed. Mot. at 19.[10]

### 2.   Test Volumes

During the IPO, Progenity was experiencing a sharp decline in test volume (*see supra* Part II.C.1). Progenity completed only 24,000 tests in April 2020 and 23,000 tests in May 2020, down from 27,000 tests per month in 2019 and 26,000 per

---

[10] Defendants curiously emphasize (in bold underlined text, no less) that the CWs do not "point to any actual statement . . . that was false or misleading." Mot. at 19. But the role of CWs is to provide factual details, not to make legal arguments.

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

month in the first quarter. ¶82. Progenity knew of this trend in June 2020 because it had access to detailed, real-time information on testing volumes from multiple sources. ¶¶87, 90-91, 94-95. And Progenity knew the trend's underlying causes: (i) COVID pandemic lockdowns significantly decreased demand for Progenity's core products [¶¶87, 89-91], (ii) Progenity decided to cease doing business with 10% to 15% of its healthcare provider customers [¶¶85, 89, 93], and (iii) Progenity discontinued the flexible billing policy that had been its main selling point [¶92].[11]

Defendants contend they sufficiently disclosed declines in test volumes. Examination of the statements at issue reveals this to be false. The Registration Statement confusingly contained three variations of similar text regarding test volumes. First, outright falsely stating that "the growth rate of our test volume is accelerating." ¶100. Second, stating that "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic," *i.e.* falsely asserting that Progenity was then experiencing "volume growth." ¶101.[12] And third, vaguely acknowledging that "[b]eginning in March 2020, we began to observe significant declines in the volumes of our molecular tests . . . due to the impact of the COVID-19 pandemic." ¶102. With respect to the effects of the COVID pandemic, each of

---

[11] Defendants incorrectly claim that Plaintiffs plead no facts to show that Progenity's decision to discontinue its customer-friendly billing policy was made before the IPO. Mot. at 18. This decision was announced at Progenity's national sales meeting in the last week of February 2020. ¶92. Defendants likewise quibble with the timing of Progenity's decision to fire 10% to 15% of its customers, but Plaintiffs plausibly allege that these cuts had at least been planned by the time of the IPO. By November 2020, Progenity was already at the "tail end" of the negative financial effects from these cuts, indicating the cuts took place much earlier. ¶85. And Progenity laid off customer-facing personnel in July 2020. ¶93.

[12] The statements about Progenity's test volume growth quoted in ¶¶100-01 directly contradict Defendants' false and hyperbolic rhetoric that "Plaintiffs go so far as to allege that Progenity told investors that testing volumes were increasing. That is nonsense. Progenity said no such thing." Mot. at 3.

---

OPPOSITION TO MOTION TO DISMISS                    Case No. 20cv01683

these three variations misleadingly reassured that "[w]e believe our business is resilient and we have observed positive signs of recovery so far." ¶¶100-02.

Defendants weakly attempt to dismiss the first two misstatements by noting their proximity to disclosures that "[s]ince our inception, we have accessioned approximately 1.5 million tests in the United States," arguing that any reasonable investor would understand all of Defendants' statements about test volumes to relate exclusively to "historical growth" and not events at the time of the IPO. *See* Mot. at 18. This argument is easily disposed of by noting the present continuous verb tense of Defendants' misrepresentations regarding test volumes. ¶100 ("the growth rate of our test volume *is accelerating*"); ¶101 ("we *are currently observing* a slowdown in volume growth as a result of the COVID-19 pandemic").

Therefore, reading the above three passages together and in their full context, a reasonable investor could conclude that although Progenity may have observed declines in test volumes in March 2020, at the time of the June 2020 IPO these declines had ceased and core test volumes were again growing and even *accelerating* as compared to the test volume results disclosed for 2019 and the first quarter of 2020, albeit at a temporarily slower growth rate than pre-pandemic. However, this eminently reasonable interpretation would mislead because Progenity was in fact suffering from a continuing trend of decreasing test volumes. ¶¶82-95.

To the extent that Progenity's muddled, double negative obfuscation "there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods" could be read to imply that test volumes were decreasing, it is flatly contradicted by Progenity's clear statements that it was then experiencing volume growth and that "the growth rate of our test volume is accelerating." ¶100-01. Surely a reasonable investor could resolve any perceived conflict in these statements by believing the direct factual assertion of accelerating growth, rather than a mere possible implication of declining growth couched within a statement of uncertainty. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S.

22

1083, 1097 (1991) ("not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow").

Defendants additionally point to the statement that "[t]he spread of COVID-19, . . . *may* materially affect us economically, including a significant reduction in laboratory testing volumes," however as discussed *supra* (*see* Part V.A.3) such disclosures that portray presently existing adverse facts as mere hypothetical possibilities are themselves false and misleading. *See Berson*, 527 F.3d at 986.

Finally, Defendants' claims of sufficient disclosure regarding test volumes are further undermined by their additional misleading statements regarding "consistent year-over-year test volume growth" (¶97) and "CONSISTENT GROWTH" (¶98), and by additional misleadingly hypothetical risk factors ("we *may* not be able to maintain our sales volume," ¶103). Viewed as a whole, the Registration Statement materially misled investors regarding Progenity's downward trend in test volumes.

