BRIAN M. LUTZ, SBN 255976
(*application pending*)
   blutz@gibsondunn.com
JEFFREY S. ROSENBERG
(*pro hac vice*)
   jsrosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200

ALEXANDER K. MIRCHEFF, SBN 245074
   amircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000

*Attorneys for Defendants Progenity, Inc.,
Harry Stylli, Eric d'Esparbes, Jeffrey Alter,
John Bigalke, Jeffrey Ferrell, Brian L.
Kotzin, Samuel Nussbaum, and Lynne
Powell*

MATTHEW W. CLOSE, SBN 188570
   mclose@omm.com
YUAN (GRACE) ZHONG, SBN 318808
   yzhong@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: 213.430.6000

DANIEL L. CANTOR (*pro hac vice*)
   dcantor@omm.com
O'MELVENY & MEYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036-6537
Telephone: 212.326.2000

*Attorneys for Defendants Piper Sandler
& Co., Wells Fargo Securities, LLC,
Robert W. Baird & Co. Incorporated,
Raymond James & Associates, Inc., and
BTIG LLC*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | CASE NO. 20cv1683-CAB-AHG |
| | **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |
| | <u>Hearing</u><br>Date:     May 10, 2021<br>Courtroom: 15A<br>Judge:     Hon. Cathy Ann Bencivengo |

**TABLE OF CONTENTS**

Page

I.   PLAINTIFFS FAIL TO PLEAD ANY MISREPRESENTATION OR OMISSION REGARDING THE $10.3 MILLION REFUND ACCRUAL ........ 2

   A.   Progenity's $10.3 Million Refund Accrual Was Not Knowable at the Time of the IPO ................................................................... 2

   B.   Progenity's Financial Practices and Results Were Not Misleading .......... 5

   C.   None of the Risks Progenity Warned of Had "Come to Fruition" ........... 6

   D.   Progenity's Expression of Belief Is Not Actionable ................................. 7

   E.   Plaintiffs Admit Progenity's Statements Regarding the Innatal Overbilling Settlement Were True ........................................................... 7

   F.   Plaintiffs Fail to Allege Omissions in Violation of Items 303 and 105 ................................................................................................. 8

II.   PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR OMISSION RELATING TO NEGATIVE TRENDS ......................................... 8

III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15 ................ 10

CONCLUSION ................................................................................................. 10

Gibson, Dunn & Crutcher LLP

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CASE NO. 20CV1683-CAB-AHG

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Altayyar v. Etsy, Inc.*,
 242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018)..........5

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ...............................................................................6

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
 2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) .......................................................3

*Brody v. Transitional Hosps. Corp.*,
 280 F.3d 997 (9th Cir. 2002) ...............................................................................8

*In re Dropbox Sec. Litig.*,
 2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) .......................................................7

*Ferreira v. Funko, Inc.*,
 2021 WL 880400 (C.D. Cal. Feb. 25, 2021) .........................................................7

*Ikeda v. Baidu, Inc.*,
 2021 WL 1299046 (N.D. Cal. Apr. 7, 2021)......................................................6, 7

*Lin v. Interactive Brokers Grp., Inc.*,
 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ..................................................................2

*Mallen v. Alphatec Holdings, Inc.*,
 2013 WL 1294640 (S.D. Cal. Mar. 28, 2013), *aff'd sub nom. Fresno Cty. Emps.
 Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015)................10

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
 2012 WL 3191860 (S.D.N.Y. Feb. 2, 2012) .........................................................2

*Rubke v. Capitol Bancorp Ltd.*,
 551 F.3d 1156 (9th Cir. 2009) .............................................................................2

*In re Sofamor Danek Grp., Inc.*,
 123 F.3d 394 (6th Cir. 1997) ...............................................................................4

*Zirkin v. Quanta Capital Holdings Ltd.*,
 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) .......................................................2, 4

ii

# TABLE OF AUTHORITIES (*continued*)

Page(s)

## REGULATIONS

17 C.F.R. § 229.105(a) ...................................................................................................... 8

17 C.F.R. § 240.13a-13 ..................................................................................................... 4

