UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No.:  20-cv-1683-CAB-AHG **ORDER ON DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** [Doc. No. 40] |

This consolidated class action alleges violations of Sections 11 and 15 of the Securities Act of 1933 arising out of alleged false and misleading statements contained in the Registration Statement filed in connection with the June 2020 initial public offering (the "IPO") of shares of common stock of Progenity, Inc. ("Progenity").  Defendants now move to dismiss Plaintiffs' first amended class action complaint (the "FAC").  [Doc. No. 40.]  The motion has been fully briefed and the Court finds it suitable for determination on the papers submitted and without oral argument.  *See* S.D. Cal. CivLR 7.1(d)(1).  For the reasons set forth below, Defendants' motion to dismiss is granted.

## I.    BACKGROUND

### A. Parties

The FAC alleges various securities violations by three groups of defendants (collectively, "Defendants"): (1) Progenity; (2) Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell (the "Individual Defendants"); and (3) Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG, LLC (the "Underwriter Defendants").  [Doc. No. 38 ¶¶ 18-34.]

Progenity is a biotechnology company based in San Diego, California that develops and commercializes molecular testing products and precision medicine applications, including "in vitro molecular tests designed to assist parents in making informed decisions related to family planning, pregnancy, and complex disease diagnosis."  [*Id.* ¶ 2.]  At the time of the IPO, Progenity's two most successful products were its Innatal and Preparent tests, which screen for fetal chromosomal conditions and mutations that cause genetic diseases, respectively.  [*Id.* ¶ 3.]

At all relevant times, Stylli served as Progenity's Chief Executive Officer and Chairman of the Board of Directors, and d'Esparbes served as Progenity's Chief Financial Officer.  [*Id.* ¶¶ 19-20.]  Alter, Bigalke, Ferrell, Kotzin, Nussbaum, and Powell served as members of Progenity's Board of Directors.  [*Id.* ¶¶ 21-27.]  All Individual Defendants signed (or authorized the signing of) the Registration Statement issued in connection with Progenity's IPO, "reviewed and helped prepare the Registration Statement," and "participated in the solicitation and sale of [Progenity's] common stock to investors in the IPO for their own financial benefit and the financial benefit of Progenity."  [*Id.* ¶ 27]

Piper Sandler, Wells Fargo, Baird, Raymond James, and BTIG are financial services companies that acted as underwriters for Progenity's IPO.  [*Id.* ¶¶ 28-34.]  The Underwriter Defendants collectively "sold more than 6.6 million Progenity shares in the IPO at $15 per share and shared $7 million in underwriting discounts and commissions."  [*Id.* ¶ 34.]  According to the FAC, the Underwriter Defendants failed to "conduct adequate due

diligence in connection with the IPO and the preparation of the Registration Statement," thereby leading to the class harm.  [*Id.*]

Lead Plaintiffs Lin Shen, Lingjun Lin, and Fusheng Lin bring this action on behalf of a putative class of investors who purchased or otherwise acquired Progenity common stock pursuant and/or traceable to the Registration Statement issued in connection with Progenity's IPO.  [*Id.* ¶ 1.]

### B. Factual Background

On May 27, 2020, Progenity filed a Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") registering Progenity's common stock in preparation for its IPO.  [*Id.* ¶ 53.]  Progenity subsequently filed four amendments to the Registration Statement on June 4, June 15, and June 18, 2020, respectively (filing two amendments on the last date).  [*Id.* ¶ 54.]  On June 22, 2020, Progenity filed a Form 424B4 Prospectus with the SEC, which was incorporated into the Registration Statement.  [*Id.* ¶ 56.]  The Registration Statement, including all amendments and the Prospectus, took effect on June 18, 2020.  [*Id.* ¶¶ 1 n.1, 56.]

Progenity conducted its IPO from June 19 through June 23, 2020, during which it issued and sold 6,666,667 shares of its common stock at a price to the public of $15.00 per share.  [*Id.* ¶¶ 4, 57.]  The IPO generated over $100 million in gross offering proceeds and approximately $88.7 million in net proceeds for Progenity.  [*Id.*]

On August 13, 2020, Progenity filed a press release and slide deck with the SEC reporting its second quarter 2020 financial results.  [*Id.* ¶ 60.]  The materials filed stated that Progenity's "second quarter revenues reflected a $10.3 million accrual for refunds to government payors."  [*Id.*]  In an investor call later that day, Stylli explained that a commissioned third-party review of Progenity's coding and billing processes revealed that Progenity had "not appropriately transitioned the implementation of the new billing

requirements for larger carrier screening panels, which were introduced in early 2019."[1] [*Id.* ¶ 61.]   Because of these billing errors, Progenity "received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020."  [*Id.*]

On August 14, 2020, Progenity filed its Form 10-Q for the second quarter of 2020 with the SEC.  The Form 10-Q confirmed that Progenity accrued $10.3 million for refunds to government payors during the second quarter of 2020.  [*Id.* ¶ 62.]  The filing further stated that Progenity's deadline to "report and return the overpayment to the government programs is 60 days from the time the overpayment was determined and quantified," so Progenity "expects to repay this amount to the relevant government programs by early October 2020."  [*Id.*]  According to Plaintiffs, that same day that Progenity filed its Form 10-Q, its stock price declined by $1.24 per share.  [*Id.* ¶ 7.]

