BRIAN M. LUTZ, SBN 255976
  blutz@gibsondunn.com
JEFFREY S. ROSENBERG
(*pro hac vice*)
  jsrosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200

ALEXANDER K. MIRCHEFF, SBN 245074
  amircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000

*Attorneys for Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell*

MATTHEW W. CLOSE, SBN 188570
  mclose@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: 213.430.6000

DANIEL L. CANTOR
(*pro hac vice*)
  dcantor@omm.com
O'MELVENY & MEYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036-6537
Telephone: 212.326.2000

*Attorneys for Defendants Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG LLC*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | CASE NO. 20cv1683-CAB-AHG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge:    Hon. Cathy Ann Bencivengo<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

Gibson, Dunn & Crutcher LLP

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ................................................................................2

    A.    Progenity's Business And Billing Practices ...............................................2

    B.    Progenity's IPO ..........................................................................................3

    C.    Post-IPO Events .........................................................................................5

    D.    Procedural History ......................................................................................6

        1.    The Court Dismisses Plaintiffs' Prior Complaint In Full ...............6

        2.    Plaintiffs' SAC .................................................................................8

III.   LEGAL STANDARDS ON A MOTION TO DISMISS .......................................8

IV.    ARGUMENT .........................................................................................................9

    A.    Plaintiffs Fail To Plead Any Actionable Misleading Statement Or Omission ...................................................................................................10

        1.    Alleged Improper Billing And Overpayments ..............................10

        2.    Negative Trends .............................................................................16

        3.    Allegedly Improper Marketing Practices ......................................20

    B.    Plaintiffs Cannot Use Items 303 And 105 Of Regulation S-K To Plead  A Section 11 Claim ........................................................................24

    C.    Plaintiffs Fail To State A Claim Under Section 15 ..................................25

V.     CONCLUSION ...................................................................................................25

i

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................. 8

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ........................................................................... 5, 6

*Baker v. Seaworld Entm't, Inc.*,
    2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) ..................................................... 14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................... 24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 8

*Berg v. Velocity Fin., Inc.*,
    2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ................................................... 11, 12

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ............................................................................. 10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*,
    856 F.3d 605 (9th Cir. 2017) ............................................................................. 14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .............................................................................. 23

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ........................................................................... 8, 21

*In re Dropbox Sec. Litig.*,
    2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) ................................................. 10, 16

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) ............................................................... 23

Gibson, Dunn & Crutcher LLP

ii

*Mallen v. Alphatec Holdings, Inc.*,
   2013 WL 1294640 (S.D. Cal. Mar. 28, 2013), *aff'd sub nom*
   *Fresno Cty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*,
   607 F. App'x 694 (9th Cir. 2015) .................................................................................25

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) .....................................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................... 10, 14, 18

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
   2018 WL 466527 (N.D. Cal. Jan. 18, 2018)................................................................23

*In re Pivotal Sec. Litig.*,
   2020 WL 4193384 (N.D. Cal. July 21, 2020) ................................................. 14, 18, 25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) .....................................................................................21

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019)................................................................. 12, 17

*Retail Wholesale & Dep't Store v. Hewlett-Packard*,
   845 F.3d 1268 (9th Cir. 2017) .....................................................................................22

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ............................................................................ 16, 17, 21

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ......................................................................................9, 12

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).........................................14

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) .........................................................................................9

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) .....................................................................................24

*In re Verifone Sec. Litig.*,
   784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993)...........24, 25

iii

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 20CV1683-CAB-AHG

*Vess v. Ciba-Geigy Corp., USA*,
    317 F.3d 1097 (9th Cir. 2003) ...................................................................................... 8

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ................................................................................ 10, 20

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................... 18

**STATUTES**

15 U.S.C. § 77k(a) .......................................................................................................... 9

**REGULATIONS**

17 C.F.R. § 229.105 ............................................................................................. 8, 13, 25

17 C.F.R. § 229.303 ........................................................................................................ 8

17 C.F.R. § 240.13a-13 .......................................................................................... 12, 17

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 20CV1683-CAB-AHG

Defendants submit this memorandum in support of their motion to dismiss the Second Amended Class Action Complaint (Doc. No. 49) (the "SAC").

## I.    INTRODUCTION

In their third bite at the apple, Plaintiffs again attempt to assert violations of the federal securities laws based simply on a company's stock price decline following an initial public offering ("IPO"). Despite doubling their prior pleading's length, Plaintiffs advance the same core theories this Court has already rejected, and their lone new argument fails as a matter of law.

As before, Plaintiffs attack IPO documents filed with the U.S. Securities and Exchange Commission ("SEC") in June 2020 by Progenity, Inc. ("Progenity" or the "Company"), whose business was focused on non-invasive prenatal testing and genetic carrier screening. Plaintiffs claim Progenity's IPO materials (the "Offering Materials") were false and misleading because they allegedly led investors to believe the Company's "core testing business [was] poised for success," supposedly without telling investors that: (1) due to a coding error, Progenity had incorrectly billed government payors beginning in 2019 and ending in early 2020; (2) Progenity's testing volumes, average selling prices ("ASPs"), and revenues were declining; and (3) in February 2020 the Company purportedly had ended "the illegal marketing practice on which the competitiveness of its business depended." SAC ¶ 12. The Court already rejected the first two theories, which are virtually unchanged in the SAC and still fail to state a claim. And as to the third, it fails for the same basic reason: Plaintiffs fail to plead facts demonstrating that any statements in the Offering Materials were false or misleading in light of the alleged change in marketing strategy several months before the IPO.

*First*, the Court has already dismissed Plaintiffs' argument that Progenity is liable for failing to disclose a bill-coding issue that would result in refunds. As this Court previously held, Progenity had no obligation to disclose the overbilling of some government payors until the existence and amount of the overbilling became known, and Plaintiffs plead no facts demonstrating that the $10.3 million liability was known at

1

the time of the IPO.  Plaintiffs challenge the same statements and offer no new factual allegations.  Plaintiffs try to salvage their failed claim by asserting that Progenity could have estimated the amount and taken the accrual earlier.  *See, e.g.*, SAC ¶ 145.  But there are no facts to support this conclusory allegation either.

*Second*, Plaintiffs' theory that Progenity failed to disclose that its business was in decline at the time of the IPO is belied by the Offering Materials themselves, which make clear that the Company's testing volumes and other financial metrics were declining and might not recover.  Plaintiffs again try to recast a failed allegation without adding facts, claiming that Progenity should have disclosed the reasons for its underperformance.  But nothing in the SAC alters the fact that Progenity explicitly disclosed in May 2020—still the early days of the pandemic—that the Company's business was under pressure and might not improve.

