ROBERT V. PRONGAY (#270796)
  *rprongay@glancylaw.com*
CASEY E. SADLER (#274241)
  *csadler@glancylaw.com*
GARTH A. SPENCER (#335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No. 3:20-cv-01683-LL-AHG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Linda Lopez |

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   THE SAC'S NEW ALLEGATIONS .................................................................. 2

A.    In Or Before Early 2020 Progenity Recognized That It Had Improperly Billed Government Payors For Preparent Tests ................. 2

1.    From Early 2019 Progenity Was Required to Use a New Billing Code, Which Would Result In Substantially Lower Reimbursements ............................................................................ 3

2.    Through An Audit In Late 2019, Progenity Identified And Ceased Improper Preparent Billing By Early 2020 ..................... 3

3.    Before the IPO, Progenity Knew Of A Risk That It Would Have To Refund A Material Amount Of Preparent Overpayments ................................................................................ 4

4.    Accounting Standards Required Disclosures Or Accruals Relating To The Improper Billing And Overpayments ............... 4

B.    In February 2020 Progenity Discontinued Its Key Illegal Marketing Practice ........................................................................... 5

1.    Progenity Admitted To Illegally Waiving Patient Payment Amounts Through April 2018 ....................................................... 6

2.    Illegal Patient Payment Waivers Were Progenity's Main Selling Point, And Progenity Continued The Practice Well Beyond Its Admitted 2018 Misconduct ...................................... 6

3.    Progenity Abruptly Ended Its Key Illegal Marketing Practice In February 2020 In Response To Government Scrutiny ...................................................................................... 7

4.    Abandoning Its Key Illegal Marketing Practice Decimated Progenity's Business ................................................................... 7

C.    Progenity's Cessation Of Its Improper Billing And Key Illegal Marketing Practice Caused Material Negative Trends In Test Volumes, Average Selling Prices, and Revenues ................................ 8

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

i

III.   PLAINTIFFS' CONFIDENTIAL WITNESS STATEMENTS ARE HIGHLY RELIABLE ....................................................................... 8

IV.   PLAINTIFFS FACE A MINIMAL PLEADING BURDEN ......................... 10

V.   THE SAC STATES A CLAIM FOR VIOLATIONS OF SECTION 11 ........ 13

    A.   The Registration Statement Failed To Disclose Progenity's Overbilling For Preparent Tests ......................................................... 13

    B.   The Registration Statement's Purported Risk Warnings Were Misleading ...................................................................................... 17

    C.   The Registration Statement Misleadingly Failed to Disclose Progenity's Decision To Abandon Its Key Illegal Marketing Practice ........................................................................................... 18

    D.   The Registration Statement Failed To Disclose Risks Required Under Regulation S-K Item 105 ........................................................ 21

    E.   The Registration Statement Contained Material Misrepresentations And Omissions Regarding Negative Trends In Test Volumes, ASP, and Revenue ....................................................... 21

        1.   The Registration Statement Falsely Claimed That Progenity's Test Volumes Were Increasing ............................... 22

        2.   The Registration Statement Failed To Make Disclosures Required By Item 303 Regarding Known Trends ...................... 23

VI.   THE COURT SHOULD GRANT LEAVE TO AMEND, IF NECESSARY ........................................................................................... 24

VII.   CONCLUSION ......................................................................................... 25

# **TABLE OF AUTHORITIES**

CASES

*Atossa Genetics Inc Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017)................................................................................17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ..........................................................................................15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................12

*Berg v. Velocity Fin., Inc.*,
    2021 WL 268250 (C.D. Cal. Jan. 25, 2021) .........................................................16

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008)..............................................................................17

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)............................................12, 21, 24

*Derr v. Ra Med. Sys., Inc.*,
    2021 WL 1117309 (S.D. Cal. Mar. 24, 2021) .......................................................12

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003)............................................................................24

*Gilligan v. Jamco Dev. Corp.*,
    108 F.3d 246 (9th Cir. 1997)..............................................................................11

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ......................................................................................11, 15

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021)............................................................................15, 17

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 535 (N.D. Cal. 2009) ...................................................................10, 12

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008)......................................................13

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005)..............................................................8, 13

*In re Immune Response*,
375 F. Supp. 2d 983 (S.D. Cal. 2005).......................................................13

*In re Restoration Robotics, Inc. Sec. Litig.*,
417 F. Supp. 3d 1242 (N.D. Cal. 2019) ....................................................15

*In re Sipex Corp. Sec. Litig.*,
2005 WL 3096178 (N.D. Cal. Nov. 17, 2005)...........................................17

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)......................................11, 12

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)...........................................................1, 3, 4

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) .............................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...............................................................11, 15, 16

*Mingbo Cai v. Switch, Inc.*,
2019 WL 3065591 (D. Nev. July 12, 2019)...............................12, 20, 24

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................11, 18

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)..........................................12

*Pirani v. Slack Techs., Inc.*,
445 F. Supp. 3d 367 (N.D. Cal. 2020) ....................................................21

*Rieckborn v. Jefferies LLC*,
81 F. Supp. 3d 902 (N.D. Cal. 2015) ......................................................13

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

iv

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009)........................................................................12, 16

*S.E.C. v. Todd*,
   642 F.3d 1207 (9th Cir. 2011)................................................................................18

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998)................................................................................23

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...............................................................................................11

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .......................................................20

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003)..........................................................................12, 13

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) .............................................................................................22

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996)....................................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)....................................................................................8

STATUTES

15 U.S.C. § 77k..................................................................................................10, 15

15 U.S.C. § 77k(a) .....................................................................................................21

RULES

Fed. R. Civ. P. 15(a)(2)..............................................................................................24

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

v

REGULATIONS

17 C.F.R. § 229.105 ............................................................................................21

17 C.F.R. § 229.303(a) ......................................................................................23

17 C.F.R. § 229.303(b)(2)(ii)............................................................................23

42 C.F.R. § 401.305(b)(1) ...................................................................................4

Lead Plaintiffs Lin Shen, Lingjun Lin and Fusheng Lin ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Second Amended Complaint.[1]

## I.   PRELIMINARY STATEMENT

The SAC cures the deficiencies that the Court identified when dismissing the FAC.[2] *First*, regarding Progenity's improper billing of government payors for Preparent tests, the SAC, *inter alia*: (i) adds detailed factual allegations from multiple confidential witnesses showing Progenity's recognition, prior to the IPO, that it was required to use the new "81443" billing code applicable to Preparent tests but had failed to do so; and (ii) explains how Progenity's failure to disclose its improper billing and receipt of overpayments was material to reasonable investors and violated relevant accounting standards.

