# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No.: 3:20-cv-01683-RBM-AHG<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>**[Doc. 52]** |

On November 15, 2021, Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, Lynne Powell, Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG, LLC ("Defendants") filed a Motion to Dismiss the Second Amended Complaint ("Motion"). (Doc. 52.) On January 14, 2022, Plaintiffs Lin Shen, Lingjun Lin and Fusheng Lin ("Plaintiffs") filed an opposition to the Motion. (Doc. 54.) Defendants filed a reply on February 22, 2022. (Doc. 55.) On August 10, 2022, Plaintiffs filed a Statement of Recent Authority. (Doc. 59.) After being granted leave to respond by the Court, Defendants filed a Response to Plaintiffs' Statement of Recent Authority. (Doc. 62.)

For the reasons discussed below, Defendants' Motion is **<u>GRANTED</u>**.

/ / /

# I.   BACKGROUND

A.   <u>Parties</u>

Plaintiffs' second amended complaint ("SAC") alleges various securities violations by Defendants, who may be organized in three groups: (1) Progenity; (2) Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell (the "Individual Defendants"); and (3) Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG, LLC (the "Underwriter Defendants").  (Doc. 49 at 13–19.)

Defendant Progenity is a biotechnology company based in San Diego, California that develops and commercializes molecular testing products and precision medicine applications, including "in vitro molecular tests designed to assist parents in making informed decisions related to family planning, pregnancy, and complex disease diagnosis." (*Id.* at 7.)  Purchasers of Progenity's securities claim that they are entitled to damages caused by Progenity's allegedly false and misleading Registration Statement issued in connection with its June 2020 Initial Public Offering ("IPO").  (*Id.* at 6.)  At the time of the IPO, Progenity's two most successful products were its Innatal and Preparent tests, which screen for fetal chromosomal conditions and mutations that cause genetic diseases, respectively.  (*Id.* at 7.)

At all relevant times, Defendant Stylli served as Progenity's Chief Executive Officer and Chairman of the Board of Directors, and Defendant d'Esparbes served as Progenity's Chief Financial Officer.  (*Id.* at 13–14.)  Defendants Alter, Bigalke, Ferrell, Kotzin, Nussbaum, and Powell served as members of Progenity's Board of Directors.  (*Id.* at 14–17.)  All Individual Defendants signed (or authorized the signing of) the Registration Statement issued in connection with Progenity's IPO, "reviewed and helped prepare the Registration Statement," and "participated in the solicitation and sale of [Progenity's] common stock to investors in the IPO for their own financial benefit and the financial benefit of Progenity."  (*Id.* at 17.)

///

Defendants Piper Sandler, Wells Fargo, Baird, Raymond James, and BTIG are financial services companies that acted as underwriters for Progenity's IPO.  (*Id.* at 17–19.)  The Underwriter Defendants collectively "sold more than 6.6 million Progenity shares in the IPO at $15 per share and shared $7 million in underwriting discounts and commissions."  (*Id.* at 19.)  According to the SAC, the Underwriter Defendants failed to "conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement," thereby leading to the class' harm.  (*Id.*)

Lead Plaintiffs Lin Shen, Lingjun Lin, and Fusheng Lin bring this action on behalf of a putative class of investors who purchased or otherwise acquired Progenity common stock pursuant and/or traceable to the Registration Statement issued in connection with Progenity's IPO.  (*Id.* at 6.)

B.   <u>Factual Background</u>

On May 27, 2020, Progenity filed a Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") registering Progenity's common stock in preparation for its IPO.  (*Id.* at 64.)  Progenity subsequently filed four amendments to the Registration Statement on June 4, June 15, and June 18, 2020, respectively (filing two amendments on the last date).  (*Id.*)  On June 22, 2020, Progenity filed a Form 424B4 Prospectus with the SEC, which was incorporated into the Registration Statement.  (*Id.*)  The Registration Statement, including all amendments and the Prospectus, took effect on June 18, 2020.  (*Id.* at 6, 64.)

Progenity conducted its IPO from June 19 through June 23, 2020, during which it issued and sold 6,666,667 shares of its common stock at a price to the public of $15.00 per share.  (*Id.* at 64.)  The IPO generated over $100 million in gross offering proceeds and approximately $88.7 million in net proceeds for Progenity.  (*Id.*)

On August 13, 2020, Progenity filed a press release and slide deck with the SEC reporting its second quarter 2020 financial results.  (*Id.* at 65.)  The materials filed stated that Progenity's "second quarter revenues reflected a $10.3 million accrual for refunds to government payors."  (*Id.*)  In an investor call later that day, Stylli explained that a

commissioned third-party review of Progenity's coding and billing processes revealed that Progenity had "not appropriately transitioned the implementation of the new billing requirements for larger carrier screening panels, which were introduced in early 2019."[1] (*Id.*) Because of these billing errors, Progenity "received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020." (*Id.*)

On August 14, 2020, Progenity filed its Form 10-Q for the second quarter of 2020 with the SEC. (*Id.* at 65.) The Form 10-Q confirmed that Progenity accrued $10.3 million for refunds to government payors during the second quarter of 2020. (*Id.*) The filing further stated that Progenity's deadline to "report and return the overpayment to the government programs is 60 days from the time the overpayment was determined and quantified," so Progenity "expects to repay this amount to the relevant government programs by early October 2020." (*Id.* at 66.) According to Plaintiffs, that same day that Progenity filed its Form 10-Q, its stock price declined by $1.24 per share. (*Id.* at 69.)

On October 29, 2020, Progenity filed a press release with the SEC reporting preliminary third quarter 2020 revenue and test volumes, and Plaintiffs argue the press release indicated "a dramatic decline from the first and second quarter [average selling prices]." (*Id.* at 71–72.) "In the three trading sessions following Progenity's October 29, 2020 disclosures, Progenity's stock price declined by $3.42 per share." (*Id.* at 72.)

---

[1] Progenity's Form 10-Q for the second quarter of 2020 explains that in the U.S., the "American Medical Association ('AMA') generally assigns specific billing codes for laboratory tests under a coding system known as Current Procedure Terminology ('CPT'), which we and our ordering healthcare providers must use to bill and receive reimbursement for our molecular tests." (Doc. 49 at 66.) The Registration Statement states that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening tests to decline." (*Id.* at 119.) Plaintiffs allege that following this AMA approval, Progenity was required to bill its Preparent tests under a new CPT code beginning in January 2019. (*Id.* at 34.) However, Plaintiffs claim that Progenity did not update its billing practices until early 2020, thereby resulting in a $10.3 million overpayment for Preparent tests by government health programs. (*Id.* at 10, 39, 65–66.)

