# Exhibit 1

Release No. 99 (S.E.C. Release No.), Release No. SAB - 99, 1999 WL 1123073

Securities and Exchange Commission (S.E.C.)
Staff Accounting Bulletin

SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

STAFF ACCOUNTING BULLETIN NO. 99

August 12, 1999

**\*1 AGENCY:** Securities and Exchange Commission

**ACTION:** Publication of Staff Accounting Bulletin

**SUMMARY:** This staff accounting bulletin expresses the views of the staff that exclusive reliance on certain quantitative benchmarks to assess materiality in preparing financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.

**DATE:** August 12, 1999

**FOR FURTHER INFORMATION CONTACT:** W. Scott Bayless, Associate Chief Accountant, or Robert E. Burns, Chief Counsel, Office of the Chief Accountant (202-942-4400), or David R. Fredrickson, Office of General Counsel (202-942-0900), Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-1103; electronic addresses: BaylessWS@sec.gov; BurnsR@sec.gov; FredricksonD@sec.gov.

**SUPPLEMENTARY INFORMATION:** The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Jonathan G. Katz
Secretary

### Part 211--(AMEND)

Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 99 to the table found in Subpart B.

### STAFF ACCOUNTING BULLETIN NO. 99

The staff hereby adds Section M to Topic 1 of the Staff Accounting Bulletin Series. Section M, entitled "Materiality," provides guidance in applying materiality thresholds to the preparation of financial statements filed with the Commission and the performance of audits of those financial statements.

## STAFF ACCOUNTING BULLETINS

## TOPIC 1: FINANCIAL STATEMENTS

*****

### M. Materiality

### 1. Assessing Materiality

*Facts*: During the course of preparing or auditing year-end financial statements, financial management or the registrant's independent auditor becomes aware of misstatements in a registrant's financial statements. When combined, the misstatements result in a 4% overstatement of net income and a $.02 (4%) overstatement of earnings per share. Because no item in the registrant's consolidated financial statements is misstated by more than 5%, management and the independent auditor conclude that the deviation from generally accepted accounting principles ("GAAP") is immaterial and that the accounting is permissible. [1]

*Question*: Each Statement of Financial Accounting Standards adopted by the Financial Accounting Standards Board ("FASB") states, "The provisions of this Statement need not be applied to immaterial items." In the staff's view, may a registrant or the auditor of its financial statements assume the immateriality of items that fall below a percentage threshold set by management or the auditor to determine whether amounts and items are material to the financial statements?

 **\*2** *Interpretive Response*: No. The staff is aware that certain registrants, over time, have developed quantitative thresholds as "rules of thumb" to assist in the preparation of their financial statements, and that auditors also have used these thresholds in their evaluation of whether items might be considered material to users of a registrant's financial statements. One rule of thumb in particular suggests that the misstatement or omission [2] of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management. The staff reminds registrants and the auditors of their financial statements that exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law.

The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that--without considering all relevant circumstances--a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.

Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important. In its Statement of Financial Accounting Concepts No. 2, the FASB stated the essence of the concept of materiality as follows:
The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item. [3]

This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is--
a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. [4]

Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality.[5] Court decisions, Commission rules and enforcement actions, and accounting and auditing literature[6] have all considered "qualitative" factors in various contexts.

 **\*3**  The FASB has long emphasized that materiality cannot be reduced to a numerical formula. In its Concepts Statement No. 2, the FASB noted that some had urged it to promulgate quantitative materiality guides for use in a variety of situations. The FASB rejected such an approach as representing only a "minority view," stating--
The predominant view is that materiality judgments can properly be made only by those who have all the facts. The Board's present position is that no general standards of materiality could be formulated to take into account all the considerations that enter into an experienced human judgment.[7]

The FASB noted that, in certain limited circumstances, the Commission and other authoritative bodies had issued quantitative materiality guidance, citing as examples guidelines ranging from one to ten percent with respect to a variety of disclosures.[8] And it took account of contradictory studies, one showing a lack of uniformity among auditors on materiality judgments, and another suggesting widespread use of a "rule of thumb" of five to ten percent of net income.[9] The FASB also considered whether an evaluation of materiality could be based solely on anticipating the market's reaction to accounting information.[10]

