ROBERT V. PRONGAY (#270796)
  *rprongay@glancylaw.com*
CASEY E. SADLER (#274241)
  *csadler@glancylaw.com*
GARTH A. SPENCER (#335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiffs*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No. 3:20-cv-01683-RBM-AHG <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT** <br><br> Hon. Ruth Bermudez Montenegro |

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ........................................................................1

II.  PLAINTIFFS FACE A MINIMAL PLEADING BURDEN ...........................2

    A.   Applicable Pleading Standards ..........................................................2

    B.   The TAC Does Not Sound In Fraud, And So Is Subject To Rule
        8(a) And Not Rule 9(b) .......................................................................4

III. THE TAC'S NEW ALLEGATIONS STATE A CLAIM AS TO
    PROGENITY'S OVERBILLING FOR PREPARENT TESTS .......................5

    A.   The New Facts Show That Progenity's Overbilling Existed And
        Was Knowable At The Time Of The IPO ...........................................6

    B.   The New Facts Show That Progenity's Financial Statements For
        The *First Quarter* Of 2020 Misleadingly Violated Accounting
        Standards' Disclosure Requirements ..................................................9

    C.   The New Facts Show That The Registration Statement Was
        Misleading Regardless Of When Progenity Calculated Its Precise
        Overpayment Liability .......................................................................11

    D.   Defendants' Arguments Against The New Allegations Fail ...............13

IV.  ALL OF PLAINTIFFS' CLAIMS ARE WELL PLEADED...........................16

    A.   The TAC States A Claim As To Defendants' Failure To Disclose
        Progenity's Decision To Abandon Its Key Illegal Marketing
        Practice ..............................................................................................16

    B.   The TAC States A Claim As To Defendants' Failure To Disclose
        Negative Trends In Test Volumes, Average Selling Prices, And
        Revenues ............................................................................................18

V.   THE TAC STATES A CLAIM FOR CONTROL PERSON
    LIABILITY ..................................................................................................19

VI.  CONCLUSION .............................................................................................20

## TABLE OF AUTHORITIES

CASES

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................4

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)................................................................................12

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)........................................................5

*Derr v. Ra Med. Sys., Inc.*,
  2021 WL 1117309 (S.D. Cal. Mar. 24, 2021) ..................................................4, 14

*Gilligan v. Jamco Dev. Corp.*,
  108 F.3d 246 (9th Cir. 1997).................................................................................3

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ...............................................................................................3

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 535 (N.D. Cal. 2009)........................................................................3, 4

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)..................................................................5

*In re Violin Memory Sec. Litig.*,
  2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)......................................................3, 5

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)..............................................................................4, 16

*Knollenberg v. Harmonic, Inc.*,
  152 F. App'x 674 (9th Cir. 2005) ...........................................................................3

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................3

*Mingbo Cai v. Switch, Inc.*,
   2019 WL 3065591 (D. Nev. July 12, 2019) ...............................................5, 17, 19

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................................................................3

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ...................................................4

*Rieckborn v. Jefferies LLC*,
   81 F. Supp. 3d 902 (N.D. Cal. 2015) .................................................................5

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ...........................................................................4

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ..........................................................................19

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .........................................................................................3

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ...........................................................................5

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ......................................................................................19

STATUTES

15 U.S.C. § 77k ..................................................................................................2

REGULATIONS

17 C.F.R. § 229.303(b)(2)(ii) ............................................................................19

Lead Plaintiffs Lin Shen, Lingjun Lin and Fusheng Lin ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Third Amended Complaint ("TAC").[1]

## I.    PRELIMINARY STATEMENT

Defendants misleadingly failed to disclose in Progenity's IPO Registration Statement that the Company had overbilled government health care programs for its "Preparent"-branded genetic carrier screening tests. The TAC cures the deficiencies that the Court identified when dismissing the prior complaint's overbilling claims. By incorporating correspondence between Progenity and the Florida and Michigan Medicaid programs, and Progenity's billing and payments data for Michigan Medicaid, the TAC more than plausibly alleges that Progenity's overbilling existed and was knowable at the time of the IPO, and that Defendants' failure to disclose that overbilling was materially misleading to reasonable investors.

