1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| IN RE PROGENITY, INC. SECURITIES LITIGATION | Case No.:  3:20-cv-01683-RBM-AHG<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**<br><br>**[Doc. 67]** |

17      On March 20, 2023, Defendants Progenity, Inc., Harry Stylli, Eric d'Esparbes,

18   Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, Lynne

19   Powell, Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co.

20   Incorporated, Raymond James & Associates, Inc., and BTIG, LLC ("Defendants") filed a

21   Motion to Dismiss the Third Amended Complaint ("Motion").  (Doc. 67.)  On May 4,

22   2023, Plaintiffs Lin Shen, Lingjun Lin and Fusheng Lin ("Plaintiffs") filed an opposition

23   to the Motion.  (Doc. 68.)  Defendants filed a reply on June 5, 2023.  (Doc. 69.)

24      For the reasons discussed below, Defendants' Motion is **<u>GRANTED</u>**.[1]

25
26   _____

27
28   [1]  The Court notes that it incorporates by reference various findings in Judge
Bencivengo's September 1, 2021 Order on Defendants' Motion to Dismiss the First

# I.   BACKGROUND

A.   <u>Parties</u>

Plaintiffs' third amended complaint ("TAC") alleges various securities violations by Defendants, who may be organized in three groups: (1) Progenity; (2) Harry Stylli, Eric d'Esparbes, Jeffrey Alter, John Bigalke, Jeffrey Ferrell, Brian L. Kotzin, Samuel Nussbaum, and Lynne Powell (the "Individual Defendants"); and (3) Piper Sandler & Co., Wells Fargo Securities, LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., and BTIG, LLC (the "Underwriter Defendants").  (*See* Doc. 64.)

Defendant Progenity is a biotechnology company based in San Diego, California that develops and commercializes molecular testing products and precision medicine applications, including "in vitro molecular tests designed to assist parents in making informed decisions related to family planning, pregnancy, and complex disease diagnosis."  (*Id.* at 7.)  Purchasers of Progenity's securities claim that they are entitled to damages caused by Progenity's allegedly false and misleading Registration Statement issued in connection with its June 2020 Initial Public Offering ("IPO").  (*Id.* at 6–7.)  At the time of the IPO, Progenity's two most successful products were its Innatal and Preparent tests, which screen for fetal chromosomal conditions and mutations that cause genetic diseases, respectively.  (*Id.* at 7.)

At all relevant times, Defendant Stylli served as Progenity's Chief Executive Officer and Chairman of the Board of Directors, and Defendant d'Esparbes served as Progenity's Chief Financial Officer.  (*Id.* at 14.)  Defendants Alter, Bigalke, Ferrell, Kotzin, Nussbaum, and Powell served as members of Progenity's Board of Directors.  (*Id.* at 15–17.)  All Individual Defendants signed (or authorized the signing of) the Registration Statement issued in connection with Progenity's IPO, "reviewed and helped prepare the Registration Statement," and "participated in the solicitation and sale of

---

Amended Complaint (Doc. 48) as well as many of the Court's own findings in its Order Granting Defendants' Motion to Dismiss the Second Amended Complaint (Doc. 63).

[Progenity's] common stock to investors in the IPO for their own financial benefit and the financial benefit of Progenity." (*Id.* at 18.)

Defendants Piper Sandler, Wells Fargo, Baird, Raymond James, and BTIG are financial services companies that acted as underwriters for Progenity's IPO. (*Id.* at 18–19.) The Underwriter Defendants collectively "sold more than 6.6 million Progenity shares in the IPO at $15 per share and shared $7 million in underwriting discounts and commissions." (*Id.* at 19.) According to the TAC, the Underwriter Defendants failed to "conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement," thereby leading to the class' harm. (*Id.*)

Lead Plaintiffs Lin Shen, Lingjun Lin, and Fusheng Lin bring this action on behalf of a putative class of investors who purchased or otherwise acquired Progenity common stock pursuant and/or traceable to the Registration Statement issued in connection with Progenity's IPO. (*Id.* at 6.)

B.   Factual Background

On May 27, 2020, Progenity filed a Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") registering Progenity's common stock in preparation for its IPO. (*Id.* at 68.) Progenity subsequently filed four amendments to the Registration Statement on June 4, June 15, and June 18, 2020, respectively (filing two amendments on the last date). (*Id.*) On June 22, 2020, Progenity filed a Form 424B4 Prospectus with the SEC, which was incorporated into the Registration Statement. (*Id.*) The Registration Statement, including all amendments and the Prospectus, took effect on June 18, 2020. (*Id.* at 6, 68.)

Progenity conducted its IPO from June 19 through June 23, 2020, during which it issued and sold 6,666,667 shares of its common stock at a price to the public of $15.00 per share. (*Id.* at 68–69.) The IPO generated over $100 million in gross offering proceeds and approximately $88.7 million in net proceeds for Progenity. (*Id.* at 69.)

On August 13, 2020, Progenity filed a press release and slide deck with the SEC reporting its second quarter 2020 financial results. (*Id.*) The second quarter results press

release provided that "the second quarter revenues reflected a $10.3 million accrual for refunds to government payors." (*Id.*)  In an investor call later that day, Stylli explained that a commissioned third-party review of Progenity's coding and billing processes revealed that Progenity had "not appropriately transitioned the implementation of the new billing requirements for larger carrier screening panels, which were introduced in early 2019."[2]   (*Id.* at 69–70.)   Because of these billing errors, Progenity "received an overpayment of approximately $10.3 million from government payors during 2019 and early 2020." (*Id.* at 70.)

On August 14, 2020, Progenity filed its Form 10-Q for the second quarter of 2020 with the SEC.  (*Id.* at 69.)  The Form 10-Q confirmed that Progenity accrued $10.3 million for refunds to government payors during the second quarter of 2020.  (*Id.*)  The filing further stated that Progenity's deadline to "report and return the overpayment to the government programs is 60 days from the time the overpayment was determined and quantified," so Progenity "expects to repay this amount to the relevant government programs by early October 2020." (*Id.* at 71.)  According to Plaintiffs, that same day that Progenity filed its Form 10-Q, its stock price declined by $1.24 per share. (*Id.* at 74.)