### 3.	Test Average Selling Prices

During the IPO, Progenity was also experiencing a sharp decline in the average selling price for its tests, (*see supra* Part II.C.2). Progenity had ASP of approximately $438 in 2019, decreasing to $380 in the first quarter of 2020. ¶109. Progenity's ASP was trending further downward and would finish the second quarter at a mere $368. *Id*. Progenity knew of this trend in June 2020 because it had access to detailed, real-time information on testing volumes and revenues, which determine ASP. ¶¶91, 94-95, 124-25. Progenity knew the trend's underlying causes: (i) Progenity's product mix shifted away from higher-priced Preparent tests and toward lower-priced Innatal and COVID-19 tests [¶¶113-15, 121-22, 127], (ii) Progenity had to cease overbilling for Preparent tests [¶¶65, 127], and (iii) Progenity slashed the cash prices of its Preparent and Innatal tests by more than 50% [¶¶128].

Defendants' arguments regarding ASP trends are entirely lacking. Defendants point to another straw-man disclosure that Plaintiffs have not challenged, and assert

OPPOSITION TO MOTION TO DISMISS                                        Case No. 20cv01683

that this language was accurate. Mot. at 19. Defendants falsely claim that Plaintiffs "do not identify any other statement in the Offering Materials that supposedly was rendered false or misleading by the alleged decline in Progenity's ASPs." Mot. at 19-20. However, the Amended Complaint clearly alleges three such statements. ¶¶129-132. By ignoring these clear allegations in their motion, Defendants have waived any argument as to the misleading nature of the challenged statements. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief").

As regards Plaintiffs' Item 303 claims, Defendants do not dispute that Progenity suffered from negative trends in ASP at the time of the IPO, or that such trends were required to be disclosed under Item 303. Rather, Defendants argue "Progenity made all required disclosures related to known, historical trend data regarding . . . average selling prices." Mot. at 21. The problem with this argument is that Defendants do not identify any such disclosures. As Defendants admit, "[t]here is only a single reference to ASP in the Offering Materials." Mot. at 19. Defendants' failure to disclose negative ASP trends violated Item 303 and Section 11.

### 4.    Revenues

During the IPO, Progenity was also experiencing a sharp decline in revenues. Progenity's revenue was on track to finish the second quarter 8% lower as compared to the first quarter of 2020, and more than 50% lower as compared to the prior year. ¶134. Progenity knew of this trend in June 2020 because it had access to detailed, real-time information on revenues and test volumes. ¶¶87, 90-91, 91, 94-95, 147, 149. And Progenity knew the trend's underlying causes: (i) overbilling repayments such as the $10.3 million Preparent refund accrual, (ii) negative trends in test volumes, and (iii) negative trends in ASP. ¶¶138, 148.

As with Progenity's other negative trends, Defendants do not dispute that these negative revenue trends existed or that Item 303 required their disclosure, but merely argue that their disclosure was sufficient. Mot. at 20-21. Defendants point to

24

disclosure of first quarter 2020 revenue that had decreased from first quarter 2019 levels. But this failed to inform investors that Progenity continued to suffer from further decreasing revenues during the IPO. Defendants then point to the statement "[i]t is *possible* that we will not generate sufficient revenue from the sale of our products to cover our costs," which similarly says nothing about known, ongoing negative trends, and which is misleadingly phrased in hypothetical terms. While Defendants baldly assert Progenity "disclosed that . . . revenue had declined in light of the COVID-19 pandemic," they fail to identify any such disclosure. Mot. at 21.

Given the severely limited nature of the two revenue related disclosures Progenity now relies on, it can hardly be argued that "the adequacy of the disclosure is so obvious that reasonable minds [could] not differ." *Todd*, 642 F.3d at 1220. Indeed, after Progenity released its third quarter financial results, securities analysts with CGS-CIMB wrote that "since its IPO" Progenity had "an unfortunate financial performance," and that "Progenity needs to show that the base business can perform *as advertised*," demonstrating that Plaintiffs are far from the only reasonable investors who were misled by Defendants' deficient disclosures. ¶152.

## VI. THE AMENDED COMPLAINT ALLEGES A VIOLATION OF SECURITIES ACT SECTION 15

Defendants' only challenge to the Section 15 control person claims is that Plaintiffs do not state a primary violation of Section 11. Accordingly, Defendants' Section 15 argument necessarily fails along with their Section 11 argument.

## VII. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' motion to dismiss in its entirety. Alternatively, if the Court grants any part of Defendants' motion, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment").

25

OPPOSITION TO MOTION TO DISMISS                                    Case No. 20cv01683

DATED: June 4, 2021 **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Garth A. Spencer*
ROBERT V. PRONGAY (#270796)
 *rprongay@glancylaw.com*
CASEY E. SADLER (#274241)
 *csadler@glancylaw.com*
GARTH A. SPENCER (#335424)
 *gspencer@glancylaw.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiffs*

26

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On June 4, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 4, 2021, at Los Angeles, California.

s/ Garth A. Spencer
Garth A. Spencer