17 C.F.R. § 299.303(b)(2)(ii) ............................................................................................ 8

Gibson, Dunn & Crutcher LLP

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
CASE NO. 20CV1683-CAB-AHG

Plaintiffs' Opposition doubles down on their misguided efforts to transform disappointing financial results into a federal securities claim.  Plaintiffs advance two core theories: *first*, that Progenity should have disclosed a $10.3 million refund accrual months before the potential liability was determined and quantified through a complex, third-party audit; and *second*, that the Company failed to disclose negative trends impacting its business notwithstanding the repeated and explicit representations that it had been, and would continue to be, adversely impacted by the COVID-19 pandemic.  Under either theory, Plaintiffs fail to plead facts sufficient to state a Section 11 claim.

As to the first theory, Plaintiffs argue that all of the financial metrics in Progenity's Offering Materials were misstated because they did not include the $10.3 million refund for mis-billed Preparent tests that was "determined and quantified" nearly two months after the IPO, following a forensic audit.  Am. Compl. ¶ 62.  Plaintiffs argue the $10.3 million refund was "known or knowable" because Progenity had changed the billing practices that led to the overpayment earlier in 2020.  But Plaintiffs conflate the risk of incorrect billing (and the potential for a refund), which Progenity explicitly disclosed in the Offering Materials, with an actual $10.3 million refund accrual, which is not alleged to have been knowable or calculated until *after* the IPO.  And the Opposition fails to refute that Progenity accurately reported its financials in accordance with the relevant accounting guidance.

As to their second theory, regarding negative trends, Plaintiffs simply ignore what Progenity actually said.  Plaintiffs argue the Offering Materials said that Progenity's testing volume and revenues were growing at the time of the IPO.  That is simply not true.  Rather, Progenity disclosed that "*[b]eginning in March 2020*, we *began* to observe *significant declines* in the volumes of our molecular tests [and] pathology tests . . . due to the impact of the COVID-19 pandemic," and "there can be no assurance that the *rate of decline* in our testing volumes will not continue or accelerate in future periods."  Am. Compl. ¶ 102 (emphases added).  Plaintiffs cannot

1

plead a misstatement by ignoring or mischaracterizing what the Offering Materials actually said.[1]

## I.   PLAINTIFFS FAIL TO PLEAD ANY MISREPRESENTATION OR OMISSION REGARDING THE $10.3 MILLION REFUND ACCRUAL

### A.   Progenity's $10.3 Million Refund Accrual Was Not Knowable at the Time of the IPO

Plaintiffs acknowledge that to state a Section 11 claim under an omissions theory, they must plead facts demonstrating that the allegedly omitted facts existed and were knowable by Defendants at the time of the IPO.  *See, e.g.*, Opp'n 9 ("[T]he fact of the Preparent overbilling . . . existed and was knowable at the time of the IPO.").  The fundamental problem with this theory, however, is that while Plaintiffs argue that overbilling occurred before the IPO, they plead no facts demonstrating that the allegedly omitted material information—that Progenity would accrue a $10.3 million refund, *see* Am. Compl. ¶ 64—existed and was knowable at the time of the IPO.

"[T]he accuracy of offering documents must be assessed in light of the information available at the time they were published," *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, 2012 WL 3191860, at *9 (S.D.N.Y. Feb. 2, 2012) (internal quotation marks omitted).  "The relevant inquiry under the Securities Act is not whether the [loss] estimate disclosed in the offering documents later turned out to be correct, but rather whether the Company knew or had reason to know, at the time the offering documents were filed, that the statement was untrue." *Zirkin v. Quanta Capital Holdings Ltd.*, 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009).  A defendant's knowledge or reason to know cannot be premised on indefinite or speculative information. *See Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d

---

[1] Plaintiffs' allegations are predicated on the Company's supposed awareness of the financial impact of the mis-billing, *see* Am. Compl. ¶¶ 6, 66, 87, 89–90, 124, 127–28, 148–49, and therefore sound in fraud.  Because the Amended Complaint thus alleges a "unified course of fraudulent conduct," Plaintiffs' claims should be dismissed for failure to "state with particularity the circumstances constituting fraud" per Rule 9(b). *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted).