On October 29, 2020, Progenity disclosed in a press release reporting preliminary third quarter 2020 revenue that it was "suffering from material negative trends with respect to [its] testing volumes, average selling prices for tests, and revenues."  [*Id.* ¶ 8.]  Plaintiffs contend that Progenity did not disclose these trends to investors at the time of the IPO, thereby leaving investors "ignorant of the significant deterioration in Progenity's prospects."  [*Id.*]  According to Plaintiffs, over the three trading days following Progenity's disclosure, Progenity's stock price declined by $3.42 per share.  [*Id.*]

Plaintiffs argue that Defendants violated their disclosure obligations in the Registration Statement by failing to disclose two categories of material facts that were

---

[1] Progenity's Form 10-Q for the second quarter of 2020 explains that in the U.S., the "American Medical Association ('AMA') generally assigns specific billing codes for laboratory tests under a coding system known as Current Procedure Terminology ('CPT'), which we and our ordering healthcare providers must use to bill and receive reimbursement for our molecular tests."  [Doc. No. 38 ¶ 62.]  The Registration Statement states that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening tests to decline."  [*Id.* ¶ 66.]  Plaintiffs allege that following this AMA approval, Progenity was required to bill its Preparent tests under a new CPT code beginning in January 2019.  However, Plaintiffs claim that Progenity did not update its billing practices until early 2020, thereby resulting in a $10.3 million overpayment for Preparent tests by government health programs.  [*Id.* ¶ 65.]

known to Defendants at the time of the IPO.  First, Defendants allegedly failed to disclose the risk that Progenity would have to refund government payors for overbilled Preparent tests, and thus have its revenue negatively impacted by at least $10.3 million.  [*Id.* ¶ 161.] Second, Defendants allegedly failed to disclose negative trends in Progenity's testing volumes, average selling prices, and revenues.  [*Id.* ¶ 8.]  Plaintiffs claim that Defendants' failure to disclose the foregoing material facts violated Section 11 and Items 105 and 303 of SEC Regulation S-K.[2]  [*Id.* ¶¶ 161-162.]  Plaintiffs also allege that as "controlling persons of Progenity," the Individual Defendants are liable under Section 15 for causing Progenity's Section 11 violations.  [*Id.* ¶¶ 184-186.]  As a result of Defendants' alleged securities laws violations, Plaintiffs claim that the class suffered significant losses.  [*Id.* ¶ 9.]

### C. Procedural Background

On December 3, 2020, the Court consolidated two related securities class actions against Progenity and appointed Lin Shen, Lingjun Lin, and Fusheng Lin as Lead Plaintiffs. [Doc. No. 33.]  Plaintiffs subsequently filed the FAC on February 4, 2021, alleging violations of Sections 11 and 15 of the Securities Act of 1933.  [Doc. No. 38.]

On April 5, 2021, Defendants moved to dismiss the FAC.  [Doc. No. 40.] Defendants argue that the FAC should be dismissed for (1) failure to plead a materially false or misleading statement or omission under Section 11 of the Securities Act of 1933; (2) failure to plead a violation of Items 303 and 105 of the U.S. Securities and Exchange Commission Regulation S-K; and (3) failure to plead control person liability under Section 15 of the Securities Act.  [*Id.* at 2.]  The motion is now fully briefed and ripe for resolution.

## II.   LEGAL STANDARD

The familiar standards on a motion to dismiss apply here.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted

---

[2] Regulation S-K sets forth various disclosure obligations for registration statements filed with the SEC. 17 C.F.R. § 229.10.

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). On the other hand, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

## III.   REQUEST FOR JUDICIAL NOTICE

A court generally cannot consider materials outside the pleadings on a motion to dismiss for failure to state a claim. FED. R. CIV. P. 12(d). A court may, however, consider materials subject to judicial notice without converting the motion to dismiss into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). Under Federal Rule of Evidence 201(b), a court may take judicial notice, either on its own accord or by a party's request, of facts that are not subject to reasonable dispute because they are (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). A court may also take judicial notice of "matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (internal citations omitted). Finally, under the incorporation by reference doctrine, courts may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but

which are not physically attached to the [plaintiff's] pleading." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (internal quotations and citations omitted).  The incorporation by reference doctrine "treats certain documents as though they are part of the complaint itself," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018), so long as "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

Defendants request that the Court take judicial notice of six exhibits: Excerpts from Progenity's Form 424B4 Prospectus, filed with the SEC on June 22, 2020 (Ex. A); a copy of Progenity stock prices from June 19, 2020 to April 5, 2021, as obtained from Yahoo! Finance (Ex. B); Progenity's Form 10-Q, filed with the SEC on August 14, 2020 (Ex. C); excerpts from the Financial Accounting Standards Board's (FASB) Accounting Standards Codification (ASC) 105 and 450 (Ex. D); and "excerpts" from ASC 606 (Exs. E-F).  [Doc. No. 40-3; Doc. No. 44-2; Doc. No. 46.]  Plaintiffs oppose Defendants' request as to Exhibit D because ASC 450 "is mentioned nowhere in the [FAC] and does not otherwise 'form the basis' of Plaintiffs' allegations."  [Doc. No. 41 at 20.]  Plaintiffs also oppose Defendants' request as to Exhibit E because it is not an actual copy of ASC 606 but rather an editorial secondary source "providing 'interpretation and analysis' of the FASB Codification."[3] [Doc. No. 45 at 2.]

The Court takes judicial notice of Progenity's Form 424B4 Prospectus, filed with the SEC on June 22, 2020, and of Progenity's Form 10-Q, filed with the SEC on August

---

[3] Defendants urge the Court to strike Plaintiffs' "Opposition to Defendants' Request for Judicial Notice In Support of Reply" [Doc. No. 45] as an improper surreply.  While Plaintiffs' filing was improper under the Local Rules, so too was Defendants' "Response to Plaintiffs' Opposition" [Doc. No. 46], as neither party sought leave of the Court to file additional briefing.  *See Daniels v. ComUnity Lending, Inc.*, No. 13cv488-WQH-JMA, 2015 WL 2338713, at *4 (S.D. Cal. May 12, 2015) ("The Local Rules do not provide for the filing of a surreply.  Other district courts within the Ninth Circuit have found that a party must seek leave of the court to file a surreply.").  Nevertheless, the Court did not consider either party's filing in connection with its analysis of the present motion.