*Third*, Plaintiffs' last-ditch attempt to portray the entirety of the Offering Materials as false and misleading due to a purported "decision" to cease an allegedly improper marketing practice is unavailing.  Plaintiffs plead no facts demonstrating how an alleged shift in the Company's marketing strategy created any false or misleading *statement* in the Offering Materials—which say *nothing* about historical marking practices.  Plaintiffs also provide no factual support for their conclusion that these practices were unlawful, that Progenity altered its marketing practices in the first place, or that the supposedly abandoned marketing strategy had been the driver of the Company's past success.

The SAC should be dismissed, this time with prejudice, for failing to plead facts sufficient to state a claim for violation of the federal securities laws.

## II.   FACTUAL BACKGROUND

### A.   Progenity's Business And Billing Practices

Progenity is a biotechnology company based in San Diego that, at the time of the IPO, specialized in developing and commercializing molecular testing products and precision applications in the maternal health and gastrointestinal spaces.  *See* SAC ¶ 62.

2

Progenity's primary products were (1) "Innatal," a non-invasive prenatal test ("NIPT") to screen for fetal chromosomal conditions such as Down Syndrome, and (2) "Preparent," an expanded carrier screening test for certain mutations that cause genetic diseases. *Id*. ¶¶ 67–68. The majority of Progenity's revenues derived from billing government health care programs and private commercial health insurance companies for its testing products. *Id*. ¶ 76. Billing for these tests required the assignment of a Current Procedure Terminology ("CPT") code describing the medical procedure performed, which also provides the basis for reimbursement by government healthcare programs. *Id*. ¶ 78. On March 31, 2020, Progenity reached a civil settlement agreement with the U.S. Department of Justice ("DOJ") and various states and paid $49 million to resolve allegations that the Company incorrectly billed government payors for Innatal tests after a change to the CPT code system in 2015. *Id*. ¶ 80–89.

As part of that agreement, Progenity acknowledged that it had offered to reduce or waive coinsurance and deductible payments from its sales efforts during the time period from January 2012 through April 2018. SAC ¶ 86(a). The SAC contains conclusory allegations, referencing vague statements by confidential witnesses ("CWs"), that these allegedly improper marketing practices continued, "albeit in a more disguised and subtle form," *id*. ¶ 170, until February 2020, when Progenity made the "decision" to change its marketing strategy, *id*. ¶¶ 170–76.

### B.    Progenity's IPO

Progenity filed its initial registration statement with the SEC on May 27, 2020, filing subsequent amendments on June 4, June 15, and June 18, 2020. *See* SAC ¶¶ 210–11. On June 22, 2020, Progenity filed its final prospectus with the SEC, *id*. ¶ 213, and pursuant to the Offering Materials, the Company sold 6,666,667 shares of common stock at $15.00 per share, *see id*. ¶¶ 212–13.

The Offering Materials described the potential business impact of the Company's reimbursement-related billing practices, including the risk that Progenity would need to refund payments based on incorrect coding. Specifically, Progenity explained that while

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 20CV1683-CAB-AHG

the Company "submit[s] for reimbursement using CPT codes that we believe are appropriate for our testing," "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code." SAC ¶ 335. The Company further cautioned that while it engaged in "efforts to implement appropriate monitoring of" its practices, "we have experienced situations in which employees may have failed to fully adhere to our policies and applicable laws in the past," and "[t]here can be no assurance that we will not experience similar issues in the future." *Id*. ¶ 336. Progenity explained that, in the event of coding errors, "[t]hird-party payors may decide to . . . recoup payment for testing . . . for which they have otherwise overpaid" and the Company "may be required to refund reimbursements already received." *Id*. ¶ 337. If this happened, the Company explained, refund "amounts could be significant and would impact our operating results and financial condition, and it may decrease reimbursement going forward." *Id.* The Company specifically noted the risk that it "may also decide to negotiate and settle with a third-party payor in order to resolve an allegation of overpayment," which "could have a material and adverse effect on our business, operating results, and financial condition." *Id*.

Progenity also described declines in its performance. The Company disclosed that "[b]eginning in March 2020, we began to observe significant declines in the volumes of our molecular tests as well as the pathology tests conducted by Avero Diagnostics due to the impact of the COVID-19 pandemic and work-from-home policies and other operational limitations mandated by federal, state and local governments as a result of the pandemic." SAC ¶ 379. Progenity also explained that "[w]e also may face competitive pricing or reimbursement rate pressures, and we may not be able to maintain our sales volume and/or reimbursement rates in the future, which would adversely affect our business, operating results, and financial condition." *Id*. ¶ 380.

The Offering Materials contain no statement or suggestion that Progenity's testing volumes, ASPs, or revenue would increase following the IPO. The Offering Materials do not discuss the Company's historical marketing practices or strategy, nor do they

4

state that the Company would adopt, maintain, or change any particular marketing strategy or tactic.

### C.    Post-IPO Events

Almost immediately after Progenity's IPO went effective, the Company's stock price traded below the $15.00 per share offer price, dropping to as low as $7.98 per share the next month.[1]  This stock price decline occurred *before* any of the disclosures that Plaintiffs claim corrected the alleged misstatements in Progenity's Offering Materials—a judicially noticeable fact Plaintiffs fail to acknowledge.  *See, e.g.*, *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017).

On August 13, 2020, Progenity hosted an investor call to discuss the second quarter financial results.  *See* SAC ¶ 218.  On the call, Progenity stated that it had discovered a new government-payor billing issue that would require the Company to accrue an expense on its financial statements to account for the reimbursement of the overbilled amounts.  *See id*.  Specifically, Progenity's CEO stated that as part of the Company's "work to improve our compliance program, including . . . internal auditing and monitoring functions, we commissioned the third-party review of our coding and billing processes," which "identified that we had not appropriately transitioned the implementation of the new billing requirements for larger carrier screening panels [i.e., Preparent tests], which were introduced in early 2019."  *Id*.  As a result of the review, Progenity determined that "over the last 18 months, [it] received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020."  *Id*.

In the Company's Form 10-Q, filed the following day, the Company made clear that potential overpayments were still being calculated.  Progenity stated that while "the final analysis of the amount of the overpayment is *still being completed*," the Company took prophylactic action to accrue a $10.3 million charge for reimbursement, "*as a result of the analysis to date.*"  SAC ¶ 220 (emphasis added).  Moreover, the Company stated

---

[1]  *See* Declaration of Alexander K. Mircheff ("Mircheff Decl.") Ex. A at 13.