*Second*, based on new revelations from Progenity and additional confidential witness interviews, the SAC adds an entirely new theory of falsity that was not previously before the Court. From its inception until just four months prior to the IPO, Progenity's business depended on the key illegal marketing practice of waiving

---

[1] Plaintiffs do not oppose Defendants' request for judicial notice to the extent that the Court takes notice of the fact those documents exist and what those documents say, but not for the truth of the factual matters stated therein. To the extent that Defendants attempt to use the exhibits in their request for judicial notice to defeat Plaintiffs' adequately pled claims, that practice is improper and is frowned upon by the Ninth Circuit Court of Appeals. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" where defendants attempt to exploit judicial notice "procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage.").

[2] Unless otherwise indicated, all emphasis in this brief has been added, all internal citations, quotation marks, and alterations have been removed, and citations in the form of "¶__" refer to the Second Amended Class Action Complaint ("SAC", ECF No. 49). References to "FAC" are to the first Amended Complaint (ECF No. 38). The Court dismissed the FAC without prejudice. ECF No. 48 (the "Order"). References to "MTD" are to the pending motion to dismiss. ECF Nos. 50 and 50-1.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

1

patient payment amounts while submitting astronomical bills to government health care programs and private insurers. Defendants failed to disclose to investors that Progenity's key marketing practice, which underpinned all of Progenity's reported historical results, had recently been abandoned, resulting in substantial loss of customers and a sharp deterioration in Progenity's future prospects.

*Third*, the SAC explains how Progenity's recent decisions to end its improper billing and illegal marketing caused negative trends in Progenity's test volumes, average selling prices, and revenues, and how failure to disclose these decisions and trends misled investors about the Company's financial prospects.

In sum, the substantial additional facts and new legal theories introduced in the SAC more than suffice to state a plausible claim for relief. Defendants' motion, which primarily attempts to relitigate the sufficiency of the FAC while ignoring the vast majority of the SAC's new allegations, should be denied in its entirety.

## II.    THE SAC'S NEW ALLEGATIONS

In the Order, the Court concluded that the FAC failed to state a claim for violation of the Securities Act. After additional research and investigation, including multiple confidential witness interviews, Plaintiffs timely filed the SAC, which includes substantial new allegations and legal theories.

### A.    In Or Before Early 2020 Progenity Recognized That It Had Improperly Billed Government Payors For Preparent Tests

The SAC substantially expands on the FAC's allegations regarding Progenity's improper billing of government payors for Preparent tests, clearly establishing that information existing and knowable to Progenity prior to the IPO revealed that Progenity had improperly billed government payors for Preparent tests, and further revealed a high probability that Progenity had received, and would have to refund, a material amount of overpayments as a result.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

**1.    From Early 2019 Progenity Was Required to Use a New Billing Code, Which Would Result In Substantially Lower Reimbursements**

In 2018 the American Medical Association published new CPT billing codes effective January 1, 2019, including the new 81443 code which was required to report genetic screening for multiple severe inherited conditions with a single test, such as Progenity's Preparent test. ¶¶100-102. Government health care programs such as Medicaid required use of the new 81443 code effective January 1, 2019, and prohibited billing such a panel test under a different CPT code or multiple different codes for the individual tests involved. ¶¶111-114. Under published government health care program coverage determinations and rate schedules, this billing code change would result in lesser reimbursement than was previously obtainable, or in some cases no reimbursement at all. ¶¶103-110.

Progenity employees routinely followed developments in CPT coding and payor billing and reimbursement policies. ¶¶117-121. They did so through annual CPT code books, billing code "cheat sheets," internet searches, Medicaid fee schedules, insurance plan medical policies, and regular meetings and record keeping. *Id.* Dedicated employees tracked such developments at each payor, and maintained binders with updated policies and procedures. ¶120. Multiple confidential witnesses corroborate that Progenity was aware of the 81443 billing code and its applicability to Preparent tests by early 2019, but experienced difficulties and confusion in implementing the billing code change. ¶¶ 122-138.

**2.    Through An Audit In Late 2019, Progenity Identified And Ceased Improper Preparent Billing By Early 2020**

By "early 2020," *i.e.* before the IPO, Progenity conducted an audit, which led it to discover and stop its improper failure to bill Preparent tests using the 81443 code. ¶¶139-144. CW5, who worked primarily on the audit at the end of her tenure stated that Progenity began its audit with a third party auditor "later in 2019." ¶¶139-140. Likewise, Defendant Stylli stated that the improper Preparent billing

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

3

arose from a legal view Progenity took "about 18 months ago" [*i.e.*, March 2019]. ¶141. Defendant Stylli further stated, "the procedures that we've taken with the company over the last couple years and *especially in the last 12 months* [*i.e.* since September 2019] makes it very difficult that we would make those kind of errors again." *Id*. Progenity was reimbursed within "a number of months" of administering a test, and received overpayments only through "early 2020," so Progenity clearly ceased the improper billing well in advance of the June 2020 IPO. ¶¶143-144.

### 3. Before the IPO, Progenity Knew Of A Risk That It Would Have To Refund A Material Amount Of Preparent Overpayments

Progenity must report and return overpayments from federal government health care programs within 60 days of when the provider has, or *should have*, "through the exercise of reasonable diligence, determined that [it] has received an overpayment and quantified the amount of the overpayment." 42 C.F.R. § 401.305(b)(1). By the end of March 2020, Progenity had reached an agreement in principle to resolve government investigations into a nearly identical pattern of improper billing with respect to Progenity's other main product, the Innatal test, showing that the government would likely seek to recoup the very similar Preparent overpayments. ¶153. As part of the settlement, Progenity would be subject to an independent claims audit, which was likely to reveal to the government what the Company already knew – the improper Preparent billing. ¶¶154-156. Therefore, prior to the IPO, Progenity possessed information showing that it would have to refund overpayments received from its improper Preparent billing. ¶¶150-157.