4

Plaintiffs argue that Defendants violated their disclosure obligations because the "Registration Statement for the IPO contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make the necessary disclosures required under the rules and regulations governing its preparation." (*Id.* at 9.)  Specifically, Plaintiffs ague:

> The Registration Statement failed to disclose that (i) Progenity had improperly billed government payors for Preparent tests beginning in 2019 and ending in or before "early 2020," (ii) there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments from government payors for Preparent tests, (iii) in February 2020 Progenity ended the illegal marketing practice on which the competitiveness of its business depended, and (iv) Progenity was presently suffering from known negative trends in test volumes, [average selling prices], and revenues.

(*Id.* at 9–10.)

### C.   Procedural Background

On December 3, 2020, the Court consolidated two related securities class actions against Progenity and appointed Lin Shen, Lingjun Lin, and Fusheng Lin as Lead Plaintiffs. (Doc. 33.)  Plaintiffs subsequently filed a first amended complaint ("FAC") on February 4, 2021, alleging violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act").  (Doc. 38.)  On April 5, 2021, Defendants filed a motion to dismiss the FAC (Doc. 40), and on September 1, 2021, the Court granted the request and allowed Plaintiffs leave to amend (Doc. 48). [2]  Plaintiffs filed the SAC on September 22, 2021.  (Doc. 48.)

On November 15, 2021, Defendants moved to dismiss the SAC.  (Doc. 52.) Defendants again argue the SAC should be dismissed for (1) failure to plead a materially

---

[2] The September 1, 2021 order granting Defendants' Motion to Dismiss Plaintiffs' FAC was issued by District Judge Cathy Ann Bencivengo.  (*See* Doc. 48.)  This case was transferred to District Judge Linda Lopez on January 3, 2022 and subsequently transferred to the undersigned on April 6, 2022.  (*See* Docs. 53, 56.)  Accordingly, the undersigned hereby incorporates by reference various findings in Judge Bencivengo's September 1, 2021 order (Doc. 48).

false or misleading statement or omission under Section 11 of the Securities Act; (2) failure to plead a violation of Items 303 and 105 of the U.S. SEC Regulation S-K; and (3) failure to plead control person liability under Section 15 of the Securities Act. (Doc. 52–1 at 15, 29–30.) In particular, Defendants state the SAC alleges many of the same arguments the Court previously rejected and that "[t]he SAC includes only one new theory: that Progenity failed to disclose the 'decision' in February 2020 to end an allegedly improper marketing practice." (*Id.* at 13.) Defendants assert the new theory also fails as a matter of law. (*Id.* at 6, 25–28.)

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), an action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*

6

*v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

### III. DISCUSSION

A.   <u>Request for Judicial Notice</u>

A court generally cannot consider materials outside the pleadings on a motion to dismiss for failure to state a claim. FED. R. CIV. P. 12(d).  A court may, however, consider materials subject to judicial notice without converting the motion to dismiss into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).  Under Federal Rule of Evidence 201(b), a court may take judicial notice, either on its own accord or by a party's request, of facts that are not subject to reasonable dispute because they are (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).  A court may also take judicial notice of "matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (internal citations omitted).  Finally, under the incorporation by reference doctrine, courts may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (internal quotations and citations omitted).  The incorporation by reference doctrine "treats certain documents as though they are part of the complaint itself," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018), so long as "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

Defendants request the Court take judicial notice of three exhibits: (1) a copy of Progenity stock prices from June 19, 2020 to November 10, 2021, as obtained from Yahoo! Finance (Ex. A); (2) an excerpt from the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 606 (Ex. B); (3) and excerpts from Progenity's Prospectus on Form 424B4, dated June 19, 2020, and filed with the SEC on

7

June 22, 2020 (Ex. C).  (Doc. 52–2 at 4, 17, 19.)  Plaintiffs do not oppose Defendants' request for judicial notice "to the extent that the Court takes notice of the fact those documents exist and what those documents say, but not for the truth of the factual matters stated therein."  (Doc. 54 at 8.)

The Court takes judicial notice of Progenity's stock price history in Exhibit A, although that history does not affect the Court's analysis for purposes of the present motion.  *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017) ("historical stock prices are not subject to reasonable dispute") (citing FED. R. EVID. 201(b)).  The Court also takes judicial notice of ASC 606 in Exhibit B as a publicly available material taken from a "source whose accuracy cannot reasonably be questioned," the FASB.  FED. R. EVID. 201(b).  Finally, the Court takes judicial notice of Progenity's Form 424B4 Prospectus in Exhibit C, filed with the SEC on June 22, 2020 in its entirety as it is a matter of public record and as a document forming the basis of Plaintiffs' claims.  *See Ritchie*, 342 F.3d at 907; *see also In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (noting that consideration of "the full text of the Prospectus, including portions which were not mentioned in the complaint[]," is appropriate in the context of a motion to dismiss).

B.   Section 11 Claim

Plaintiffs' first cause of action is brought against all Defendants for alleged violations of Section 11 of the Securities Act.  Section 11 imposes liability where a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  To prevail on a Section 11 claim, the plaintiff must demonstrate  "(1)  that  the  registration  statement  contained  an  omission  or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citing *Stac Elec.*, 89 F.3d at 1403–04).  "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions."  *Id.* (internal citations

omitted).[3]

Section 11's omissions clause "affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). In other words, an actionable omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The plaintiff must also "demonstrate that the omitted information existed at the time the registration statement became effective." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009).