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions"[11] in favor of an approach that takes into account all the relevant considerations. In so doing, it made clear that--
[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.[12]

Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature:
As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.[13]

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are--
• whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate[14]

•whether the misstatement masks a change in earnings or other trends

•whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

•whether the misstatement changes a loss into income or vice versa

•whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

**\*4**  •whether the misstatement affects the registrant's compliance with regulatory requirements

•whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements

•whether the misstatement has the effect of increasing management's compensation--for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

•whether the misstatement involves concealment of an unlawful transaction.

This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement.[15] Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself "too blunt an instrument to be depended on" in considering whether a fact is material.[16] When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.[17]

For the reasons noted above, the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.[18] While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.[19] The staff believes that investors generally would regard as significant a management practice to over-or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole.[20] "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity"[21] is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information--as with materiality generally--

**\*5**  situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.[22]

### *Aggregating and Netting Misstatements*

In determining whether multiple misstatements cause the financial statements to be materially misstated, registrants and the auditors of their financial statements should consider each misstatement separately and the aggregate effect of all misstatements.[23] A registrant and its auditor should evaluate misstatements in light of quantitative and qualitative factors and

"consider whether, in relation to individual line item amounts, subtotals, or totals in the financial statements, they materially misstate the financial statements taken as a whole."[24] This requires consideration of--the significance of an item to a particular entity (for example, inventories to a manufacturing company), the pervasiveness of the misstatement (such as whether it affects the presentation of numerous financial statement items), and the effect of the misstatement on the financial statements taken as a whole....[25]

Registrants and their auditors first should consider whether each misstatement is material, irrespective of its effect when combined with other misstatements. The literature notes that the analysis should consider whether the misstatement of "individual amounts" causes a material misstatement of the financial statements taken as a whole. As with materiality generally, this analysis requires consideration of both quantitative and qualitative factors.

If the misstatement of an individual amount causes the financial statements as a whole to be materially misstated, that effect cannot be eliminated by other misstatements whose effect may be to diminish the impact of the misstatement on other financial statement items. To take an obvious example, if a registrant's revenues are a material financial statement item and if they are materially overstated, the financial statements taken as a whole will be materially misleading even if the effect on earnings is completely offset by an equivalent overstatement of expenses.

Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading.[26]

The staff believes that, in considering the aggregate effect of multiple misstatements on a subtotal or total, registrants and the auditors of their financial statements should exercise particular care when considering whether to offset (or the appropriateness of offsetting) a misstatement of an estimated amount with a misstatement of an item capable of precise measurement. As noted above, assessments of materiality should never be purely mechanical; given the imprecision inherent in estimates, there is by definition a corresponding imprecision in the aggregation of misstatements involving estimates with those that do not involve an estimate.

 *6  Registrants and auditors also should consider the effect of misstatements from prior periods on the current financial statements. For example, the auditing literature states.

Matters underlying adjustments proposed by the auditor but not recorded by the entity could potentially cause future financial statements to be materially misstated, even though the auditor has concluded that the adjustments are not material to the current financial statements.[27]

This may be particularly the case where immaterial misstatements recur in several years and the cumulative effect becomes material in the current year.

### 2. Immaterial Misstatements That are Intentional

*Facts*: A registrant's management intentionally has made adjustments to various financial statement items in a manner inconsistent with GAAP. In each accounting period in which such actions were taken, none of the individual adjustments is by itself material, nor is the aggregate effect on the financial statements taken as a whole material for the period. The registrant's earnings "management" has been effected at the direction or acquiescence of management in the belief that any deviations from GAAP have been immaterial and that accordingly the accounting is permissible.

*Question*: In the staff's view, may a registrant make intentional immaterial misstatements in its financial statements?

*Interpretive Response*: No. In certain circumstances, intentional immaterial misstatements are unlawful.