Specifically, the new documents incorporated into the TAC prove beyond dispute that (i) late in 2018 Progenity wrote to state health care programs informing them that it intended not to use new billing codes scheduled to go into effect on January 1, 2019, including the 81443 code that would apply to Progenity's Preparent tests; (ii) shortly thereafter the states responded in writing, informing Progenity that use of the new billing codes was required; (iii) at least one state, Michigan, explicitly informed Progenity that genetic testing billed with the 81443 code "will not be covered as this test does not align with Medicaid's laboratory's standards of coverage"; (iv) Progenity in fact began using the 81443 code in March 2019, but then abruptly stopped using it in June 2019; (v) Progenity resumed using the 81443 code

---

[1] Unless otherwise indicated, all emphasis in this brief has been added, all internal citations, quotation marks, and alterations have been removed, and citations in the form of "¶__" refer to the Third Amended Class Action Complaint ("TAC", ECF No. 64). References to "SAC" are to the Second Amended Complaint (ECF No. 49). The Court dismissed the SAC without prejudice. ECF No. 63 (the "Order"). References to "MTD" are to the pending motion to dismiss. ECF Nos. 67 and 67-1.

in May 2020, a month *before* its June 2020 IPO; and (vi) consistent with its response to Progenity's December 2018 letter, Michigan never paid Progenity for claims billed with the 81443 code.

When combined with the TAC's other allegations regarding Progenity's overbilling for Preparent tests (*e.g.*, that beginning around September 2019 Progenity conducted an audit that led it to discover and stop this overbilling, and that Progenity in fact stopped receiving related overpayments in "early 2020," *before* the IPO), these newly uncovered facts clearly show that Progenity's overbilling both existed and was knowable at the time of the June 2020 IPO. Yet, notwithstanding Progenity's possession of this material information, Defendants failed to disclose it in the IPO Registration Statement. This rendered multiple statements in the Registration Statement materially misleading to reasonable investors, including, *inter alia,* Progenity's financial statements for the first quarter of 2020 which failed to make required qualitative disclosures concerning the overpayments received by Progenity, and the Registration Statement's disclosures presenting the *possibility* of overbilling as a mere hypothetical risk. Defendants' arguments to the contrary misconstrue Plaintiffs' claims, improperly ask the Court to draw inferences in Defendants' favor at the pleading stage, and disregard the clear import of Plaintiffs' new, well-pleaded facts.

Therefore, the TAC's newly pleaded facts, sourced from undisputedly authentic governmental freedom of information records, clearly establish Defendants' liability under the Securities Act, and the Court should deny Defendants' motion.

## II.   PLAINTIFFS FACE A MINIMAL PLEADING BURDEN

### A.   Applicable Pleading Standards

To state a *prima facie* claim under § 11, a plaintiff need only plead that he acquired a security pursuant to a registration statement that: (1) contained an untrue statement of fact; (2) omitted a material fact required to be stated therein; *or* (3) omitted a material fact necessary to make the statements made not misleading. 15

U.S.C. § 77k; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 535, 544 (N.D. Cal. 2009). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011). When a material misstatement or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Thus, a "buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015).

Since fraud is not an element of claims brought under Section 11 of the Securities Act of 1933, the heightened pleading standard of Rule 9(b) does not apply. *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *7 (N.D. Cal. Oct. 31, 2014) (Rule 9(b) did not apply, in part, because "Section 11 claims are not inherently fraud-based"). Accordingly, Section 11 claims are subject to the permissive notice pleading standards of Rule 8(a), unless the claims necessarily "sound in fraud." *See Knollenberg*, 152 F. App'x at 684. As such, "Section 11 places a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382.

Under the permissive notice pleading standards of Rule 8(a), a plaintiff need only "provide a short and plain statement of the claim showing that [he] is entitled to relief. . . . Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Violin Memory*, 2014 WL 5525946, at *8 (noting that "[t]his is not an onerous burden"). Additionally, there is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Moreover, at this stage, the Court must accept such factual allegations as true and construe them in the light most favorable to Plaintiffs. *Tellabs v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018) (noting the "fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage"). "The required short and plain statement 'does not need detailed factual allegations,' only 'factual allegations . . . enough to raise a right to relief above the speculative level'." *Derr v. Ra Med. Sys., Inc.*, 2021 WL 1117309, at *3 (S.D. Cal. Mar. 24, 2021) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

**B.    The TAC Does Not Sound In Fraud, And So Is Subject To Rule 8(a) And Not Rule 9(b)**

Defendants wrongly claim that the TAC must satisfy Rule 9(b) since it alleges a "*unified* course of fraudulent conduct." MTD at 7. This argument is incorrect and their sole citation in support is inapposite. Defendants rely on *Rubke v. Capitol Bancorp Ltd.*, where, unlike here, the plaintiffs brought a fraud claim under the Securities Exchange Act of 1934 and then argued that this "unified course of fraudulent conduct" resulted in corresponding Securities Act violations. 551 F.3d 1156, 1161 (9th Cir. 2009). Plaintiffs here bring only negligence and strict liability-based claims under the Securities Act, and do not allege a fraud claim so there cannot be a *unified* course of conduct between fraud and non-fraud claims. On the contrary, "[c]ourts generally apply Rule 8 to Section 11 claims where," as here, "*only* non-fraud bases for liability are pled or where such claims are adequately distinguished from fraud claims." *Schwab*, 257 F.R.D. at 546 (collecting cases).