On October 29, 2020, Progenity filed a press release with the SEC reporting preliminary third quarter 2020 revenue and test volumes, and Plaintiffs argue the press

---

[2] Progenity's Form 10-Q for the second quarter of 2020 explains that in the U.S., the "American Medical Association ('AMA') generally assigns specific billing codes for laboratory tests under a coding system known as Current Procedure Terminology ('CPT'), which we and our ordering healthcare providers must use to bill and receive reimbursement for our molecular tests."  (Doc. 64 at 70.)  The Registration Statement states that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening tests to decline."  (*Id.* at 41.)  Plaintiffs allege that following this AMA approval, Progenity was required to bill its Preparent tests under a new CPT code beginning in January 2019. (*Id.* at 34–35.)  However, Plaintiffs claim that Progenity did not update its billing practices until early 2020, thereby resulting in a $10.3 million overpayment for Preparent tests by government health programs.  (*Id.* at 10, 39, 69–70.)

4

release indicated "a dramatic decline from the first and second quarter [average selling prices]." (*Id.* at 75–77.) "In the three trading sessions following Progenity's October 29, 2020 disclosures, Progenity's stock price declined by $3.42 per share." (*Id.* at 76.)

Plaintiffs argue that Defendants violated their disclosure obligations because the "Registration Statement for the IPO contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make the necessary disclosures required under the rules and regulations governing its preparation." (*Id.* at 9.)  Specifically, Plaintiffs ague:

> The Registration Statement failed to disclose that (i) Progenity had improperly billed government payors for Preparent tests beginning in 2019 and ending in or before "early 2020," (ii) there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments from government payors for Preparent tests, (iii) in February 2020 Progenity ended the illegal marketing practice on which the competitiveness of its business depended, and (iv) Progenity was presently suffering from known negative trends in test volumes, [average selling prices], and revenues.

(*Id.* at 9–10.)

C.   Procedural Background

On December 3, 2020, the Court consolidated two related securities class actions against Progenity and appointed Lin Shen, Lingjun Lin, and Fusheng Lin as Lead Plaintiffs.  (Doc. 33.)  Plaintiffs subsequently filed a first amended complaint ("FAC") on February 4, 2021, alleging violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act").  (Doc. 38.)  On April 5, 2021, Defendants filed a motion to dismiss the FAC (Doc. 40), and on September 1, 2021, the Court granted the request and allowed Plaintiffs leave to amend (Doc. 48).  Plaintiffs filed a Second Amended Complaint ("SAC") on September 22, 2021.  (Doc. 49.)  On November 15, 2021, Defendants filed a motion to dismiss the SAC (Doc. 52), which the Court granted on January 13, 2023 and again granted leave to amend (Doc. 63).  Plaintiffs filed the instant TAC on February 3, 2023.  (Doc. 64.)

On March 20, 2023, Defendants moved to dismiss the TAC arguing the TAC should be dismissed because Plaintiffs have failed to cure the deficiencies in the FAC and SAC. (Doc. 67–1 at 16.) In particular, Defendants contend that Plaintiffs have: (1) failed to plead a materially false or misleading statement or omission under Section 11 of the Securities Act; (2) failed to plead a violation of Items 303 and 105 of the U.S. SEC Regulation S-K; and (3) failed to plead control person liability under Section 15 of the Securities Act. (Doc. 67 at 2.) Defendants acknowledge that, in regard to the alleged improper billing, Plaintiffs submitted new information consisting of "correspondence with two states (Michigan and Florida) that they claim is relevant to showing that Progenity allegedly knew by early 2019 that it was required to use a new billing code for Preparent tests and that services represented by that code would not be reimbursed." (Doc. 67–1 at 6.) However, Defendants argue that their alleged awareness of new billing code requirements does not establish that they knew by June 18, 2022 that they had overbilled and would have to refund $10.3 million to government payors. (*Id.*)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), an action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is

the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

## III.   DISCUSSION

### A.   Section 11 Claim

Plaintiffs' first cause of action is brought against all Defendants for alleged violations of Section 11 of the Securities Act. Section 11 imposes liability where a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To prevail on a Section 11 claim, the plaintiff must demonstrate "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citing *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1403–04 (9th Cir.1996)). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *In re Stac*, 89 F.3d at 1403–04 (internal citations omitted).[3]

Section 11's omissions clause "affords a cause of action only when an issuer's

---

[3] While Section 11 does not contain an element of fraud, a plaintiff may be subject to Rule 9(b)'s particularity requirement if the complaint "sounds in fraud." *In Re Daou*, 411 F.3d at 1027. The parties dispute whether Plaintiffs' Section 11 claims sounds in fraud and, thus, whether Plaintiffs must satisfy the heightened pleading standards of Rule 9(b). (*See* Doc. 67–1 at 11; Doc. 68 at 4–5.) However, the Court need not address whether Plaintiffs' Section 11 claims sound in fraud because the claims fail regardless for the reasons set forth herein.

failure to include a material fact has rendered a published statement misleading." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). In other words, an actionable omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The plaintiff must also "demonstrate that the omitted information existed at the time the registration statement became effective." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009).

Plaintiffs' Section 11 claim is based on five allegedly material omissions from Progenity's Registration Statement: (1) that Progenity had overbilled government payors for Preparent tests and would be required to refund them at least $10.3 million; (2) that Progenity was experiencing a trend of decreasing test volumes; (3) that Progenity was experiencing a trend of decreasing average selling prices ("ASPs") for tests; (4) that Progenity was experiencing a trend of decreasing revenues; (5) and that Progenity discontinued an alleged illegal marketing practice on which its business depended. (Doc. 64 at 93–125.) Plaintiffs identify various statements in the Registration Statement that they allege were consequently "materially false and misleading when made" because of Defendants' failure to disclose the foregoing information. (*Id.*) Plaintiffs claim that these omissions also violate Items 303 and 105 of SEC Regulation S-K. (*Id.* at 9, 91–94.)