408, 422 (S.D.N.Y. 2008) ("[I]f the adverse information is not known or knowable until after purchasers have made an irrevocable commitment . . . , then there can be no duty to disclose the adverse information."); *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *11 (E.D.N.Y. Apr. 22, 2020) (Section 11 claim failed when "Plaintiffs [did] not allege[] any facts to support the conclusion Blue Apron knew delays at Linden would *necessarily* delay plans to expand Blue Apron's products"). The allegedly omitted material information here was not that overbilling occurred, but that Progenity would need to refund $10.3 million for overpayments, and there are no facts alleged demonstrating that this was known (or knowable) until well after the IPO.

Plaintiffs ignore the relevant timeline, because it undercuts their claim. Progenity completed the IPO on June 23, 2020. Am. Compl. ¶ 57. Nearly two months later, on August 13, 2020, the Company hosted an investor call to discuss its 2020 second quarter results, during which Progenity disclosed that a third-party billing audit had determined Progenity had "received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020." *Id*. ¶ 61. This figure was an interim financial result—in Progenity's Form 10-Q, filed the next day, the Company noted that while analysis was "still being completed," Progenity accrued a $10.3 million refund charge "as a result of analysis to date." *Id*. ¶ 62. The Company made clear that its "deadline to report and return the overpayment to the government programs [was] 60 days from the time the overpayment was *determined and quantified*," setting the repayment date for early October 2020. *Id.* (emphasis added). In other words, the $10.3 million refund was not "determined and quantified" as a result of the third-party audit until *early August* 2020—well after the IPO.[2]

---

[2] Plaintiffs do not allege that these statements were false, or that Progenity's reporting to the government was untimely. Rather, they quibble with the phrase "determined and quantified" as a technical "term of art," and plead no facts supporting their conjecture that "it is entirely likely that Progenity simply interpreted this term so as to delay its repayment obligation as long as possible." Opp'n 11 n.4.

3

Plaintiffs are left arguing that the need for a $10.3 million accrual must have existed and been knowable at the time of the IPO because "the Company accrued a $10.3 million liability for the Preparent overbilling in the second quarter (April-June) of 2020, which ended only days after the IPO was completed."  Opp'n 9 (citing Am. Compl. ¶¶ 55–57, 65); *see id.* at 1–2.  That is nonsense.  SEC regulations permit an issuer to file quarterly disclosures up to 45 days after the end of the last fiscal quarter or the effective date of the registration statement, whichever is later.  *See* SEC, Form 10-Q, General Instructions; 17 C.F.R. § 240.13a-13.  Progenity complied by filing its second-quarter Form 10-Q on August 14, 2020—45 days after the quarter ended and nearly two months after the IPO, but only shortly after the third-party firm completed the audit that led Progenity to "determine[] and quantif[y]" the amount of the overbilling.  Regardless, the closeness in time between when the registration statement was filed and the end of a quarter does not mean that the registration statement was false, let alone that any supposedly false statement was knowable earlier.  *See Zirkin*, 2009 WL 185940, at *10 (filing prospectus 11 days before end of quarter did not support inference that issuer knew prior estimate was inaccurate).

Plaintiffs argue that Progenity could have figured out the "dollar amount of Preparent overbilling" at the time of the IPO because "Progenity had access to real-time" testing volume and "revenues associated with different CPT billing codes."  Opp'n 10 (citing Am. Compl. ¶¶ 91, 94–95, 147).  But this is pure speculation; Plaintiffs plead no actual facts rebutting Progenity's statement that the amount of the $10.3 million accrual was not determined and quantified until August 2020, after the third-party firm had completed its audit.  To the contrary, aside from their baseless hindsight claim about the $10.3 million accrual, Plaintiffs do not even argue that the Offering Materials failed to accurately report Progenity's historical financial results available at the time of the IPO, a dispositive point given that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997).  Courts

4

are skeptical of Section 11 claims that "do not contest the accuracy of the [revenue] figures per se," but rather argue the "figures were false and misleading because the reported numbers" omitted calculations that should have reduced revenue totals. *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 179–80 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018) (dismissing claims that defendant misleadingly withheld information that revenue figures were in part composed of profits derived from undisclosed patent infringement).