14, 2020, in their entirety as both matters of public record and as documents forming the basis of Plaintiffs' claims. *See Ritchie*, 342 F.3d at 907; *see also In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (noting that consideration of "the full text of the Prospectus, including portions which were not mentioned in the complaint[]," is appropriate in the context of a motion to dismiss).  The Court also takes judicial notice of Progenity's stock price history in Exhibit B, although that history does not affect the Court's analysis for purposes of the present motion.  *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017) ("[H]istorical stock prices are not subject to reasonable dispute") (citing Fed. R. Evid. 201(b)).  Finally, the Court takes judicial notice of ASC 105, ASC 450, and ASC 606 as publicly available materials taken from a "source whose accuracy cannot reasonably be questioned," the FASB.  Fed. R. Evid. 201(b).  However, the same cannot be said for Defendants' Exhibit E, which appears to be an editorial overview of ASC 606 rather than the accounting standard itself.  Thus, the Court declines to take judicial notice of Exhibit E.

## IV.    DISCUSSION

### A. Section 11 Claim

Plaintiffs' first cause of action is brought against all Defendants for alleged violations of Section 11 of the Securities Act of 1933.  Section 11 imposes liability where a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Therefore, to prevail on a Section 11 claim, the plaintiff must demonstrate "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citing *Stac Elec.*, 89 F.3d at 1403-04).  "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions."  *Id.* (internal citations

omitted).[4]

Section 11's omissions clause "affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). "A securities fraud complaint based on a purportedly misleading omission must 'specify the reason or reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (citing *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). The plaintiff must also "demonstrate that the omitted information existed at the time the registration statement became effective." *Id.* at 1164.

Plaintiffs' Section 11 claim is based on four allegedly material omissions from Progenity's Registration Statement: (1) that Progenity had overbilled government payors for Preparent tests and would be required to refund them at least $10.3 million; (2) that Progenity was experiencing a trend of decreasing test volume; (3) that Progenity was experiencing a trend of decreasing average selling prices for tests; and (4) that Progenity was experiencing a trend of decreasing revenues. [Doc. No. 38 ¶¶ 58-152.] Plaintiffs identify various statements in the Registration Statement that they allege were consequently "materially false and misleading when made" because of Defendants' failure to disclose the foregoing facts. [*Id.*] Plaintiffs claim that these omissions also violate Items 105 and 303 of Regulation S-K, which they argue constitutes another basis for liability under Section 11.[5] The Court addresses each category of alleged omissions in turn.

---

[4] While Section 11 does not contain an element of fraud, a plaintiff may be subject to Rule 9(b)'s particularity requirement if the complaint "sounds in fraud." *Daou Sys.*, 411 F.3d at 1027. Defendants argue that Plaintiffs' Section 11 claim "sounds in fraud" and therefore must satisfy the heightened pleading standards of Rule 9(b). [Doc. No. 40-1 at 13.] The Court need not address whether Plaintiffs' Section 11 claims sound in fraud because the claims fail regardless for the reasons set forth herein.

[5] The parties dispute whether a violation of Item 303 of Regulation S-K can give rise to a Section 11 claim. [Doc. No. 40-1 at 25; Doc. No. 41 at 25.] Because the Court finds that Plaintiffs failed to establish an Item 303 violation, it need not reach the issue.

9

### 1. $10.3 Million Refund Liability to Government Payors

First, Plaintiffs claim that Defendants violated Section 11 by failing to disclose that Progenity would "imminently have to accrue and refund $10.3 million" for overbilling government payors for Preparent tests.  [*Id.* ¶¶ 59, 64.]  Plaintiffs suggest that the overbilling and resulting $10.3 million refund liability both existed and was known to Defendants at the time the Registration Statement took effect on June 18, 2020.  According to Plaintiffs, the failure to disclose this information made Progenity's previously issued financial statements (concerning revenue, accrued expenses, current and future liabilities, and other financial metrics) reproduced in the Registration Statement misleading because they do not account for the $10.3 million liability and revenue reversal.  [*Id.* ¶¶ 68-70, 72.] Plaintiffs also contend that the Registration Statement's risk factor disclosures[6] regarding payors seeking reimbursement are misleading because the risks disclosed had actually materialized by the time of the IPO.  [*Id.* ¶¶ 73-74.]

Plaintiffs essentially claim that Defendants failed to disclose two separate facts: (1) that Progenity overbilled government payors for Preparent tests, and (2) that Progenity would have to accrue and refund $10.3 million for such overbilling.  [*Id.* ¶ 64.]  However, an actionable omission under Section 11 must be material, and the fact that Progenity had overbilled some payors could not be material until the amount of that overbilling and resulting liability was quantified.  Thus, it is the actual accrual of the $10.3 million refund liability itself—and more specifically the calculation of the exact amount of that liability— that is material and potentially actionable under Section 11.