5

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

its "deadline to report and return the overpayment to the government programs is 60 days from the time the overpayment was *determined and quantified*, thus the Company expects to repay this amount to the relevant government programs by early October 2020." *Id*. (emphasis added).  In other words, the scope of potential overpayment was not "determined and quantified" until *early August 2020*—well *after* the June 2020 IPO, but before the Company's second quarter financial statements were prepared.

### D.     Procedural History

#### 1.     The Court Dismisses Plaintiffs' Prior Complaint In Full

In the first amended complaint in this action (the "Prior Complaint"), Plaintiffs based their claim under Section 11 of the Securities Act of 1933 (the "Securities Act") on four alleged omissions in Progenity's Offering Materials: "(1) that Progenity had overbilled government payors for Preparent tests and would be required to refund them at least $10.3 million; (2) that Progenity was experiencing a trend of decreasing test volume; (3) that Progenity was experiencing a trend of decreasing average selling prices for tests; and (4) that Progenity was experiencing a trend of decreasing revenues."  Order on Defs.' Mot. Dismiss First Am. Compl. (Doc. No. 48) (2021 WL 3929808) ("Op.") at 9.   Plaintiffs claimed these statements were false or misleading because "the overbilling and resulting $10.3 million refund liability both existed and was known to Defendants at the time the Registration Statement took effect," *id.* at 10, and because negative trends in testing volume, ASPs, and revenues were material facts not adequately disclosed by the Company, *see id*. at 12.  The Prior Complaint also claimed "Defendants violated Section 11 by failing to meet their disclosure obligations under Items 303 and 105 of SEC Regulation S-K."  *Id.* at 22.  Plaintiffs also asserted a claim for control person liability against the individual Defendants under Section 15 of the Securities Act, *id.* at 25.  Defendants moved to dismiss all claims.

The Court dismissed the Prior Complaint in its entirety, holding that Plaintiffs failed adequately to plead any false or misleading statement or omission under Section 11 or control person liability under Section 15.  Op. 26.  The Court rejected

6

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

Plaintiffs' overbilling theory, explaining that "an actionable omission under Section 11 must be material, and the fact that Progenity had overbilled some payors could not be material until the amount of that overbilling and resulting liability was quantified." *Id*. at 10. "Thus, it is the actual accrual of the . . . refund liability itself—and more specifically the calculation of the exact amount of that liability—that is material and potentially actionable under Section 11." *Id*. The Court held that "the actual accrual of the . . . liability did not materialize until Progenity's second quarter 2020 financial results were prepared following the end of that quarter," and per SEC guidance, "Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter." *Id*. at 11. "Accordingly, the . . . liability accrual 'did not exist at the time the registration statement became effective' and therefore cannot be an actionable omission under Section 11." *Id*. at 12 (citation omitted).

The Court also rejected Plaintiffs' claim that Defendants violated Section 11 by failing to disclose adverse trends. The Court concluded that "Defendants were under no obligation to disclose their test volume data for the second quarter of 2020 in the Registration Statement," Op. 14, and "although [statements regarding testing volume] have slight inconsistencies between them, a reasonable investor reviewing the Registration Statement in its entirety would not be misled to believe that Progenity's test volume was increasing at the time of the IPO," *id*. at 15. Moreover, "Plaintiffs [did] not identify any statements that were rendered misleading because of the failure to disclose the alleged decline in ASP," *id*. at 19, and "the Registration Statement actually discloses negative trends in Progenity's revenue that Defendant had observed by the time the Registration Statement took effect," *id*. at 21–22.

The Court dismissed related claims under Items 303 and 105 of Regulation S-K for similar reasons, *see* Op. 23–25, and rejected Plaintiffs' Section 15 claim in light of the failure to adequately plead a Section 11 claim, *see id*. at 25.

7

Gibson, Dunn &
Crutcher LLP

### 2.   Plaintiffs' SAC

Like the Prior Complaint, the SAC asserts claims under Sections 11 and 15 of the Securities Act. The SAC alleges that the same statements challenged in the Prior Complaint were false or misleading for the same reasons this Court previously rejected. The SAC includes only one new theory: that Progenity failed to disclose the "decision" in February 2020 to end an allegedly improper marketing practice. *See* SAC ¶¶ 350–69. Specifically, Plaintiffs allege that the Offering Materials contained false and misleading statements due to a purported failure to disclose that: (1) the Company had improperly billed government payors for Preparent tests and there was high probability that Progenity would have to refund those overpayments; (2) in February 2020, the Company ended an allegedly improper marketing practice; and (3) Progenity was undergoing negative trends in test volumes, ASPs, and revenues. *See id.* ¶ 115. Plaintiffs assert a Section 11 claim (Count I) against the Company, certain of its officers and directors, and the underwriters of the IPO. *Id.* ¶¶ 410–18. Plaintiffs further claim that Defendants violated Items 303 and 105 of SEC Regulation S-K, 17 C.F.R. §§ 229.303 & 229.105, by allegedly failing to disclose known trends or uncertainties and material facts and risks that existed at the time of the IPO. Plaintiffs also assert control person claims under Section 15 (Count II) against the individual Defendants. *Id.* ¶¶ 419–26.

## III.   LEGAL STANDARDS ON A MOTION TO DISMISS

A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court is not required to accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Section 11 claims that "sound in fraud" must satisfy the heightened pleading standards of Rule 9(b). *E.g.*, *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1103–04

8

(9th Cir. 2003). Plaintiffs allege that the Company was "aware" or "knew" of the billing issues and their potential impact on revenue, SAC ¶¶ 5, 85, 121–22, 128, 138, 183, 188, 191, 200, 204, 209, 334, made a "decision" to end its allegedly "disguised" illegal marketing practice, *id.* ¶¶ 9, 15, 170, 190, 351–54, 364, 367, 372, 374–75, 377–78, 380, 383, 388, 390, 394, 398, 400, and failed to disclose these "known" material trends and uncertainties as required by Item 303, *id.* ¶¶ 306–07, 315–16, 353-54, 371–72, 374–75, 377–79, 387–88, 396–98. Because the SAC attempts to ground liability on a "unified course of fraudulent conduct," including based on allegations of supposedly fraudulent marketing practices, Plaintiffs must "state with particularity the circumstances constituting the fraud" by "set[ting] forth what is false or misleading about [the challenged] statement[s], and why [they are] false." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted). Plaintiffs' failure to plead each challenged misstatement or omission with specificity defeats their claims.

Even if this heightened pleading standard does not apply, Plaintiffs' Section 11 claim also fails to satisfy Rule 8's notice pleading standard and should be dismissed because Plaintiffs fail to plead facts giving rise to a plausible claim that the Offering Materials contained material misstatements or omissions.