### 4. Accounting Standards Required Disclosures Or Accruals Relating To The Improper Billing And Overpayments

Progenity's IPO Registration Statement, effective June 18, 2020, included financial statements through March 31, 2020, and represented that Progenity "has evaluated subsequent events from the balance sheet date through May 27, 2020, the date the consolidated financial statements were available to be issued." ¶318 n.16.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

4

By May 27, 2020, as discussed *supra*, information available to Progenity showed that it had improperly billed government payors and likely received material Preparent overpayments. This material information should have been disclosed according to relevant provisions of the Accounting Standards Codification ("ASC").

For example, ASC 450 requires disclosure of the nature of a loss contingency, and either an estimate of the possible range of loss or a statement that such an estimate cannot be made, if the chance of the loss contingency occurring is "more than remote." ¶¶286-298; 327-330; ASC 450-20-50; ASC 450-20-20. Thus, Progenity was required to accrue an estimated loss in connection with its likely Preparent refunds, or at the very least to make qualitative disclosures regarding those refunds and to expressly state that a quantified estimate was not possible.

ASC 606 required Progenity to reduce its revenue and recognize liabilities in connection with its likely Preparent refunds. ¶¶267-285; 317-322. For example, Progenity was only allowed to include variable consideration in the price for its services to the extent that "it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved." *Id*.; ASC 606-10-32. Thus, Progenity was required to disclose that it was not probable that Progenity would be allowed to retain those overpayments indefinitely.

The Preparent overpayments were reasonably estimable, as evidenced by Progenity's ability to routinely account for other similar refunds well in advance of payment, and well in advance of determining the precise refund amounts. ¶¶95-99.[3]

**B.     In February 2020 Progenity Discontinued Its Key Illegal Marketing Practice**

In addition to obtaining overpayments through improper billing, the key to

---

[3] That Progenity was required to make such disclosures and accruals is bolstered by SEC enforcement actions against other companies for failures to apply these standards under analogous circumstances. ¶¶285, 298.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

5

Progenity's genetic testing business strategy was illegally waiving patient payment amounts while submitting astronomical bills to third party payors. Defendants ended this practice mere months before the IPO, without disclosing this or the immediate, devastating effect of ending the practice (*e.g.*, customers were *already* abandoning Progenity), or that *all* of Progenity's historical results substantially depended on this practice. Ending this practice had devastating effects on the Company's business. Less than one year after the IPO, Progenity announced that it was exiting its core genetic testing business, which was no longer commercially viable.

### 1.   Progenity Admitted To Illegally Waiving Patient Payment Amounts Through April 2018

As part of its July 2020 settlement with the Department of Justice and other government agencies, Progenity admitted that from January 2012 until April 2018 (*i.e.*, from Progenity's inception through the beginning of the governmental investigations) it had routinely reduced or waived coinsurance and deductible payments as part of a marketing effort to sell its expensive tests, which Progenity euphemistically referred to as the "Peace of Mind" program. ¶¶80-83, 86-88. Progenity agreed not to make any statement suggesting this conduct was not wrongful. ¶88. The routine waiver of patient payment amounts results in wasteful and unnecessary expenditures by health care programs, and violates payor policies and federal laws such as the False Claims Act and Anti-Kickback Statute. ¶¶90-93. Progenity's Vice president of billing and reimbursement, CW14, stated that this practice was "bad," "flagrant," and "like robbery." ¶161.

### 2.   Illegal Patient Payment Waivers Were Progenity's Main Selling Point, And Progenity Continued The Practice Well Beyond Its Admitted 2018 Misconduct

According to multiple former Progenity employees, illegal patient payment waivers were Progenity's main selling point, and Progenity's competitors offered superior tests at lower prices. ¶¶164-169. This illegal practice continued well beyond the period covered by government investigations—multiple former

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

6

Progenity employees confirmed that throughout 2018, 2019, and into 2020, Progenity continued to inform doctors that Progenity would waive the vast majority of ostensible patient payment amounts. ¶¶170-174.

### 3.    Progenity Abruptly Ended Its Key Illegal Marketing Practice In February 2020 In Response To Government Scrutiny

While Progenity was in the process of negotiating its governmental settlement, in the last week of February 2020, the Company held its annual national sales meeting. ¶¶175-177. Two former Progenity employees in attendance confirmed that at this meeting Progenity announced that, effective immediately, it would stop waiving patient payment amounts. *Id.* According to Senior Business Development Manager CW7, "everyone was kind of up-in-arms" after this announcement, and "everything changed overnight." ¶175. At the meeting CW7 pulled aside Progenity's VP of Sales to ask why the change was made so suddenly; he responded that if Progenity gave customers a transition period "we'd lose our company," and that Progenity was being sued by the federal government. ¶176.

### 4.    Abandoning Its Key Illegal Marketing Practice Decimated Progenity's Business

Progenity's abrupt abandonment of its key illegal marketing practice demoralized its sales force and angered doctors and patients. ¶¶178-180. Progenity lost substantial business nationwide as a result of this change, as customers switched to Progenity's competitors who offered lower prices. *Id.* Progenity slashed the cash prices for its tests and reduced its billing to insurers, in an effort to compete without being able to rely on illegal patient payment waivers. ¶¶181-182. Over the following months, Progenity repeatedly announced declining core test volumes, average selling prices, and revenues. ¶¶15, 215, 222-229, 235-241, 244-247. In June 2021, Progenity announced that it would exit the core genetic testing business that had been its main focus and source of revenues since inception. ¶¶254-262.