Plaintiffs' Section 11 claim is based on five allegedly material omissions from Progenity's Registration Statement: (1) that Progenity had overbilled government payors for Preparent tests and would be required to refund them at least $10.3 million; (2) that Progenity was experiencing a trend of decreasing test volumes; (3) that Progenity was experiencing a trend of decreasing average selling prices for tests; (4) that Progenity was experiencing a trend of decreasing revenues; (5) and that Progenity discontinued an alleged illegal marketing practice on which its business depended. (Doc. 49 at 89–121.) Plaintiffs identify various statements in the Registration Statement that they allege were consequently "materially false and misleading when made" because of Defendants' failure to disclose the foregoing facts. (*Id.*) Plaintiffs claim that these omissions also violate Items 105 and 303 of Regulation S-K, which they argue constitutes another basis for liability

---

[3] While Section 11 does not contain an element of fraud, a plaintiff may be subject to Rule 9(b)'s particularity requirement if the complaint "sounds in fraud." *Daou*, 411 F.3d at 1027. Defendants argue that Plaintiffs' Section 11 claim sounds in fraud and therefore must satisfy the heightened pleading standards of Rule 9(b). (Doc. 52–1 at 13–14.) The Court need not address whether Plaintiffs' Section 11 claims sound in fraud because the claims fail regardless for the reasons set forth herein.

under Section 11.[4]

Defendants counter that "Progenity had no obligation to disclose the overbilling of some government payors until the existence and amount of the overbilling became known, and Plaintiffs plead no facts demonstrating that the $10.3 million liability was known at the time of the IPO." (Doc. 52–1 at 6–7.)  Further, Defendants claim that the Registration Statement specifically warned investors that Progenity could be required to reimburse government payors who challenged its billing practices, thereby making any alleged omission not misleading.  (*Id.* at 18.)  Defendants also argue that any alleged omission of negative trend information did not render the Registration Statement misleading because the information Progenity disclosed "[made] clear that the [Progenity]'s testing volumes and other financial metrics were declining and might not recover."  (*Id.* at 7.)  Finally, Plaintiffs provide "no factual support" for their conclusion that Progenity's marketing practices were unlawful and similarly does not demonstrate how an alleged shift in the marketing strategy created any false or misleading statement.  (*Id.*)  The Court addresses each category of alleged omissions in turn.

### a.    $10.3 Million Refund Liability to Government Payors

First, Plaintiffs claim that Defendants violated Section 11 by failing to disclose that Progenity had overbilled government payors for Preparent tests, and that "there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments."  (Doc. 49 at 89.)  Plaintiffs claim that "these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement."  (*Id.*)  Plaintiffs also argue that statements in the Registration Statement concerning Progenity's revenue and liabilities were misleading because they do not account for the $10.3 million

---

[4] The parties dispute whether a violation of Item 303 of Regulation S-K can give rise to a Section 11 claim.  (Doc. 52–1 at 29; Doc. 54 at 30.)  Because the Court finds that Plaintiffs failed to establish an Item 303 violation (*see infra*, pp. 27–29), it need not reach the issue.

liability and revenue reversal.  (*Id.* at 91–96.)  Plaintiffs contend that Progenity failed "to account for loss contingencies relating to its Preparent billing and make required qualitative disclosures, which rendered numerous statements in the Registration Statement materially false and misleading."  (*Id.* at 96–97.)  Finally, Plaintiffs argue that the Registration Statement contained misleading risk factor disclosures regarding payors seeking reimbursement because the risks portrayed as hypothetical had already materialized by the time of the IPO.  (*Id.* at 101.)  Plaintiffs believe these alleged misleading statements and omissions would be highly material to a reasonable investor.  (*Id.* at 104.)

Plaintiffs suggest that Progenity's improper billing of government payors was a "known trend" and that "there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments."  (*Id.* at 90–91.)  Plaintiffs explain that "Progenity improperly billed government payors for Preparent tests beginning in 2019, but identified and stopped this practice in or before early 2020, prior to the IPO," which was conducted from June 19 through June 23, 2020.  (*Id.* at 39, 64.)  Plaintiffs contend that "[h]aving identified and ceased its improper billing of government payors for Preparent tests, Progenity had ample information that would have allowed it to reasonably estimate the amount, or at least the magnitude, of the resulting overpayments."  (*Id.* at 46.)  Further, Plaintiffs argue that Progenity settled with government agencies in March 2020 to resolve allegations of overbilling government payors for Innatal tests and, thus, "Progenity had information prior to the IPO which showed that government payors would seek to recoup amounts of overpayments resulting from improper billing by failing to effectively transition to a new CPT code."  (*Id.* at 49.)

However, the Court finds Plaintiffs have not demonstrated that the alleged omitted information—that Progenity had overbilled government payors and would need to refund $10.3 million in overpayments—"existed at the time the registration statement became effective."  *Rubke*, 551 F.3d at 1164.  Plaintiffs point to the Registration Statement to establish that at the time of the IPO "Progenity was already aware of the CPT code that became effective in 2019 for Progenity's Preparent tests."  (Doc. 49 at 40.)  However,

Defendants argue that, as stated in Progenity's Form 10-Q filed August 14, 2020, the overpayment was not "determined and quantified" until August 2020 following a third-party review of Progenity's coding and billing processes. (Doc. 52–1 at 10–11, 18.) Thus, the scope of the potential overpayment was not determined until nearly two months after the June 2020 IPO, "but before [Progenity's] second quarter financial statements were prepared." (*Id.* at 11.) Publicly reporting companies have at least 40 days to file Forms 10-Q following the end of a fiscal quarter, and generally "need time to audit [financial] data before including it in any public materials." *Berg v. Velocity Fin., Inc.*, No. 2:20-cv-06780-RGK-PLA, 2021 WL 268250, at *5 n.1 (C.D. Cal. Jan. 25, 2021); *see* 17 C.F.R. § 240.13a–13. Thus, as the Court previously held, Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter. (*See* Doc. 48 at 11); *see also In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1254 (N.D. Cal. 2019) ("omissions are actionable only if a defendant has a duty to disclose information and fails to do so") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

Plaintiffs SAC includes allegations by former Progenity employees' ("CWs") who describe their experiences working for Progenity to show that Defendants were aware of the overbilling (*see* Doc. 49), which Defendants scrutinize stating that "Plaintiffs rely entirely on CW statements that Progenity had access to unspecific 'real-time' data regarding its billing and reimbursement practices, and that [Progenity] had audited its processes beginning in late 2019." (Doc 52–1 at 17.) However, as the Court previously noted, "Defendants were under no obligation to disclose their real-time revenue data at the time that the Registration Statement took effect." (Doc. 48 at 22.) Defendants state that "Progenity's refund liability did not exist until it was calculated, and it was not 'determined and quantified' until nearly two months after the IPO and still longer after May 27, 2020" when Progenity filed a Form S-1 Registration Statement with the SEC registering Progenity's common stock in preparation for its IPO. (Doc. 52–1 at 17; *see* Doc. 49 at 64.)