### *Considerations of the Books and Records Provisions Under the Exchange Act*

Even if misstatements are immaterial,[28] registrants must comply with Sections 13(b)(2)-(7) of the Securities Exchange Act of 1934 (the "Exchange Act").[29] Under these provisions, each registrant with securities registered pursuant to Section 12 of the Exchange Act,[30] or required to file reports pursuant to Section 15(d),[31] must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.[32] In this context, determinations of what constitutes "reasonable assurance" and "reasonable detail" are based not on a "materiality" analysis but on the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs.[33] Accordingly, failure to record accurately immaterial items, in some instances, may result in violations of the securities laws.

The staff recognizes that there is limited authoritative guidance[34] regarding the "reasonableness" standard in Section 13(b)(2) of the Exchange Act. A principal statement of the Commission's policy in this area is set forth in an address given in 1981 by then Chairman Harold M. Williams.[35] In his address, Chairman Williams noted that, like materiality, "reasonableness" is not an "absolute standard of exactitude for corporate records."[36] Unlike materiality, however, "reasonableness" is not solely a measure of the significance of a financial statement item to investors. "Reasonableness," in this context, reflects a judgment as to whether an issuer's failure to correct a known misstatement implicates the purposes underlying the accounting provisions of Sections 13(b)(2)-(7) of the Exchange Act.[37]

 **\*7** In assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that are accurate "in reasonable detail," registrants and their auditors should consider, in addition to the factors discussed above concerning an evaluation of a misstatement's potential materiality, the factors set forth below.
• *The significance of the misstatement*, Though the staff does not believe that registrants need to make finely calibrated determinations of significance with respect to immaterial items, plainly it is "reasonable" to treat misstatements whose effects are clearly inconsequential differently than more significant ones.

• *How the misstatement arose*. It is unlikely that it is ever "reasonable" for registrants to record misstatements or not to correct known misstatements--even immaterial ones--as part of an ongoing effort directed by or known to senior management for the purposes of "managing" earnings. On the other hand, insignificant misstatements that arise from the operation of systems or recurring processes in the normal course of business generally will not cause a registrant's books to be inaccurate "in reasonable detail."[38]

• *The cost of correcting the misstatement*. The books and records provisions of the Exchange Act do not require registrants to make major expenditures to correct small misstatements.[39] Conversely, where there is little cost or delay involved in correcting a misstatement, failing to do so is unlikely to be "reasonable."

• *The clarity of authoritative accounting guidance with respect to the misstatement*. Where reasonable minds may differ about the appropriate accounting treatment of a financial statement item, a failure to correct it may not render the registrant's financial statements inaccurate "in reasonable detail." Where, however, there is little ground for reasonable disagreement, the case for leaving a misstatement uncorrected is correspondingly weaker.

There may be other indicators of "reasonableness" that registrants and their auditors may ordinarily consider. Because the judgment is not mechanical, the staff will be inclined to continue to defer to judgments that "allow a business, acting in good faith, to comply with the Act's accounting provisions in an innovative and cost-effective way." [40]

### *The Auditor's Response to Intentional Misstatements*

Section 10A(b) of the Exchange Act requires auditors to take certain actions upon discovery of an "illegal act." [41] The statute specifies that these obligations are triggered "whether or not [the illegal acts are] perceived to have a material effect on the financial statements of the issuer...." Among other things, Section 10A(b)(1) requires the auditor to inform the appropriate level of management of an illegal act (unless clearly inconsequential) and assure that the registrant's audit committee is "adequately informed" with respect to the illegal act.

 **\*8**  As noted, an intentional misstatement of immaterial items in a registrant's financial statements may violate Section 13(b)(2) of the Exchange Act and thus be an illegal act. When such a violation occurs, an auditor must take steps to see that the registrant's audit committee is "adequately informed" about the illegal act. Because Section 10A(b)(1) is triggered regardless of whether an illegal act has a material effect on the registrant's financial statements, where the illegal act consists of a misstatement in the registrant's financial statements, the auditor will be required to report that illegal act to the audit committee irrespective of any "netting" of the misstatements with other financial statement items.