Defendants are also incorrect that certain allegations, such as those regarding "known trends" made in connection with Plaintiffs' claims for violation of Item 303, or other information that Progenity "knew," necessarily sound in fraud. Whether Defendants "knew" one fact or another is a distinct question from "whether Defendants acted with *fraudulent intent*." *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020) (emphasis added). Indeed, courts consistently apply Rule 8 to Section 11 claims including Item 303 violations regarding

"known trends." *See, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020); *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019); *Violin Memory*, 2014 WL 5525946, at *8. Defendants cite *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003), but that case in fact supports Plaintiffs' argument. In *Vess*, the Ninth Circuit held that despite being pleaded alongside fraud-based claims, allegations that the defendant *negligently* failed to disclose *known* information were not subject to Rule 9(b). *E.g., id.* at 1106-07.

In sum, Plaintiffs have not alleged fraud claims at all, so there clearly is not a unified set of fraud and non-fraud allegations. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) (finding that it would "eviscerate § 11" to give Rule 9(b) protection to defendants against whom no fraud claims had been alleged); *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 918 n.5 (N.D. Cal. 2015) (noting that courts "regularly apply Rule 8(a)" where "Section 11 defendants are not accused of violating Section 10(b)"). The notice pleading standards of Rule 8(a) govern Plaintiffs' negligence and strict liability-based claims.

## III. THE TAC'S NEW ALLEGATIONS STATE A CLAIM AS TO PROGENITY'S OVERBILLING FOR PREPARENT TESTS

In its Order dismissing the SAC, the Court found that Plaintiffs had "not demonstrated that the alleged omitted information—that Progenity had overbilled government payors and would need to refund $10.3 million in overpayments—existed at the time the registration statement became effective." Order at 11. The Court further reasoned that "Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter." *Id.* at 12. Ultimately, the Court concluded that Plaintiffs had "not established that Defendants knew or reasonably could have known they had overbilled for Preparent tests by the time the Registration Statement took effect." *Id.* at 13.

The TAC's new allegations directly address the Court's concerns, more than plausibly establishing that Progenity's overbilling existed and was knowable when

the Registration Statement became effective, and that Progenity's financial statements for the *first* quarter of 2020 were materially misleading for violating applicable accounting standards. Moreover, these new allegations show why it was materially misleading for Defendants to fail to disclose Progenity's overbilling, *regardless* of when Progenity first calculated the precise amount of overpayments received. Therefore, Defendants' motion should be denied as to Plaintiffs' overbilling claims.

### A. The New Facts Show That Progenity's Overbilling Existed And Was Knowable At The Time Of The IPO

Progenity's overbilling for Preparent tests was a fact that both existed and was knowable at the time of the IPO. As alleged in the TAC, and as previously alleged in the SAC, in 2018 the American Medical Association published new CPT billing codes effective January 1, 2019, including the new 81443 code which was required to report genetic screening for multiple severe inherited conditions with a single test, such as Progenity's Preparent test. ¶¶100-102. Government health care programs such as Medicaid required use of the new 81443 code effective January 1, 2019, and prohibited billing such a panel test under a different CPT code or multiple different codes for the individual tests involved. ¶¶111-114. Under published government health care program coverage determinations and rate schedules, this billing code change would result in lesser reimbursement than was previously obtainable, and in some cases no reimbursement at all. ¶¶103-110.

These facts, and Progenity's contemporaneous knowledge of them, are now conclusively established by the TAC's new allegations and corresponding exhibits, obtained by Plaintiffs through freedom of information requests to the Florida and Michigan agencies responsible for administering the Medicaid program in their respective states. ¶¶145-54; TAC Exhibits 2-6. On December 5, 2018 Progenity's VP of Strategic Accounts sent two nearly identical letters to Michigan and Florida health agencies, stating that Progenity intended *not* to implement the new CPT codes scheduled to go effective in 2019, including the 81443 code applicable to Progenity's

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

6

Preparent carrier screening test. *See* ¶146; TAC Exhibit 2 ("we have identified specific CPT codes we bill for, specifically carrier screening and oncology CPT codes, are changing in 2019"); TAC Exhibit 4 (same). Both states promptly responded, informing Progenity that use of the new billing codes was required. *See* TAC Exhibit 5 ("Newly covered codes and fee schedules will be retroactively effective beginning January 1, 2019 and claims with dates of service on or after January 1, 2019 should reflect 2019 changes."); TAC Exhibit 3 ("providers must report the most current and appropriate billing code(s), modifier(s), and billing unit(s) for the service rendered").