Defendants' Motion contends that "Plaintiffs offer no new allegations with respect to two of their three 'omission' theories, i.e., that: (1) Progenity allegedly omitted that its testing volumes, ASPs and revenues were declining, and (2) in February 2020, the Company purportedly ended an alleged illegal marketing practice." (Doc. 67–1 at 12.) Defendants contend these theories were already rejected by the Court and, therefore, "the Court should dismiss Plaintiffs' Section 11 claim based on each of these theories without further consideration." (*Id.*) In regard to Plaintiffs' improper billing theory, Defendants argue that Plaintiffs' new assertions involving data from Florida and Michigan Medicaid programs do not cure the deficiencies noted by the Court and do not show the overbilling

8

was knowable at the time of the IPO.  (*Id.* at 13–14.)  It is Defendants' position that "Plaintiffs' new allegations require exactly the same improper speculation and do not alter this Court's conclusion that Plaintiffs failed to plead a Section 11 claim based on an alleged omission of the $10.3 million refund liability."  (*Id.* at 14.)  The Court addresses each category of alleged omissions in turn.

### a.    $10.3 Million Refund Liability to Government Payors

First, Plaintiffs claim that Defendants violated Section 11 by failing to disclose that Progenity had overbilled government payors for Preparent tests and that "[a]t the time of the IPO information existing and knowable to Progenity revealed a high probability that it had received a material amount of overpayments from government health care programs . . . which Progenity would almost certainly have to refund."  (Doc. 64 at 39.) Plaintiffs argue "these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement."  (*Id.* at 94.)

The Court notes Plaintiffs' TAC presents many of the same arguments presented in the SAC.  Plaintiffs suggest that Progenity's improper billing of government payors was a "known trend" and that "there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments."  (*Id.* at 94–98.)  Plaintiffs explain that "Progenity improperly billed government payors for Preparent tests beginning in 2019, but identified and stopped this practice in or before early 2020, prior to the IPO," which was conducted from June 19 through June 23, 2020.  (*Id.* at 39, 68.) Additionally, "[h]aving identified and ceased its improper billing of government payors for Preparent tests, Progenity had ample information that would have allowed it to reasonably estimate the amount, or at least the magnitude, of the resulting overpayments."  (*Id.* at 51.)

To support these allegations, Plaintiffs explain that, prior to the IPO, Progenity had access to information regarding CPT codes and payor billing and reimbursement policies via various online and print sources as well as fee schedules published by government

payors.  (*Id.* at 40.)  Plaintiffs present statements by former Progenity employees, referred to as confidential witnesses ("CWs"), who reviewed these resources in the course of their employment and explain that "[i]nterviews with former Progenity employees make clear that Progenity was almost immediately aware of the introduction of the 81443 code and its applicability to Preparent tests."  (*Id.* at 41.)  Plaintiffs present the following recounts by CWs: "CW10 recalled that Progenity had used 12 codes or more . . . that were replaced by the single 81443 code . . . CW10 believes she was told to change these CPT codes at the end of 2018 or early 2019"; "CW14 stated that the 81443 billing code began to be discussed at Progenity prior to her October 2019 departure from Progenity, but that she was 'very unclear as to the right way to bill' with respect to that code"; "CW5 stated that 'we weren't able to accurately report out revenue for that panel' because Progenity was receiving a number of denials from payors where Progenity had been anticipating receiving payments based on historical reimbursement."  (*Id.* at 42–44.)  Additionally, Plaintiffs argue that Progenity settled with government agencies in March 2020 to resolve allegations of overbilling government payors for Innatal tests and, thus, "Progenity had information prior to the IPO which showed that government payors would seek to recoup amounts of overpayments resulting from improper billing by failing to effectively transition to a new CPT code."  (*Id.* at 53.)

Notably, Plaintiffs' TAC presents a new theory in support of their contention that the overbilling was knowable at the time of the IPO.  (*See id.* at 47–50.)  Plaintiffs explain that "[i]nformation received by Plaintiff in response to freedom of information requests submitted to government health care programs shows that Progenity was told it was required to use the new 81443 billing code, and that in some cases this would result in reduced or eliminated payments to Progenity."  (*Id.* at 47.)  Plaintiffs allege that "Progenity VP of Strategic Accounts, Daniel R. Visage, sent nearly identical letters (both dated December 5, 2018) on behalf of Progenity to the Florida Agency for Health Care Administration . . . and the Michigan Department of Community Health . . . ."  (*Id.* at 47.)
/ / /

The letters explain, in part, that:

> We frequently review our testing and coding procedures to ensure compliance and alignment with our partnering providers' medical policies. During this periodic review, we have identified specific CPT codes we bill for, specifically carrier screening and oncology CPT codes, are changing in 2019.
>
> The new 2019 CPT codes being added that affect us are:
>
> * * *
>
> o 81443, Genetic testing for severe inherited conditions genomic sequence analysis panel, must include sequencing of at least 15 genes (eg, ACADM, ARSA, ASPA, ATP7B, BCKDHA, BCKDHB, BLM, CFTR, DHCR7, FANCC, G6PC, GAA, GALT, GBA, GBE1, HBB, HEXA, IKBKAP, MCOLN1, PAH)
>
> Our plan is to continue billing for our testing using the 2018 CPT code conventions until there is clarity on these changes from your organization, to determine your timing for implementation of the new codes, including updating the reimbursement fee schedules and coverage.

(*Id.* at 47–48.)  By letter dated January 11, 2019, the Michigan Department of Health and Human Services responded, in part, as follows:

> Newly covered codes and fee schedules will be retroactively effective beginning January 1, 2019 and claims with dates of service on or after January 1, 2019 should reflect 2019 changes . . . Genetic testing for severe inherited conditions panel, including a minimum of sequencing of at least 15 genes (CPT 81443) will not be covered as this test does not align with Medicaid's laboratory's standards of coverage.

(*Id.* at 48.)  Moreover, the Florida Bureau of Medicaid Policy responded via email on January 24, 2019 stating:

> The Agency's Florida Medicaid Laboratory Service Coverage Policy outlines the Agency's laboratory services billing policy. The policy states that Florida Medicaid reimburses for services as specified in the policy and in accordance with the American Medical Association's Current Procedural Terminology (CPT). The policy also states that providers must report the

most current and appropriate billing code(s), modifier(s), and billing unit(s) for the service rendered, as incorporated by reference in Rule 59G-4.002, F.A.C.