The Court should reach the same conclusion here. Plaintiffs do not plausibly allege that the $10.3 million refund was knowable to Progenity when the IPO went live, and fail to assert that the financial information Progenity disclosed at the time of the IPO was inaccurate.

**B.      Progenity's Financial Practices and Results Were Not Misleading**

Recognizing that the financial results in Progenity's Offering Materials were prepared in accordance with GAAP, *see* Mem. 11; Opp'n 12, Plaintiffs shift gears and argue Progenity failed to "apply ASC 606 to recognize as revenue only *expected* payment amounts *net of probable future refunds*," Opp'n 11 (emphases added). This argument fails because it is grounded on a misapplication of the unambiguous accounting guidance. Once more, Progenity could not have reduced "expected payment amounts" by "*probable* future refunds" until it "determined and quantified" the refund. *See supra* at 3.[3] Further, ASC 606 provides that companies should "consider both the likelihood and the magnitude of the revenue reversal" when determining whether a significant reversal is sufficiently probable to require disclosure. Mircheff Decl. Ex. E at 6 (ASC 606-10-32-12). Here, again, there are no facts alleged demonstrating that Progenity had determined the magnitude of the refund until nearly two months after the IPO.

---

[3] ASC 606 requires that refund liability "be updated at the end of each report period for changes in circumstances"—which is what Progenity did, *see* Am. Compl. ¶¶ 61–63—not immediately upon a potential change in circumstances, as Plaintiffs suggest, Mircheff Decl. Ex. E at 2–5 (ASC 606-10-32-10).

5

Plaintiffs also argue that Progenity failed to comply with ASC 450 because, at the time of the IPO, it "had access to substantial information from which liability for Preparent overbilling was probable [and] reasonably estimable." Opp'n 12. But this, again, is improper speculation, not facts, as required to plead a false statement. Plaintiffs would require companies to engage in continuous and instantaneous computation of potential contingencies based on countless underlying data points—an impossible burden not required by any accounting rule.

### C.    None of the Risks Progenity Warned of Had "Come to Fruition"

Plaintiffs argue that Progenity's risk factor disclosures "misleadingly discussed as mere hypothetical risks existing and knowable adverse information relating to Preparent overbilling." Opp'n 14. But Plaintiffs conflate the potential for incorrect billing that could result in reimbursements—a risk that was explicitly disclosed by Progenity, *see* Mem. 13–14 (quoting Am. Compl. ¶¶ 66, 71, 73–74)—with the allegedly material omission that Progenity would have to refund $10.3 million in overpayments, which Plaintiffs have not adequately pleaded was known or knowable at the time of the IPO, *see supra* at 2.

Plaintiffs state that risk factors are not actionable without specific factual allegations showing that the risks had already "come to fruition." Opp'n 15 (internal quotation marks omitted). Defendants agree. *See* Mem. 14. But Plaintiffs wrongly contend that the risk that had "come to fruition" at the time of the IPO was "a $10.3 million refund liability." Am. Compl. ¶ 66. Again, the timeline shows that Progenity did not determine that it would need to make a $10.3 million accrual until early August 2020, nearly two months after the IPO. *See id.* ¶ 62; *supra* at 3–4. To the extent Progenity was required to disclose the potential for overbilling prior to determining a sum certain, it did so.