Plaintiffs have failed to establish that the accrual of the $10.3 million refund liability

---

[6] Specifically, the Registration Statement warned that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code" [Doc. No. 38 ¶ 71]; "commercial third-party payors may . . . seek repayment from us of amounts previously reimbursed" [*Id.* ¶ 73]; and "[t]hird-party payors may decide to deny payment or recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received . . . Any of these outcomes . . . could have a material and adverse effect on our business, operating results, and financial condition." [*Id.* ¶ 74.]

existed at the time that Progenity's Registration Statement took effect. *See Rubke*, 551 F.3d at 1164. Plaintiffs' allegations indicate that at the very least, Defendants were aware of the AMA's implementation of a new billing code for Preparent tests by the time of the IPO.[7] However, Defendants' awareness that the Preparent billing code had changed in January 2019 does not mean that Progenity's $10.3 million refund liability existed on June 18, 2020. Rather, the actual accrual of the $10.3 million liability did not materialize until Progenity's second quarter 2020 financial results were prepared following the end of that quarter.

Publicly reporting companies have at least 40 days to file Forms 10-Q following the end of a fiscal quarter, and generally "need time to audit [financial] data before including it in any public materials." *Berg v. Velocity Fin., Inc.*, No. 2:20-cv-06780-RGK-PLA, 2021 WL 268250, at *5 n.1 (C.D. Cal. Jan. 25, 2021); *see* 17 C.F.R. § 240.13a-13. Defendants were thus under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter. *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1254 (N.D. Cal. 2019) ("[O]missions are actionable only if a defendant has a duty to disclose information and fails to do so.") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). Moreover, Defendants would only be required by ASC 450 to accrue the refund liability in the first quarter of 2020 if it were "probable that . . . a liability had been incurred at the date[8] of the financial statements" and the "amount of loss [could] be reasonably estimated." [Doc. No. 40-2 at 44.] The amount of Progenity's refund liability could not be reasonably estimated until it was calculated and accrued following

---

[7] The Registration Statement itself states that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening tests to decline." [Doc. No. 38 ¶ 66.]

[8] ASC 450 defines "date of the financial statements" to mean "the end of the most recent accounting period for which financial statements are being presented." [Doc. No. 40-2 at 44.]

20-cv-1683-CAB-AHG

the end of the second quarter of 2020.[9]  Accordingly, the $10.3 million liability accrual did not exist "at the time the registration statement became effective," *Rubke*, 551 F.3d at 1164, and therefore cannot be an actionable omission under Section 11.[10]

In sum, liability under Section 11 "only attaches for misrepresenting [or omitting] information that was available when the offering materials became effective." *Berg*, 2021 WL 268250, at \*5 (citing *Stac Elec.*, 89 F.3d at 1403-04).  The $10.3 million liability accrual reported in Progenity's second quarter 2020 Form 10-Q did not exist when the Registration Statement became effective.  Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of the $10.3 million refund liability, it is hereby **DISMISSED** without prejudice.

### 2.  Negative Trends in Test Volume, Average Price, and Revenue

Next, Plaintiffs claim that Defendants violated Section 11 by failing to disclose Progenity's negative trends in test volume, average selling price, and revenue.  [Doc. No. 38 ¶¶ 82-152.]  Plaintiffs claim that "these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were negligently omitted." [*Id.* ¶ 86.]  The Court analyzes each alleged trend in turn.

---

[9] Plaintiffs also claim that Progenity wrongfully included "variable consideration" in its revenue reported in the Registration Statement, although it was likely to reverse $10.3 million of that revenue for refunds. Under ASC 606, estimates of variable consideration are recognized as revenue "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty . . . is subsequently resolved."  [ACCT. STANDARDS CODIFICATION § 606-10-05-04-c (FIN. ACCT. STANDARDS BOARD 2019).]  Plaintiffs' limited allegations do not indicate that Defendants had reason to believe a "significant reversal in the amount of cumulative revenue recognized" would occur at the time the Registration Statement took effect.  Therefore, the Court declines to find Section 11 liability on this basis.

[10] Plaintiffs' claims regarding Defendants' risk factor disclosures fail for the same reason: Plaintiffs cannot show that the risk of accruing a $10.3 million refund liability had materialized by the time the Registration Statement took effect.  *See In re Pivotal Sec. Litig.*, No. 3:19-cv-03589-CRB, 2020 WL 4193384, at \*6 (N.D. Cal. July 21, 2020) ("The Ninth Circuit has noted that 'risk factors' are not actionable without further factual allegations indicating that the risks had already 'come to fruition.'") (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27).

### a. Negative Trend in Test Volume

As Plaintiffs point out, the Registration Statement contains three separate disclosures relating to Progenity's test volume growth that slightly contradict each other.  [*Id.* ¶ 99.] First, in the Prospectus Summary section of Progenity's Form 424B4, which appears at the beginning of the Registration Statement and "highlights selected information contained elsewhere in this prospectus," Defendants state:

> Since our inception, we have accessioned approximately 1.5 million tests in the United States and the growth rate of our test volume was accelerating over a multi-year period, including early 2020. However, we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic. The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

[*Id.* ¶ 101.]  Next, on page 91 of the Prospectus under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the subsection titled "Factors Affecting Our Performance," Defendants state:

> Beginning in March 2020, we began to observe significant declines in the volumes of our molecular tests as well as the pathology tests conducted by Avero Diagnostics due to the impact of the COVID-19 pandemic and work-from-home policies and other operational limitations mandated by federal, state and local governments as a result of the pandemic. However, we believe our business is resilient and we have observed positive signs of recovery so far. While we are implementing mitigation strategies to address these limitations, such as supporting patients and physicians virtually, there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods. Our initial assessment of the impact of the COVID-19 pandemic is that our NIPT test volumes have proved more resilient than our carrier screening test volumes; however, the comparative impact may change over time.