## IV.   ARGUMENT

To state a claim under Section 11, a plaintiff must plead facts demonstrating that registration materials either "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). "To prevail in [a Section 11] action, a plaintiff must prove . . . that the [alleged] omission or misrepresentation . . . would have misled a reasonable investor about the nature of his or her investment." *Rubke*, 551 F.3d at 1161 (internal quotation marks omitted). To plead a material misstatement, a plaintiff must plead contemporaneous facts showing that statements were false or misleading *at the time of the offering*—not simply that events occurred after the IPO that were harmful to the company's business. *See, e.g.*, *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409

9

(9th Cir. 1996); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (a plaintiff "cannot use the benefit of 20-20 hindsight to turn management's business judgment into" a securities violation) (internal quotation marks omitted).  An alleged misstatement also must be considered in light of "cautionary language disclosing specific risks, [because] no reasonable inference can be drawn that a statement regarding those risk was misleading." *In re Worlds of Wonder*, 35 F.3d at 1413.

Pleading a Section 11 claim on an omission theory is "no small task for an investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  "Section 11's omissions clause . . . is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Id.*  "[A]n omission 'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists' to be actionable." *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

### A.   Plaintiffs Fail To Plead Any Actionable Misleading Statement Or Omission

As before, Plaintiffs fail to plead facts demonstrating that the Offering Materials contained any false or misleading statement.

### 1.   Alleged Improper Billing And Overpayments

As in the Prior Complaint, Plaintiffs allege that statements in the Offering Materials regarding Progenity's financial statements, and billing and revenue practices, were false as a result of the Company's failure to disclose that "Progenity had improperly billed government payors for Preparent tests beginning in 2019 and ending in or before early 2020."  SAC ¶ 312.  Plaintiffs, however, still allege no facts demonstrating that Progenity knew of the existence or amount of the overpayments prior to the IPO, only that "there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments from government payors."  *Id*.  But "liability under

10

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

Section 11 'only attaches for misrepresenting [or omitting] information that was available when the offering materials became effective.'" Op. 12 (quoting *Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *5 (C.D. Cal. Jan. 25, 2021)). The Court has already rejected Plaintiffs' core theory, and their new spin does not alter this Court's prior conclusion that Plaintiffs failed to plead a misstatement based on the post-IPO $10.3 million accrual. *See id.* at 10–12.

      **i)**      **Financial Results.** Plaintiffs claim that Progenity's financial statements for the first quarter of 2020, which are included in the Offering Materials, were false and misleading because Progenity improperly accounted for revenue and failed to make qualitative disclosures related to its improper billing and corresponding potential overpayments to government payors. SAC ¶¶ 317, 327. This, Plaintiffs argue, is required for compliance with Generally Accepted Accounting Principles ("GAAP"), specifically under two provisions of the Financial Accounting Standards Board's Accounting Standards Codification ("ASC")—ASC 606 and ASC 450. *Id*. ASC 450 requires disclosure when the "'amount of loss [could] be reasonably estimated,'" *id.* ¶ 288 (quoting ASC 450-20-25-2), and ASC 606 requires disclosure of significant changes in the Company's transactional obligations, for example, "changes in transaction price," Mircheff Decl. Ex. B at 15. Further, ASC 606 provides that companies should "'consider both the likelihood and the magnitude of the revenue reversal.'" SAC ¶ 276 (quoting ASC 606-10-32-12). For both provisions, Plaintiffs peg May 27, 2020—when Progenity filed its initial registration statement—as the date by which the Company should have revised its financial statements for the first quarter of 2020 with allegedly then-available information "indicat[ing] that it was probable that a liability had been incurred as of March 31, 2020 relating to Progenity's obligation to refund Preparent overpayments." *Id*. ¶ 328; *see also id*. ¶ 321. Both theories fail for the same reason: just like the Prior Complaint, the SAC pleads no facts demonstrating that Progenity's refund liability actually existed at the time of the IPO. *See* Op. 10–12. Indeed, the SAC does not challenge Progenity's disclosure that the amount of the

11

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

overpayment was not "determined and quantified" by Progenity until nearly two months *after* the IPO.  SAC ¶ 220.

Plaintiffs' new theory is that "Progenity had ample information that would have allowed it to reasonably estimate the amount, or at least the magnitude, of the resulting overpayments" in early 2020.  SAC ¶ 145. But Plaintiffs rely entirely on CW statements that Progenity had access to unspecified "real-time" data regarding its billing and reimbursement practices, *id.* ¶ 147, and that the Company had audited its processes beginning in late 2019, *id*. ¶ 141.  Neither of these allegations provides factual support to establish a misstatement in Progenity's financial statement.  This Court has already held that "Defendants were under no obligation to disclose their real-time revenue data at the time that the Registration Statement took effect."  Op. 22.  And the SAC pleads no facts to show that Progenity conducted a "real-time" data analysis before the IPO that revealed the overbilling issue and its magnitude.  Accordingly, just as before, Progenity's refund liability *did not exist until it was calculated*, and it was not "determined and quantified" until nearly two months after the IPO and still longer after May 27, 2020.  *See Rubke*, 551 F.3d at 1164 ("A claim under section 11 based on the omission of information must demonstrate that the omitted information *existed* at the time the registration statement became effective.") (emphasis added); *In re Restoration Robotics, Inc. Sec. Litig*., 417 F. Supp. 3d 1242, 1254 (N.D. Cal. 2019) ("[O]missions are actionable only if a defendant has a duty to disclose information and fails to do so.").

The SAC's suggestion that Progenity *could have* estimated the overpayment amounts before the IPO, *see* SAC ¶¶ 145, 149, ignores the well-established limits of Progenity's disclosure obligations.  SEC regulations afford issuers 45 days from the end of a fiscal quarter to file their quarterly disclosures, *see* 17 C.F.R. § 240.13a-13, and courts recognize that companies "need[] time to audit [financial] data before including it in any public materials," *Berg*, 2021 WL 268250, at *5 n.1.  Plaintiffs admit that Progenity filed its Form 10-Q for the second quarter of 2020 with the SEC on August 14, 2020, SAC ¶ 216—45 days after the quarter ended and nearly two months after the IPO,

12

but only shortly after the completion of the third party audit that led Progenity to "determine[] and quantif[y]" the amount of the overbilling. Plaintiffs' speculative allegations that Progenity had the ability to calculate the precise amount of its accrual liability at some unidentified period before its quarterly report was required to be filed—is both unsupported by any facts and at odds with the applicable SEC regulations.