### C.   Progenity's Cessation Of Its Improper Billing And Key Illegal Marketing Practice Caused Material Negative Trends In Test Volumes, Average Selling Prices, and Revenues

The SAC's new allegations regarding Progenity's improper Preparent billing and key illegal marketing practice provide vital context and reinforcement to Plaintiffs' allegations of negative trends in key performance metrics. Progenity's trend of decreasing test volumes was caused in substantial part by its abandonment of illegal patient payment waivers, which resulted in the loss of customers. ¶¶178-180, 184, 190. Progenity's trends of declining test average selling prices and, in turn, decreasing revenues, were caused in substantial part by (i) Progenity ceasing its improper billing of government payors for Preparent tests, and (ii) price reductions that Progenity implemented to try to stay competitive in connection with the end of its illegal marketing practice. ¶¶196, 202-203, 205.

### III.   PLAINTIFFS' CONFIDENTIAL WITNESS STATEMENTS ARE HIGHLY RELIABLE

The SAC's new allegations based on interviews with 16 former Progenity employee confidential witnesses ("CWs") provide key details demonstrating Defendants' violations of Section 11 and corroborating Plaintiffs' other mutually reinforcing allegations. Even in cases, unlike here, that rely on CWs to allege fraud under the heightened pleading requirements of Rule 9(b) and the PSLRA, the CWs need only be "described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), as amended (Feb. 10, 2009). This requirement can be met by describing information such as the CWs' job responsibilities, titles, and reporting lines, as Plaintiffs have done here. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005); ¶¶46-61 (describing CWs).

Defendants simply ignore the vast majority of the SAC's CW statements while mischaracterizing others, and attempt to dismiss *all* of the CW allegations in broad-brush fashion as supposedly "vague" or "conclusory." Contrary to

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

Defendants' contentions, the SAC contains highly specific accounts from witnesses in positions to know the information discussed. Moreover these statements are highly probative of Defendants' material misrepresentations and omissions. For example, CW10 was a Billing and Accounts Receivable Supervisor who led a team of employees over a period of six weeks to manually re-bill thousands of claims using the new 81443 billing code in or around early 2019, and she stated that after large payors complained to Progenity about its failure to implement the new code, she and her colleagues knew they had to make the change with all payors. ¶¶123-29. CW5 and CW14 likewise describe the Company's awareness of the new billing code in 2019. ¶¶131, 134.

Defendants attack the statements of CW5 as "conclusory" and "anecdotal" regarding the audit that revealed Progenity's improper Preparent billing, but they are nothing of the sort. CW5 was employed as a Revenue Analyst from about March 2019 to March 2020, helping to produce financial reports for Progenity executives including the CFO and the board of directors. ¶50. During CW5's last months at Progenity (*i.e.*, the months leading up to March 2020), her work focused on an internal audit carried out with a third-party organization. ¶139. Her recollection that the audit began later in 2019 is corroborated both by her statement that the audit was a focus during her last months at Progenity, and by Defendant Stylli's later statements regarding the audit and its timing. ¶141. Similarly, CW5's recollection of the audit's scope as encompassing correct documentation, business practices and reporting integrity, is likewise expanded upon and corroborated by (i) her highly specific description of providing account-level billing and payment data for the audit, and (ii) Defendant Stylli's public statements regarding the scope of the audit that "we decided to invite an external party to carry out a further independent audit of the billing and coding functions," which revealed the improper billing. ¶¶139-41.

Defendants wrongly claim that the SAC's CW statements fail to allege that Progenity continued its illegal marketing practice beyond its admitted misconduct

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

9

through April 2018. In fact, four different CWs provided mutually reinforcing statements on this point, amply showing that Progenity continued the practice up until its February 2020 national sales meeting. ¶¶170-77. In the fall of 2018 Business Intelligence Analyst CW4 built a software dashboard to allow Progenity to assure doctors that it wasn't seeking to collect from their patients. ¶¶169, 174. Sales personnel CW2, CW11 and CW7 all confirmed that Progenity continued to routinely reduce patient payment amounts in 2018 and 2019. ¶¶171-73. CW2 and CW7 both attended Progenity's February 2020 national sales meeting, and both provided information showing that at that meeting Progenity announced a dramatic change in policy—effective immediately patients were required to pay their full charges—because Progenity was being sued by the federal government. ¶¶175-177.

Finally, Defendants falsely contend that the CW statements do not show that Progenity lost business due to ending its key illegal marketing practice in February 2020. However, again, two CWs corroborate that discontinuing the practice led customers to competitors offering lower prices, and that Progenity's test volumes declined as a result. *See* ¶¶178-180. For example, according to CW2, "Everybody was . . . [a]ngry that everything we'd been told to sell on was being taken away. Really, the only benefit to using Progenity over competitors was making sure the patient wasn't going to overpay . . . If you've gotten business based on that, you kind of realize that business might go somewhere else now – and people did." ¶179.

Progenity fails in its weak attempts to brush off the SAC's highly reliable, factually detailed, and mutually reinforcing CW statements.

## IV.    PLAINTIFFS FACE A MINIMAL PLEADING BURDEN

To state a *prima facie* claim under § 11, a plaintiff need only plead that he acquired a security pursuant to a registration statement that: (1) contained an untrue statement of fact; (2) omitted a material fact required to be stated therein; *or* (3) omitted a material fact necessary to make the statements made not misleading. 15 U.S.C. § 77k; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 535, 544 (N.D.

Cal. 2009). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011).   When a material misstatement or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Thus, a "buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015).

Since fraud is not an element of claims brought under Section 11 of the Securities Act of 1933, the heightened pleading standard of Rule 9(b) does not apply. *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *7 (N.D. Cal. Oct. 31, 2014) (Rule 9(b) did not apply, in part, because "Section 11 claims are not inherently fraud-based"). Accordingly, Section 11 claims are subject to the permissive notice pleading standards of Rule 8(a), unless the claims necessarily "sound in fraud." *See Knollenberg*, 152 F. App'x at 684.  As such, "Section 11 places a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382.