While Plaintiffs speculate that Defendants became aware of their overbilling in

12

"early 2020," the Court cannot assume that Defendants could both determine Progenity had probably incurred a refund liability and reasonably estimate the loss amount before issuing its financial statements for the first quarter of 2020.[5]  Therefore, Plaintiffs have presented no basis for inferring that Defendants knew or reasonably could have known about the $10.3 million refund liability by the time that the Registration Statement took effect.

Plaintiffs' allegations indicate that, at the very least, Defendants were aware of the AMA's implementation of a new billing code for Preparent tests by the time of the IPO.[6]  However, Defendants' awareness that the Preparent billing code had changed in January 2019, without more, does not warrant the conclusory deduction that Progenity's overbilling and $10.3 million refund liability was knowable by the time the Registration Statement took effect.  *See Daniels-Hall*, 629 F.3d at 998.  Moreover, the fact that Defendants had previously settled with government agencies to resolve allegations related to Innatal overbilling does not necessarily relate to Preparent overbilling discovered later.  Plaintiffs still have not established that Defendants knew or reasonably could have known they had overbilled for Preparent tests by the time the Registration Statement took effect.

Finally, Plaintiffs argue that various statements in the Registration Statement were

---

[5] Plaintiffs also claim that Progenity wrongfully included "variable consideration" in its revenue reported in the Registration Statement, although it was likely to reverse $10.3 million of that revenue for refunds.  (Doc. 49 at 32–33.)  Under ASC 606, estimates of variable consideration are recognized as revenue "only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty . . . is subsequently resolved."  (ACCT. STANDARDS CODIFICATION § 606-10-05-04-c (FIN. ACCT. STANDARDS BOARD 2019).)  Plaintiffs' limited allegations do not indicate that Defendants had reason to believe a "significant reversal in the amount of cumulative revenue recognized" would occur at the time the Registration Statement took effect.  Therefore, the Court declines to find Section 11 liability on this basis.

[6] The Registration Statement itself states that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening tests to decline."  (Doc. 49 at 40–41.)

"materially false and misleading" because the risk factor disclosure "merely stated in hypothetical terms that the new CPT code 'may' cause a decline in Preparent reimbursement." (Doc. 49 at 101.)  Specifically, the Registration Statement warned that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code"; "commercial third-party payors may . . . seek repayment from us of amounts previously reimbursed"; and "[t]hird-party payors may decide to deny payment or recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received . . . [a]ny of these outcomes . . . could have a material and adverse effect on our business, operating results, and financial condition." (*Id.* at 101–03.)  Plaintiffs' claims regarding Defendants' risk disclosures fail for the same reason discussed above: Plaintiffs fail to plead anything beyond conclusory assertions to establish that the risk of refunding government payors had materialized by the time the Registration Statement took effect.  *See In re Pivotal Sec. Litig.*, No. 3:19-cv-03589-CRB, 2020 WL 4193384, at *6 (N.D. Cal. July 21, 2020) ("[t]he Ninth Circuit has noted that 'risk factors' are not actionable without further factual allegations indicating that the risks had already 'come to fruition'") (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27).  As such, Plaintiffs have failed to adequately allege that these risk factor statements were false or misleading when made.

Liability under Section 11 "only attaches for misrepresenting [or omitting] information that was available when the offering materials became effective."  *Berg*, 2021 WL 268250, at *5 (citing *In re Stac*, 89 F.3d at 1403–04).  Accepting all factual allegations in the SAC as true, Plaintiffs' evidence that the $10.3 million liability was "knowable" at the time of the IPO amounts to no more than speculation.  Plaintiffs have not established that Defendants knew or reasonably could have known by June 18, 2020 that they had overbilled and would have to refund $10.3 million to government payors.  Moreover, Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter.  *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d at 1254.  Plaintiffs have not shown that any financial metrics or related

statements in the Registration Statement were false or misleading at the time the Statement took effect.  Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of the $10.3 million refund liability, it is hereby **DISMISSED** without prejudice.

### b. Negative Trends in Test Volume, Average Selling Price, and Revenue

Next, Plaintiffs claim that Defendants violated Section 11 by failing to disclose Progenity's negative trends in test volume, average selling price, and revenue.  (Doc. 49 at 113–21.)  Plaintiffs claim that "these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were omitted." (*Id.* at 113, 118, 120.)  The Court analyzes each alleged trend in turn.

#### i. Negative Trend in Test Volume

As Plaintiffs point out, the Registration Statement contains "three different versions of the same disclosure relating to Progenity's test volume growth, each of which was misleading in its own way."  (*Id.* at 115.)  First, Plaintiffs point to a section of the Registration Statement in which Defendants state:

> Since our inception, we have accessioned approximately 1.5 million tests in the United States and the growth rate of our test volume is accelerating. The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

(*Id.*)  Plaintiffs argue that these statements were materially false or misleading when made because they indicated that Progenity's test volumes were accelerating, but "they failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends."  (*Id.*)  Second, Plaintiffs point to a nearly identical statement by Defendants:

> Since our inception, we have accessioned approximately 1.5 million tests in

15

> the United States and the growth rate of our test volume was accelerating over a multi-year period, including early 2020.   However, we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic.   The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

(*Id.* at 115–16.)  In looking at this portion of the Registration Statement, Plaintiffs allege "the Registration Statement admitted to 'a slowdown in volume growth' rather than accelerating growth, but nonetheless claimed that Progenity was currently experiencing 'volume growth.'"  (*Id.* at 115.)

Next, Plaintiffs reference a section of the Registration Statement in which Defendants state:

> Beginning in March 2020, we began to observe significant declines in the volumes of our molecular tests as well as the pathology tests conducted by Avero Diagnostics due to the impact of the COVID-19 pandemic and work-from-home policies and other operational limitations mandated by federal, state and local governments as a result of the pandemic.  However, we believe our business is resilient and we have observed positive signs of recovery so far.   While we are implementing mitigation strategies to address these limitations, such as supporting patients and physicians virtually, there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods.  Our initial assessment of the impact of the COVID-19 pandemic is that our NIPT test volumes have proved more resilient than our carrier screening test volumes; however, the comparative impact may change over time.