The requirements of Section 10A echo the auditing literature. See, for example, Statement on Auditing Standards No. ("SAS") 54, "Illegal Acts by Clients," and SAS 82, "Consideration of Fraud in a Financial Statement Audit." Pursuant to paragraph 38 of SAS 82, if the auditor determines there is evidence that fraud may exist, the auditor must discuss the matter with the appropriate level of management. The auditor must report directly to the audit committee fraud involving senior management and fraud that causes a material misstatement of the financial statements. Paragraph 4 of SAS 82 states that "misstatements arising from fraudulent financial reporting are intentional misstatements or omissions of amounts or disclosures in financial statements to deceive financial statement users." [42] SAS 82 further states that fraudulent financial reporting may involve falsification or alternation of accounting records; misrepresenting or omitting events, transactions or other information in the financial statements; and the intentional misapplication of accounting principles relating to amounts, classifications, the manner of presentation, or disclosures in the financial statements. [43] The clear implication of SAS 82 is that immaterial misstatements may be fraudulent financial reporting. [44]

Auditors that learn of intentional misstatements may also be required to (1) reevaluate the degree of audit risk involved in the audit engagement, (2) determine whether to revise the nature, timing, and extent of audit procedures accordingly, and (3) consider whether to resign. [45]

Intentional misstatements also may signal the existence of reportable conditions or material weaknesses in the registrant's system of internal accounting control designed to detect and deter improper accounting and financial reporting. [46] As stated by the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, in its 1987 report,
The tone set by top management--the corporate environment or culture within which financial reporting occurs--is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur. [47]

 **\*9**  An auditor is required to report to a registrant's audit committee any reportable conditions or material weaknesses in a registrant's system of internal accounting control that the auditor discovers in the course of the examination of the registrant's financial statements. [48]

### *GAAP Precedence Over Industry Practice*

Some have argued to the staff that registrants should be permitted to follow an industry accounting practice even though that practice is inconsistent with authoritative accounting literature. This situation might occur if a practice is developed when there are few transactions and the accounting results are clearly inconsequential, and that practice never changes despite a subsequent growth in the number or materiality of such transactions. The staff disagrees with this argument. Authoritative literature takes precedence over industry practice that is contrary to GAAP. [49]

### *General Comments*

This SAB is not intended to change current law or guidance in the accounting or auditing literature. [50] This SAB and the authoritative accounting literature cannot specifically address all of the novel and complex business transactions and events that may occur. Accordingly, registrants may account for, and make disclosures about, these transactions and events based on analogies to similar situations or other factors. The staff may not, however, always be persuaded that a registrant's determination is the most appropriate under the circumstances. When disagreements occur after a transaction or an event has been reported, the consequences may be severe for registrants, auditors, and, most importantly, the users of financial statements who have a right to expect consistent accounting and reporting for, and disclosure of, similar transactions and events. The staff, therefore, encourages registrants and auditors to discuss on a timely basis with the staff proposed accounting treatments for, or disclosures about, transactions or events that are not specifically covered by the existing accounting literature.

## Footnotes

1    American Institute of Certified Public Accountants ("AICPA"), Codification of Statements on Auditing Standards ("AU") § 312, "Audit Risk and Materiality in Conducting an Audit," states that the auditor should consider audit risk and materiality both in (a) planning and setting the scope for the audit and (b) evaluating whether the financial statements taken as a whole are fairly presented in all material respects in conformity with generally accepted accounting principles. The purpose of this Staff Accounting Bulletin ("SAB") is to provide guidance to financial management and independent auditors with respect to the evaluation of the materiality of misstatements that are identified in the audit process or preparation of the financial statements (i.e., (b) above). This SAB is not intended to provide definitive guidance for assessing "materiality" in other contexts, such as evaluations of auditor independence, as other factors may apply. There may be other rules that address financial presentation. *See, e.g.*, Rule 2a-4, 17 CFR 270.2a-4, under the Investment Company Act of 1940.