Michigan even told Progenity that, while use of the new 81443 code was required, it would not be reimbursed. *See* TAC Exhibit 5 ("Genetic testing for severe inherited conditions panel, including a minimum of sequencing of at least 15 genes (CPT 81443) will not be covered as this test does not align with Medicaid's laboratory's standards of coverage"). Data from Michigan Medicaid regarding Progenity's billing claims reveals that, true to its word, Michigan never paid Progenity for claims submitted using the 81443 billing code. Although that data reflects dozens of instances of Progenity using the 81443 code, and shows numerous payments made to Progenity for use of *other* billing codes, it shows *no* payments made in connection with the 81443 billing code. *See* ¶¶150-53; TAC Exhibit 6.

Therefore, the TAC's newly pleaded facts prove beyond dispute that from at least January 2019 on, Progenity was on notice that government health care programs required use of the new 81443 billing code, and that in some cases this would reduce or eliminate reimbursements to Progenity for its Preparent tests.

Moreover, the Michigan Medicaid claims data show that Progenity incorrectly failed to use the 81443 code for an 11-month period in 2019 and early 2020, and then recognized its error and resumed using the code in May 2020, *prior to the IPO*. The data shows that Progenity did in fact submit dozens of claims using the 81443 code in March through May of 2019. ¶151. Then Progenity abruptly stopped using the

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

81443 code from June 2019 through April 2020.[2] ¶¶151-52. And Progenity resumed regularly using the 81443 code in May 2020, *before* the June 2020 IPO and the effective date of the Registration Statement. ¶152.

These newly pleaded facts corroborate and reinforce Plaintiffs' prior allegations showing that Progenity knew of its overbilling prior to the IPO. Progenity conducted an audit, which led it to discover and stop its failure to bill Preparent tests using the 81443 code. ¶¶139-144. CW5, who worked primarily on the audit at the end of her tenure, stated that Progenity began its audit with a third party auditor "later in 2019." ¶¶139-140. Likewise, Defendant Stylli stated in September 2020 that the improper Preparent billing arose from a "legal view" Progenity took "about 18 months ago," and further stated, "the procedures that we've taken with the company over the last couple years and especially in the last 12 months [*i.e.* since September 2019] makes it very difficult that we would make those kind of errors again." ¶141. And Progenity's public disclosures admit that it only received the overpayments through "early 2020." ¶¶143-144.

When viewed holistically, such prior allegations and Plaintiffs' newly acquired Michigan Medicaid claims data showing that Progenity failed to use the 81443 code during June 2019 through April 2020, but then resumed its use in May 2020, combine to more than plausibly establish that Progenity was aware of its overbilling *prior to the IPO*. As such, the TAC supplies the key fact that the Court found to be lacking when it dismissed the SAC, that "Defendants knew or reasonably could have known they had overbilled for Preparent tests by the time the Registration Statement took effect." Order at 13. Defendants' failure to disclose the existence of this overbilling rendered materially misleading to reasonable investors numerous statements contained in Progenity's IPO Registration Statement, and constituted an actionable

---

[2] The Michigan claims data reflect one isolated use of the 81443 code in October 2019, which appears to be an anomaly.

omission under SEC Regulation S-K Items 105 and 303. *See* ¶¶322-59.

### B. The New Facts Show That Progenity's Financial Statements For The *First Quarter* Of 2020 Misleadingly Violated Accounting Standards' Disclosure Requirements

While the Court previously held "Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter" (Order at 11), the TAC's new allegations show that Progenity's financial statements for the *first quarter* of 2020 contained in the IPO Registration Statement violated applicable accounting standards, and so were materially misleading to reasonable investors.

Progenity's IPO Registration Statement became effective on June 18, 2020. ¶1 n.1. The Registration Statement included financial statements through March 31, 2020, and represented that Progenity "has evaluated subsequent events from the balance sheet date through May 27, 2020, the date the consolidated financial statements were available to be issued." ¶328 n.17. Consistent with Progenity's statement, under the Accounting Standards Codification ("ASC") the May 27, 2020 date determines what information must be included in the financial statements. *See* ¶¶309-10; ASC 855-10-25-1 ("An entity shall recognize in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet"); ASC 855-10-25-1A and ASC 855-10-25-2 (an entity shall evaluate subsequent events through at least "the date that the financial statements are available to be issued"). As demonstrated by the TAC's new allegations, by May 27, 2020 Progenity had discovered and corrected its overbilling for Preparent tests, and resumed billing such claims using the 81443 code as required. *See* ¶152; TAC Exhibit 6. As such, Progenity's financial statements for the *first quarter* of 2020, as presented in the Registration Statement, were required to take this information into account.