(*Id.* at 49.)  Plaintiffs explain that "shortly after Florida and Michigan informed Progenity in January 2019 that Progenity had to use the 81443 billing code, Progenity in fact began using the 81443 billing code for claims to Michigan Medicaid" and "Progenity used that code in March 2019, and made dozens of claims using the 81443 code in each of April and May 2019. Then, Progenity abruptly stopped using the code in June 2019." (*Id.* at 50.)  Progenity subsequently "resumed regularly using the 81443 code in claims to Michigan in May 2020, when Progenity was in the midst of settlement discussions with the [Department of Justice] and various state agencies relating to Progenity's improper Innatal test billing codes and Progenity's payment of illegal kickbacks." (*Id.*)

Therefore, it is Plaintiffs' position that "Progenity told these state health care programs that it intended to bill incorrectly for Preparent tests, unless the state health care programs told Progenity not to do so.  Michigan's response "thereby informed Progenity that the newly effective CPT codes, including 81443, must be used for dates of service on or after January 1, 2019" and that "services represented by the 81443 code 'will not be covered,' i.e., that Progenity would receive no reimbursement for providing them, because 'this test does not align with Medicaid's laboratory's standards of coverage.'" (*Id.* at 48–49.)  Similarly, Florida "informed Progenity that it was required to use the new CPT codes, including 81443." (*Id.* at 49.)  Thus, Plaintiffs contend that "from at least January 2019, Progenity was on notice that government health care programs would require use of the new 81443 billing code, and that in some cases this would reduce or eliminate reimbursements to Progenity for its Preparent tests." (*Id.*)

Defendants' Motion explains that the above argument merely shows: (1) Michigan never reimbursed Progenity for any claims billed with the 81443 billing code, and (2) that Progenity supposedly stopped using the 81443 billing code for Michigan in June 2019 and resumed in May 2020 prior to the IPO.  (Doc. 67–1 at 14.)  Defendants argue that

12

such allegations "offer no facts showing that Progenity knew it had been overpaid by Michigan—let alone that Progenity knew of overpayments from any other payor" and "offer no facts that Progenity incorrectly billed Michigan." (*Id.* at 14–15.)  Therefore, the Michigan data does not show that Defendants knew or reasonably could have known by June 18, 2020 that they had overbilled and would have to refund $10.3 million to government payors.  (*Id.* at 15.)

The Court is not persuaded by Plaintiffs' contentions and reiterates that, while Plaintiffs speculate that Defendants became aware of their overbilling in "early 2020," the Court cannot assume that Defendants could both determine Progenity had probably incurred a refund liability and reasonably estimate the loss amount before issuing its financial statements for the first quarter of 2020.  It is undisputed that Defendants overbilled government payors resulting in a $10.3 million refund liability to government payors.  However, whether Defendants overbilled is not the question the Court is deciding.  The Court's concern is whether the registration statement "contain[ed] an untrue statement of a material fact or omit[ted] to state a material fact required to be stated therein or necessary to make the statements therein not misleading" and whether "the omitted information existed at the time the registration statement became effective." *See* 15 U.S.C. § 77k(a); *Rubke*, 551 F.3d at 1164.  The Court finds that, accepting all factual allegations in the TAC as true, Plaintiffs' evidence that the $10.3 million liability was "knowable" at the time of the IPO amounts to no more than speculation. Plaintiffs' allegations indicate that, at the very least, Defendants were aware of the AMA's implementation of a new billing code for Preparent tests by the time of the IPO.[4] However, Plaintiffs have not demonstrated that the alleged omitted information—that Progenity had overbilled government payors and would need to refund $10.3 million in

---

[4] The Registration Statement itself states that "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may . . . cause reimbursement for our Preparent expanded carrier screening tests to decline." (Doc. 64 at 41, 105.)

overpayments—"existed at the time the registration statement became effective." *Rubke*, 551 F.3d at 1164.

Plaintiffs point to the Registration Statement to establish that at the time of the IPO "Progenity was already aware of the CPT code that became effective in 2019 for Progenity's Preparent tests." (Doc. 64 at 41.) Moreover, Plaintiffs use the communications with the Michigan and Florida public agencies to show that "from at least January 2019, Progenity was on notice that government health care programs would require use of the new 81443 billing code, and that in some cases this would reduce or eliminate reimbursements to Progenity for its Preparent tests." (*Id.* at 49.) However, Plaintiffs have not established that Defendants knew they would have to refund $10.3 million to government payors, and Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter. Defendants' awareness that the Preparent billing code had changed in January 2019, without more, does not warrant the conclusory deduction that Progenity's overbilling and $10.3 million refund liability was knowable by the time the Registration Statement took effect. *See Daniels-Hall*, 629 F.3d at 998. Moreover, the fact that Defendants had previously settled with government agencies to resolve allegations related to Innatal overbilling does not necessarily relate to Preparent overbilling discovered later.

As the Court previously explained, publicly reporting companies have at least 40 days to file Forms 10-Q following the end of a fiscal quarter, and generally "need time to audit [financial] data before including it in any public materials." *Berg v. Velocity Fin., Inc.*, No. 2:20-cv-06780-RGK-PLA, 2021 WL 268250, at *5 n.1 (C.D. Cal. Jan. 25, 2021); *see* 17 C.F.R. § 240.13a–13. Thus, Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter. (*See* Doc. 48 at 11; Doc. 63 at 12); *see also In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1254 (N.D. Cal. 2019) ("omissions are actionable only if a defendant has a duty to disclose information and fails to do so") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). Thus, Defendants' assertion that "Progenity's

14

refund liability did not exist until it was determined," which was not until nearly two months following the June 2020 IPO, is well taken.  (*See* Doc. 67–1 at 15.)

Moreover, the Registration Statement warned that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code"; "commercial third-party payors may . . . seek repayment from us of amounts previously reimbursed"; and "[t]hird-party payors may decide to deny payment or recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received . . . [a]ny of these outcomes . . . could have a material and adverse effect on our business, operating results, and financial condition."  (*Id.* at 105–07.)  Even including Plaintiffs' new allegations, Plaintiffs fail to establish that the obligation to refund government payors had materialized by the time the Registration Statement took effect.  *See In re Pivotal Sec. Litig.*, No. 3:19-cv-03589-CRB, 2020 WL 4193384, at *6 (N.D. Cal. July 21, 2020) ("[t]he Ninth Circuit has noted that 'risk factors' are not actionable without further factual allegations indicating that the risks had already 'come to fruition'") (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27).