Plaintiffs ignore case law interpreting *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), to distinguish disclosures regarding the risk of enforcement in the abstract from specific penalty amounts. For example, in *Ikeda v.*

6

Gibson, Dunn &
Crutcher LLP

*Baidu, Inc.*, the court assessed a risk statement that the company "[has] and may be subject to penalties in the future for violations" against the allegation that the statement misled investors because it "conveyed . . . that the future risk of enforcement was abstract." 2021 WL 1299046, at *13 (N.D. Cal. Apr. 7, 2021). The court rejected that approach, stating, "Plaintiff does not explain why this statement presents the risk of enforcement as abstract . . . [.] Baidu explicitly stated that it had been subject to past enforcement penalties." *Id.* Here, Progenity disclosed its prior settlement with the government. Similarly, in *Ferreira v. Funko, Inc.*, the plaintiffs claimed that risk factor statements did not account for purchase orders that had already been cancelled. *See* 2021 WL 880400, at *13 (C.D. Cal. Feb. 25, 2021). The court held such an alleged omission to be non-actionable, because "Plaintiffs do not allege an objectively-verifiable amount, percentage, or value . . . [defendant] should have disclosed." *Id.* The same is true here, and Progenity's risk factor disclosures are not actionable.

### D.      Progenity's Expression of Belief Is Not Actionable

Progenity's statement that it submitted for reimbursements using codes it "believe[d]" were appropriate is a classic statement of opinion protected under *Omnicare*. Mem. 15. Plaintiffs' argument that it was "materially misleading" for Progenity to express this (truthful) belief is yet another reformulation of their flawed contention that Progenity's $10.3 million refund accrual was knowable at the time of the IPO, *see* Opp'n 16–17, and fails for the same reasons, *see supra* at 2.

### E.      Plaintiffs Admit Progenity's Statements Regarding the Innatal Overbilling Settlement Were True

The Opposition admits it is "literally accurate" that, as disclosed, Progenity reached a $49 million settlement with the government related to its Innatal tests to "resolve all of the government's outstanding civil and criminal investigations." Opp'n 17. To mislead investors, "an omission 'must affirmatively create an impression of a state of affairs that differs in a material way from one that actually exists.'" *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020)

7

(quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Progenity's statements about the Innatal settlement had nothing to do with its Preparent tests, and it never said that the Innatal settlement resolved all possible claims for overbilling, as Plaintiffs suggest.  Mem. 15.  No investor could have been misled.

       **F.     Plaintiffs Fail to Allege Omissions in Violation of Items 303 and 105**

As it pertains to the $10.3 million accrual, Plaintiffs admit that the Company need not have disclosed trends of which it was not aware.  Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a *material* favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 299.303(b)(2)(ii) (emphasis added). Plaintiffs twist their claim to try to fit within Item 303, arguing that (1) "[t]o the extent that Progenity knew of its Preparent overbilling prior to the IPO, this was a 'known trend'" and required disclosure; and (2) "[a]t the very least, the liability to refund overbilled Preparent amounts was a 'known uncertainty,' also requiring disclosure." Opp'n 18–19.  But, once again, Plaintiffs miss the point: until the amount of the Preparent mis-billing was "determined and quantified"—in August—it was neither a "known trend" nor a "known uncertainty" that was reasonably likely to have a *material* impact, and thus did not require disclosure under Item 303.

Item 105 requires a mere "discussion" of the "material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a). Plaintiffs argue Progenity did not adequately disclose "[t]he potential for an imminent, multi-million dollar refund liability," Opp'n 18, but this ignores the Offering Materials' warning of the potential impact of overbilling government payors—a discussion of the risks sufficient to meet Item 105's requirements, *see supra* at 3–4.

**II.    PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR OMISSION RELATING TO NEGATIVE TRENDS**

Plaintiffs' claim that Progenity failed to warn of "material negative trends," Am. Compl. ¶ 8, ignores Progenity's clear disclosures and is premised on cherry-picked

snippets lifted far out of context.[4]  When read alongside the pertinent disclosures—that, in the period immediately preceding the IPO, testing volume and revenue was in decline and might not recover—no reasonable investor could possibly have been misled to believe, as Plaintiffs claim, that "at the time of the IPO investors reasonably . . . understood that Progenity's test volumes were growing at the time of the IPO, and were positioned for continued growth in the near future."  *Id*. ¶ 105.  Plaintiffs' allegation ignores Progenity's disclosure that "*[b]eginning* in March 2020, we *began* to observe *significant declines* in the volume of our . . . tests . . . due to the impact of the COVID-19 pandemic."  *Id*. ¶ 102 (emphases added).  Progenity also disclosed that COVID-19 "may materially affect us economically, including a *significant reduction* in laboratory testing volumes."  *Id*. ¶ 104 (emphasis added).