[*Id.* ¶ 102.]   Finally, on page 115 of the Prospectus under the "Business" section, Defendants state:

> Since our inception, we have accessioned approximately 1.5 million tests in the United States and the growth rate of our test volume is accelerating. The

figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

[*Id.* ¶ 100.]  This statement is followed by a graph representing Progenity's test volume growth from 2016 through the first quarter of 2020:



[Progenity, Inc., Prospectus (Form 424B4), at 115 (June 19, 2020).]

Defendants were under no obligation to disclose their test volume data for the second quarter of 2020 in the Registration Statement.  As discussed above, publicly held companies are not required to report the results of a fiscal quarter until at least 40 days following the end of that quarter.  *See* 17 C.F.R. § 240.13a-13.  Nor are companies required to disclose all material adverse events to investors—"even if investors would consider the omitted information significant"—so long as the omission does not make the actual statements made misleading.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("We have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'"); *see also Brody*, 280 F.3d at 1006 (noting that a statement often "will not mislead even if it is incomplete or does not include all relevant facts").  Nevertheless,

14

Defendants' failure to disclose a negative trend may be actionable under Section 11 if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006; *see also Rigel Pharm.*, 697 F.3d at 881 n.10 (finding that public statements were not false or misleading when "the omitted information did not contradict, or render misleading, the original [statements]").

Plaintiffs argue that "reading the above three passages together and in their full context, a reasonable investor could conclude that although Progenity may have observed declines in test volumes in March 2020, at the time of the June 2020 IPO these declines had ceased and core test volumes were again growing and even *accelerating* . . . albeit at a temporarily slower growth rate than pre-pandemic." [Doc. No. 41 at 29 (emphasis in original).] The Court disagrees. Although the statements above have slight inconsistencies between them, a reasonable investor reviewing the Registration Statement in its entirety would not be misled to believe that Progenity's test volume was increasing at the time of the IPO. In all three statements, Defendants mention COVID-19's negative effect on test volume and other challenges they faced because of the pandemic. Defendants expressly warn that "there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods." [Doc. No. 38 ¶ 102.] Moreover, under the "Risks Related to Our Business and Industry" subsection of the Registration Statement, Defendants caution that the spread of COVID-19 "may materially affect us economically, including a significant reduction in laboratory testing volumes."[11] [*Id.* ¶ 104.] Although Plaintiffs claim that Defendants failed to disclose Progenity's "significant test volume

---

[11] Plaintiffs claim that these statements were false and misleading because they presented the risk of decreasing test volumes as hypothetical, although the risks had already materialized by the time of the IPO. [Doc. No. 38 ¶ 103.] As shown by the Registration Statement excerpts reproduced herein, Defendants disclosed that Progenity was experiencing a decrease in test volume at the time of the IPO. Moreover, "risk factors are not actionable without further factual allegations indicating that the risks had already come to fruition." *Pivotal*, 2020 WL 4193384, at *6. Plaintiffs have not established that Defendants knew or reasonably could have known at the time that Progenity's test volume would continue to decrease beyond the date of the IPO. In other words, Plaintiffs do not plead "anything beyond conclusory assertions that the risks had already materialized." *Id.*, at *7.

declines" at the time of the IPO, Defendants reiterated several times that they had begun to observe "significant declines in the volumes of our molecular tests as well as the pathology tests" in March 2020.  [*Id.* ¶ 102.]  The one inconsistent statement that "the growth rate of our test volume is accelerating," when read in context with the various other statements emphasizing Progenity's declining test volumes stemming from the pandemic, is insufficient to establish that a reasonable investor would have been misled about the nature of their investment.  *See Daou Sys.*, 411 F.3d at 1027.

Plaintiffs also argue that Defendants' statement that "we believe our business is resilient and we have observed positive signs of recovery so far" is false and misleading because it emphasizes resilience and recovery, though Defendants knew at the time that Progenity's test volumes were likely to remain depressed.  [Doc. No. 38 ¶ 102.]  Insofar as Defendants' statement is a sincere statement of pure opinion, it generally cannot be an "untrue statement of material fact" generating liability under Section 11. [12]  *Omnicare*, 575 U.S. at 186.  However, liability under Section 11's false-statement provision follows if the "speaker did not hold the belief she professed" or "if the supporting fact she supplied were untrue."  *Id.* at 185-186.  Thus, to establish a Section 11 claim based on this statement, Plaintiffs must show that Defendants either did not believe their business to be resilient or had not observed any signs of recovery.  Plaintiffs have not pleaded facts to support either possibility.

Plaintiffs argue that at the time of the IPO, Progenity knew its declining test volume was unlikely to recover, as supported by five former Progenity employees' ("Confidential Witnesses" or "CWs") accounts describing their experiences working for Progenity.  However, Defendants' disclosures in the Registration Statement are largely consistent with

---

[12] The first portion of the sentence at issue—Defendants' statement that "[w]e believe our business is resilient"—is not actionable insofar as it constitutes a statement of corporate optimism, which expresses an opinion that generally cannot be objectively verified.  *See Restoration Robotics*, 417 F. Supp. 3d at 1254 ("[B]usiness puffery or opinion (vague, optimistic statements) are not actionable because they do not 'induce the reliance of a reasonable investor.'") (citing *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)).

these witnesses' statements.  For example, CW1 states that "low testing rates in Progenity's lab commenced with the pandemic and continued through her departure in October 2020." [Doc. No. 38 ¶ 90.]  CW2 similarly states that within her sales territory, "sales volume went down significantly during the initial COVID lockdown."  [*Id.* ¶ 91.]  These claims are consistent with Defendants' disclosure that "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic."  [*Id.* ¶ 101.]  The remaining CW accounts do not provide any additional support for Plaintiffs' theory of liability.[13]