Accordingly, neither a reasonably estimable amount of loss, per ASC 450, nor significant changes in Progenity's transactional obligations, per ASC 606, existed until Progenity calculated its overpayments in August 2020, months after the IPO.

**ii)   Risk Factor Disclosures.**  Plaintiffs also cannot credibly cast Progenity's risk factors—the same disclosures challenged in the Prior Complaint regarding billing, compliance, and business practices—as misstatements. *See* SAC ¶¶ 334–38. Risk factor disclosures are "'discussion[s] of the material factors that make an investment in the registrant or offering speculative or risky.'" *Id*. ¶ 310 (quoting 17 C.F.R. § 229.105(a)). As before, "Plaintiffs' claims regarding Defendants' risk factor disclosures fail for the same reason: Plaintiffs cannot show that the risk of accruing a . . . refund liability had materialized by the time the Registration Statement took effect." Op. 12 n.10.

In the Offering Materials, Progenity warned investors of key risks to its business, including risks that ultimately came to pass, such as that it might have to refund payments from third-party payors. *See* SAC ¶¶ 334–37.  Plaintiffs claim these risk factors were "materially false and misleading" because they supposedly "presented as a mere hypothetical risk that Progenity 'may' be required to refund third-party payors for improper billing." *Id.* ¶¶ 336–37.  But Plaintiffs are merely repeating their baseless, conclusory argument that the Company was required to disclose that it had overbilled government payors for Preparent tests *before* Progenity had determined and quantified the issue. *See id.* ¶ 220 (Progenity "determined and quantified" the billing issue in August 2020—nearly two months *after* the IPO); *supra* at 11–12.  At most, Plaintiffs claim that at the time of the risk disclosure statements, there was a "*probability* that Progenity had received and would have to refund a material amount of overpayments."

13

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

*Id.* ¶¶ 335–37 (emphasis added).  But "'risk factors' are not actionable [under Section 11] without further factual allegations indicating that the risks had already 'come to fruition.'" *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at \*6 (N.D. Cal. July 21, 2020) (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011)); *see also Baker v. Seaworld Entm't, Inc.*, 2016 WL 2993481, at \*12 (S.D. Cal. Mar. 31, 2016) (holding that risk factor disclosures were not false or misleading because "[p]laintiffs . . . fail to plausibly allege Defendants knew that [the cautioned risks] were having any impact" at the time of the IPO).  Pleading that a risk had a "probability" of occurring *is not* the same as pleading facts showing that the risk had materialized at the time of the risk factor statement.

Plaintiffs inaccurately describe the risk factor disclosures themselves.  For example, Plaintiffs incorrectly assert that the risk factor disclosures warned only of potential risks when, according to Plaintiffs, Progenity had already experienced "billing compliance failures."  SAC ¶ 336.  That is not what the risk factor disclosures actually said.  Progenity warned that "we *have experienced* situations in which employees may have failed to fully adhere to our polices . . . *in the past*."  *Id.* (emphases added).  Plaintiffs also claim that the Company "represented that Progenity appropriately billed payors for its tests."  *Id.* ¶ 335.  Not so.  Rather, Progenity stated "[w]e currently submit for reimbursement using CPT codes that we *believe* are appropriate for our testing."  *Id.* (emphasis added).  To state a claim for a false or misleading statement of opinion or belief, a plaintiff must plead that the "speaker d[id] not honestly hold the stated belief and the belief is objectively incorrect."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech, Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (citing *Omnicare*, 575 U.S. at 183–84).  Plaintiffs plead no facts to support either prong.[2]

---

[2] Plaintiffs' own CW allegations indicate that certain coding errors may have been caused by *payors* rather than Progenity.  *See* SAC ¶ 131 ("CW14 stated that . . . some private and government payors did not adopt or recognize the new code, which gave rise to inconsistencies between coding for different payors."); *id.* ¶ 137 ("According to CW5 . . . some [payors] asked Progenity to bill under the old code because they had not switched to the new code yet.").

14

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

**iii)    Settlement with the DOJ and the State of New York.**  Plaintiffs again claim that Progenity misled investors when describing the Company's $49 million settlement with the DOJ and the State of New York.  According to Plaintiffs, Progenity failed to disclose that its improper billing of government payors for Preparent tests was "a pattern almost identical to Progenity's improper billing of government payors for Innatal tests, and that Progenity's improper Preparent billing would not be resolved by the $49 million settlement."  SAC ¶ 338.  Progenity never said the $49 million settlement was in any way related to its Preparent tests—a fact the SAC acknowledges.  *Compare* ¶¶ 80, 83, 84, 330, *with id.* ¶¶ 5, 220, 330.  The Offering Materials stated that the Company "reached an agreement on the monetary terms with the DOJ and the State of New York . . . to resolve all of the government's outstanding civil and criminal investigations" pursuant to which it would "pay $49.0 million in the aggregate."  *Id.* And Progenity warned investors that "payors may seek refunds of amounts that they claim were inappropriately billed to a specific CPT code."  *Id.* ¶ 335; *see also id.* ¶ 337 (explaining that Progenity "may be required to refund reimbursements already received").  Progenity even warned of future potential settlements "to resolve an allegation of overpayment," which "could have a material and adverse effect on our business, operating results, and financial condition."  *Id.* ¶ 337.  The statements about the settlement were accurate.  No reasonable investor could have been misled into believing that the settlement resolved every conceivable overbilling claim.

**iv)    Revenue Recognition Practices.**  Plaintiffs claim that the Offering Materials misstated that Progenity's revenue recognition practices were "in accordance with ASC 606."  SAC ¶ 326.  The Offering Materials explained that under ASC 606—the GAAP guidance covering "Revenue from Contracts with Customers"—"Revenue is primarily derived from providing molecular testing products, which are reimbursed through arrangements with third-party payors, laboratory distribution partners, and amounts from individual patients."  Mircheff Decl. Ex. C at 20, 22. Plaintiffs plead no

15

Gibson, Dunn & Crutcher LLP

facts demonstrating that this statement was false, and as explained above, *see supra* at 11, Progenity's revenue recognition was conducted in accordance with ASC 606.