Under the permissive notice pleading standards of Rule 8(a), a plaintiff need only "provide a short and plain statement of the claim showing that [he] is entitled to relief. . . . Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Violin Memory*, 2014 WL 5525946, at *8 (noting that "[t]his is not an onerous burden"). Additionally, there is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Moreover, at this stage, the Court must accept such factual allegations as true and construe them in the light most favorable to Plaintiffs. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  "The required

short and plain statement 'does not need detailed factual allegations,' only 'factual allegations . . . enough to raise a right to relief above the speculative level'." *Derr v. Ra Med. Sys., Inc.*, 2021 WL 1117309, at *3 (S.D. Cal. Mar. 24, 2021) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Defendants falsely claim that the SAC must satisfy Rule 9(b) since it alleges a "*unified* course of fraudulent conduct." MTD at 9. This argument is incorrect and their citations in support are highly misleading. Plaintiffs bring only negligence and strict liability claims under the Securities Act, and do not allege a fraud claim so there cannot be a *unified* course of conduct between fraud and non-fraud claims. On the contrary, "[c]ourts generally apply Rule 8 to Section 11 claims where," as here, "*only* non-fraud bases for liability are pled or where such claims are adequately distinguished from fraud claims." *Schwab*, 257 F.R.D. at 546 (collecting cases).[4]

Defendants are also incorrect that certain allegations, such as those regarding "known trends" made in connection with Plaintiffs' claims for violation of Item 303, or other information that Progenity "knew," necessarily sound in fraud. The relevant inquiry "is whether the above-described trends were 'known' for purposes of Item 303, not whether Defendants acted with fraudulent intent." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020). Indeed, courts consistently apply Rule 8 to Section 11 claims including Item 303 violations. *See, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020); *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019); *Violin Memory*, 2014 WL 5525946, at *8.[5]

---

[4] Defendants rely on *Rubke v. Capitol Bancorp Ltd.*, where, unlike here, the plaintiffs brought a fraud claim under the Securities Exchange Act of 1934 and then argued that this "unified course of fraudulent conduct" resulted in corresponding Securities Act violations. 551 F.3d 1156, 1161 (9th Cir. 2009).

[5] Defendants cite *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003), but there, the Ninth Circuit held that despite being pled alongside fraud based claims, (footnote continued)

In sum, Plaintiffs have not alleged fraud claims at all, so there clearly is not a unified set of fraud and non-fraud allegations. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) (finding that it would "eviscerate § 11" to give Rule 9(b) protection to defendants against whom no fraud claims had been alleged); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 918 n.5 (N.D. Cal. 2015) (noting that courts "regularly apply Rule 8(a)" where "Section 11 defendants are not accused of violating Section 10(b)").

## V.    THE SAC STATES A CLAIM FOR VIOLATIONS OF SECTION 11

On a motion to dismiss, courts accept the complaint's allegations as true and construe them in the light most favorable to the non-moving party. *Daou*, 411 F.3d at 1013. "Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *In re Immune Response*, 375 F. Supp. 2d 983, 1017 (S.D. Cal. 2005). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

### A.    The Registration Statement Failed To Disclose Progenity's Overbilling For Preparent Tests

There is no dispute that Progenity engaged in overbilling of government payors for Preparent tests prior to Company's IPO. The introduction of the 81443 billing code was not only known, but sowed confusion, at Progenity. ¶¶122-138. This resulted in Progenity conducting an audit, which led it to stop receiving Preparent overpayments from government payors no later than "early 2020." ¶¶139-144. Thus, the Company had clearly identified and ceased its improper billing before "early 2020," well in advance of the June 2020 IPO. ¶144. Moreover, following this cessation of the improper Preparent billing, Progenity possessed

allegations that the defendant *negligently* failed to disclose *known* information were not subject to Rule 9(b). *E.g., id.* at 1106-07.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

13

information showing it had received a material amount of overpayments as a result. ¶¶145-149.    The Registration Statement failed to disclose that Progenity had improperly billed for Preparent tests, that the Company had uncovered this issue, and that it had resulted in substantial overpayments.

Defendants argue that "just as before, Progenity's refund liability did not exist until it was calculated" and that since the precise liability amount was ostensibly calculated after the IPO, they had no obligation to disclose the improper billing. MTD at 12.    This argument ignores the new allegations in the SAC which demonstrate that Progenity knew of the overbilling, and that the Registration Statement was materially misleading regardless of when Progenity calculated its refund liability. ASC 450 required Progenity to accrue an estimated loss for its likely Preparent refunds, or at the very least to make qualitative disclosures regarding those refunds (including an express statement, if true, that an estimate of the loss cannot be made) because the chance of their occurring was "more than remote." ¶¶286-298, 327-330. ASC 606 similarly required Progenity to reduce its revenue in connection with its improper billing because it was not probable that Progenity would retain the overpayments forever. ¶¶267-285, 317-322. Neither ASC 450 nor 606 delays these disclosure obligations until the company has absolute certainty regarding the amounts involved. *E.g.*, ¶291 (the company "shall not delay accrual of a loss until only a single amount can be reasonably estimated").

Moreover, Defendants' argument is flawed because it heavily relies on the Order's holding that "the fact that Progenity had overbilled some payors could not be material until the amount of that overbilling and resulting liability was quantified" (Order at 10), while ignoring that the Order was decided without a complete record or argument on this issue. Plaintiffs respectfully submit that this holding was in error.  As noted in Plaintiffs' prior opposition to Defendants' first motion to dismiss, Defendants' initial motion had failed to argue a lack of materiality *at all*, let alone due to the non-calculation of the overpayments, thus

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

14

waiving the argument. ECF No. 41 at 8. Defendants' impermissibly raised this argument for the first time in their previous motion to dismiss reply brief, without Plaintiffs' having the opportunity to address it. *See* ECF No. 44 at 8. Defendants' argument is flawed for two principal reasons.

*First*, Defendants wrongly focus the materiality inquiry on their own subjective knowledge. MTD at 7, 10-13. But this inquiry "requires delicate assessments of the inferences a '***reasonable shareholder***,' [not defendants] would draw from a given set of facts and the significance of those inferences to him." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021); *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("materiality depends on the significance the *reasonable investor* would place on the withheld or misrepresented information.").[6] "[T]hese assessments are peculiarly ones for the trier of fact," and therefore, "resolving materiality as a matter of law is generally appropriate only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ." *Alphabet*, 1 F.4th at 700.[7] This is not such an instance.