(*Id.* at 116.)  Plaintiffs argue these statements were also materially false and misleading when made because they "misleadingly emphasized resilience and recovery in Progenity's test volumes, and failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends."  (*Id.*)  Additionally, Plaintiffs acknowledge that "the Registration Statement contained a risk factor relating to fluctuations in test volumes and other performance metrics."  (*Id.*)

16

However, Plaintiffs argue these statements "presented as a mere hypothetical risk that Progenity 'may' experience a decrease in test volumes, pricing or revenue, and failed to disclose that Progenity was at the time of the IPO experiencing significant declines for each of these metrics." (*Id.*) Plaintiffs also provide that the above statements "were additionally misleading for failing to disclose that Progenity's decision to end its key illegal marketing practice in February 2020 had, and would foreseeably have, the effect of depressing test volumes, pricing and revenue." (*Id.* at 115–17.) The Court notes alleged illegal marketing practices will be discussed in full below. (*See infra*, pp. 24–26.) Moreover, Plaintiffs contend these negative trends in Progenity's test volumes were material facts that would be highly material to a reasonable investor. (*Id.* at 117–18.)

Defendants counter that they were under no obligation to disclose their test volume data for the second quarter of 2020 in the Registration Statement. (Doc. 52–1 at 22.) As discussed above, publicly held companies are not required to report the results of a fiscal quarter until at least 40 days following the end of that quarter. *See* 17 C.F.R. § 240.13a–13. Nor are companies required to disclose all material adverse events to investors—"even if investors would consider the omitted information significant"—so long as the omission does not make the actual statements made misleading. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("[w]e have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'"); *see also Brody*, 280 F.3d at 1006 (noting that a statement often "will not mislead even if it is incomplete or does not include all relevant facts"). Nevertheless, Defendants' failure to disclose a negative trend may be actionable under Section 11 if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006; *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d at 881 n.10 (finding that public statements were not false or misleading when "the omitted information did not contradict, or render

17

misleading, the original [statements]").

While Plaintiffs allege the above statements "contained three different versions of the same disclosure relating to Progenity's test volume growth, each of which was misleading in its own way," the Court disagrees. (*See* Doc. 49 at 115.)  Although the statements have slight inconsistencies between them, a reasonable investor reviewing the Registration Statement in its entirety would not be misled to believe that Progenity's test volume was increasing at the time of the IPO.  As the Court previously noted (*see* Doc. 48), in all three statements, Defendants mention COVID-19's negative effect on test volume and other challenges they faced because of the pandemic.  (Doc. 49 at 115–16.) Defendants expressly warn that "there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods." (*Id.* at 116.)  Although Plaintiffs claim that Defendants failed to disclose Progenity's decreasing test volumes at the time of the IPO, Defendants reiterated several times that they had begun to observe "significant declines in the volumes of our molecular tests as well as the pathology tests" in March 2020.  (*Id.*)  The statement that "the growth rate of our test volume is accelerating," when read in context with the various other statements emphasizing Progenity's declining test volumes stemming from the pandemic, is insufficient to establish that a reasonable investor would have been misled about the nature of their investment. *See Daou Sys.*, 411 F.3d at 1027.

Plaintiffs also argue that Defendants' statement that "we believe our business is resilient and we have observed positive signs of recovery so far" is false and misleading because it emphasizes resilience and recovery, though Defendants knew at the time that Progenity's test volumes were likely to remain depressed.  (Doc. 49 at 116.)  Insofar as Defendants' statement is a sincere statement of pure opinion, it generally cannot be an "untrue statement of material fact" generating liability under Section 11.[7]  *Omnicare*, 575

---

[7] The first portion of the sentence at issue—Defendants' statement that "[w]e believe our business is resilient"—is not actionable insofar as it constitutes a statement of corporate

U.S. at 186.  However, liability under Section 11's false-statement provision follows if the "speaker did not hold the belief she professed" or "if the supporting fact she supplied were untrue."  *Id.* at 185–86.  Thus, to establish a Section 11 claim based on this statement, Plaintiffs must show that Defendants either did not believe their business to be resilient or had not observed any signs of recovery.  Plaintiffs have not pleaded facts to support either possibility.

Plaintiffs argue that at the time of the IPO, Progenity knew its declining test volume was unlikely to recover, as supported by CW accounts describing their experiences working for Progenity.  (*See* Doc. 49 at 59–60.)  Defendants counter that "[t]he conclusory statements attributed to the CWs offer at most anecdotal discussions regarding various Progenity business practices, including coding, billing, and reimbursement."  (Doc. 52–1 at 23.)  For example, "CW1 and CW2 assert that Progenity's testing volumes declined in the spring of 2020" and "[o]ther CW allegations merely confirm what the Company disclosed in the Offering Materials—that testing volumes had declined in the period before the IPO."  (*Id.*)  The Court finds Defendants' disclosures in the Registration Statement, such as "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic," are largely consistent with CW statements.  For example, "[a]ccording to CW1, in the spring of 2020 as the COVID crisis began in the United States, Progenity's testing volume became very low and employees working in the lab had almost no samples coming in."  (Doc. 49 at 59.)  CW2 similarly states that her territory sales volume "went down significantly during the initial COVID lockdown."  (*Id.* at 60.)  These claims are consistent with Defendants' disclosure that "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic."  (*Id.* at 58–59, 115.)

---

optimism, which expresses an opinion that generally cannot be objectively verified.  *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d at 1254 ("business puffery or opinion (vague, optimistic statements) are not actionable because they do not 'induce the reliance of a reasonable investor'") (citing *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)).

The remaining CW accounts do not provide any additional support for Plaintiffs' theory of liability.[8]

The Court finds that Defendants were under no obligation to disclose their real-time test volume data from the second quarter of 2020 at the time that the Registration Statement took effect. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (holding that company was "under no duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly warned that [the company] expected lower net sales"). Nevertheless, the Registration Statement clearly warned that at the time of the IPO, Progenity had experienced a significant drop in test volume due to the COVID-19 pandemic. Defendants also cautioned that they could not guarantee that the decline in test volumes would not continue or even accelerate in the future. Accordingly, Plaintiffs have not established that Defendants made any false statement or omitted to state a material fact necessary to make the other statements in the Registration Statement not misleading. 15 U.S.C. § 77k(a). To the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in test volume, it is hereby **DISMISSED** without prejudice.