2    As used in this SAB, "misstatement" or "omission" refers to a financial statement assertion that would not be in conformity with GAAP.

3    FASB, Statement of Financial Accounting Concepts No. 2. *Qualitative Characteristics of Accounting Information* ("Concepts Statement No. 2"). ¶ 132 (1980). *See also* Concepts Statement No. 2, Glossary of Terms--Materiality.

4    *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449 (1976). *See also Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). As the Supreme Court has noted, determinations of materiality require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him...." *TSC Industries, 426 U.S. at 450.*

5    *See, e.g.*, Concepts Statement No. 2, ¶¶ 123-124; AU § 312.10 (?? materiality judgments are made in light of surrounding circumstances and necessarily involve both quantitative and qualitative considerations."); AU § 312.34 ("Qualitative

considerations also influence the auditor in reaching a conclusion as to whether misstatements are material."). As used in the accounting literature and in this SAB, "qualitative" materiality refers to the surrounding circumstances that inform an investor's evaluation of financial statement entries. Whether events may be material to investors for non-financial reasons is a matter not addressed by this SAB.

6    *See, e.g.*, Rule 1-02(o) of Regulation S-X, 17 CFR 210.1-02(o), Rule 405 of Regulation C, 17 CFR 230,405, and Rule 12b-2, 17 CFR 240.12b-2; AU §§ 312.10-11, 317.13, 411.04 n.1, and 508.36; *In re Kidder Peabody Securities Litigation*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997); *In re Westinghouse Securities Litigation*, 90 F.3d 696 (3d Cir. 1996); *In the Matter of W.R. Grace & Co.*, Accounting and Auditing Enforcement Release No. ("AAER") 1140 (June 30, 1999); *In the Matter of Eugene Gaughan*, AAER 1141 (June 30, 1999); *In the Matter of Thomas Scanlon*, AAER 1142 (June 30, 1999); and *In re Sensormatic Electronics Corporation*, Sec. Act Rel. No. 7518 (March 25, 1998).

7    Concepts Statement No. 2, ¶ 131 (1980).

8    Concepts Statement No. 2, ¶¶ 131 and 166.

9    Concepts Statement No. 2, ¶ 167.

10    Concepts Statement No. 2, ¶¶ 168-69.

11    Concepts Statement No. 2, ¶ 170.

12    Concepts Statement No. 2, ¶ 125.

13    AU § 312.11.

14    As stated in Concepts Statement No. 2, ¶ 130:

Another factor in materiality judgments is the degree of precision that is attainable in estimating the judgment item. The amount of deviation that is considered immaterial may increase as the attainable degree of precision decreases. For example, accounts payable usually can be estimated more accurately than can contingent liabilities arising from litigation or threats of it, and a deviation considered to be material in the first case may be quite trivial in the second.

This SAB is not intended to change current law or guidance in the accounting literature regarding accounting estimates. *See, e.g.*, Accounting Principles Board Opinion No. 20, *Accounting Changes* ¶¶ 10, 11, 31-33 (July 1971).

15    The staff understands that the Big Five Audit Materiality Task Force ("Task Force") was convened in March of 1998 and has made recommendations to the Auditing Standards Board including suggestions regarding communications with audit committees about unadjusted misstatements. *See generally* Big Five Audit Materiality Task Force, "Materiality in a Financial Statement Audit-- Considering Qualitative Factors When Evaluating Audit Findings" (August 1998). The Task Force memorandum is available at www.aicpa.org.

16    *See* Concepts Statement No. 2, ¶ 169.

17    If management does not expect a significant market reaction, a misstatement still may be material and should be evaluated under the criteria discussed in this SAB.

18    Intentional management of earnings and intentional misstatements, as used in this SAB, do not include insignificant errors and omissions that may occur in systems and recurring processes in the normal course of business. *See* notes 38 and 50 *infra*.

19    Assessments of materiality should occur not only at year-end, but also during the preparation of each quarterly or interim financial statement. *See, e.g., In the Matter of Venator Group, Inc.,* AAER 1049 (June 29, 1998).