Among the accounting standards violated by Progenity's failure to disclose its Preparent overbilling was, for example, ASC 450. ASC 450 governs "financial

accounting and reporting for loss contingencies." ¶296; ASC 450-10-05-4. A loss contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ¶297; ASC 450-20-20. Loss contingencies include, for example, "actual or possible claims and assessments," such as the contingency that Progenity would have to return overpayments received for its Preparent tests. ¶297; ASC 450-20-05-10(c).

A numerical estimate for a loss contingency must be disclosed if the contingency is "probable," and the amount can be "reasonably estimated." ¶298; ASC 450-20-25-2.[3] Even if the contingency is not "probable" or the amount cannot be "reasonably estimated," it is nonetheless a requirement that "[d]isclosure of the contingency shall be made if there is at least a *reasonable possibility* that a loss or an additional loss may have been incurred." ¶303; ASC 450-20-50-3 (emphasis added). A "reasonable possibility" exists where "[t]he chance of the future event or events occurring is *more than remote* but less than likely." ¶304; ASC 450-20-20 (emphasis added). "Remote" means that "[t]he chance of the future event or events occurring is slight." *Id.* Therefore, ASC 450 required Progenity to disclose the contingency that it would have to return overpayments received for its Preparent tests, if that contingency had a more than "remote" or "slight" chance of occurring. As shown by the TAC's new allegations, as of May 27, 2020, existing and knowable facts such as Progenity's having identified and corrected is overbilling for Preparent tests, showed that there was a "more than remote" chance that Progenity would have to refund the resulting

---

[3] These requirements to estimate a numerical loss contingency amount "are not intended to be so rigid that they require virtual certainty before a loss is accrued." ¶300; ASC 450-20-25-3. Similarly, these requirements "shall not delay accrual of a loss until only a single amount can be reasonably estimated. To the contrary, when . . . information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated." ¶301; ASC 450-20-25-5.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

10

overpayments.

Where disclosure of a loss contingency is required, the financial statements "shall include both of the following: [a] The nature of the contingency [b] An estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ¶305; ASC 450-20-50-4. Therefore, *at a minimum*, Progenity was required to disclose in the Registration Statement the nature of the loss contingency (*i.e.* that it had overbilled for Preparent tests and may be required to return the resulting overpayments), and to state that an estimate of the possible loss could not be made (if true). Defendants' failure to make the required disclosures rendered related statements in Progenity's *first quarter* 2020 financial statements materially misleading. *See* ¶¶337-43.

**C.    The New Facts Show That The Registration Statement Was Misleading Regardless Of When Progenity Calculated Its Precise Overpayment Liability**

In the Order dismissing the SAC, the Court in some passages discusses the alleged omission as the overbilling itself, and in other passages appears to focus on the $10.3 million refund liability that Progenity later accrued relating to the overbilling. *Compare* Order at 13 ("Plaintiffs still have not established that Defendants knew or reasonably could have known they had overbilled for Preparent tests by the time the Registration Statement took effect") *with* Order at 15 ("to the extent that Plaintiffs' Section 11 claim is premised on an alleged omission of the $10.3 million refund liability, it is hereby DISMISSED without prejudice"). For the avoidance of doubt, Plaintiffs argue that Defendants' failure to disclose the *overbilling itself* was materially misleading, regardless of when Progenity first calculated, or even first could have calculated, its precise refund liability. The TAC's new allegations perfectly illustrate why Defendants' failure to disclose the overbilling was materially misleading to reasonable investors.

As shown in Part III.A *supra*, the newly pleaded documents and claims data that Plaintiffs obtained from Michigan's Medicaid program show that, *prior to the*

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

11

*IPO*, Progenity knew that: (i) it was required to use the 81443 billing code for its Preparent tests; (ii) Michigan would not reimburse claims that used the 81443 code; and (iii) Progenity had improperly failed to use the 81443 code for 11 months, but then resumed using it in May 2020. *See* ¶¶145-54; TAC Exhibits 2-6. And Michigan was no outlier as to its decision not to reimburse claims billed using the 81443 code. As unequivocally stated in Michigan's letter to Progenity, Michigan would not reimburse such claims because "this test does not align with Medicaid's laboratory's standards of coverage." ¶147; TAC Exhibit 5. Similarly, the TAC plausibly alleges facts showing that many government health care programs provided substantially less reimbursement for claims using the 81443 code than for the codes it replaced, or (like Michigan) provided no reimbursement at all for such claims. ¶¶103-110.