Liability under Section 11 "only attaches for misrepresenting [or omitting] information that was available when the offering materials became effective."  *Berg*, 2021 WL 268250, at *5 (citing *In re Stac*, 89 F.3d at 1403–04).  While Plaintiffs include new allegations and evidence related to Defendants' billing practices, they have not established that Defendants knew or reasonably could have known by June 18, 2020 that they had overbilled and would have to refund $10.3 million to government payors.  Defendants were under no obligation to audit and report their second quarter 2020 financial results prior to the end of that fiscal quarter.  *See In re Restoration Robotics*, 417 F. Supp. 3d at 1254.  Plaintiffs have not shown that any financial metrics or related statements in the Registration Statement were false or misleading at the time the Statement took effect.  Therefore, to the extent Plaintiffs' Section 11 claim is premised on an alleged omission of the $10.3 million refund liability, it is hereby **DISMISSED**.

b.      **Negative Trends in Test Volume, Average Selling Price, and Revenue**

Next, Plaintiffs claim that Defendants violated Section 11 by failing to disclose Progenity's negative trends in test volume, average selling price, and revenue.  (Doc. 64 at 117–25.)  Plaintiffs contend that "these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were omitted." (*Id.* at 117, 122, 124.)  The Court analyzes each alleged trend in turn.

i.      *Negative Trend in Test Volume*

Plaintiffs allege that "Progenity's decreasing test volumes constituted a known trend that had and was reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations" and that Item 303 of SEC Regulation S-K required Progenity to disclose this trend in the Registration Statement. (*Id.* at 117.)

Plaintiffs state that the Registration Statement "misleadingly insured investors that '[s]ince 2010, our molecular testing business has achieved consistent year-over-year test volume growth through our robust product portfolio and our strong commercial organization.'" (*Id.* at 118.)  Moreover, the Registration Statement "misleadingly emphasized in an eye-catching graphic, 'CONSISTENT GROWTH,' in a heading with large size, all capital letter font." (*Id.*)  Plaintiffs claim these statements "indicated that Progenity's test volumes were still growing at the time of the IPO, and failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends." (*Id.*)

Additionally, Plaintiffs point out that the Registration Statement contains "three different versions of the same disclosure relating to Progenity's test volume growth, each of which was misleading in its own way." (*Id.* at 119.)  First, Plaintiffs point to a section of the Registration Statement in which Defendants state:

Since our inception, we have accessioned approximately 1.5 million tests in

16

the United States and the growth rate of our test volume is accelerating. The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

(*Id.*)  Second, Plaintiffs point to a nearly identical statement by Defendants:

Since our inception, we have accessioned approximately 1.5 million tests in the United States and the growth rate of our test volume was accelerating over a multi-year period, including early 2020.  However, we are currently observing a slowdown in volume growth as a result of the COVID-19 pandemic.  The figure below shows our test volume growth from 2016 through 2019, as well as the first quarter of 2020, in which quarter we observed volumes largely consistent with the fourth quarter of 2019 despite the challenges presented by the COVID-19 pandemic. We believe our business is resilient and we have observed positive signs of recovery so far.

(*Id.* at 119–20.)  Plaintiffs argue that these statements were materially false or misleading when made because they indicated that Progenity's test volumes were accelerating, but again failed to disclose that Progenity's test volumes were lower in April and May of 2020 and were likely to remain low due to known trends.  (*Id.*)  Next, Plaintiffs reference a section of the Registration Statement in which Defendants state:

Beginning in March 2020, we began to observe significant declines in the volumes of our molecular tests as well as the pathology tests conducted by Avero Diagnostics due to the impact of the COVID-19 pandemic and work-from-home policies and other operational limitations mandated by federal, state and local governments as a result of the pandemic.  However, we believe our business is resilient and we have observed positive signs of recovery so far.  While we are implementing mitigation strategies to address these limitations, such as supporting patients and physicians virtually, there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods.  Our initial assessment of the impact of the COVID-19 pandemic is that our NIPT test volumes have proved more resilient than our carrier screening test volumes; however, the comparative impact may change over time.

(*Id.* at 120.)  Plaintiffs argue these statements were materially false and misleading when made because they "misleadingly emphasized resilience and recovery in Progenity's test volumes, and failed to disclose that Progenity's test volumes were sharply lower in April and May of 2020 and were likely to remain depressed due to known trends."  (*Id.*)  Plaintiffs also contend the above statements "were additionally misleading for failing to disclose that Progenity's decision to end its key illegal marketing practice in February 2020 had, and would foreseeably have, the effect of depressing test volumes, pricing and revenue."  (*Id.* at 118, 120–21.)  The Court notes alleged illegal marketing practices will be discussed in full below.  (*See infra*, pp. 24–25.)  It is Plaintiff's position that the aforementioned negative trends in Progenity's test volumes were material facts that would be highly material to a reasonable investor.  (*Id.* at 121–22.)

Plaintiffs do acknowledge that "the Registration Statement contained a risk factor relating to fluctuations in test volumes and other performance metrics."  (*Id.* at 121.)  However, Plaintiffs argue these statements "presented as a mere hypothetical risk that Progenity 'may' experience a decrease in test volumes, pricing or revenue, and failed to disclose that Progenity was at the time of the IPO experiencing significant declines for each of these metrics."  (*Id.*)

Defendants' Motion explains that Plaintiffs offer no new allegations with respect to the contention that Progenity's failed to mention that its testing volumes were declining.  (Doc. 67–1 at 12.)  Plaintiffs themselves state "they have not amended their allegations concerning [the alleged illegal marketing practices and negative trends involving test volume, ASPs, and revenue] in the TAC.  However, Plaintiffs respectfully disagree with the [orders] rulings on these claims, and so briefly summarize their arguments [in the TAC] to ensure that they are preserved for any appeal."  (Doc. 68 at 16.)

In reviewing the TAC, the Court maintains that Plaintiffs have not sufficiently pled that Defendants failed to disclose material facts relating to Progenity's negative trends in test volume.  It does not appear that a reasonable investor reviewing the Registration Statement in its entirety would be misled to believe that Progenity's test volume was

increasing at the time of the IPO.  As the Court previously noted (*see* Docs. 48, 63), in all three statements, Defendants mention COVID-19's negative effect on test volume and other challenges they faced because of the pandemic.  (Doc. 64 at 119–20.)  Defendants expressly warn that "there can be no assurance that the rate of decline in our testing volumes will not continue or accelerate in future periods."  (*Id.* at 120.)  While Plaintiffs claim that Defendants failed to disclose Progenity's decreasing test volumes at the time of the IPO, Defendants reiterated several times that they had begun to observe "significant declines in the volumes of our molecular tests as well as the pathology tests" in March 2020.  (*Id.*)  The statement that "the growth rate of our test volume is accelerating," when read in context with the various other statements emphasizing Progenity's declining test volumes stemming from the pandemic, is insufficient to establish that a reasonable investor would have been misled about the nature of their investment.  (Doc. 64 at 119); *see In Re Daou*, 411 F.3d at 1027.