Given these disclosures, which contradict Plaintiffs' core theory that Progenity failed to disclose negative trends, the Opposition tries to argue that Progenity's disclosures regarding testing volumes were "confusing[]," Opp'n 21, because elsewhere in the Offering Materials Progenity said that the Company's "growth rate" and "volume growth" had accelerated "[s]ince our inception," Am. Compl. ¶¶ 101–02; *see* Opp'n 21–22.  This argument strips all context from the relevant language.  Any reasonable investor would have understood that, at the time of the IPO, and in contrast to its historical performance, Progenity was "currently observing a slowdown" in testing volume and that previous testing volumes were uncertain to return given the COVID-19 pandemic, because that was exactly what Progenity said.  *Id.* ¶ 101.

The same misreading of Progenity's disclosures dooms Plaintiffs' claims regarding negative trends in revenues, where the Offering Materials disclosed that

---

[4]  Plaintiffs' reliance on Confidential Witnesses, *see* Opp'n 20, cannot overcome these deficiencies.  The CWs' conclusory and anecdotal statements merely confirm that the Company disclosed the information available to it—that testing volumes had declined in the period before the IPO—and do not demonstrate that any statement was false.  Plaintiffs offer no support for the astounding suggestion that no such false statement is required when CWs otherwise "provide factual details."  *Id.* at 20 n.10.

revenues were in decline compared to the prior year, *see* Mircheff Decl. Ex. A at 9, and warned that "[i]t is possible that we will not generate sufficient revenue from the sale of our products to cover our costs," *id.* at 6.

And there is only a single reference to "average selling prices" in the Offering Materials, which Plaintiffs fail to claim was false or misleading. *See* Am. Compl. ¶¶ 43, 108–33. Progenity's other disclosures were not misleading simply because they did not mention trends in a metric Plaintiffs would prefer to see (and could calculate themselves) but that the Company never purported to track in its Offering Materials.

Finally, Plaintiffs ignore that the Offering Materials disclosed that Progenity's financial position remained uncertain, stating that "there is [a] substantial doubt about the Company's ability to continue as a going concern." Mircheff Decl. Ex. A at 13.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 15

Because the Amended Complaint "fails to adequately plead a primary violation under the Securities Act, the claims brought under § 15 of the Securities Act" must necessarily fail. *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at *13 (S.D. Cal. Mar. 28, 2013), *aff'd sub nom. Fresno Cnty. Emps. Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).

**CONCLUSION**

For the reasons stated above, Defendants respectfully request the Court dismiss the Amended Complaint with prejudice.

10

Dated: July 19, 2021

GIBSON, DUNN & CRUTCHER LLP

By: _s/ Alexander K. Mircheff_
Brian M. Lutz
Jeffrey S. Rosenberg
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Email: blutz@gibsondunn.com
Email: jsrosenberg@gibsondunn.com

Alexander K. Mircheff
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Email: amircheff@gibsondunn.com

*Attorneys for Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell*

O'MELVENY & MEYERS LLP

By: _s/ Daniel L. Cantor_
Matthew W. Close
Yuan (Grace) Zhong
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: 213.430.6000
Email: mclose@omm.com
Email: yzhong@omm.com

Daniel L. Cantor
Times Square Tower
7 Times Square
New York, NY 10036-6537
Telephone: 212.326.2000
Email: dcantor@omm.com

*Attorneys for Defendants Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG LLC*

11

REPLY IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
CASE NO. 20CV1683-CAB-AHG

# SIGNATURE CERTIFICATION

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable to the above-listed counsel, and that I have obtained authorization to affix all electronic signatures to this document.

Dated: July 19, 2021

GIBSON, DUNN & CRUTCHER LLP

By: *s/ Alexander K. Mircheff*
Alexander K. Mircheff

12