Plaintiffs also claim that Progenity's declining test volume trend was due in part to its decision to "let go 10% to 15% of its healthcare provider customers and to discontinue the flexible billing policy that had previously been Progenity's main selling point with its customers," which Defendants were aware of at the time of the IPO.  [*Id.* ¶ 82.]  In support of their claim, Plaintiffs refer to Progenity's November 9, 2020 investor call where Stylli disclosed that Progenity had let 10% to 15% of its customers go due to "revenue cycle considerations" and indicated that Progenity was "already at the tail end" of suffering the customer turnover effects.[14]  [*Id.* ¶ 85.]  Plaintiffs also cite to CW2's statement that in March 2020, Progenity implemented a new billing policy which resulted in lost business as customers turned to competitors offering lower prices.  [*Id.* ¶ 92.]  While these allegations, taken as true, highlight other factors that may have contributed to Progenity's

---

[13] CW4 and CW5's accounts purport to establish that Progenity "had access to real-time data regarding its business." [Doc. No. 38 ¶¶ 94-95.]  Most companies in existence today have access to similar data for their businesses.  Nevertheless, companies filing registration statements are not required to disclose every shred of data in their possession in real-time, so long as the omission of that data does not render the statements they do share misleading.  *See Rigel Pharm.*, 697 F.3d at 880 n.8.  For the reasons discussed above, Plaintiffs have not established that Defendants had an obligation to share their real-time data, nor that the failure to disclose such data rendered any statement false or misleading to Progenity's potential investors.

[14] Plaintiffs also cite to CW3's account that she was laid off from her position at Progenity in July 2020 as evidence that Progenity's 10% to 15% reduction in customers occurred or was planned at the time of the IPO.  [Doc. No. 38 ¶ 93.]  Plaintiffs do not explain how CW3's termination (allegedly due to Progenity's business underperforming in Oklahoma) relates to Progenity's reduction of its customer base, nor how CW3's termination is evidence that Progenity had reduced or planned to reduce its customer base at the time of the IPO.  Nevertheless, Defendants disclosed the reduction in the Registration Statement.

decreased test volume, they were also disclosed in the Registration Statement.  Under the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the subsection titled "Factors Affecting Our Performance," Defendants disclose the customer reduction and resulting decreases in test volume:

> As the types and categories of tests that are covered by reimbursement increase or decrease, the volume of testing may correspondingly increase or decrease, respectively. In 2019, we conducted a comprehensive review of our existing accounts and sought to eliminate accounts that did not contribute to our gross margin. Our test volumes decreased as a result of this exercise.

[Progenity, Inc., Prospectus (Form 424B4), at 20 (June 19, 2020).]  Under the section titled "Risk Factors," Defendants warn that they "may face competitive pricing or reimbursement rate pressures, and we may not be able to maintain our sales volume and/or reimbursement rates in the future, which would adversely affect our business, operating results, and financial condition."  [*Id.*, at 45.]  Defendants also note that "[i]ncreased competition is likely to result in pricing pressures, which could harm our revenues, operating income, or market share."  [*Id.*, at 91.]  In light of these disclosures, Plaintiffs' allegations do not show that a reasonable investor reviewing the Registration Statement in its entirety would be misled about the nature of their investment.

Defendants were under no obligation to disclose their real-time test volume data from the second quarter of 2020 at the time that the Registration Statement took effect.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (holding that company was "under no duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly warned that [the company] expected lower net sales").  Nevertheless, the Registration Statement clearly warned that at the time of the IPO, Progenity had experienced a significant drop in test volume due to the COVID-19 pandemic.  Defendants also cautioned that they could not guarantee that the decline in test volumes would not continue or even accelerate in the future.  Accordingly, Plaintiffs have not established that Defendants made any false statement or omitted to state a material fact necessary to make the other statements in the Registration Statement not misleading.  15

U.S.C. § 77k(a).  To the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in test volume, it is hereby **DISMISSED** without prejudice.

### b.  Negative Trend in Average Price

Plaintiffs next claim that the Registration Statement failed to disclose that at the time of the IPO, Progenity was experiencing a "significant decline in the average selling price ('ASP') for its tests" and expected further decreases.  [Doc. No. 38 ¶¶ 123, 127.]  Plaintiffs define ASP as "Progenity's revenue from testing divided by the number of such tests."  [*Id.* ¶ 108.]  Plaintiffs also claim that Progenity's failure to disclose the negative ASP trend "rendered materially false and misleading numerous statements contained in the Registration Statement."  [*Id.* ¶ 129.]

The question presented on a motion to dismiss a Section 11 claim is whether Plaintiffs have plausibly alleged that Defendants' "failure to include a material fact has rendered a published statement misleading."  *See Omnicare*, 575 U.S. at 194.  Here, Plaintiffs do not identify any statements that were rendered misleading because of the failure to disclose the alleged decline in ASP or the ASP of Progenity's tests across any specific period. [15]

The first two statements Plaintiffs present as false and misleading both relate to changes in the volume sold of each of Progenity's test offerings.  Plaintiffs first claim that Defendants' statement that "our NIPT [i.e., Innatal] test volumes have proved more resilient than our carrier screening [i.e., Preparent] test volumes" during the COVID-19 pandemic was false and misleading because it did not disclose that the Innatal test had a lower ASP than the Preparent test, so a change in those tests' respective sales volumes

---

[15] Defendants note that the Registration Statement contains a single reference to ASP when explaining how Progenity calculates its gross margins: "Higher gross margins reflect the average selling price of our tests, as well as the operating efficiency of our laboratory operations."  [Doc. No. 40-1 at 24.]  However, the Registration Statement does not mention the actual ASP charged for any of Progenity's test offerings across any specific period.

would harm Progenity's revenue.   [Doc. No. 38 ¶ 130.]   Plaintiffs next argue that Defendants' statement that the "Avero Diagnostics laboratory [Progenity's affiliate] is providing molecular testing for diagnosing COVID-19" was false and misleading because it failed to disclose that the COVID-19 test had a much lower ASP than Progenity's other tests, so an increase in COVID-19 tests' sales volume over other tests would also harm Progenity's revenue.   [*Id.* ¶ 131.]   Plaintiffs do not maintain that either of these statements was untrue.