### 2.   Negative Trends

Plaintiffs also repeat the Prior Complaint's claim that Progenity failed to warn investors of known trends in testing volumes, ASPs, and revenues. *See* SAC ¶¶ 370–402. According to Plaintiffs, Progenity misled investors into believing that the Company's testing volumes were decreasing, and failed to "fully" disclose declines in its average price per test and revenues at the time of the IPO. *Id.* ¶¶ 374, 389–91, 396–402. The Court already rejected this theory, holding that Progenity's disclosures regarding the Company's declining business metrics were more than enough to ensure a reasonable investor would not be misled. *See, e.g.*, Op. 13. Plaintiffs add no new factual allegations to bolster this claim. Plaintiffs admit that "Progenity had a history of large losses, substantial indebtedness, limited cash on hand, and limited ability to generate revenue," SAC ¶ 63, but they fail to acknowledge that Defendants *did* disclose declining testing, sales, and revenue data, *see id.* ¶¶ 374–75, 377–793. Indeed, Plaintiffs' only response to this claim's previous dismissal is to remove from the SAC the Prior Complaint's explicit reference to the Company's disclosure that "[t]he spread of COVID-19, which has caused a broad impact globally, may materially affect us economically, *including a significant reduction in laboratory testing volumes.*" Prior Compl. (Doc. No. 38) ¶ 104 (emphasis added). Plaintiffs cannot carry their burden of pleading an omission that "affirmatively created an impression of a state of affairs that differs in a material way from the one that actually exists," *In re Dropbox Sec. Litig*, 2020 WL 6161502 at *6, by refusing to acknowledge what Progenity disclosed—namely, that the Company's business had declined and there was no assurance it would rise again, *see In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 881 n.10 (9th Cir. 2012) (holding public statements not false or misleading when "the omitted information did not contradict, or render misleading, the original [statements]"). These statements once

16

again defeat Plaintiffs' theory that Progenity failed to disclose in its Offering Materials negative trends in the Company's business.

**i)    Testing Volumes.**   Plaintiffs contend that statements in the Offering Materials concerning Progenity's testing volumes were false and misleading because they misled investors into believing that testing volumes were increasing when, according to Plaintiffs, they were actually declining at the time of the IPO. *See* SAC ¶¶ 370, 374–75, 377–81.   Plaintiffs claim that the Offering Materials "indicated that Progenity's test volumes were still growing at the time of the IPO and . . . exceeded those from the same time period in the previous year," *id.* ¶ 374, and "were positioned for continued growth in the near future," *id.* ¶ 381.  This theory fails for two reasons.

*First*, as the Court recognized in dismissing Plaintiffs' identical claims in the Prior Complaint, Progenity was "under no obligation to disclose [its] test volume data for the second quarter of 2020" (i.e., April and May) in its Offering Materials.  Op. 14.  The SEC does not require publicly held companies to disclose the results of a fiscal quarter until 45 days following the close of that quarter.  *See* 17 C.F.R. § 240.13a-13; *see supra* at 12.  And companies are not required to disclose all material adverse events to investors so long as the omission does not make the actual statements misleading.  *See In re Rigel Pharm.*, 697 F.3d at 880 n.8.  Progenity therefore was "under no obligation to disclose," Op. 14, the alleged "sharp[]" declines in testing volumes from April and May until August 2020, when Progenity filed its quarterly report for the second quarter of 2020 with the SEC, *see In re Restoration Robotics*, 417 F. Supp. 3d at 1254 ("[O]missions are actionable only if a defendant has a duty to disclose information and fails to do so.").

*Second*, Progenity repeatedly explained exactly what Plaintiffs now allege it omitted: declines in testing volumes, which Progenity said might not recover.  The Company stated "*[b]eginning in March 2020*, we began to observe significant declines in the volume of our molecular tests as well as the pathology tests conducted by Avero Diagnostics,"  and that "there can be no assurance that the rate of *decline in our testing volumes will not continue* to accelerate in future periods." SAC ¶ 379 (emphases added).

17

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

Progenity's purported failure to include April and May 2020 testing volumes data could not "render[] a published statement misleading," *Omnicare*, 575 U.S. at 194, because the Offering Materials disclosed that testing volumes had begun to decline significantly *in March*. Op. at 16 ("Defendants reiterated several times that they had begun to observe 'significant declines in the volumes of our molecular tests as well as the pathology tests' in March 2020.") (quoting Prior Compl. ¶ 102).

Plaintiffs' claim that statements regarding "growth rate" and "volume growth" were misleading also go nowhere because the Offering Materials made clear that these were statements about growth and volume "[s]ince our inception." SAC ¶¶ 377–78. As the Court recognized, *see* Op. 15–16, no reasonable investor reading these statements about Progenity's historical growth dating back to 2010, together with the explicit warnings that testing volumes and revenue had recently declined in the period leading up to the IPO, would be misled to believe that Progenity's testing volumes were on the uptick and likely to increase following the IPO.

The SAC's CW allegations fail to cure these pleading deficiencies. "When confidential witnesses report only unreliable hearsay or allege conclusory assertions, these allegations are insufficient." *In re Pivotal*, 2020 WL 4193384, at *13 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009)). The conclusory statements attributed to the CWs offer at most anecdotal discussions regarding various Progenity business practices, including coding, billing, and reimbursement. For example, CW5 purports to have participated in an audit that began "*maybe* later in 2019" that was geared toward "making sure everything was correctly documented," "reporting integrity," and "business practices." SAC ¶ 139 (emphasis added). Other CW allegations merely confirm what the Company disclosed in the Offering Materials—that testing volumes had declined in the period before the IPO. For example, CW1 and CW2 assert that Progenity's testing volumes declined in the spring of 2020. *See id.* ¶¶ 191–92. That is consistent with what the Company disclosed. *See id.* ¶ 379; Prior Compl. ¶ 104. CW4 and CW5 claim that Progenity had access to real-time business, sales, and

18

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

revenue data, *see* SAC ¶¶ 193–94, but neither of them (or any other CW) alleges that Progenity knew before the IPO that an accrual liability existed or that testing volume differed from Progenity's disclosures.  As the Court recognized, "[m]ost companies in existence today have access to similar data for their businesses," but "[n]evertheless, companies filing registration statements are not required to disclose every shred of data in their possession in real-time, so long as the omission of that data does not render the statements they do share misleading."  Op. 17 n.13.

Plaintiffs fail to plead that any statement in the Offering Materials was false or misleading on account of Progenity's alleged failure to say more about what it already disclosed—that its testing volumes had declined.

**ii)    Average Selling Prices.**  Plaintiffs' claim that the Offering Materials failed to disclose that the ASP for Progenity's tests was declining also fails.  *See* SAC ¶¶ 389–91.  This Court already held that "Plaintiffs do not identify any statements that were rendered misleading because of the failure to disclose the alleged decline in ASP or the ASP of Progenity's tests across any specific period."  Op. 19.  Nothing has changed.