Here, the improper billing would have been important to a reasonable investor because it presented substantial risks that, *inter alia*: (i) Progenity would be required to refund a material amount to government payors, (ii) Progenity would generate significantly less revenue in the future as a result of correcting its billing, (iii) Progenity had similarly improperly billed and received overpayments from private

---

[6] Defendants' improper efforts to focus the materiality standard on their own actual knowledge of the undisclosed information would, contrary to statute (15 U.S.C. § 77k), effectively impose a scienter requirement on Section 11 claims. However, under Section 11 "there is no requirement that Defendants know the statement . . . was false when made." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1260 (N.D. Cal. 2019) (citing *Huddleston*, 459 U.S. at 381).

[7] The Supreme Court has repeatedly rejected "bright-line rule[s]" with respect to materiality, such as that proposed by Defendants here. *Matrixx*, 563 U.S. at 39; *Basic*, 485 U.S. at 236.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

15

payors that would also have to be corrected and refunded, (iv) Progenity suffered from pervasive overbilling problems across all of its products, and (v) Progenity may be subject to additional investigations and enforcement actions. ¶¶340-344. These risks were highly significant to investors in light of Progenity's precarious financial position, large operating losses and pressing need for cash. ¶¶63-66, 346. These risks existed at the time of the IPO unlike the cases cited by defendants.[8]

*Second*, even though Defendants were aware that Progenity engaged in the improper billing that resulted in the overpayments for Preparent tests, they assert that they were not obligated to disclose the improper billing because *they* were not aware it was material until the precise amount of the overpayment was finally calculated. This position is not supported by case law and, in fact, would lead to absurd results. If Defendants' assertion were taken as true, companies could simply decide never to quantify the effects of known, material adverse information (in this case the improper Preparent billing), and thereby successfully shield themselves from liability under the securities laws. The Securities Act is not so toothless.

Moreover, the Supreme Court and Ninth Circuit have repeatedly found materiality adequately alleged with respect to information for which the defendant had not quantified its financial impact at the time of the alleged false statements or omissions.[9] *E.g.*, *Matrixx*, 563 U.S. at 47 (drug adverse event reports were material

---

[8] *See Rubke*, 551 F.3d at 1164 (board members made deceptive statements *after* registration statement became effective); *Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *5 (C.D. Cal. Jan. 25, 2021) (no requirement to disclose second quarter 2020 results in January 2020 registration statement).

[9] In reality, information in Progenity's possession at the time of the IPO showed that the amount of overpayments received was likely large. *See* ¶¶145-149.  Even if such information had indicated that the Company may have received only small overpayments, the facts of the improper billing and receipt of overpayments would still have been material to investors. SEC guidance regarding materiality of financial information states that this inquiry cannot be reduced to a numerical formula, and must consider a wide range of qualitative factors, which "may cause misstatements (footnote continued)

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

16

because they posed "a significant risk to [defendant's] leading revenue-generating product"); *Alphabet*, 1 F.4th at 703 (failure to disclose cyber-security vulnerabilities was material); *Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 803 (9th Cir. 2017) ("A reasonable investor would place great value in knowledge that one of Atossa's marquee products was not cleared by the FDA and that the FDA had expressed concern about that lack of clearance."). In fact, the Ninth Circuit has specifically held that undisclosed information "may be material even if it does not . . . have an immediate financial impact on the company." *Alphabet*, 1 F.4th at 704.

Therefore, the SAC adequately alleges that Progenity failed to disclose *material* improper overbilling, and Defendants' arguments to the contrary fail.

**B. The Registration Statement's Purported Risk Warnings Were Misleading**

The SAC identifies several purported risk warnings in the IPO Prospectus that each misleadingly characterize improper billing as a mere potential risk. ¶¶334-37. As Defendants' own distinguishable authorities acknowledge, such disclosures are actionably misleading where they present risks in mere hypothetical terms and fail to inform investors that the risk has already materialized. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008). Here, improper billing had already materialized because prior to the IPO Progenity had improperly billed government payors for Preparent tests, and had identified and even ceased the overbilling. Defendants attempt to re-frame the issue as whether Progenity had

---

of quantitatively small amounts to be material". SEC Staff Accounting Bulletin No. 99 (Aug. 12, 1999), 1999 WL 1123073 (SAC Exhibit 1, ECF No. 49-1) ("SAB 99"); *see, e.g.*, *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *2 (N.D. Cal. Nov. 17, 2005) (under SAB 99, materiality sufficiently alleged for sham transaction accounting for only 0.5% of annual revenue). Given its inherently fact-intensive nature, such an analysis is not appropriate on a motion to dismiss. *See Alphabet*, 1 F.4th at 700.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

17

quantified its refund liability, but that is irrelevant to Plaintiffs' claim that failure to disclose the fact of the improper billing itself was materially misleading.

Defendants wrongly argue that the challenged risk factors adequately disclosed Progenity's improper Preparent billing. However, "whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011). Defendants claim to have disclosed their improper Preparent billing by the statement "we have experienced situations in which employees *may* have failed to fully adhere to our policies and applicable laws in the past." MTD at 14; ¶336. But this statement was itself materially misleading because (i) it was framed in hypothetical terms stating employees "may have" failed to comply with laws, and (ii) neither it nor any other Prospectus disclosure reveals the improper Preparent billing, and on the contrary investors would understand this statement to relate to the concurrently disclosed improper billing for Innatal tests.

Defendants claim that the statement "[w]e currently submit for reimbursement using CPT codes that we believe are appropriate for our testing," is a non-actionable statement of opinion. MTD at 14; ¶335. But this statement misled investors to believe that Progenity had performed a reasonable inquiry to verify that its billing was appropriate, and that it was not in possession of undisclosed contradictory information. *See Omnicare*, 575 U.S. at 189.

## C. The Registration Statement Misleadingly Failed to Disclose Progenity's Decision To Abandon Its Key Illegal Marketing Practice

Progenity's genetic testing business strategy centered on illegally waiving patient payment amounts while submitting astronomical bills to third party payors. Defendants only stopped this practice, which violates payor policies and federal laws such as the False Claims Act and Anti-Kickback Statute (¶¶90-93), due to government intervention. ¶¶80-89, 170, 175-77.  Even though Defendants admitted to using this illegal practice through April 2018, the Registration Statement failed to

disclose that Progenity continued the illegal practice through February 2020, ending it merely four months before the IPO, and likewise failed to disclose the immediate, devastating effect of ending this practice, or that *all* of Progenity's historical results substantially depended on the recently discontinued practice. As such, the Registration Statement was materially misleading.