### ii.    Negative Trend in Average Selling Price

Plaintiffs next claim that the Registration Statement failed to disclose Progenity's known trend of decreasing average selling prices ("ASPs"). (Doc. 49 at 118.) Plaintiffs define ASP as "Progenity's revenue from testing divided by the number of such tests." (*Id.*

---

[8] CW4 and CW5's accounts purport to establish that Progenity "had access to real-time data regarding its business." (Doc. 49 at 60.) Many companies have access to similar data for their businesses. Nevertheless, companies filing registration statements are not required to disclose every shred of data in their possession in real-time, so long as the omission of that data does not render the statements they do share misleading. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d at 880 n.8. For the reasons discussed above, Plaintiffs have not established that Defendants had an obligation to share their real-time data, nor that the failure to disclose such data rendered any statement false or misleading to Progenity's potential investors.

at 61.)  Plaintiffs contend that Progenity's decreasing ASP "was reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations." (*Id.* at 118.)

Upon review of the Registration Statement, the Court cannot locate any disclosures regarding the actual ASP of Progenity's test offerings.[9]  Nevertheless, the question presented on a motion to dismiss a Section 11 claim is whether Plaintiffs have plausibly alleged that Defendants' "failure to include a material fact has rendered a published statement misleading." *See Omnicare*, 575 U.S. at 194.  The Court finds that Plaintiffs have not pointed to any statements that were rendered misleading by Defendants' failure to disclose the ASP of Progenity's tests across any specific period.

Plaintiffs identify two statements that they allege were rendered false or misleading by the supposed decline in Progenity's ASPs which are: (1) that "[i]n response to the COVID-19 pandemic, the Avero Diagnostics laboratory is providing molecular testing for diagnosing COVID-19"; and (2) that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may similarly cause reimbursement for our Preparent expanded carrier screening tests to decline." (Doc. 49 at 119.)  In regard to the first statement, Plaintiffs contend that Defendants "failed to disclose that Progenity's COVID tests had much lower ASP than its other tests, that Progenity's core test volumes were in decline in part due to its decision to discontinue its illegal marketing practice, and that Progenity's revenues and business would be harmed as a result of Progenity's core tests becoming a smaller portion of its product mix relative to COVID tests." (*Id.*)  Plaintiffs argue the second statement is materially false and misleading because it presents "a mere hypothetical risk that this CPT code 'may' cause Preparent

---

[9] Defendants note that the Registration Statement contains a single reference to ASP when explaining how Progenity calculates its gross margins: "Higher gross margins reflect the average selling price of our tests, as well as the operating efficiency of our laboratory operations." (Doc. 52–1 at 24.)  However, the Registration Statement does not mention the actual ASP charged for any of Progenity's test offerings across any specific period.

reimbursement to decline, while omitting to disclose that Progenity had." (*Id.*)

As discussed above, a statement often "will not mislead even if it is incomplete or does not include all relevant facts." *Brody*, 280 F.3d at 1006. Although the two statements at issue do not mention the allegedly resulting decrease in Progenity's ASP and revenue, nothing in the statements would be rendered misleading by failing to disclose that information. If Defendants had suggested that this fluctuation in test volumes would not impact Progenity's ASP or revenue, the statements at issue may well have been misleading. However, the actual statements made did not state or imply anything regarding the fiscal impact of the changes. Defendants' failure to disclose a potential decrease in ASP and revenue, "even if investors would consider the omitted information significant," is not actionable insofar as it did not make the actual statements made about test volume fluctuation misleading.[10] *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d at 880 n.8.

Moreover, although these two statements did not disclose the potential effect of the changes on Progenity's revenue, the Court finds that they are consistent with other disclosures made in the Registration Statement relating to Progenity's test volumes and revenue. For example, Defendants disclosed that although the revenue derived from the Innatal and Preparent tests were roughly equal at the time of the IPO, the "ratio may fluctuate over time." (Progenity, Inc., Prospectus (Form 424B4), at 93 (June 19, 2020).) Defendants also stated that "the high level of competition in our industry could force us to reduce the price at which we sell our products," and that these pricing pressures "could harm our revenues, operating income, or market share." (*Id.* at 20.) It is unlikely that a

---

[10] Plaintiffs also allege that Defendants failed to disclose that around March 2020, Progenity reduced the cash price for both its Preparent and Innatal tests, which Defendants knew would affect ASP in the second quarter of 2020 and beyond. (Doc. 49 at 62.) However, Plaintiffs do not point to any statement made by Defendants that was rendered misleading by the failure to disclose this information. Therefore, the Court finds that Plaintiffs have not stated a plausible claim under Section 11's omissions clause based on this omitted factual allegation.

reasonable investor reviewing the Registration Statement in its entirety would be misled to believe that Progenity's ASP would never decrease or that its revenue could not be affected as a result.

Plaintiffs have not adequately pleaded that Defendants were required to disclose the alleged negative trend in Progenity's ASP in order to make the other statements in the Registration Statement not misleading. Accordingly, to the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in ASP, it is hereby **DISMISSED** without prejudice.

### iii.    *Negative Trend in Revenue*

Plaintiffs also claim that the Registration Statement failed to disclose "the decreasing trends in Progenity's revenue" even though "these material facts existed at the time of the IPO." (Doc. 49 at 120.)

The Court finds Plaintiffs' broad assertion that Defendants' failure to disclose a negative trend in revenue rendered the entire Registration Statement false and misleading is insufficient to state a claim. At a minimum, Rule 8 requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). As the Court has previously noted and repeats throughout this opinion, in order to adequately state a claim under Section 11's omissions clause, a plaintiff must demonstrate that the defendant's failure to include a material fact rendered a published statement misleading. *Omnicare*, 575 U.S. at 194.

The Registration Statement discloses negative trends in Progenity's revenue that Defendants had observed by the time the Registration Statement took effect. Under the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," Defendants compare the fiscal results of Progenity's operations from the first quarter of 2019 and the first quarter of 2020. (Progenity, Inc., Prospectus (Form 424B4), at 96 (June 19, 2020).) Defendants disclose that Progenity's revenue for the first quarter of 2020 was down $30.7 million from its revenue for the first quarter of 2019, which it notes was a 64.6% decrease. (*Id.* at 97.) Further, under the subsection titled "Risks

23

Related to Our Business and Industry," the Registration Statement states in bold, italicized font: "We have incurred losses in the past, and we may not be able to achieve or sustain profitability in the future." (*Id.* at 19.)  It then goes on to state that "[i]t is possible that we will not generate sufficient revenue from the sale of our products to cover our costs . . . and achieve or sustain profitability." (*Id.*)  These disclosures would not mislead a reasonable investor to believe that Progenity's revenue was increasing or even stable at the time the Registration Statement took effect.