20    *See, e.g., In the Matter of W.R. Grace & Co.,* AAER 1140 (June 30, 1999).

21    AUI § 326.33.

22    *Id.*

23    The auditing literature notes that the "concept of materiality recognizes that some matters, either individually or in the aggregate, are important for fair presentation of financial statements in conformity with generally accepted accounting principles." AU § 312.03. *See also* AU § 312.04.

24    AU § 312.34. Quantitative materiality assessments often are made by comparing adjustments to revenues, gross profit, pretax and net income, total assets, stockholders' equity, or individual line items in the financial statements. The particular items in the financial statements to be considered as a basis for the materiality determination depend on the proposed adjustment to be made and other factors, such as those identified in this SAB. For example, an adjustment to inventory that is immaterial to pretax income or net income may be material to the financial statements because it may affect a working capital ratio or cause the registrant to be in default of loan covenants.

25    AU § 508.36.

26    AU § 312.34

27    AU § 380.09.

28    FASB Statements of Financial Accounting Standards ("Standards" or "Statements") generally provide that "[t]he provisions of this Statement need not be applied to immaterial items." This SAB is consistent with that provision of the Statements. In theory, this language is subject to the interpretation that the registrant is free intentionally to set forth immaterial items in financial statements in a manner that plainly would be contrary to GAAP if the misstatement were material. The staff believes that the FASB did not intend this result.

29    15 U.S.C. §§ 78m(b)(2)-(7).

30    15 U.S.C. § 78*l*.

31    15 U.S.C. § 78*o*(d).

32    Criminal liability may be imposed if a person knowingly circumvents or knowingly fails to implement a system of internal accounting controls or knowingly falsifies books, records or accounts. 15 U.S.C. §§ 78m(4) and (5). See also Rule 13b2-1 under the Exchange Act, 17 CFR 240.13b2-1, which states, "No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."

33    15 U.S.C. § 78m(b)(7). The books and records provisions of section 13(b) of the Exchange Act originally were passed as part of the Foreign Corrupt Practices Act ("FCPA"). In the conference committee report regarding the 1988 amendments to the FCPA, the committee stated,

The conference committee adopted the prudent man qualification in order to clarify that the current standard does not connote an unrealistic degree of exactitude or precision. The concept of reasonableness of necessity contemplates the weighing of a number of relevant factors, including the costs of compliance.

Cong. Rec. H2116 (daily ed. April 20, 1988).

So far as the staff is aware, there is only one judicial decision that discusses Section 13(b)(2) of the Exchange Act in any detail, *SEC v. World-Wide Coin Investments, Ltd.*, 567 F.Supp. 724 (N.D. Ga. 1983), and the courts generally have found that no private right of action exists under the accounting and books and records provisions of the Exchange Act. *See e.g., Lamb v. Phillip Morris Inc.*, 915 F.2d 1024 (6th Cir. 1990) and *JS Service Center Corporation v. General Electric Technical Services Company*, 937 F. Supp. 216 (S.D.N.Y. 1996).

The Commission adopted the address as a formal statement of policy in Securities Exchange Act Release No. 17500 (January 29, 1981), 46 FR 11544 (February 9, 1981), 21 SEC Docket 1466 (February 10, 1981).

*Id*. at 46 FR 11546.

*Id*.

For example, the conference report regarding the 1988 amendments to the FCPA stated,

The Conferees intend to codify current Securities and Exchange Commission (SEC) enforcement policy that penalties not be imposed for insignificant or technical infractions or inadvertent conduct. The amendment adopted by the Conferees [Section 13(b)(4)] accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the FCPA's books and records or accounting provisions. This provision [Section 13(b)(5)] is meant to ensure that criminal penalties would be imposed where acts of commission or omission in keeping books or records or administering accounting controls have the purpose of calsifying books, records or accounts, or of circumventing the accounting controls set forth in the Act. This would include the deliberate falsification of books and records and other conduct calculated to evade the internal accounting controls requirement.