As such, regardless of when Progenity calculated its precise refund liability, it was a knowable and existing fact at the time of the IPO that Progenity had overbilled for its Preparent tests and received overpayments that it was not entitled to retain. These material facts rendered highly misleading Defendants' statements such as "[w]e currently submit for reimbursement using CPT codes that we believe are appropriate for our testing, but . . . payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code," which presented inappropriate CPT code billing as a mere hypothetical risk, while failing to disclose that Progenity had recently corrected its *known* inappropriate CPT code billing for Preparent tests. *See* ¶345; *see also* ¶¶322-48 (detailing additional false statements and omissions related to overbilling); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (falsity of risk disclosure alleged where "[n]othing alerts the reader that some of these risks may already have come to fruition"). Nothing in such statements logically requires Progenity to be able to calculate a precise overpayment amount before the statements would be capable of misleading investors. And it would be highly material to reasonable investors that Progenity had systemically overbilled for one of its two main products, including many instances in which Progenity was not even entitled to

*any* reimbursement at all. *See* ¶¶349-59 (explaining the materiality of Progenity's Preparent overbilling).

Further showing that Defendants' failure to disclose Progenity's Preparent overbilling was misleading regardless of when Progenity was first able to calculate its refund liability, as shown in Part III.B *supra*, relevant accounting standards required qualitative disclosures relating to the overbilling in Progenity's *first quarter* 2020 financial statements, whether or not it was able to calculate the amount of overpayments. As discussed, ASC 450 requires that where the chance of a loss contingency occurring is more than remote, the financial statements must disclose, "[a] The nature of the contingency," and, "[b] An estimate of the possible loss or range of loss *or a statement that such an estimate cannot be made*." ¶305; ASC 450-20-50-4. As such, Defendants' failure to at least disclose Progenity's Preparent overbilling and to state that it was unable to estimate the amount of the resulting overpayments (if true) rendered the related statements in Progenity's first quarter 2020 financials materially misleading to reasonable investors. *See* ¶¶337-43.

## D. Defendants' Arguments Against The New Allegations Fail

Defendants make several arguments to try to minimize the significance of the TAC's new allegations, none of which is persuasive. As shown above, these new allegations firmly establish that at the time of the IPO, Progenity knew it had overbilled for its Preparent tests, but failed to disclose this material fact to investors.

*First*, Defendants argue that the new allegations are insufficient because they relate to "just two states." MTD at 9. However, the new allegations concerning Progenity's communications with Michigan and Florida do not exist in a vacuum. Rather, they must be understood in the context of the TAC's other well pleaded factual allegations that government health care programs such as Medicare and Medicaid required use of the new 81443 billing code (*see* ¶¶111-14), and that Medicare and many Medicaid programs would only reimburse claims using the 81443 code at substantially reduced rates if at all (*see* ¶¶103-110). Viewed holistically, the most

logical inference to be drawn from these facts is that many such government health care programs across the country required use of the 81443 billing code, and would only provide lesser or no reimbursement for such claims. At this stage of litigation, and under the notice pleading standard of Rule 8(a), Plaintiffs need only plausibly allege their claims. *See Derr*, 2021 WL 1117309, at *3 ("The required short and plain statement 'does not need detailed factual allegations,' only 'factual allegations . . . enough to raise a right to relief above the speculative level'."). Defendants would purport to require Plaintiffs, before any discovery, to plead details of Progenity's correspondence with all 50 states. While such a survey *might* be appropriate at summary judgment or trial, it is certainly not at the pleading stage, where the appropriate question is only the plausibility of Plaintiffs' allegations.

Similarly, Defendants take certain allegations out of context to argue that some government health care programs did not require use of the new 81443 billing code. *See* MTD at 9-10. However, Defendants fail to acknowledge that those allegations refer to the transition period after the effectiveness of the new codes on January 1, 2019. *See* ¶137 (CW5 stated that some payors "asked Progenity to bill under the old code because they *had not switched to the new code yet*") (emphasis added). Other allegations in the TAC make clear that *after* this transition period and *before* the June 2020 IPO, Progenity realized that it was required to use the new billing code. *See, e.g.*, ¶¶127-28 (CW10, who personally led a team to manually re-bill thousands of claims using the new code over a six week period, stated that "after large payors complained to Progenity about its use of the old coding, she and her colleagues knew they had to make the change with all payors"). Regardless, even if a small handful of payors decided never to transition to the 81443 billing code, the fact remains that many other government health care programs did require use of the new code, which was known to Progenity.