Again, the Court notes that publicly held companies are not required to report the results of a fiscal quarter until at least 40 days following the end of that quarter.  *See* 17 C.F.R. § 240.13a–13.  Nor are companies required to disclose all material adverse events to investors—"even if investors would consider the omitted information significant"—so long as the omission does not make the actual statements made misleading.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012); *accord Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("[w]e have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'"); *see also Brody*, 280 F.3d at 1006 (noting that a statement often "will not mislead even if it is incomplete or does not include all relevant facts").  However, Defendants' failure to disclose a negative trend may be actionable under Section 11 if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody*, 280 F.3d at 1006; *see also In re Rigel*, 697 F.3d at 881 n.10 (finding that public

statements were not false or misleading when "the omitted information did not contradict, or render misleading, the original [statements]").

Therefore, the Court finds that Defendants were under no obligation to disclose their real-time test volume data from the second quarter of 2020 at the time that the Registration Statement took effect. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (holding that company was "under no duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly warned that [the company] expected lower net sales"). The Registration Statement advised that at the time of the IPO, Progenity had experienced a significant drop in test volume due to the COVID-19 pandemic. Defendants also cautioned that they could not guarantee that the decline in test volumes would not continue or even accelerate in the future. Accordingly, Plaintiffs have not established that Defendants made any false statement or omitted to state a material fact necessary to make the other statements in the Registration Statement not misleading. 15 U.S.C. § 77k(a). To the extent Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in test volume, it is **DISMISSED**.

### ii.   *Negative Trend in Average Selling Price*

Next, Plaintiffs claim that the Registration Statement failed to disclose Progenity's known trend of decreasing ASPs. (Doc. 64 at 122.) Plaintiffs define ASP as "Progenity's revenue from testing divided by the number of such tests." (*Id.* at 65.) Plaintiffs contend that Progenity's decreasing ASP "constituted a known trend that had and was reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations." (*Id.* at 122.)

Plaintiffs point to the following two statements included in the Registration Statement: (1) "[i]n response to the COVID-19 pandemic, the Avero Diagnostics laboratory is providing molecular testing for diagnosing COVID-19"; and (2) "effective January 1, 2019, the AMA approved the use of a CPT code for expanded carrier screening tests, which may similarly cause reimbursement for our Preparent expanded

20

carrier screening tests to decline." (*Id.* at 123.)   Plaintiffs contend that, in the first statement, Defendants "failed to disclose that Progenity's COVID tests had much lower ASP than its other tests, that Progenity's core test volumes were in decline in part due to its decision to discontinue its illegal marketing practice, and that Progenity's revenues and business would be harmed as a result of Progenity's core tests becoming a smaller portion of its product mix relative to COVID tests." (*Id.*)   Plaintiffs argue the second statement is materially false and misleading because it presents "a mere hypothetical risk that this CPT code 'may' cause Preparent reimbursement to decline, while omitting to disclose that Progenity had improperly billed government health care programs for Preparent tests . . . ." (*Id.* at 123–24.)   Plaintiffs believe these statements and omissions would be highly material to a reasonable investor. (*Id.* at 124.)

The Court notes Plaintiffs' assertions mimic the assertions included in the SAC, which it previously rejected.   The Court maintains that it is unable to locate any disclosures regarding the actual ASP of Progenity's test offerings[5], and Plaintiffs have not pointed to any statements that were rendered misleading by Defendants' failure to disclose the ASP of Progenity's tests across any specific period.

As previously mentioned (*see supra*, p. 19), a statement often "will not mislead even if it is incomplete or does not include all relevant facts." *Brody*, 280 F.3d at 1006. Although the two statements at issue do not mention the allegedly resulting decrease in Progenity's ASP and revenue, nothing in the statements would be rendered misleading by failing to disclose that information.   If Defendants had suggested that this fluctuation in test volumes would not impact Progenity's ASP or revenue, the statements at issue may well have been misleading.   However, the actual statements made did not state or imply anything regarding the fiscal impact of the changes.   Defendants' failure to disclose a potential decrease in ASP and revenue, "even if investors would consider the omitted

---

[5] The Registration Statement does not mention the actual ASP charged for any of Progenity's test offerings across any specific period.

information significant," is not actionable insofar as it did not make the actual statements made about test volume fluctuation misleading.  *In re Rigel*, 697 F.3d at 880 n.8.

Moreover, although these two statements did not disclose the potential effect of the changes on Progenity's revenue, the Court finds that they are consistent with other disclosures made in the Registration Statement relating to Progenity's test volumes and revenue.  For example, Defendants disclosed that although the revenue derived from the Innatal and Preparent tests were roughly equal at the time of the IPO, the "ratio may fluctuate over time."  (Progenity, Inc., Prospectus (Form 424B4), at 93 (June 19, 2020).)

Plaintiffs have not adequately plead that Defendants were required to disclose the alleged negative trend in Progenity's ASP in order to make the other statements in the Registration Statement not misleading.  Accordingly, to the extent Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in ASP, it is **DISMISSED**.

### iii.    Negative Trend in Revenue

Plaintiffs claim that the Registration Statement failed to "fully disclose the decreasing trends in Progenity's revenue" and that "these material facts existed at the time of the IPO and were required to be included in the Registration Statement but were omitted."  (Doc. 64 at 124.)  Plaintiffs explain that "[t]his known trend of decreasing revenues had already directly affected revenues, and so also affected the related metrics of sales and income. This trend was reasonably likely to continue to materially unfavorably affect sales, revenues, and income because it was caused by factors likely to continue into the future . . . ."  (*Id.* at 125.)