As discussed above, a statement often "will not mislead even if it is incomplete or does not include all relevant facts." *Brody*, 280 F.3d at 1006.  The two statements at issue disclose a fluctuation in the respective test volumes for each of Progenity's test offerings. Although they do not mention the allegedly resulting decrease in Progenity's ASP and revenue, nothing in the statements is rendered misleading by failing to disclose that information.  Defendants' failure to disclose a potential decrease in ASP and revenue, "even if investors would consider the omitted information significant," is not actionable insofar as it did not make the actual statements made about test volume fluctuation misleading.[16]  *Rigel Pharm.*, 697 F.3d at 880 n.8.

Moreover, although Defendants did not disclose the potential effect of the test volume changes on Progenity's revenue, the allegedly omitted information is still consistent with other disclosures made in the Registration Statement relating to Progenity's test volumes and revenue.  For example, Defendants disclosed that although the revenue derived from the Innatal and Preparent tests were roughly equal at the time of the IPO, the "ratio may fluctuate over time."  [Progenity, Inc., Prospectus (Form 424B4), at 93 (June 19, 2020).]  Defendants also stated that "the high level of competition in our industry could

---

[16] Plaintiffs also allege that Defendants failed to disclose that around March 2020, Progenity reduced the cash price for both its Preparent and Innatal tests, which Defendants knew would affect ASP in the second quarter of 2020 and beyond.  [Doc. No. 38 ¶ 128.]  However, Plaintiffs do not point to any statement made by Defendants that was rendered misleading by the failure to disclose this information.  Therefore, the Court finds that Plaintiffs have not stated a plausible claim under Section 11's omissions clause based on this omitted factual allegation.

force us to reduce the price at which we sell our products," and that these pricing pressures "could harm our revenues, operating income, or market share." [*Id.*, at 20.] It is unlikely that a reasonable investor reviewing the Registration Statement in its entirety would be misled to believe that Progenity's ASP would never decrease or that its revenue could not be affected as a result.

Plaintiffs have not adequately pleaded that Defendants were required to disclose the alleged negative trend in Progenity's ASP in order to make the other statements in the Registration Statement not misleading. Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in ASP, it is hereby **DISMISSED** without prejudice.

### c.   Negative Trend in Revenue

Finally, Plaintiffs claim that the Registration Statement failed to disclose that at the time of the IPO, Progenity was experiencing a "significant decline in revenue" caused by the events and trends discussed above. [Doc. No. 38 ¶¶ 134-135.] Plaintiffs broadly claim that Progenity's failure to disclose the negative revenue trend rendered the entire Registration Statement materially false and misleading. [*Id.* ¶ 150.]

First, Plaintiffs' broad assertion that Defendants' failure to disclose a negative trend in revenue rendered the entire Registration Statement false and misleading is insufficient to state a claim. At a minimum, Federal Rule of Civil Procedure 8 requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To adequately state a claim under Section 11's omissions clause, a plaintiff must demonstrate that the defendant's failure to include a material fact rendered a published statement misleading. *Omnicare*, 575 U.S. at 194. Plaintiffs' allegation that a 222-page Registration Statement is false and misleading in its entirety is exactly the type of "conclusory, unwarranted deduction[] of fact or unreasonable inference[]" that the Court must disregard in analyzing a motion to dismiss under Rule 12(b)(6). *Daniels-Hall*, 629 F.3d at 998.

Moreover, the Registration Statement actually discloses negative trends in

Progenity's revenue that Defendants had observed by the time the Registration Statement took effect.  Under the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," Defendants compare the fiscal results of Progenity's operations from the first quarter of 2019 and the first quarter of 2020.  [Progenity, Inc., Prospectus (Form 424B4), at 96 (June 19, 2020).]  Defendants disclose that Progenity's revenue for the first quarter of 2020 was down $30.7 million from its revenue for the first quarter of 2019, which it notes was a 64.6% decrease.  [*Id.*, at 97.]  Further, under the subsection titled "Risks Related to Our Business and Industry," the Registration Statement states in bold, italicized font: "We have incurred losses in the past, and we may not be able to achieve or sustain profitability in the future."  [*Id.*, at 19.]  It then goes on to state that "[i]t is possible that we will not generate sufficient revenue from the sale of our products to cover our costs . . . and achieve or sustain profitability."  [*Id.*]  These disclosures would not mislead a reasonable investor to believe that Progenity's revenue was increasing or even stable at the time the Registration Statement took effect.

Defendants were under no obligation to disclose their real-time revenue data at the time that the Registration Statement took effect.  *See Worlds of Wonder*, 35 F.3d at 1419 (holding that company was "under no duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly warned that [the company] expected lower net sales").  Nevertheless, the Registration Statement clearly warned that in the first quarter of 2020, Progenity had experienced a significant drop in revenue as compared to the first quarter of 2019.  Accordingly, Plaintiffs have not established that Defendants omitted to state a material fact necessary to make other statements in the Registration Statement not misleading.  15 U.S.C. § 77k(a).  To the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in revenue, it is hereby **DISMISSED** without prejudice.