There is only a single reference to ASPs in the Offering Materials: "Higher gross margins reflect the average selling price of our tests, as well as the operating efficiency of our laboratory operations."  SAC ¶ 72.  Plaintiffs do not claim this statement was false or misleading.  Plaintiffs identify only two statements that they allege were rendered false or misleading by the supposed decline in Progenity's ASPs, neither of which mentions ASPs: (1) that "[i]n response to the COVID-19 pandemic, the Avero Diagnostics laboratory is providing molecular testing for diagnosing COVID-19" and (2) that the new CPT code for expanded carrier screening tests "may similarly cause reimbursement for our Preparent expanded carrier screening tests to decline."  *Id.* ¶¶ 390, 391.  Plaintiffs offer no explanation of how the former, a factual statement about the allocation of testing, or the latter, a risk factor disclosure warning of potential declines, are rendered inaccurate by the absence of a mention of ASPs.  Plaintiffs again plead no misstatement or omission related to ASPs.

19

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

**iii)  Decreasing Revenues.**  Plaintiffs' theory that Progenity failed to "fully disclose" a trend of decreasing revenues, *see* SAC ¶¶ 396–402, also makes no sense in light of what the Company plainly disclosed: that its revenues had decreased, as the Court recognized when it dismissed these same claims, Op. 21.

Plaintiffs point to three factors that supposedly caused this negative trend: (1) Progenity's decision to stop improperly billing for Preparent tests; (2) Progenity's decision to discontinue its allegedly improper marketing practice; and (3) Progenity's decision to cut testing prices. *See* SAC ¶ 398.  But none of these unsupported allegations changes the critical fact that Progenity disclosed that the Company's revenues in the first quarter of 2020 were 64.6% lower than the first quarter of 2019.  Mircheff Decl. Ex. C at 19.  As the Court also recognized in dismissing this same argument, no reasonable investor could have been misled because the Offering Materials explained "in bold, italicized font: 'We have incurred losses in the past, and we may not be able to achieve or sustain profitability in the future,'" and "'[i]t is possible that we will not generate sufficient revenue from the sale of our products to cover our costs . . . and achieve or sustain profitability.'"  Op. 22.

Further, Plaintiffs allege that "negative trends in Progenity's revenues *at the time of the IPO* were additionally material because they would have provided investors with critical information regarding Progenity's revenue performance."  SAC ¶ 400 (emphasis added).  Courts regularly reject this same argument.  *See, e.g.*, *Worlds of Wonder*, 35 F.3d at 1419 (holding that a company is "under no duty to disclose the precise extent of the anticipated revenue drop" when the "prospectus clearly warned that [the company] expected lower net sales").

### 3.  Allegedly Improper Marketing Practices

The SAC's only new allegation is that Progenity failed to disclose a "decision" to end its allegedly improper marketing practices that were purportedly bolstering its business.  *See, e.g.*, SAC ¶¶ 350–69.  This new theory fares no better than the theories this Court already rejected.  To plead a cognizable securities law claim, Plaintiffs must

20

allege facts showing that the Company made statements that were false or misleading. Plaintiffs attack a historical business practice that they allege ended months before Progenity's IPO, and they make little effort to demonstrate how a purported shift in the Company's marketing practices rendered any statement in the Offering Materials false or misleading. This is not surprising, given that the Offering Materials say nothing about Progenity's historical marketing practices. Nor do Plaintiffs plead facts supporting the core premise of their new theory—that the prior marketing efforts were instrumental to the Company's success, and that changing its marketing practices would cripple the Company. The Court previously rejected exactly this kind of sweeping, unsubstantiated theory. *See* Op. 21 ("Plaintiffs' allegation that a 222-page Registration Statement is false and misleading in its entirety is exactly the type of 'conclusory, unwarranted deduction[] of fact or unreasonable inference[]' that the Court must disregard in analyzing a motion to dismiss under Rule 12(b)(6)." (quoting *Daniels-Hall*, 629 F.3d at 998)). Plaintiffs' new theory fails as a matter of law.

*First*, Plaintiffs fail to identify any statement in the Offering Materials rendered false or misleading by the omission of details regarding Progenity's allegedly improper historical marketing practices. The SAC does not cite a single statement in the Offering Materials that discussed the Company's marketing practices in any period prior to the IPO—including before February 2020, when Plaintiffs allege Progenity made the "decision" to terminate such practices. SAC ¶¶ 12, 115, 158, 170, 190, 262, 351–53, 355, 357, 359–60, 361, 363–64, 374–75, 377–80, 383, 388, 394, 398, 400. Having never spoken about its historical marketing practices, Progenity was not required to say anything about alleged changes to its marketing strategy. *See* Op. 14; *In re Rigel Pham.*, 697 F.3d at 880 n.8 (no disclosure requirement "even if investors would consider the omitted information significant" as long as actual statements remain accurate); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("We have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely

21

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 20CV1683-CAB-AHG

to be additional details that could have been disclosed but were not.'") (citation omitted). Plaintiffs misleadingly cite provisions in the Offering Materials that either describe the risk of non-compliance with relevant laws or reference current—rather than historic—marketing practices, to which Plaintiffs concede the supposed February 2020 "decision" (months prior to the IPO) could not apply. *See, e.g.*, SAC ¶ 357 ("[W]e have experienced situations in which employees may have failed to fully adhere to our policies and applicable laws in the past. There can be no assurance that we will not experience similar issues in the future."); *id.* ¶ 360 ("We generally seek to collect co-payments and deductibles directly from patients in cases where we have billed the payor."). None of these statements is rendered inaccurate by Progenity's failure to say that it supposedly had changed its marketing strategy several months before the IPO.

*Second*, Plaintiffs plead no facts supporting their legal conclusion that Progenity's marketing practices from April 2018 until February 2020—which they allege were "more disguised and subtle" than prior practices—were unlawful. *E.g.*, SAC ¶ 170.[3] That alone is fatal to Plaintiffs' theory that Progenity engaged in a long-running violation of the Anti-Kickback Statute—a theory that only Plaintiffs, not any regulators, have endorsed. Plaintiffs also ignore what the Offering Materials said about the Company's marketing practices and related risks: "[a]lthough we believe that our sales and marketing practices comply in all material[] respects with all applicable federal and state laws and regulations, regulatory authorities may disagree." *Id.* ¶ 363; *see also* Mircheff Decl. Ex. C at 18, 21. Progenity had no duty to disclose anything further. *See Retail Wholesale & Dep't Store v. Hewlett-Packard*, 845 F.3d 1268, 1278 (9th Cir. 2017) (no duty to disclose where "affirmative statements did not create an impression of full compliance"). The "[f]ederal securities laws do not impose . . . a 'duty to disclose

---

[3] To support their claim that Progenity "continued [supposedly illegal] practices up until February 2020," Plaintiffs offer only vague and conclusory CW statements that if health care providers had "any issue they could contact Progenity to work it out," or that "the message from the training by the billing team . . . in December 2018 was that fees could be adjusted." SAC ¶ 171.