Defendants ignore the allegations in the SAC and argue that the "Offering Materials" do not "discuss[] the Company's marketing practices in any period prior to the IPO." MTD at 21. This is simply not true. Among the many directly related misleading statements identified in the SAC (¶¶355-63), the Offering Materials specifically discuss how the Company had claimed it "generally seek[s] to collect co-payments and deductibles directly from patients in cases where we have billed the payor." ¶360. This statement was misleading because, up until February 2020, the Company did not seek to collect the vast majority of patient payments when it had billed a payor. Likewise, the Registration Statement states that "Although we believe that our sales and marketing practices comply in all materials respects with all applicable federal and state laws and regulations, regulatory authorities may disagree." ¶363. This statement was also misleading when made because Defendants failed to disclose that up until February 2020 Progenity's key marketing policy centered on illegal waivers of copayments and deductible amounts designed to influence beneficiaries to select Progenity products, which violated applicable laws.

Defendants argue that since this practice had already stopped at the time of the IPO, statements about its marketing and legal compliance must be understood to relate *exclusively* to Progenity's practices *at the moment of the IPO* and going forward. *See* MTD at. 21-22. This strained reading is not how a reasonable investor would understand these disclosures. Progenity's argument is also wrong because the statements at issue were not forward looking, and were misleading due to Defendants' failure to disclose the recent, abrupt and drastic abandonment of Progenity's key marketing strategy, from which the new, lawful practices were a

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

19

material departure. *See, e.g., Switch*, 2019 WL 3065591, at \*5 (failure to disclose change in sales strategy that "presented a serious risk of diminishing revenue" was materially misleading).[10] For example, the statement "regulatory authorities **may** disagree" is misleading when authorities ***had already disagreed*** that the sales and marketing practices complied with applicable federal and state laws and regulations. As the SAC explains, the Company's own VP of Sales admitted that the change was because "we'd lose our company," and that Progenity was being sued by the federal government. ¶176.[11] Likewise, a discussion about its billings practices "in cases where we *have billed* the payor" (¶360), concerns already existing facts.

Defendants further claim that Plaintiffs do not provide any facts demonstrating that there actually was a change in policy, and that one CW's belief is insufficient. MTD at 23. But, Plaintiffs allege the policy change based on *two* different witnesses who both attended the national sales meeting where Progenity announced the change. ¶¶175, 177. While either one of these CWs would be sufficient, their mutually corroborating statements place the existence of this policy change beyond any reasonable dispute. Similarly, Defendants falsely contend that the SAC's CW statements do not plausibly show that Progenity lost business as a result of discontinuing its key illegal marketing practice in February 2020. However,

---

[10] *Cf. Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*11 (C.D. Cal. Apr. 12, 2016) (noting that statement regarding "'compliance with the FDA's [regulations]' is not concerned with future projections or predictions but is stating a belief regarding a then-existing fact").

[11] The fact that the Company's own vice president of sales admitted the Company ended its practice after it was being sued by the federal government over this conduct eviscerates Defendants' argument that Plaintiffs have not alleged any facts that this practice was unlawful. *See* MTD at 22 (ignoring this fact). Moreover, Progenity admitted that its nearly identical conduct through April 2018 was wrongful, and the SAC explains the specific rules and regulations that prohibit this conduct and how Progenity was violating them. ¶¶90-93. Progenity's Vice president of billing and reimbursement, CW14, stated that this practice was "bad," "flagrant," and "like robbery." ¶161.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

20

again, the mutually reinforcing, independent recollections of Progenity sales personnel CW2 and CW7 demonstrate (i) that the billing policy change directly resulted in lost business for Progenity as customers switched to its competitors offering lower prices, (ii) that doctors and patients were upset about the new billing policy, and (iii) that test volumes declined due to the new policy. ¶¶178-180.

**D.    The Registration Statement Failed To Disclose Risks Required Under Regulation S-K Item 105**

Item 105 of Regulation S-K required the Registration statement to discuss "the material factors that make an investment in the registrant or offering speculative or risky," and to "[c]oncisely explain how each risk affects" Progenity and its securities. 17 C.F.R. § 229.105. Because this information is "required to be stated" in a registration statement, its omission violates Section 11. *See* 15 U.S.C. § 77k(a); *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *7 (N.D. Cal. Aug. 7, 2020). Progenity's recent, undisclosed decision to stop improperly billing Preparent tests made an investment in Progenity's stock speculative and risky because, *inter alia*, it presented the risk of material refunds and materially decreased future revenues. ¶¶313-14. Similarly, Progenity's recent, undisclosed decision to abandon its key illegal marketing practice made an investment in Progenity's stock speculative and risky because, *inter alia*, it presented the risk that Progenity would lose customers and be forced to slash test prices in an effort to compete on a level playing field. ¶¶351-52.

**E.    The Registration Statement Contained Material Misrepresentations And Omissions Regarding Negative Trends In Test Volumes, ASP, and Revenue**

At the time of the IPO, Progenity was suffering from known negative trends of sharply decreasing test volumes (¶¶183-94), average test selling prices ("ASP") (¶¶195-203), and revenue (¶¶204-09). These negative trends were caused in substantial part by, and were reasonably expected to continue into the future due to,

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

Progenity's recent decisions (undisclosed to investors) to cease its improper billing for Preparent tests, and to discontinue its key illegal marketing practice. Defendants' false statements regarding such trends and failure to make required disclosures under Item 303 were materially misleading to reasonable investors.

### 1. The Registration Statement Falsely Claimed That Progenity's Test Volumes Were Increasing

The Registration Statement confusingly contained three variations of similar text regarding test volumes. First, stating that "the growth rate of our test volume is accelerating." ¶377. Second, that "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic," *i.e.* that Progenity was experiencing "volume growth." ¶378. These first two variations were objectively false, because Progenity's test volumes were decreasing at the time. ¶¶183-94. Defendants' argument to the contrary, that these statements merely related to "historical" and not present growth, would require the Court to ignore their plain text, written in the present tense and discussing Progenity's "current[]" observations. Third, the Registration Statement vaguely acknowledged that "[b]eginning in March 2020, we began to observe significant declines in the volumes of our molecular tests . . . due to the impact of the COVID-19 pandemic . . . However, we believe our business is resilient and we have observed positive signs of recovery so far." ¶379.