Defendants were under no obligation to disclose their real-time revenue data at the time that the Registration Statement took effect.  *See Worlds of Wonder*, 35 F.3d at 1419 (holding that company was "under no duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly warned that [the company] expected lower net sales").  Nevertheless, the Registration Statement clearly warned that in the first quarter of 2020, Progenity had experienced a significant drop in revenue as compared to the first quarter of 2019.  Accordingly, Plaintiffs have not established that Defendants omitted to state a material fact necessary to make other statements in the Registration Statement not misleading.  15 U.S.C. § 77k(a).  To the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in revenue, it is hereby **DISMISSED** without prejudice.

### c.   Marketing Practices

Finally, Plaintiffs' SAC includes a new allegation that "[n]owhere did the Registration Statement disclose that Progenity had recently ended the illegal marketing practice on which the competitiveness of its business depended." (Doc. 49 at 106.) However, "this material fact existed at the time of the IPO, was necessary to make the statements in the Registration Statement not misleading, and was required to be included in the Registration Statement." (*Id.*)

It is Plaintiffs' position that:

Progenity's February 2020 decision to end its key illegal marketing practice of waiving patient payment amounts made an investment in Progenity

24

speculative or risky because, inter alia: (i) this illegal marketing practice had been Progenity's main selling point for its entire history through February 2020, (ii) Progenity's competitors offered higher quality tests at lower prices, (iii) Progenity's historical results reflected additional testing and revenue which Progenity would not have achieved absent its illegal marketing practice, (iv) the end of this illegal marketing practice had already resulted in Progenity losing certain customers and angering others, and (v) the end of this illegal marketing practice would make it more difficult for Progenity to obtain new customers in the future.

(*Id.* at 107.)  Defendants counter that this new theory fails as a matter of law because: (1) Plaintiffs fail to identify any statement in the Offering Materials rendered false or misleading by the omission of details regarding Progenity's allegedly improper marketing practices, (2) Plaintiffs plead no facts supporting their legal conclusion that Progenity's marketing practices from April 2018 until February 2020—which they allege were "more disguised and subtle" than prior practices—were unlawful, (3) Plaintiffs plead no facts supporting their premise that there was a change in policy in February 2020, and (4) Plaintiffs' conclusory allegation that the supposedly improper marketing practices were the reason for the Progenity's past success is unsupported.  (Doc. 52–1 at 26–28.)

The Court finds Plaintiffs' argument that Progenity failed to disclose that it had ended the alleged illegal marketing practice on which the competitiveness of its business depended is insufficient to constitute a Section 11 violation.  Plaintiffs' SAC references several "false and misleading" statements included in the Registration Statement such as "[s]ince 2010, our molecular testing business has achieved consistent year-over-year test volume growth through our robust product portfolio and our strong commercial organization" and "[w]e believe our future success will be driven by continued capture of market share by our molecular testing business and new revenue streams resulting from our diversified product development pipeline, both within and beyond women's health." (Doc. 49 at 108.)  Plaintiffs claim these statements were materially false and misleading when made because "the volume growth in Progenity's genetic testing business was driven primarily by Progenity's illegal marketing practices, which Progenity had ended in

February 2020 shortly before the IPO," and Progenity failed to disclose they ended a marketing practice key to their success. (*Id.*) However, the Court fails to see how such statements relate to alleged illegal marketing practices.

As the Court previously noted (*see supra*, p. 17), companies are not required to disclose all material adverse events to investors so long as the omission does not make the actual statements made misleading. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("[w]e have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'"); *see also Brody*, 280 F.3d at 1006 (noting that a statement often "will not mislead even if it is incomplete or does not include all relevant facts"). Progenity had not discussed historical marketing practices and was not required to discuss alleged changes to its marketing strategy. Moreover, Plaintiffs do not sufficiently plead how the alleged improper marketing practices were unlawful. *See In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17-CV-00162-RS, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) ("[f]ederal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing'"). Additionally, the Court finds Plaintiffs' allegation that the improper marketing practice "was its main selling point" is unsubstantiated. (*See* Doc. 49 at 52.) Plaintiffs reference several accounts of CWs; however, Plaintiffs do not offer any statistical data or further factual support to aid this conclusion. (*See id.* at 52–53.)

Based on the foregoing, to the extent that Plaintiffs' Section 11 claim is premised on Progenity's alleged failure to disclose its decision to end improper marketing practices, it is hereby **DISMISSED** without prejudice.

C.   Items 303 and 105 Disclosure Obligations

Plaintiffs also claim that Defendants violated Section 11 by failing to meet their disclosure obligations under Items 303 and 105 of SEC Regulation S-K. (Doc. 49 at 9, 87–89.) The Court will analyze Items 303 and 105 separately.

26

### a.    Item 303

Item 303 of Regulation S-K requires that registrants describe "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," as well as "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(i)-(ii).  Under the SEC's 1989 release interpreting Item 303(a), a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir. 1998).

Plaintiffs explain that since Progenity had overbilled government payors for Preparent tests and would be required to refund them at least $10.3 million, and since there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments from government payors for Preparent tests, there "were known trends or uncertainties that had and were reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations."  (*Id.* at 90.)  Moreover, Plaintiffs argue the Registration Statement did not fully disclose decreasing trends in Progenity's test volumes, average selling prices, and revenues "[h]owever, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were omitted."  (Doc. 49 at 113, 118, 120.)  It is Plaintiffs' position that Progenity's test volumes, average selling prices, and revenues "constituted a known trend that had and was reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations."  (*Id.*)  Additionally, Plaintiffs contend the Registration Statement failed to disclose that Progenity discontinued its allegedly improper marketing practice on which its business depended.  (*Id.* at 106–07.)  Thus, "Item 303 of SEC Regulation S-K required Progenity to describe [these] trend[s] in the

27

Registration Statement." (*Id.* at 107.)