Cong. Rec. H2115 (daily ed. April 20, 1988).

As Chairman Williams noted with respect to the internal control provisions of the FCPA, "[t]housands of dollars ordinarily should not be spent conserving hundreds." 46 FR 11546.

*Id*., at 11547.

Section 10A(f) defines, for purposes of Section 10A, an "illegal act" as "an act or omission that violates any law, or any rule or regulation having the force of law." This is broader than the definition of an "illegal act" in AU § 317.02, which states, "Illegal acts by clients do not include personal misconduct by the entity's personnel unrelated to their business activities."

AU § 316.04. See also AU § 316.03. An unintentional illegal act triggers the same procedures and considerations by the auditor as a fraudulent misstatement if the illegal act has a direct and material effect on the financial statements. See AU §§ 110 n. 1, 316 n. 1, 317.05 and 317.07. Although distinguishing between intentional and unintentional misstatements is often difficult, the auditor must plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatements in either case. See AU § 316 note 3.

AU § 316.04. Although the auditor is not required to plan or perform the audit to detect misstatements that are immaterial to the financial statements, SAS 82 requires the auditor to evaluate several fraud "risk factors" that may bring such misstatements to his or her attention. For example, an analysis of fraud risk factors under SAS 82 must include, among other things, consideration of management's interest in maintaining or increasing the registrant's stock price or earnings trend through the use of unusually aggressive accounting practices, whether management has a practice of committing to analysts or others that it will achieve unduly aggressive or clearly unrealistic forecasts, and the existence of assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties. See AU §§ 316.17a and .17c.

44    AU §§ 316.34 and 316.35, in requiring the auditor to consider whether fraudulent misstatements are material and in requiring differing responses depending on whether the misstatement is material, make clear that fraud can involve immaterial misstatements. Indeed, a misstatement can be "inconsequential" and still involve fraud.

Under SAS 82, assessing whether misstatements due to fraud are material to the financial statements is a "cumulative process" that should occur both during and at the completion of the audit. SAS 82 further states that this accumulation is primarily a "qualitative matter" based on the auditor's judgment. AU § 316.33. The staff believes that in making these assessments, management and auditors should refer to the discussion in Part 1 of this SAB.

45    AU §§ 316.34 and 316.36. Auditors should document their determinations in accordance with AU §§ 316.37, 319.57,339, and other appropriate sections.

46    *Sec. e.g.*, AU § 316.39.

47    Report of the National Commission on Fraudulent Financial Reporting at 32 (October 1987). See also Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (February 8, 1999).

48    AU § 325.02. *See also* AU § 380.09, which in discussing matters to be communicated by the auditor to the audit committee, states,

The auditor should inform the audit committee about adjustments arising from the audit that could, in his judgement, either individually or in the aggregate, have a significant effect on the entity's financial reporting process. For purposes of this section, an audit adjustment, whether or not recorded by the entity, is a proposed correction of the financial statements.

49    *See* AU § 411.05.

50    The FASB Discussion Memorandum, *Criteria for Determining Materiality*, states that the financial accounting and reporting process considers that "a great deal of the time might be spent during the accounting process considering insignificant matters.... If presentations of financial information are to be prepared economically on a timely basis and presented in a concise intelligible form, the concept of materiality is crucial."

This SAB is not intended to require that misstatements arising from insignificant errors and omissions (individually and in the aggregate) arising from the normal recurring accounting close processes, such as a clerical error or an adjustment for a missed accounts payable invoice, always be corrected, even if the error is identified in the audit process and known to management. Management and the auditor would need to consider the various factors described elsewhere in this SAB in assessing whether such misstatements are material, need to be corrected to comply with the FCPA, or trigger procedures under Section 10A of the Exchange Act. Because this SAB does not change current law or guidance in the accounting or auditing literature, adherence to the principles described in this SAB should not raise the costs associated with recordkeeping or with audits of financial statements.

Release No. 99 (S.E.C. Release No.), Release No. SAB - 99, 1999 WL 1123073

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.