*Second*, Defendants attempt to re-frame Plaintiffs' arguments, myopically focusing on whether Progenity's precise $10.3 million refund liability was knowable

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

14

at the time of the IPO. *See* MTD at 10. However, as shown in Part III.C *supra*, and as Plaintiffs have consistently argued throughout this case, the Registration Statement was materially misleading for failing to disclose the overbilling itself, regardless of when Progenity was first able to calculate the precise amount of overpayments it had received. *See, e.g.*, ECF No. 54 (Plaintiffs' opposition to second motion to dismiss) at 14 ("the Registration Statement was materially misleading regardless of when Progenity calculated its refund liability"); ECF No. 41 (Plaintiffs' opposition to first motion to dismiss) at 10 ("Regardless of when Progenity bothered to quantify its precise liability, the Registration Statement was required to disclose the existence of substantial Preparent overbilling").

*Third*, Defendants raise factual disputes concerning the meaning of Progenity's Michigan Medicaid claims data. *See* MTD at 10-11. Defendants argue that the claims data does not show that Progenity incorrectly billed Michigan or received any overpayments from Michigan. But Progenity's overbilling and receipt of overpayments from Michigan is by far the most plausible inference from the newly alleged facts that: (i) Michigan told Progenity that use of the 81443 billing code was required, and would not be reimbursed; (ii) Progenity at first used that billing code in dozens of claims to Michigan; (iii) Michigan paid Progenity nothing for those claims; (iv) then from June 2019 to April 2020 Progenity ceased using the 81443 billing code; (v) all the while, Michigan routinely paid Progenity for claims submitted using *other* billing codes; and (vi) Progenity suddenly resumed using the 81443 billing code in May 2020. *See* ¶¶147, 150-53; TAC Exhibit 6. At no time in this period did Progenity ever stop selling its Preparent tests. The only logical explanation for these facts and the 11-month gap in Progenity's use of the 81443 billing code, especially in light of Progenity's admitted receipt of overpayments from government health care programs for overbilling its Preparent tests, is that in June 2019 Progenity began improperly using billing codes other than 81443 when submitting claims to Michigan Medicaid for its Preparent tests, and continued to do so through April 2020, receiving

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

15

overpayments from Michigan as a result. Defendants' argument is in essence another impermissible attempt to demand proof at the pleading stage, and to have the Court draw unwarranted inferences in Defendants' favor. *See Khoja*, 899 F.3d at 1014 (noting the "fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage").

*Fourth*, Defendants argue that they had no obligation to disclose second quarter 2020 financial results at the time of the IPO. But as shown in Part III.B *supra*, the TAC's new allegations demonstrate that the financial statements for the *first quarter* of 2020 contained in Progenity's IPO Registration Statement violated applicable accounting standards. Progenity was required to disclose the fact of its overbilling in the *first quarter* financials, including under ASC 450. Its failure to do so was materially misleading to reasonable investors.

## IV.   ALL OF PLAINTIFFS' CLAIMS ARE WELL PLEADED

The Court dismissed the SAC's allegations concerning Progenity's February 2020 decision to discontinue its key illegal marketing practice of waiving patient payment amounts, and concerning negative trends in certain the key financial metrics of test volume, average selling price, and revenue. Order at 15-26. Plaintiffs acknowledge that they have not amended their allegations concerning these topics in the TAC. However, Plaintiffs respectfully disagree with the Order's rulings on these claims, and so briefly summarize their arguments herein to ensure that they are preserved for any appeal. Plaintiffs expressly incorporate herein, intend to assert, and do not waive, all of the allegations contained in the TAC, and all of the arguments contained in Plaintiffs' briefs filed in opposition to Defendants' prior motions to dismiss. *See* ECF Nos. 41, 54.

### A.   The TAC States A Claim As To Defendants' Failure To Disclose Progenity's Decision To Abandon Its Key Illegal Marketing Practice

Progenity's genetic testing business strategy centered on illegally waiving patient payment amounts while submitting astronomical bills to third party payors.

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

16

Defendants only stopped this practice, which violates payor policies and federal laws such as the False Claims Act and Anti-Kickback Statute (¶¶90-93), due to government intervention. ¶¶80-89, 180, 185-87. Even though Defendants admitted to using this illegal practice through April 2018, the Registration Statement failed to disclose that Progenity continued the illegal practice through February 2020, ending it merely four months before the IPO, and likewise failed to disclose the immediate, devastating effect of ending this practice, or that *all* of Progenity's historical results substantially depended on the recently discontinued practice. As such, the Registration Statement contained several materially misleading statements and omissions that were material to reasonable investors.