In reviewing the TAC, the Court finds Plaintiffs' allegations particularly broad. The assertion that Defendants' failure to disclose a negative trend in revenue rendered the entire Registration Statement false and misleading is insufficient to state a claim.  The Court previously explained that, at a minimum, Rule 8 requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  Here, there is no indication that Defendants' failure to include a

22

material fact regarding revenue rendered a published statement misleading. *See Omnicare*, 575 U.S. at 194.

The Registration Statement discloses negative trends in Progenity's revenue that Defendants had observed by the time the Registration Statement took effect. The Court has previously explained that under the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," Defendants compare the fiscal results of Progenity's operations from the first quarter of 2019 and the first quarter of 2020. (Progenity, Inc., Prospectus (Form 424B4), at 96 (June 19, 2020).) Defendants disclose that Progenity's revenue for the first quarter of 2020 was down $30.7 million from its revenue for the first quarter of 2019, which it notes was a 64.6% decrease. (*Id.* at 97.) Further, under the subsection titled "Risks Related to Our Business and Industry," the Registration Statement states in bold, italicized font: "We have incurred losses in the past, and we may not be able to achieve or sustain profitability in the future." (*Id.* at 19.) It then goes on to state that "[i]t is possible that we will not generate sufficient revenue from the sale of our products to cover our costs . . . and achieve or sustain profitability." (*Id.*) These disclosures would not mislead a reasonable investor to believe Progenity's revenue was increasing or even stable at the time the Registration Statement took effect.

Defendants were under no obligation to disclose their real-time revenue data at the time that the Registration Statement took effect. *See In Re Worlds of Wonder*, 35 F.3d at 1419 (holding that company was "under no duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly warned that [the company] expected lower net sales"). Nevertheless, the Registration Statement clearly warned that in the first quarter of 2020, Progenity had experienced a significant drop in revenue as compared to the first quarter of 2019. Accordingly, Plaintiffs have not established that Defendants omitted to state a material fact necessary to make other statements in the Registration Statement not misleading. 15 U.S.C. § 77k(a). To the extent Plaintiffs' Section 11 claim is premised on an alleged omission of Progenity's negative trend in revenue, it is **DISMISSED**.

23

### c.    Marketing Practices

Moreover, Plaintiffs argue that "[n]owhere did the Registration Statement disclose that Progenity had recently ended the illegal marketing practice on which the competitiveness of its business depended." (Doc. 64 at 110.)  However, "this material fact existed at the time of the IPO, was necessary to make the statements in the Registration Statement not misleading, and was required to be included in the Registration Statement." (*Id.*)

It is Plaintiffs' position that:

Progenity's February 2020 decision to end its key illegal marketing practice of waiving patient payment amounts made an investment in Progenity speculative or risky because, inter alia: (i) this illegal marketing practice had been Progenity's main selling point for its entire history through February 2020, (ii) Progenity's competitors offered higher quality tests at lower prices, (iii) Progenity's historical results reflected additional testing and revenue which Progenity would not have achieved absent its illegal marketing practice, (iv) the end of this illegal marketing practice had already resulted in Progenity losing certain customers and angering others, and (v) the end of this illegal marketing practice would make it more difficult for Progenity to obtain new customers in the future.

(*Id.* at 111.)  Defendants' Motion contends that Plaintiffs' TAC does not include any new allegations with respect to this omission theory and thus should be dismissed with prejudice. (Doc. 67–1 at 12.)  As stated in their opposition, "Plaintiffs acknowledge that they have not amended their allegations concerning [this] topics in the TAC." (Doc. 68 at 16.)

Plaintiffs' TAC references several of the same "false and misleading" statements included in the Registration Statement such as "[s]ince 2010, our molecular testing business has achieved consistent year-over-year test volume growth through our robust product portfolio and our strong commercial organization" and "[w]e believe our future success will be driven by continued capture of market share by our molecular testing business and new revenue streams resulting from our diversified product development pipeline, both within and beyond women's health." (Doc. 64 at 112.)  Plaintiffs claim

24

these statements were materially false and misleading when made because "the volume growth in Progenity's genetic testing business was driven primarily by Progenity's illegal marketing practices, which Progenity had ended in February 2020 shortly before the IPO," and Progenity failed to disclose they ended a marketing practice key to their success. (*Id.*)  However, the Court does not see how such statements relate to alleged illegal marketing practices.

As the Court previously noted (*see supra*, p. 19), companies are not required to disclose all material adverse events to investors so long as the omission does not make the actual statements made misleading.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("[w]e have expressly declined to require a rule of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'"); *see also Brody*, 280 F.3d at 1006 (noting that a statement often "will not mislead even if it is incomplete or does not include all relevant facts").  Progenity had not discussed historical marketing practices and was not required to discuss alleged changes to its marketing strategy. Moreover, Plaintiffs do not sufficiently plead how the alleged improper marketing practices were unlawful. *See In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17-CV-00162-RS, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) ("[f]ederal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated wrongdoing'").  Additionally, the Court finds Plaintiffs' allegation that the improper marketing practice "was its main selling point" is unsubstantiated. (*See* Doc. 64 at 56.)  Plaintiffs again reference accounts of CWs; however, Plaintiffs do not offer any statistical data or further factual support to aid this conclusion. (*See id.* at 56–58.)  Therefore, to the extent Plaintiffs' Section 11 claim is premised on Progenity's alleged failure to disclose its decision to end improper marketing practices, it is **DISMISSED**.

### B.    Items 303 and 105 Disclosure Obligations

Plaintiffs claim that Defendants violated Section 11 by failing to meet their

disclosure obligations under Items 303 and 105 of SEC Regulation S-K.  (Doc. 64 at 9, 91–93.)  The Court will analyze Items 303 and 105 separately.

### a.      Item 303

Item 303 of Regulation S-K requires that registrants describe "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," as well as "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(i)-(ii).  Under the SEC's 1989 release interpreting Item 303(a), a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir. 1998).