### 3.  Items 105 and 303 Disclosure Obligations

Plaintiffs also claim that Defendants violated Section 11 by failing to meet their disclosure obligations under Items 303 and 105 of SEC Regulation S-K.  [Doc. No. 38 ¶¶

161-162.]  The Court analyzes each provision in turn.

### a. Item 303

Item 303 of Regulation S-K requires that registrants describe "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," as well as "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(i)-(ii).  Under the SEC's 1989 release interpreting Item 303(a), a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296-97 (9th Cir. 1998).  Plaintiffs argue that Defendants violated Item 303 by failing to disclose the $10.3 million liability Progenity would incur due to its Preparent overbilling, as well as the company's negative trends in test volumes, average selling prices, and revenues.  [Doc. No. 38 ¶ 162.]

As for the $10.3 million liability, Plaintiffs claim that "[t]o the extent that Progenity knew of its overbilling prior to the IPO, this was a 'known trend' reasonably expected to have a material unfavorable impact on revenues, and so required disclosure under Item 303."  [Doc. No. 41 at 18-19.]  However, Plaintiffs cannot establish that Defendants knew or had reason to know of Progenity's $10.3 million overbilling liability by the time of the IPO because that liability did not come to fruition until Progenity issued its second quarter 2020 Form 10-Q almost two months later.  Plaintiffs' argument that this event or "trend" was known to management at the time the Registration Statement took effect therefore must fail, and Plaintiffs cannot show an Item 303 violation on this basis.

As for the negative trends, Defendants plainly disclosed that Progenity was experiencing downturns in test volume and revenue at the time the Registration Statement took effect.  Further, Plaintiffs define ASP as "Progenity's revenue from testing divided by the number of such tests."  [Doc. No. 38 ¶ 108.]  While the ASP of Progenity's test offerings

was not explicitly disclosed by Defendants, it could easily be calculated from Progenity's disclosed revenue and test volume data.  *See In re Dropbox Sec. Litig.*, No. 19-cv-06348-BLF, 2020 WL 6161502, at *8 (N.D. Cal. Oct. 21, 2020) (rejecting Item 303 allegations based on failure to disclose trend of declining revenue growth rate where "[a]nyone with basic mathematical skills could discern" the trend in light of defendant's disclosure of its annual revenue); *see also In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (rejecting Section 11 allegations based on failure to disclose number of subscription cancellations where the "number could be calculated through simple arithmetic using other numbers that were disclosed").  Accordingly, Plaintiffs have failed to show that Defendants omitted a known material trend from the Registration Statement that was not adequately captured by the disclosure of declining test volume and revenue data.  Plaintiffs' Section 11 claim predicated on Item 303 violations is thus **DISMISSED** without prejudice.

### b.  Item 105

Item 105 of Regulation S-K requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.  Plaintiffs argue that Defendants violated Item 105 by failing to disclose that Progenity's Preparent overbilling "presented a significant risk that Progenity would have to refund the overbilled amounts, and as a result Progenity's revenue would be negatively impacted by at least $10.3 million."  [Doc. No. 38 ¶ 161.]

Plaintiffs' Item 105 claim is based on the same alleged omission of the $10.3 million liability as Plaintiffs' Item 303 claim.  Accordingly, Plaintiffs' Item 105 claim fails for the same reason—Plaintiffs have not established that the liability existed at the time the Registration Statement took effect.  Because the liability did not exist, Defendants could not have reasonably known about it, and they could not have discussed it in the Registration Statement as a material factor making an investment in Progenity "speculative or risky."  Moreover, Defendants made various statements in the Registration Statement disclosing the possibility that payors could seek refunds of amounts paid.  For example, the

Registration Statement stated that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code" [*Id.* ¶ 71]; "commercial third-party payors may . . . seek repayment from us of amounts previously reimbursed" [*Id.* ¶ 73]; and "[t]hird-party payors may decide to deny payment or recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received . . . Any of these outcomes . . . could have a material and adverse effect on our business, operating results, and financial condition."  [*Id.* ¶ 74.]  These statements are sufficient to satisfy Item 105's disclosure requirements.   Accordingly, Plaintiffs' Section 11 claim predicated on Item 105 violations is **DISMISSED** without prejudice.

## B. Section 15 Claim

Plaintiffs' second cause of action is brought against the Individual Defendants for alleged violations of Section 15 of the Securities Act of 1933.  Section 15 imposes joint and several liability upon every person who controls any person liable under Section 11. 15 U.S.C. § 77o.  The section provides:

> "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

*Id.*  Nevertheless, "[t]here can be no Section 15 violation without an underlying Section 11 violation."  *In re Ubiquiti Networks, Inc. Sec. Litig.*, 669 Fed. Appx. 878, 880 (9th Cir. 2016).   For the reasons stated above, Plaintiffs fail to adequately plead a Section 11 violation.  Accordingly, the Court **GRANTS** the motion to dismiss Plaintiffs' Section 15 claim, and Plaintiffs' second cause of action is hereby **DISMISSED** without prejudice.

## V.    CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss the FAC is **GRANTED**, and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**.

Plaintiffs may file a second amended complaint no later than **twenty-one (21)** calendar days following the date of this order.  Should Plaintiffs choose to file a second amended complaint, it must be filed in compliance with Local Civil Rule 15.1(c).  If Plaintiffs choose not to file an amended complaint by the above deadline, the Clerk of Court shall close this case.

It is **SO ORDERED**.

Dated:  September 1, 2021

_____
Hon. Cathy Ann Bencivengo
United States District Judge

26

20-cv-1683-CAB-AHG