22

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

uncharged, unadjudicated wrongdoing.'" *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)); *accord In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019).

*Third*, Plaintiffs plead no facts supporting their premise that there was a *change* in policy in February 2020.  Plaintiffs cite a meeting where they allege there were discussions emphasizing the need to bill patients.  *See* SAC ¶ 172.  That Progenity emphasized this point does not mean that there was any change in policy.  Plaintiffs offer only their own conjecture and re-interpretation of a single CW's "belie[f]" to support the premise that there was actually a change in policy.  *Id.*

*Fourth*, Plaintiffs conclusorily allege that the supposedly improper marketing practices were the reason for the Company's past success.  Without any factual support, Plaintiffs frame Progenity's allegedly improper marketing practices as "the centerpiece of its sales and marketing strategy for its genetic tests," SAC ¶ 8, and claim that without them, Progenity's "business was no longer viable," *id*. ¶ 16.  There is not a single financial metric or other fact alleged that supports this sweeping conclusion.  Nowhere does the SAC explain how, or to what degree, Progenity's business had been bolstered by these alleged practices, or why the supposed shift away from them was a strategy doomed to fail.  Plaintiffs' only support for their assertions that Progenity's business declined due to the "decision" to end its purported practices are the conclusory assertions of CWs that Progenity lost an undefined number of accounts and reduced the prices of its tests.  *See id.* ¶¶ 178–82.  That is insufficient.  And to the extent Plaintiffs argue that the cessation of Progenity's allegedly improper marketing practices led to a decline in ASPs and decreasing revenues, *see id.* ¶¶ 365–69, they plead no facts supporting that premise, and in any event the Company adequately disclosed those negative trends, *see supra* at 19–20.

23

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

**B.    Plaintiffs Cannot Use Items 303 And 105 Of Regulation S-K To Plead A Section 11 Claim**

Having failed to plead a material misstatement or omission, Plaintiffs attempt to recast their inadequate Section 11 claim as a violation of Items 303 and 105 of SEC Regulation S-K.  *See* SAC ¶¶ 313–16, 351–54, 371–72, 387–88, 397–398.  These arguments are fundamentally the same as the Prior Complaint and should be rejected for the same reasons as before.  *See* Op. 22–24.

To the extent Item 303 could be a basis for a Section 11 claim, Plaintiffs fail to plead that Progenity violated any disclosure duty under Item 303.[4]  Item 303 requires disclosure "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman*, 143 F.3d at 1296–97 (internal quotation marks omitted).  And while Regulation S-K "governs the disclosure of known historic trends," it "does not provide a basis of liability where a corporation fails to disclose the future."  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (internal quotation marks omitted).

Progenity could not have disclosed that "there was a high probability that [it] had received, and would have to refund, a material amount of overpayments from government payors for Preparent tests," SAC ¶ 315, because there are no facts pled demonstrating that the accrual liability was known at the time of the IPO, and the

---

[4] It is unclear whether a violation of Item 303 can even give rise to a Section 11 claim. Although the Ninth Circuit has stated that "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11," *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998), it has also held that "a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under" Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014) (internal quotation marks omitted). Because the "duty to disclose under Item 303 is much broader than what is required under the standard pronounced in *Basic* [*Inc. v. Levinson*, 485 U.S. 224, 231 (1988)]," which defines materiality for both Section 11 and Section 10(b), the principal espoused by NVIDIA applies with equal force to a Section 11 claim. *Id.*

24

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT CASE NO. 20CV1683-CAB-AHG

Company was under no obligation to "disclose the future," *In re Verifone*, 784 F. Supp. at 1483. Further, Progenity made all required disclosures related to known, historical trend data regarding testing volume, ASPs, and revenue. *See supra* at 16–20. And to the extent "Progenity's February 2020 decision to end its key illegal marketing practice of waiving patient payment amounts was a known *trend*," SAC ¶ 353 (emphasis added), this too was properly disclosed in Progenity's historical data. Item 303 did not require the Company to make future projections based on those trends, as Plaintiffs allege. *See, e.g., id.* ¶ 352 (alleging Company failed to disclose "the end of this illegal marketing practice would make it more difficult for Progenity to obtain new customers in the future").

Nor can Plaintiffs plead a claim under Item 105, which requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Progenity's Offering Materials warned investors of the potential impact of overbilling government payors. *See supra* at 4, 13. Progenity also warned of the risks Plaintiffs claim were associated with ending its allegedly improper marketing practices, *see* SAC ¶¶ 351–52, namely declines in revenue, *see supra* at 20. Item 105 requires only a "discussion" of such risks, not clairvoyance—a standard plainly met here. *See In re Pivotal*, 2020 WL 4193384, at *8 (dismissing an Item 105 claim where "risk disclosures discuss exactly these possibilities" alleged in the complaint).

### C.   Plaintiffs Fail To State A Claim Under Section 15

"Because the SAC fails to adequately plead a primary violation under the Securities Act . . . the claims brought under § 15 of the Securities Act" necessarily fail. *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at *13 (S.D. Cal. Mar. 28, 2013)), *aff'd sub nom. Fresno Cty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).

### V.   CONCLUSION

Accordingly, the SAC should be dismissed with prejudice.

Gibson, Dunn & Crutcher LLP

25

Dated: November 15, 2021

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Alexander K. Mircheff
Brian M. Lutz
Jeffrey S. Rosenberg
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Email: blutz@gibsondunn.com
Email: jsrosenberg@gibsondunn.com

Alexander K. Mircheff
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Email: amircheff@gibsondunn.com

*Attorneys for Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell*

O'MELVENY & MEYERS LLP

By: /s/ Daniel L. Cantor
Daniel L. Cantor
Times Square Tower
7 Times Square
New York, NY 10036-6537
Telephone: 212.326.2000
Email: dcantor@omm.com

Matthew W. Close
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: 213.430.6000
Email: mclose@omm.com

*Attorneys for Defendants Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG LLC*

26

Gibson, Dunn & Crutcher LLP

## SIGNATURE CERTIFICATION

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable to the above listed counsel, and that I have obtained authorization to affix all electronic signatures to this document.

Dated: November 15, 2021                    GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Alexander K. Mircheff_
Alexander K. Mircheff

Gibson, Dunn &
Crutcher LLP