Reading these three passages together and in their full context, a reasonable investor would conclude (wrongly, though through no fault of her own) that although Progenity observed declines in test volumes in March 2020, at the time of the June 2020 IPO core test volumes were again growing and even *accelerating*. And to the extent that these three statements contradict each other, Defendants cannot escape liability by providing one partial, incomplete disclosure in addition to two false disclosures, because taken as a whole these statements would materially mislead investors. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("not every mixture with the true will neutralize the deceptive. If it would

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

22

take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow").

### 2. The Registration Statement Failed To Make Disclosures Required By Item 303 Regarding Known Trends

"[A]ny omission of facts required to be stated under Item 303 will produce liability under Section 11." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). Item 303 required Defendants to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Defendants do not genuinely dispute that they knew of negative trends in test volumes, ASP and revenue at the time of the IPO or that Item 303 required their disclosure. They merely argue that such trends were sufficiently disclosed because the Registration Statement provided historical revenue and test volume data through the first quarter of 2020. However, nowhere did Defendants disclose as required that these negative trends were expected to continue and to *worsen* due to Progenity's recent decisions to cease its improper billing for Preparent tests, and to discontinue its key illegal marketing practice.

Defendants' Item 303 argument is thus that they had no obligation to provide any disclosure regarding how these undisclosed decisions were expected to affect Progenity's business (including its test volumes, ASP and revenue) in the future. Defendants' argument is refuted by the plain text of Item 303, which requires disclosure of known trends that "have had," *i.e.* in the past, or "*are reasonably likely to have*," *i.e.* in the future, a material unfavorable financial impact. 17 C.F.R. § 229.303(b)(2)(ii);[12] *see also Steckman*, 143 F.3d at 1297 (disclosure required by

---

[12] *See also* 17 C.F.R. § 229.303(a) ("The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of *future* operating results or of *future* financial condition. This includes (footnote continued)

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

23

Item 303 where "*future* material impacts are reasonably likely to occur from the present-day perspective"). And Defendants simply ignore the contrary authorities cited in the SAC, requiring disclosure of known past events such as a "reduction in the registrant's product prices" or an "erosion in the r[e]gistrant's market share" that are "reasonably expect[ed]" to negatively impact future results. Managements Discussion & Analysis of Fin. Condition & Results of Operations, S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).[13] Defendants misleadingly failed to make the required disclosures regarding the expected effects of Progenity's recent decisions to cease its improper billing and to discontinue its key illegal marketing practice. *See, e.g., Switch*, 2019 WL 3065591, at *5 ("the complaint sufficiently alleges facts from which a reasonable jury could find that [defendant] violated Item 303 by failing to disclose its new sales strategy").

## VI. THE COURT SHOULD GRANT LEAVE TO AMEND, IF NECESSARY

If the Court grants any part of Defendants' motion, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment"). As they did in the SAC, Plaintiffs could further supplement their allegations with additional research, witness interviews, and other sources.

Furthermore, after filing the SAC Plaintiffs have obtained documentary evidence, produced to Plaintiffs in response to freedom of information requests to

---

descriptions and amounts of . . . matters that are reasonably likely based on management's assessment to have a material impact on *future* operations.").

[13] *See also id.* at *3 ("Several specific provisions in Item 303 require disclosure of *forward-looking information*"); *id.* at *17 (Item 303 requires "particular emphasis on the registrant's prospects *for the future*"); Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

government health care programs, corroborating key allegations, and providing significant additional facts, regarding Progenity's improper Preparent billing. *See generally* Ligman Declaration (filed herewith). On December 5, 2018 Progenity sent letters to Florida and Michigan health agencies (and presumably other states) stating that it intended *not* to transition to the new 2019 CPT code set, including the 81443 billing code. *See* Ligman Decl. Exhibits 1 and 3. Both Michigan and Florida promptly responded to Progenity indicating that, in accord with program policies, Progenity was required to use the newly effective 2019 CPT codes. *See* Ligman Decl. Exs. 2 and 4. According to Michigan's response, no reimbursement would be provided for procedures billed with the 81443 code because "this test does not align with Medicaid's laboratory's standards of coverage." Ligman Decl. Ex. 4. According to data produced by Michigan, Progenity began using the 81443 billing code for claims to Michigan Medicaid in March 2019, abruptly stopped using the code in June 2019, and resumed regularly using it in May 2020.[14]

Therefore, the Florida and Michigan productions confirm Plaintiffs' allegations and show that: (i) Progenity was immediately aware of the 81443 billing code upon its introduction, (ii) Progenity knew that use of the 81443 billing code would result in decreased reimbursements, (iii) Progenity started billing with this code shortly after its 2019 introduction, (iv) Progenity then ceased using the 81443 billing code, and (v) *prior to the IPO* Progenity resumed using the 81443 billing code as required.

## VII.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied. If the motion is granted in whole or in part, Plaintiffs request leave to amend.

---

[14] *See* Ligman Decl. Ex. 5. The data indicate a single instance of Progenity using the 81443 billing code in October 2019, which is the only such instance from June 2019 through April 2020. Given the higher test volumes reported for other months, this single instance appears to be an isolated anomaly.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

25

DATED: January 14, 2022

**GLANCY PRONGAY & MURRAY LLP**

By: _s/ Garth A. Spencer_

ROBERT V. PRONGAY (#270796)
  _rprongay@glancylaw.com_
CASEY E. SADLER (#274241)
  _csadler@glancylaw.com_
GARTH A. SPENCER (#335424)
  _gspencer@glancylaw.com_
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

_Attorneys for Lead Plaintiffs_

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG

26

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On January 14, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 14, 2022, at Los Angeles, California.

*s/ Garth A. Spencer*
Garth A. Spencer

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-LL-AHG