The Court again finds Plaintiffs have not established that Defendants knew or had reason to know of Progenity's $10.3 million overbilling liability by the time of the IPO. Plaintiffs' argument that this was a "known trend" at the time the Registration Statement took effect fails, and Plaintiffs cannot prove an Item 303 violation on this basis. As for the negative trends, Defendants disclosed that Progenity was experiencing downturns in test volume and revenue at the time the Registration Statement took effect. As previously explained by the Court (*see* Doc. 48), while the average selling prices of Progenity's test offerings was not explicitly disclosed by Defendants, it could easily be calculated from Progenity's disclosed revenue and test volume data. *See In re Dropbox Sec. Litig.*, No. 19-cv-06348-BLF, 2020 WL 6161502, at *8 (N.D. Cal. Oct. 21, 2020) (rejecting Item 303 allegations based on failure to disclose trend of declining revenue growth rate where "[a]nyone with basic mathematical skills could discern" the trend in light of defendant's disclosure of its annual revenue); *see also In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (rejecting Section 11 allegations based on failure to disclose number of subscription cancellations where the "number could be calculated through simple arithmetic using other numbers that were disclosed"). Moreover, "to the extent 'Progenity's February 2020 decision to end its key illegal marketing practice of waiving patient payment amounts was a known trend,' this too was properly disclosed in Progenity's historical data." (Doc. 52–1 at 30 (quoting Doc. 49 at 107).)

The Court agrees with Defendants that "Item 303 did not require [Progenity] to make future projections based on those trends, as Plaintiffs allege." *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd sub nom*, *In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991)) ("Regulation S–K thus governs the disclosure of known historic trends, but does not provide a basis of liability where a corporation fails to 'disclose' the future").

Accordingly, Plaintiffs have failed to show that Defendants omitted a known

28

material trend from the Registration Statement.   Thus, Plaintiffs' Section 11 claim predicated on Item 303 violations fails.

### b.   Item 105

Item 105 of Regulation S-K requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.

Plaintiffs argue that Item 105 required Defendants to include a discussion of the following factors in the Registration Statement, and to explain how they affect Progenity or the stock offered in the IPO:

> (i) Progenity had improperly billed government payors for Preparent tests beginning in 2019 and ending in or before early 2020, and (ii) there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments from government payors for Preparent tests, made an investment in Progenity speculative or risky.

(Doc. 49 at 89–90.)  Plaintiffs assert that "[t]his trend and these uncertainties had already materially unfavorably affected sales, revenues, and income because Progenity had already stopped its improper billing, thus reducing revenues."  (*Id.* at 91.)  Moreover, Plaintiffs contend that "Progenity's February 2020 decision to end its key illegal marketing practice of waiving patient payment amounts made an investment in Progenity speculative or risky."  (*Id.* at 106.)  "Item 105 of SEC Regulation S-K required Progenity to include a discussion of this factor in the Registration Statement, and to explain how it affects Progenity or the stock offered in the IPO," which they failed to do.  (*Id.* at 107.)

The Court finds Plaintiffs' Item 105 claim fails for the same reason as Plaintiffs' Item 303 claim because Plaintiffs have not established that Defendants knew or had reason to know of the company's liability at the time the Registration Statement was issued.  As noted in the Court's prior order (*see* Doc. 48), if Defendants could not have reasonably known about the liability, they could not have discussed it in the Registration Statement as a material factor making an investment in Progenity "speculative or risky."  Moreover, Defendants made various statements in the Registration Statement disclosing the possibility that payors could seek refunds of amounts paid.  For example, the Registration

Statement stated that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code" (Doc. 49 at 101); "commercial third-party payors may . . . seek repayment from us of amounts previously reimbursed" (*Id.* at 102); and "[t]hird-party payors may decide to deny payment or recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received . . . [a]ny of these outcomes . . . could have a material and adverse effect on our business, operating results, and financial condition" (*Id.* at 102–03). These statements are sufficient to satisfy Item 105's disclosure requirements. Accordingly, Plaintiffs' Section 11 claim based on Item 105 violations also fails.

D.   Section 15 Claim

Plaintiffs' second cause of action alleges violations of Section 15 of the Securities Act against the Individual Defendants. (*Id.* at 125–27.) Section 15 imposes joint and several liability upon every person who controls any person liable under Section 11. 15 U.S.C. § 77o (West). The section provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

*Id.* Nevertheless, "[t]here can be no Section 15 violation without an underlying Section 11 violation." *In re Ubiquiti Networks, Inc. Sec. Litig.*, 669 Fed. Appx. 878, 880 (9th Cir. 2016). As explained *supra*, the Court does not find a Section 11 violation and, as such, finds Plaintiffs fail to adequately plead a Section 15 violation.

E.   Leave to Amend

If a court dismisses a complaint for failure to state a claim, it must then determine whether to grant leave to amend. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

"A district court may deny a plaintiff leave to amend if it determines that 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' or if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (internal quotation marks and citations omitted).  In deciding whether justice requires granting leave to amend, factors to be considered include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).  Here, Plaintiffs argue that, if necessary, the Court should grant leave to amend because "Plaintiffs could further supplement their allegations with additional research, witness interviews, and other sources." (Doc. 54 at 31.)  Furthermore, Plaintiffs explain that "after filing the SAC Plaintiffs have obtained documentary evidence, produced to Plaintiffs in response to freedom of information requests to government health care programs, corroborating key allegations, and providing significant additional facts, regarding Progenity's improper Preparent billing." (*Id.* at 31–32.)  In considering the *Foman* factors listed above, the Court **GRANTS** Plaintiffs leave to amend.  The request does not appear to be frivolous or in bad faith.  Moreover, the Court does not find amendment will create undue prejudice or delay.

## IV.   CONCLUSION

Based on the foregoing, the Court:

1.    **GRANTS** Defendants' Motion.  (Doc. 52.)

2.    **DISMISSES** Plaintiffs' SAC for failure to state a claim upon which relief may be granted.

3.    **GRANTS** Plaintiffs twenty-one (21) days leave from the date of this Order in which to file an amended complaint which cures all the deficiencies of pleading noted.  If Plaintiffs choose not to file an amended complaint by then, the Clerk of Court shall close

this case. *See Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005) ("[i]f a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action").

**IT IS SO ORDERED.**

DATE:  January 13, 2022

_____

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

32