Among the many misleading statements and actionable omissions identified in the TAC (¶¶360-73), the Registration Statement specifically discusses how Progenity had claimed it "generally seek[s] to collect co-payments and deductibles directly from patients in cases where we have billed the payor." ¶370. This statement was misleading because, up until February 2020, the Company did not seek to collect the vast majority of patient payments when it had billed a payor. Likewise, the Registration Statement states that "[a]lthough we believe that our sales and marketing practices comply in all materials respects with all applicable federal and state laws and regulations, regulatory authorities may disagree." ¶373. This statement was also misleading when made because Defendants failed to disclose that up until February 2020 Progenity's key marketing policy centered on illegal waivers of copayments and deductible amounts designed to influence beneficiaries to select Progenity products, which violated applicable laws. Further, the omission from the Registration Statement that Progenity had recently abandoned this key illegal marketing practice violated Items 105 and 303 of Regulation S-K. ¶¶361-64.

The statements at issue were misleading due to Defendants' failure to disclose the recent, abrupt and drastic abandonment of Progenity's key marketing strategy, from which its new, lawful practices were a material departure. *See, e.g., Mingbo Cai*

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

17

*v. Switch, Inc.*, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (failure to disclose change in sales strategy that "presented a serious risk of diminishing revenue" was materially misleading). For example, the statement that "regulatory authorities *may* disagree" is misleading when authorities *had already disagreed* that the sales and marketing practices complied with applicable federal and state laws and regulations.

### B. The TAC States A Claim As To Defendants' Failure To Disclose Negative Trends In Test Volumes, Average Selling Prices, And Revenues

At the time of the IPO, Progenity was suffering from known negative trends of sharply decreasing test volumes (¶¶193-204), average test selling prices ("ASP") (¶¶205-213), and revenue (¶¶214-19). These negative trends were caused in substantial part by, and were reasonably expected to continue into the future due to, Progenity's recent decisions (undisclosed to investors) to cease its improper billing for Preparent tests, and to discontinue its key illegal marketing practice of waiving patient payment amounts. Defendants' statements regarding such trends, and failure to make required disclosures under Item 303, were materially misleading to reasonable investors. *See* ¶¶380-412.

The Registration Statement confusingly contained three variations of similar text regarding test volumes. First, stating that "the growth rate of our test volume is accelerating." ¶387. Second, that "we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic," *i.e.* that Progenity was experiencing "volume growth." ¶388. These first two variations were objectively false, because Progenity's test volumes were decreasing at the time. ¶¶193-204. Third, the Registration Statement vaguely acknowledged that "[b]eginning in March 2020, we began to observe significant declines in the volumes of our molecular tests . . . due to the impact of the COVID-19 pandemic . . . However, we believe our business is resilient and we have observed positive signs of recovery so far." ¶389. Reading these three passages together and in their full context, a reasonable investor would conclude (wrongly, though through no fault of her own) that although Progenity observed

declines in test volumes in March 2020, at the time of the June 2020 IPO core test volumes were again growing and even *accelerating*. And to the extent that these three statements contradict each other, Defendants cannot escape liability by providing one partial, incomplete disclosure in addition to two false disclosures, because taken as a whole these statements would materially mislead investors. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow").

In addition to Defendants' liability for their misleading affirmative statements, "any omission of facts required to be stated under Item 303 will produce liability under Section 11." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). Item 303 required Defendants to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Defendants knew of negative trends in test volumes, ASP and revenue at the time of the IPO and Item 303 required their disclosure. These trends were reasonably likely to continue and to *worsen* due to Progenity's recent decisions to cease its improper billing for Preparent tests, and to discontinue its key illegal marketing practice of waiving patient payment amounts. Defendants misleadingly failed to make the disclose the known, reasonably likely effects of Progenity's recent decisions to cease its improper billing and to discontinue its key illegal marketing practice of waiving patient payment amounts, which suffices to allege their violation of Item 303 and Section 11. *See, e.g., Switch*, 2019 WL 3065591, at *5 ("the complaint sufficiently alleges facts from which a reasonable jury could find that [defendant] violated Item 303 by failing to disclose its new sales strategy").

**V.    THE TAC STATES A CLAIM FOR CONTROL PERSON LIABILITY**

Defendants' only challenge to Plaintiffs' control person claims under Securities

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

19

Act Section 15 is that Plaintiffs purportedly do not state a primary violation of Section 11. Because the TAC sufficiently pleads Defendants' violation of Section 11, this argument fails.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Defendants' motion.

DATED: May 4, 2023

**GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Garth A. Spencer*

ROBERT V. PRONGAY (#270796)
  *rprongay@glancylaw.com*
CASEY E. SADLER (#274241)
  *csadler@glancylaw.com*
GARTH A. SPENCER (#335424)
  *gspencer@glancylaw.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiffs*

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG

20

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On May 4, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 4, 2023, at Wilmington, North Carolina.

*s/ Garth A. Spencer*
Garth A. Spencer

OPPOSITION TO MOTION TO DISMISS
Case No. 3:20-cv-01683-RBM-AHG