Plaintiffs explain that since Progenity had overbilled government payors for Preparent tests and would be required to refund them at least $10.3 million, and since there was a high probability that Progenity had received, and would have to refund, a material amount of overpayments from government payors, there "were known trends or uncertainties that had and were reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations."  (*Id.* at 94–95.) Moreover, Plaintiffs argue the Registration Statement did not fully disclose decreasing trends in Progenity's test volumes, average selling prices, and revenues "[h]owever, these material facts existed at the time of the IPO, were necessary to make the statements in the Registration Statement not misleading, and were required to be included in the Registration Statement but were omitted."  (*Id.* at 117, 122, 124.)  It is Plaintiffs' position that Progenity's test volumes, average selling prices, and revenues "constituted a known trend that had and was reasonably likely to have a material unfavorable impact on net sales and revenues and income from continuing operations."  (*Id.*)   Additionally, Plaintiffs contend the Registration Statement failed to disclose that Progenity

discontinued its allegedly improper marketing practice on which its business depended. (*Id.* at 110.)  Thus, Item 303 of SEC Regulation S-K required Progenity to describe these trends in the Registration Statement, and they failed to do so.  (*See id.* at 95, 111, 117, 122, 124.)

The Court finds Plaintiffs have not established that Defendants knew or had reason to know of Progenity's $10.3 million overbilling liability by the time of the IPO.  Plaintiffs' argument that this was a "known trend" at the time the Registration Statement took effect fails, and Plaintiffs cannot prove an Item 303 violation on this basis.  As for the negative trends, Defendants disclosed that Progenity was experiencing downturns in test volume and revenue at the time the Registration Statement took effect.  As previously explained by the Court (*see* Docs. 48, 63), while the average selling prices of Progenity's test offerings were not explicitly disclosed by Defendants, they could easily be calculated from Progenity's disclosed revenue and test volume data.  *See In re Dropbox Sec. Litig.*, No. 19-cv-06348-BLF, 2020 WL 6161502, at *8 (N.D. Cal. Oct. 21, 2020) (rejecting Item 303 allegations based on failure to disclose trend of declining revenue growth rate where "[a]nyone with basic mathematical skills could discern" the trend in light of defendant's disclosure of its annual revenue); *see also In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (rejecting Section 11 allegations based on failure to disclose number of subscription cancellations where the "number could be calculated through simple arithmetic using other numbers that were disclosed").  Accordingly, Plaintiffs' Section 11 claim predicated on Item 303 violations fails.

### b.   Item 105

Item 105 of Regulation S-K requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.

Plaintiffs argue that the Registration Statement "contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading," and failed to make necessary disclosures in violation of Item 105.  (Doc.

27

64 at 9.)  Plaintiffs contend that Progenity had improperly billed government payors and that there was a high probability that Progenity would have to refund a material amount of overpayments and that this was required to be disclosed in the Registration Statement. (*Id.* at 93–94.)  Moreover, Plaintiffs contend that "Progenity's February 2020 decision to end its key illegal marketing practice of waiving patient payment amounts made an investment in Progenity speculative or risky." (*Id.* at 111.)  "Item 105 of SEC Regulation S-K required Progenity to include a discussion of this factor in the Registration Statement, and to explain how it affects Progenity or the stock offered in the IPO," which they failed to do.  (*Id.*)

The Court finds Plaintiffs' Item 105 claim fails for the same reason as Plaintiffs' Item 303 claim because Plaintiffs have not established that Defendants knew or had reason to know of the company's liability at the time the Registration Statement was issued.  As noted in the Court's prior orders (*see* Docs. 48, 63), if Defendants could not have reasonably known about the liability, they could not have discussed it in the Registration Statement as a material factor making an investment in Progenity "speculative or risky."  Moreover, Defendants made various statements in the Registration Statement disclosing the possibility that payors could seek refunds of amounts paid.  For example, the Registration Statement stated that "payors may seek refunds of amounts that they claim were inappropriately billed to a specified CPT code" (Doc. 64 at 105); "commercial third-party payors may . . . seek repayment from us of amounts previously reimbursed" (*Id.* at 106); and "[t]hird-party payors may decide to deny payment or recoup payment for testing . . . for which they have otherwise overpaid, and we may be required to refund reimbursements already received . . . [a]ny of these outcomes . . . could have a material and adverse effect on our business, operating results, and financial condition" (*Id.* at 106–07).  These statements are sufficient to satisfy Item 105's disclosure requirements.  Accordingly, Plaintiffs' Section 11 claim based on an Item 105 violation fails.

/ / /

D.   Section 15 Claim

Plaintiffs' second cause of action alleges violations of Section 15 of the Securities Act against the Individual Defendants.  (*Id.* at 129–31.)  Section 15 imposes joint and several liability upon every person who controls any person liable under Section 11.  15 U.S.C. § 77o (West).  The section provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

*Id.*  Nevertheless, "[t]here can be no Section 15 violation without an underlying Section 11 violation."  *In re Ubiquiti Networks, Inc. Sec. Litig.*, 669 Fed. Appx. 878, 880 (9th Cir. 2016).  As explained *supra*, the Court does not find a Section 11 violation and, as such, finds Plaintiffs fail to adequately plead a Section 15 violation.

E.   Leave to Amend

If a court dismisses a complaint for failure to state a claim, it must then determine whether to grant leave to amend.  *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).  "A district court may deny a plaintiff leave to amend if it determines that 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' or if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies."  *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (internal quotation marks and citations omitted).  In deciding whether justice requires granting leave to amend, factors to be considered include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [or] futility of amendment."  *Foman v. Davis*,

371 U.S. 178, 182 (1962); *see also Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).  Defendants' Motion contends Plaintiffs' TAC should be dismissed with prejudice because "[t]he TAC does not cure any of the prior deficiencies."  (Doc. 67–1 at 16.)

In reviewing the above *Foman* factors, the Court finds leave to amend is not warranted in this action.  Plaintiffs had have ample opportunity to state a plausible cause of action and have failed to do so.  *See William O. Gilley Enterps., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 668 n.8 (9th Cir. 2009) (finding that the plaintiff's repeated failures to cure deficiencies suggested it would be "futile to offer [the plaintiff] another chance" to amend his complaint); *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008) ("[l]eave to amend may [] be denied for repeated failure to cure deficiencies by previous amendment") (citing *Foman*, 371 U.S. at 182).  Therefore, the Court **DENIES** Plaintiffs leave to amend.

## IV.   CONCLUSION

Based on the foregoing, the Court:

1.   **GRANTS** Defendants' Motion.  (Doc. 67.)

2.   **DISMISSES WITH PREJUDICE** Plaintiffs' TAC for failure to state a claim upon which relief may be granted.

**IT IS SO ORDERED.**

DATE:  July 12, 2023

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE